IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| BOBBIE JO HOROCOFSKY,    ) | |
|        ) | |
|      Plaintiff,    ) | |
|        ) | |
| v.    ) | Case No. 2:20-cv-02529 |
|        ) | |
| CITY OF LAWRENCE, KANSAS,    ) | |
|        ) | |
| CHARLES B. COTTENGIM,    ) | |
|        ) | |
| KIMBERLEE A. NICHOLSON,    ) | |
|        ) | |
| DANIEL L. AFFALTER, JR.,    ) | |
|        ) | |
| and    ) | |
|        ) | |
| THE UNIVERSITY OF KANSAS,    ) | |
|        ) | |
|      Defendants.    ) | |

## COMPLAINT WITH JURY DEMAND

1.      Plaintiff Bobbie Jo Horocofsky brings this civil rights action under 42 U.S.C. § 1983, 42 U.S.C. § 1985, the Fourth and Fourteenth Amendments of the United States Constitution and state law to seek compensation for harms she suffered and to redress the deprivation under color of law of her rights secured by the United States Constitution.

2.      Plaintiff also brings this action to seek compensation for harms she suffered as a result of the discriminatory and retaliatory educational environment created by the Defendant University of Kansas in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

3.      There is hardly a week, often not even a day, that goes by without a story in the media about the plague of sexual assaults of young women in college towns.  Frankly, it is a national epidemic causing serious physical, emotional and psychological injuries.  Rather than

properly addressing sexual violence, police detectives and school officials have often sought to sweep it under the rug, claiming that a victim had simply engaged in "regret sex" or had been sexually "experimenting" or was not credible enough to be a reliable witness. The failure to adequately address the epidemic of sexual violence has been particularly glaring in Lawrence, Kansas, where prosecution rates for sexual assault cases have lagged well behind the national average.  The Lawrence Police Department has been so determined to maintain its willful blindness toward sexual assault claims that the detectives in the present case took a credible report of rape from a woman who'd been too intoxicated to consent and flipped her allegations on their head – charging the woman criminally with making a false report to police.  That woman was the Plaintiff, Bobbie Horocofsky.

4.        In September 2018, Bobbie Horocofsky, then a third-year law student at the University of Kansas School of Law, was sexually assaulted by a fellow student, Joel Thompson, following a sanctioned law school event.  Along with other students, Bobbie bar hopped after the event and consumed several drinks.  Hours later, she woke up groggy and confused in a strange bed and had no idea where she was.  She was naked and had bruises on her body.  She remembered feeling pressure on her neck, and a man whom she did not initially recognize – he had unfamiliar tattoos – was in bed with her.  She quickly realized that the man had engaged in sex with her even though she was far too intoxicated to consent. Horocofsky then recognized him – he was Joel Thompson, the best friend of her then-boyfriend, Kriston Guillot.  Horocofsky pulled away and told him to stop.  Thompson told her that her resistance was pointless; he'd already had his penis inside her and Guillot would therefore not want her anymore.  The subsequent police investigation, conducted largely without Bobbie's knowledge, was not aimed at investigating the sexual assault of Bobbie, but rather at proving she had lied.  After Bobbie

told police she did not want to pursue charges, the police went full bore with an investigation to prove that she lied.  The lead detective sympathized with perpetrator Thompson and made clear his intent to arrest Bobbie if he could prove a case against her.  Five months after Bobbie was raped, she was arrested by the Lawrence Police and charged with falsely reporting a felony crime.

5.     The failure of the Lawrence Police Department (LPD) to respond properly to reports of sexual assault reflects an across-the-board lack of adequate policies and training at the LPD.  Notably, the detectives assigned to Bobbie's case lacked any specialized training in the knowledge and skills necessary to properly investigate a report of sexual assault or handle a sensitive interview with the victim.  Investigators knew nothing about a "trauma-informed" approach, and their usual choice was to quickly dispose of such cases, either through neglect, reliance on flimsy reasons to dismiss the victim's report, or by making a quick judgment that the woman was lying.  Women such as Plaintiff were often treated with hostility or disbelief by police.  For any victim who did sit down to talk with the detectives, the Department's stated "policy" was to use its practice of "documenting" sexual assault claims as a tool to intimidate an uncertain or frightened victim.  It was also the specific intent of the LPD to look for a false statement case for the purpose of discouraging reports of sexual assault. In this case, the unconstitutional actions and failures of the individual officers and the LPD violated Plaintiff's clearly established constitutional rights under the Fourth and Fourteenth Amendments of the United States Constitution.

6.     With little basis and prior to any meaningful or objective investigation, LPD detectives rushed to judgment and turned Bobbie into their suspect.  They decided to build a case against her for making a false statement to police based on the theory that she was "lying" in an

attempt to manipulate or punish her boyfriend, Kriston Guillot, in the aftermath of their supposed break-up, and after having sex with Thompson, his best friend.  In reaching their investigative "conclusions," detectives failed to investigate Thompson's clear intent, as reflected in his crude, play-by-play text messages to friends during their bar hopping, where he indicated his intent to top Kriston Guillot in their ongoing sexual rivalry by "fucking" a severely intoxicated Bobbie just so "he [Kriston] knows I can."  After one of Thompson's friends responded that Bobbie "looked fucked up yo," Thompson bragged: "I'm bout to see what she working with."

7.      Despite the text messages of Thompson and his friends about how drunk Bobbie was and despite her own description of "blacking out," detectives inexplicably failed to investigate her severe level of intoxication or whether she was too drunk to consent.  Detectives also disregarded the extent of Bobbie's physical injuries, including bruises on her neck and her extremities and a tear in her vaginal area, all of which were documented in the hospital report. They did not ask Bobbie for her medical report or photographs from her SANE examination, and they did not seek testing of her rape kit.  Detectives also disregarded statements from her friend Courtney Hurtig, who saw Bobbie shortly after the assault, and noticed the bruising on Bobbie's arms and legs and noted her clear emotional distress.  Detectives also failed to interview other witnesses who could corroborate key portions of Bobbie's account.  Detectives refused to investigate Thompson's background, thoroughly review his history of troubling text messages, or accord any weight to his admission that he knew Bobbie was intoxicated.  They also developed a false theory that Bobbie was upset by a breakup with Guillot and sought to exact revenge by accusing his friend Thompson of sexual assault.

8.      In taking all of these steps, detectives ignored Bobbie's frequent protests that she did *not* want to press charges against Thompson and that she did not want to proceed with a

police investigation because she and Thompson were headed to work at the same law firm after graduation.  Although the lead detective assured Bobbie that he would respect her choice to proceed only with a Title IX complaint, the detective admitted in a police report that he lied and that "the investigation would continue despite what I told Bobbie."  Detectives busily proceeded with building a false statement case against Bobbie while interfering with and improperly influencing the KU Title IX investigation. The LPD and KU both rejected Bobbie's claims. Detectives, acting in conjunction with the Title IX office, treated Bobbie from the outset like a suspect instead of a victim and worked to build a case against her.  Neither entity conducted a fair investigation and neither investigated Bobbie's assailant.  Neither provided any notice to Bobbie that they viewed her not as a victim, but as a target of their investigations.

9.     Like the LPD, the KU Title IX office rejected Bobbie's claims and accused her of falsely accusing Thompson.  Throughout its investigation, the KU Title IX office communicated regularly with the LPD and acted in concert with detectives.  The University's failure to fairly and objectively investigate Bobbie's claim is deeply troubling as the school was on notice as to the danger of alcohol-driven sexual assaults and the culture of certain groups on its campus and yet did little to nothing about it.  Moreover, after KU learned Plaintiff had become a victim of a sexual assault, they again did little to nothing about it and merely replicated the flawed and biased LPD investigation.  And even more importantly, KU's Title IX investigators, who are supposed to be trained in trauma-informed interview techniques, completely disregarded such training and instead blamed the victim.

**Jurisdiction and Venue**

10.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343 and 1367 because the matters in controversy arise under the laws of the United States.

11.     This Court has supplemental jurisdiction over state and common law claims pursuant to 28 U.S.C. § 1367 because the claims arise and involve the same nexus of law and fact.

12.     Venue is proper with this Court pursuant to the provisions of 28 U.S.C. §1391 as the events, acts and omissions alleged in this Complaint were committed within this Judicial District.

<u>**Parties**</u>

13.     Plaintiff Horocofsky was a female student who at all relevant times was a student at the University of Kansas and a resident of the City of Lawrence, Kansas. [note – is this true, or should we say Douglas County???]

14.     Defendant City of Lawrence, Kansas is a home-rule municipal corporation and it operates and oversees the Lawrence Police Department ("LPD").

15.     Defendant Charles B. Cottengim was, at all times relevant to this complaint, a duly appointed and active detective of the LPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Lawrence, Kansas as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

16.     Defendant Kimberlee A. Nicholson was, at all times relevant to this complaint, a duly appointed and active detective of the LPD acting within the scope of her employment and

under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Lawrence, Kansas as well as the State of Kansas. Upon information and belief, she is entitled to indemnification under statute and by contract. She is sued in her individual capacity.

17.     Defendant Daniel L. Affalter, Jr. was, at all times relevant to this complaint, a duly appointed and active police officer of the LPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Lawrence, Kansas as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

18.     Defendant University of Kansas ("KU") is a Kansas educational institution located in the City of Lawrence, Douglas County, Kansas, and is a recipient of federal funds.

### Facts Supporting Plaintiff's Claims

#### *Friday, September 28*

19.      On September 28, 2018, Bobbie woke up in a strange bed and did not know where she was or how she got there.  She was still feeling the effects of the alcohol she drank the night before during hours of bar hopping with other students after a law school event.  She was naked and had bruises on her arms and legs.  She noticed uncomfortable pressure on her neck, and realized that a man whom she did not initially recognize was in bed with her.  She knew he'd had sex with her, even though she was far too intoxicated to consent.  Bobbie eventually recognized him – he was Joel Thompson, the best friend of her on-again, off-again boyfriend, Kriston Guillot.  Horocofsky pulled away from him and told him to stop.  She told him she could not believe this was happening.  He told her she was being weird, and was making him feel like he needed to "Kavanaugh this bitch right now."  Thompson also indicated her protest was pointless; he'd already had his penis inside her.. Thompson told her that she was in his bedroom

at his house.  Bobbie tried to leave, but she was still too drunk and couldn't find her clothes. She

laid back down, and woke up again around 4 a.m.  She walked outside and could not find her car.

Thompson told her that her car was parked downtown and that he will drive her to it in the

morning.

20.     At around six o'clock that morning, she started sending text messages to her close

friend, Courtney Hurtig.  When she first opened her phone, Bobbie noticed a message she'd sent

to Hurtig at two o'clock that morning saying she had "fucked up" and "slept with Joel," but she

had no memory of sending that message.  Her memory of the night was very patchy and

confused at that point, and she was trying to piece together what had occurred.  She didn't want

to believe she had been raped.  She also knew Thompson, who was right next to her, was

watching her send the messages.  She told Hurtig that she was in Joel's bed, but they would be

leaving soon to take her back to her car.

21.     In response to Bobbie's text messages, Hurtig was shocked and asked Bobbie

whether she is joking.

22.     Later that morning, after Bobbie was back home at the horse farm where she lived, the effects

of the alcohol started to wear off.   Bobbie was anxious, upset, and very sore.  She texted Hurtig, starting: "Get here

fast -- I'm literally about to have a breakdown." When Hurtig arrived at Bobbie's house, Hurtig noticed

Bobbie's bruises and began to suspect that there was more to the story than what Bobbie had

initially told her.  Hurtig, who had worked at an outpatient psychology center before law school,

suspected that Bobbie had been raped.  She also noticed that Bobbie's state of mind seemed "clearly

off – like she was so upset," which was very unusual for Bobbie.

**Saturday, September 29**

23.     The next day, Hurtig wanted to get Bobbie out of her house, so she took her out to

celebrate Homecoming weekend. Bobbie did not drink, but Hurtig and her boyfriend, Blake Stokes, did. Hurtig and Stokes eventually argued, and Stokes told Hurtig to get all her stuff out of Stokes's house. Bobbie and Hurtig left to do just that. Stokes then went to a party at Thompson's house. Stokes sent a text message to Bobbie, telling her that she was responsible for getting Hurtig out of his house. If she didn't, Stokes said, he would tell everyone that Bobbie slept with Thompson — something Stokes had supposedly learned from Hurtig.

24.     Strokes' threats were out of line. Bobbie texted back: "I'm pretty sure it was borderline date rape and I have the bruises and statements to prove it."

25.     At that point, Bobbie's hazy memories of the night began to come back — fragments of memory, like snippets of a movie. She remembered someone on top of her, having sex with her. That he had tattoos that were unfamiliar to her; that she did not know who he was. She remembered telling Thompson that she didn't want to sleep with him, and Thompson telling her that his penis was already inside her. She remembered telling Thompson to stop, that her boyfriend, Guillot, would be mad, and Thompson replying that it was already done, that Guillot would never want her again. She remembered feeling pressure on her neck. Her memories were not in an orderly sequence; she could not remember which one happened first, or second, or third.

26.     She told Hurtig "I don't know…I don't know if it's rape. I'm so embarrassed." She fears people will not believe her because she did not leave Thompson's house, even though she was drunk and had no means to leave. Bobbie is also afraid – she and Thompson had both accepted offers to work at the same law firm after law school, and Bobbie tells Hurtig she's afraid that if she says anything, she would be the one to lose her job. Her boyfriend, Guillot, is already an associate at the firm, adding more pressure.

27.     When Bobbie finally acknowledges that she may have been raped, Hurtig springs into action. Hurtig had not shared her own conclusion that Bobbie was raped because she did not want to influence Bobbie; Bobbie needed to reach it on her own. Hurtig tells Bobbie that she knows what to do and she will take care of everything. Hurtig calls the Lawrence Police Department's nonemergency number and says that her friend is ready to report a rape. She leaves her phone number. Officer Dan Affalter calls Hurtig back and speaks with both women. He asks them to meet him outside the Lawrence Memorial Hospital.

28.     Bobbie is hesitant. Hurtig encourages her to come forward. "Even if you don't want to end up pressing charges," Hurtig tells her, "you still have all the marks from this. Let's, let's just go. They can document it, and then if you don't want to press charges, then no. You don't have to. That's not an obligation." Bobbie agrees, and they go to the hospital so at least the evidence can be collected.

29.     Officer Affalter, along with Detectives Charles Cottengim and Kim Nicholson, are waiting for them when they arrive at the hospital.

30.     Bobbie speaks with Nicholson, who explains that Bobbie has three choices. Option one: the police would do nothing. Option two: the police would document the report but do nothing further. Option three: the police would do a full-scale investigation, including questioning witnesses and collecting evidence. Bobbie choses option one — she does not want the police to do anything. But by this point, Bobbie had already given her cell phone to police when they pushed her to provide it.   Nicholson promises to have it back to her soon.

31.     Bobbie had told Affalter that she had been raped the day before. She explained the details were blurry because she had been drunk at the time. She remembered telling the man she wanted to leave, and she remembered the man telling her she couldn't leave. She remembered

waking up naked in his bed while he was having sex with her, and remembered him holding her down and that she told him "no." She remembered waking up again to him still having sex with her and pushing him off of her before she blacked out again. Despite the memories surfacing, Bobbie did not want to press charges.  She was worried about how reporting a rape could affect her career.  She indicated that she did not want to press charges. Nicholson told Bobbie if she decided to proceed, she could come down to station later and give a full statement.

32.     Bobbie allowed the police to look through her phone before going inside for a rape examination. Hurtig provided her phone to the police as well.  Nicholson, Cottengim, and Affalter returned to the police station and examined Bobbie and Hurtig's phones. They found the text messages Bobbie had sent Hurtig after the assault while she was still at intoxicated and at Thompson's house, telling her friend that she was in Joel's bed and that she'd slept with him. She also seemingly tries to reassure a shocked Hurtig: "It's all good . . .this was a fuck up though I literally made him stop having sex and was like"[sic] oh no what will Kriston say."   At that point, based solely on the text messages, detectives leaped to the conclusion that no rape had occurred. The "investigation," barely one hour old, instantly morphed into a focus on Bobbie's "false statements."

33.     Lindsie Ford, a friend of Bobbie's, had joined Hurtig and Bobbie at the hospital to provide support and reassurance. Ford, who was also a law student, had worked as a victim advocate at the Johnson County District Attorney's Office, and at other organizations dedicated to helping survivors of sexual and domestic violence.  Ford immediately noticed that Bobbie seemed very distracted and "flat," not at all like her usual energetic self. Lindsie noted that Bobbie displayed trauma symptoms similar to those that Ford had seen in many other victims.

11

34.     Terri Woodson, a trained SANE nurse at LMH, examined Bobbie.  She collected physical evidence, mapped Bobbie's vaginal injuries on an anatomical diagram and took photographs of Bobbie's bruised neck and extremities.  The vaginal area had a small tear and bruising, and Bobbie's neck, arms and legs all had bruises or contusions.  At the end of the examination, the nurse asked Bobbie if she wanted to disclose to police the evidence collected as part of examination.  Bobbie said "no," she did not. By the time the detectives return to the hospital, the women had already left.  Nurse Woodson tells them that Bobbie had decided not to report the rape.

*Monday, October 1*

35.     When Thompson learned that Bobbie felt he raped her, he sent a text message asking her to meet with him to discuss things. They agree to meet at the law library on October 1. Thompson does not know she had spoken with the police.

36.     Lindsie Ford was working at the library's front desk when Bobbie walked in to meet with Thompson. When Bobbie told her why she was there, Ford tried to talk her out of meeting with Thompson. Bobbie said she needs some closure; she must know what happened. Ford would later surreptitiously sit outside the room where Thompson and Bobbie were meeting. While she could not hear much of what was said, she could partially see into the room. She saw Thompson as relaxed, sitting back in his chair. She could not see Bobbie. She heard Thompson raise his voice. She heard him say that Bobbie was making him feel like an abuser.

37.     Inside the room, Bobbie asks Thompson what had happened. How had she ended up in his bed that night? Thompson told her that they'd been drinking and that the sex was consensual.  Bobbie asked how she had gotten the bruises. Thompson said he doesn't know. Bobbie was concerned that her boyfriend, Guillot, thought the two of them had made a conscious

choice to betray Guillot.  But that was not true, and Thompson knew that. Bobbie asked Thompson to tell her boyfriend that Thompson had taken advantage of her; that she was intoxicated and had not chosen to sleep with Thompson. He agreed, as long as Bobbie remains silent about what happened and to tell Hurtig to do the same. Thompson was not worried about Bobbie; he was worried about his reputation. Bobbie did not tell Thompson that she had spoken to the police.

38.    Ford saw Thompson and Bobbie leave the meeting. Thompson looked casual and relaxed. Later that night, Bobbie sends Thompson a text message saying that she just wants her boyfriend to be happy even if they no longer see each other.

### *Wednesday, October 3*

39.    Even though Bobbie had told the detectives she did not want to proceed with criminal charges, Detective Nicholson called her a few days later.  Bobbie said she'd thought about it, and reiterates her decision to not proceed.  Nicholson nonetheless asked to speak to Bobbie in person, and Bobbie agreed.  Documenting accounts from a victim who does not want to proceed was policy as "per our captain."

40.    Nicholson and Affalter then drove out to Bobbie's house and interviewed her at length.  At least nine separate times, Bobbie expressed that she did not want to pursue charges, explaining that she feared doing so could ruin law school and her career. "I just signed a contract . . .and I do not want to lose that job. I don't want to put any pressure on my employment situation."

41.    Nicholson asked Bobbie about the text messages, saying that it looks like Bobbie just regrets what had happened. "No," Bobbie interjected. "That is not what happened."  She explained that she "play[ed] it off" initially in the text messages with Courtney because she was concerned about protecting her future job.  "I just honestly want to move forward without any repercussions in my job."

42.     Nicholson interjected with the detectives' "point of view," telling  Bobbie that "it happens a lot in college towns, just things like that where females mess up or males mess up and sleep with the wrong person."

43.     Nicholson told Bobbie that "it looks like you cheated on your boyfriend and you're like 'Oh, shit,' and then your friend was like 'Well, you were raped,' and that's why we were called. And it happens a lot, and we just like to clear it up so we don't have to do further investigation…"

44.     Nicholson expressed no concern for Bobbie's well-being and did not ask her how she was doing.   Remarkably, she increased Bobbie's discomfort by telling her that she should let Thompson know that she'd spoken with the police.  "I'm sure he would want to know."

45.     Nicholson stated that merely listing Thompson in a police report would turn him into a "person of interest" and that the listing "would pop up" if someone ran a criminal background check.   So, in a rape investigation, police "like to clear it up so they don't have to do further investigation."  Nicholson expressed concern for the potential impact of the investigation on Thompson, stating that "listing Joel as a suspect in a rape could ruin his career."

46.     Nicholson told Bobbie "We're not, per your request, we're not going to go out and contact him or anything like that."

***Wednesday, October 10***

47.     As Bobbie struggled in the aftermath of the sexual assault, she started working with a counselor, Merrill Evans.  On October 10, Evans, Hurtig and Bobbie had a meeting, and the topic of contacting the University's Office of Institutional Opportunity and Access ("IOA") came up. The three made a visit to the office and met with IOA staff, who explained the complaint process to Bobbie. The first step would be for Bobbie to make a statement. Since she had already briefly

spoken to the police, IOA staff suggested notifying the police that Bobbie would be making that statement. That way, the staff explained to Bobbie, she would not have to talk about what happened more than once.

48.     IOA staff also encouraged Bobbie to call Officer Affalter and let him know she had contacted the office. During the meeting at IOA, Bobbie called Affalter. She told him she's met with IOA and was *thinking about* making a full statement to the police and *potentially* pursuing charges against Thompson. She told Affalter that IOA will be in touch with the police to schedule a time for Bobbie to make her statement.  Very late that same day, however, Bobbie cancelled the interview due to a family emergency she needed to attend to.

49.     Affalter emailed Cottengim and Nicholson that Bobbie "is thinking of going ahead and making a full statement and wanting to pursue charges in this case." He stated he informed her that he and a Detective should be at KU when IOA interviews her. He also stated that the "Title IX people will call dispatch with some dates and times that work for them to have a meeting."

50.     When he received this email, Cottengim immediately asked for permission to go to IOA staff and share his concerns about the "possible repercussions that could affect Joel Thompson as the reported suspect."  Cottengim does not tell Bobbie he will do this.

51.     Cottengim also began immediately interviewing witnesses, including two of Thompson's roommates and then Thompson himself.

### *Thursday, October 11*

52.     Thompson showed up to meet with Cotttengim a few minutes after midnight. He told Cottengim that the sex with Bobbie was consensual.  At the end of Thompson's interview, Cottengim told Thompson that he doesn't believe Bobbie and that if he can prove it didn't happen, he will arrest her.

53.     Cottengim interviewed Guillot, who started the false narrative that Bobbie indicated she would not pursue charges against Thompson if she got Guillot back as her boyfriend.

54.     At school, Bobbie heard that the police were interviewing witnesses. Amid this, her stress intensified, and she worried about the impact that reporting Thompson might have on her job offer and future employment.

55.     Cottengim and Detective Amy Price met with Kate Burns, a Title IX investigator at KU's IOA office. When they met, Burns told the detectives that Bobbie did not want to pursue this matter at this time and therefore, she would not be taking any action. Cottengim tells Burns he has concerns and shows Burns the messages he took from Bobbie's phone.

56.     After Cottengim interviewed Guillot, he interviewed Thompson for the second time. Thompson added to the false narrative by stating that as long as Bobbie could continue her relationship with Guillot, that she would stop saying Thompson had taken advantage of her.

57.     Cottengim was not able to extract Thompson's messages from his phone that day.

***Friday, October 12***

58.     Bobbie called Cottengim and tells him that he does not want any criminal investigation to go forward. She tells him her doctor advised her not to continue with the investigation due to the amount of stress it was causing her.   People were asking her questions about the case, and Bobbie repeats that she doesn't want this to jeopardize her job. She tells him that she does not plan to pursue a complaint with IOA and she doesn't want to give any more statements. She asks Cottengim if he plans to talk to anyone else about the case. He lies and tells her he does not.  Cottengim states in his report: "The investigation will continue despite what I told Bobbie Horocofsky over the phone."

59.     Cottengim interviewed Alison Collins, Guillot's girlfriend. She tells the detective that she was upset, as she had just learned that Guillot had also been seeing Bobbie.

**Saturday October 13**

60.     Cottengim sent an email to Burns informing her that he spoke to Bobbie and that she no longer wanted to pursue charges and that she would not be contacting the IOA office.

61.     Cottengim interviewed Blake Stokes and Austin Jaspers, both friends of Thompson. Stokes turns over the text messages from Bobbie referring to "date rape."  He told Cottengim that both Bobbie and Courtney Hurtig (his girlfriend) believe that what happened with Thompson was a rape.   Jaspers stated that he heard "sex sounds" coming from Thompson's room the night that Bobbie was there.

**Wednesday October 24**

62.     After seeking advice from a professor, Bobbie decided to proceed with the Title IX complaint.  Bobbie met with Ms. Burns of the KU IOA office. She then provided a written statement, a log of events and a copy of text messages with Blake Stokes where she said Thompson had committed "date rape."

63.     Burns then turns over this information to Cottengim.

**Thursday, October 25**

64.     Thompson called Cottengim and told the Detective that IOA is investigating the allegations against Thompson.

65.     Cottengim emailed Burns and asked if he would be able to get a copy of the interview of Bobbie.

66.     Burns sends Bobbie an email with an attached letter providing the Notice of Investigation and No Contact directive to Thompson.  Burns did not provide a similar letter to Bobbie, but instead writes in her email to Bobbie that the no contact directive is mutual and also applies to Bobbie.

67.     The email states that "both you and Mr. Thompson are prohibited from initiating, or contributing through third parties, to any physical, verbal, electronic, or written communication with one another, directly or indirectly."

*Friday, October 26*

68.     On October 26, Cottengim heard that Detective Affalter had received a message from Bobbie asking that Cottengim call her.  Cottengim does not return her call but instead records Affalter calling Bobbie back.

69.     Bobbie tells Affalter she has given a statement to IOA and was going forward with the Title IX investigation but did not want to pursue any criminal charges. She was very clear about that. But rather than terminating contact with Bobbie at that point, Affalter tells Bobbie that he really needs her to come to the police station, explaining that he hadn't a chance to record everything the first time he spoke with her. He states: "Would you be able to come in and just run through everything again with me? So it could be recorded this time?" Affalter tells Bobbie that it'sbest to get her statement "[w]hile it's still fresh" instead of "months down the road" if Bobbie ever did decide to pursue charges. Affalter tells her that he "empathize[s]" with Bobbie, and she agreed to come in and give her full statement.

70.     Affalter does not tell Bobbie that he's recording their call.  He also does not tell her that there is no rape investigation, that she is no longer regarded as a victim and that she is instead now considered the "suspect."

*Monday, October 29*

71.     Cottengim informs Burns that Bobbie has agreed to give the LPD a complete statement, that she does not want to pursue charges at this time, but does want to pursue a Title IX investigation. He states that he hopes Bobbie will sign a waiver allowing him to share the LPD reports with the IOA office.

72.     Bobbie meets with Affalter and Cottengim at the LPD, and she provides her full account.  They record her statement. The officers do not believe that she had been raped.

*Wednesday, October 31*

73.     Cottengim notifies Burns that he met with Bobbie on October 29 and she signed a waiver allowing the release of the LPD reports to the IOA office. He stated that he would work on getting everything that he can from the investigation to her.

74.     Burns specifically asks if he will be able to provide text messages and when he anticipated the investigation will be complete.

*November 5-7*

75.     Burns contacts Cottengim about the information he planned on sharing.  Cottengim responded that he should be back on track soon.

76.     On November 6, 2018, Burns also provided Bobbie with links to the Discrimination Complaint Resolution Process and the Sexual Violence Procedure at KU for her reference.

*Wednesday, November 14*

77.     Bobbie contacted Cottengim to request the case number for the investigation. Cottengim returned her call and provided the case number.  Bobbie reported to Cottengim that

Guillot had threatened her employment at the law firm if she continued to pursue the rape case against Thompson.

78.     Bobbie meets with Ms. Burns of the IOA office and reports that Thompson is retaliating through Guillot by threatening her employment.

*Saturday, November 17*

79.     Burns then sends an updated respondent notification letter to Thompson. The letter informs him of Bobbie's allegation and stated: "Mr. Guillot advocated for her to drop the IOA investigation and that she 'be ready to deal with the repercussions of what [she] was doing because the "other shoe hadn't dropped yet.'" "Ms. Horocofsky alleged that you are retaliating against her through Mr. Guillot as a third party."

*Tuesday November 20*

80.     Cottengim and Burns meet at the KU IOA office and discussed the LPD investigation for approximately three (3) hours.  Cottengim allowed Burns to read and take notes from his report.  Throughout October and November, Cottengim and Burns had frequently exchanged emails, and it appeared that Burns was eager for Cottengim's information and was following his lead.

*Monday, November 26*

81.     Bobbie contacted Cottengim and informed him she no longer consented to the LPD sharing her information with the IOA office.  Cottengim agreed to comply with her request.

82.     Cottengim did not tell Bobbie about his extensive contacts with Kate Burns and told her that IOA had only reviewed a couple reports in the case.

*Wednesday, December 5*

83.     Burns contacted Cottengim for an update on the investigation and asked if Cottengim was able to verify if there were text messages "missing in the string we reviewed" as they had discussed. Cottengim responded to Burns' email, asking her to call him in response.

84.     On December 5, 2018, Cottengim signed a probable cause Affidavit in which he alleged and stated under oath that he believes Bobbie had consented to sexual intercourse with Thompson and had falsely reported to police that she'd been raped. Cottengim's affidavit relied almost entirely on what he "believed" about Bobbie's motives.  He stated that she reported she'd been raped to get back at Guillot after she found out he was having a relationship with another woman at the same time as her.

85.     The affidavit was full of gross omissions, misleading statements, and unsupported claims. It reflected the LPD's biased, incomplete and reckless investigation that, from the beginning, had been aimed at clearing Thompson rather than discovering the facts.   Had the affidavit contained accurate and complete information, it would not have supported probable cause to arrest Plaintiff.   If police had conducted a thorough and unbiased investigation from the beginning, they would have discovered that the overwhelming weight of the evidence supported Bobbie.  They would have discovered that her text messages sent to Hurtig while she was still at Thompson's reflected that she was still under the influence of alcohol and was embarrassed, confused and unsure what to do next.  They would have discovered her assailant had a history of sleeping with intoxicated women and that he'd been bragging about his intent to have sex with Bobbie.  The investigation by detectives was biased, incomplete and consisted of deliberate and reckless failures to ascertain the facts.

a.      Bobbie reported from the beginning, and consistently throughout, that she was too intoxicated to consent. Under Kansas law, engaging in sexual intercourse with a victim who is too intoxicated to consent constitutes rape under K.S.A. 21-5503(a)(2). Despite the centrality of this issue, none of the detectives ever made any effort to determine the level of Bobbie's intoxication or to determine whether she suffered an alcoholic blackout as she had described. Although the surveillance video from one of the bars clearly showed Bobbie stumbling and bumping her shoulder into the door frame as she entered, Cottengim did not include this key fact in his affidavit. He made no effort to investigate the amount of alcohol she ingested even though he could have easily requested her credit card receipts, which reflected the purchase of numerous drinks. Cottengim also could have interviewed witnesses who saw that Bobbie was still in poor condition the next day. Cottengim also could have relied on numerous text messages exchanged among Thompson and his friends observing how "fucked up" Bobbie was. Inexplicably, Cottengim did not credit this evidence and repeatedly indicated his skepticism that Bobbie had "blacked out."

b.      Cottengim never investigated Thompson's background even though Bobbie and other witnesses said he had a reputation for taking advantage of young women who'd had too much to drink. Even one of Thompson's casual girlfriends, Miranda Clark, indicated that she'd heard of "something occurring" between Thompson and another young woman, whose name she provided. Detectives were also told that Thompson had some type of "hit" or "to do" list of women he wanted to have sex with, and that Bobbie was on it. Beyond obtaining a denial from Thompson,

detectives made no effort to document or investigate this critical fact, and the affidavit made no mention of it.

c.   Given the allegations about Thompson, detectives inexplicably failed to carefully review or place any weight on his text messages.  Thompson clearly expressed his intent while he and Bobbie and the other students were bar hopping, to have sex with Bobbie that night.  He sent a series of crude texts, telling a male friend that Bobbie "was so fucked up," that Bobbie was "Kriston's side joint," and that he was going to be "fucking" Bobbie just so "he [Kriston] knows I can."  As he and Bobbie continued drinking, Thompson bragged to his friend: "I'm bout to see what she working with."   Thompson's intent to have sex with Bobbie dated back months.  During July 2018, Thompson and Guillot had exchanged crude texts about Bobbie, bantering about Thompson "tak[ing] Bobbie Jo off [Kriston's] hands now I know she down for the team."  They also joked about "tag team[ing]' her and doing a "train ride."  Bobbie had no knowledge of these texts or that the two of them had even discussed her.

d.   The affidavit was silent on Bobbie's physical injuries. Inexplicably, detectives had never asked her to release the results of her rape examination to them, including the diagram and photographs that documented her injuries.  She had a tear in her vaginal opening as well as a small bruise. Her neck had bruising, which would be consistent with the "pressure" she remembered feeling during the assault, and her arms and legs all had bruising and contusions. Bobbie had none of those injuries prior to that evening.  Detectives never asked Bobbie to consent to a release of her medical exam report and photos, nor did they interview either of the SANE nurses,

who would have told them that Bobbie's injuries were consistent with the sexual assault she described.

e.  Detectives did not attempt to seek Bobbie's consent to have the biological material in the rape kit tested.  Although Thompson admitted that he'd had sex with Bobbie, he also indicated that he had stopped after a few minutes after Bobbie told him to stop. The rape kit was eventually tested during Bobbie's criminal case, and a compound found in seminal fluid was detected on swabs.

f.  Detectives failed to conduct key interviews and made no mention of exculpatory facts available to them.  Bobbie's friend Courtney Hurtig was with her most of the weekend, and noticed Bobbie's emotional distress and physical injuries, including bruising on her extremities.   At the hospital, Hurtig told police about Bobbie's distress and her injuries, but they made no attempt to follow up or include these facts in the affidavit. Detectives also failed to interview: (1) Lindsie Ford who was at the hospital with Bobbie and made similar observations; (2) Amy Adams, a friend who saw Bobbie early the next morning, and noticed that Bobbie seemed troubled and distracted; (3) Bobbie's medical providers, including Dr. Pavika Saripalli who diagnosed Bobbie with PTSD and treated her ongoing symptoms of anxiety, insomnia, flashbacks, mood changes, and hypervigilance.  Dr. Saripalli was the doctor who had advised Bobbie that proceeding with her complaint against Thompson might be too stressful for her to handle.  Bobbie had told this to Cottengim, but he chose, without basis, to disbelieve Bobbie's report and never contacted or interviewed Dr. Saripalli.

*December 6-12*

86.     Still unaware that both the LPD and KU are treating her as the suspect, Bobbie emails Burns regarding the KU investigation, requests information about the availability of evidence and interviews, and also provides her with the names of two additional witnesses.

*Thursday, January 3*

87.     Burns extends the 60-day timeframe for the IOA investigation and notifies Bobbie of the extension.

*Friday, January 25*

88.     Cottengim obtains a warrant for Bobbie's arrest for the felony crime of providing false information to a police officer. Bobbie is unaware of Cottengim's actions and is trying to focus on starting the spring semester at law school.

*Monday, January 28*

89.     Cottengim employs a ruse to lure Bobbie to the Lawrence Police Department so that detectives can arrest her.  He calls Bobbie and says he received an anonymous note about her rape. But he can't decipher it. He asks Bobbie to come to the police station and help him. She says she will. He does not tell Bobbie about the arrest warrant. Instead, he tells her not to worry, it was nothing "bad."

*Wednesday, January 30*

90.     As requested, Bobbie goes to the police station with her care advocate, Merrill Evans.  Cottengim then tells Bobbie that he lied to her and that he has a warrant for her arrest for falsely reporting a rape.  He does not immediately tell her about her Miranda rights. He tries to get Bobbie to admit that she made a false claim. He tells her that he does not believe she was raped.

Bobbie remained adamant, telling Cottengim and another detective, Amy Price, that "this did happen" and that her "story had not changed from the very beginning."

91. Cottengim then reads Bobbie the Miranda warnings and tries to get her to admit she made a false claim again. He relies on the false narrative and suggests she had been scheming and that it "appeared as though she was using the threat of rape to get what she wanted." Bobbie responded firmly: "No, sir." She tells Cottengim that he's wrong. Bobbie asks Cottengim why he couldn't have just told her the truth about the warrant; that she has class that afternoon. He does not answer her question.

92. The police then snap the handcuffs on Bobbie. She is forced to wait in the lobby while Cottengim and Price bring up the car. They place her in the police vehicle and transport her to the detention center, where she is fingerprinted and processed. Bobbie calls Lindsie Ford and gets her help to secure bond money so she can be released. Bobbie remained in custody the entire afternoon, missing her classes and dealing with a trauma that had been totally unexpected.

93. That same day, Cottengim emails Burns and asks her to call him that afternoon.

### February 19 - March 13

94. After learning that witnesses whose names were provided to IOA in connection with the sexual assault that occurred on Sept. 28, 2018 had not yet been contacted or interviewed. Bobbie communicates with Burns regarding the investigation and schedules a follow up meeting.

### May 1-7

95. Bobbie and Burns communicate about reviewing Bobbie's statement provided to the IOA.

**Monday, July 1**

96.     Bobbie emails Burns about the status of the IOA investigation and the release of the final report, since it had been 8 weeks since they last spoke and over 8 months since the investigation began.

**Tuesday, July 9**

97.     The IOA issues its report of its investigation which concluded that Bobbie had made a false complaint, engaged in "serious misconduct" and referred her to the Office of Student Conduct for further review.

98.     The July 9, 2019 report made numerous references to "witnesses" but no specific witnesses were identified in the report as having been interviewed.

99.     Like the Lawrence Police Department, the Title IX investigator made a finding that Plaintiff had filed a "false complaint" and referred this "finding" to the Office of Student Conduct and Community Standards to "determine whether a policy violation occurred regarding the filing of a false complaint."   Later, Bobbie had a hearing before the Office of Student Conduct, which issued the following conclusion: "Student Conduct understood and confirmed the findings of IOA based on the "information they were provided", however, upon further review, Student Conduct found that no further disciplinary action was necessary."

**Wednesday, June 5**

100.     On the day of her preliminary hearing, Bobbie learns she has been charged with two additional counts of falsely reporting a felony crime. She now faced seven to twenty-three months in prison for each count. The district court, remarkably, found probable cause to support the charges, relying primarily on the correct spelling in Bobbie's early morning text messages to Hurtig, while also not noting that smart phones all have "auto correct" and would like fix any

spelling errors.  The litigation continues for months, with the filing of motions and responses by both sides.

### *October 29, 2019*

101.    With little warning and after months of intense litigation, the Douglas County District Attorney files on October 28, 2019, a motion to dismiss the case against Bobbie.  No explanation was provided.   On October 29, all charges against Bobbie are dismissed with prejudice.  The case is over.  A couple of weeks later, Bobbie heard that when the case against her was first filed, some detectives had been cheering – they had wanted a "false statement" case, knowing that such a case would discourage reports of sexual assault.

### LPD's responsibilities and conduct

102.    It is well recognized that a police department that pursues charges for a "false report" leads to a "chilling effect" and prevents survivors across the county, especially college students, from reporting assault as it is not safe to do so.

103.    It is also well recognized that untrained investigators easily misinterpret a sexual assault survivor's response shortly after an incident because trauma manifests in many different ways and often the victims' account of the assault changes as they remember pieces and act in unexpected ways.

104.    Throughout the case, the detectives showed startling solicitude for Thompson but indifference or even hostility toward Bobbie.   Even though Thompson was the alleged assailant, Cottengim shared his perceptions of the case (that he hadn't yet investigated) with Thompson, telling him that he did not believe Bobbie and that if he could prove she was lying, he would arrest her.  He made clear to Thompson that the investigation of sexual assault allegations was a task to

be dispatched quickly, stating: "I don't want to drag this out forever. And I…want to document the best I can, so that if it didn't happen, it didn't happen. I'm fine with it."

105.     The failure of the LPD to take sexual assault cases seriously and conduct fair and thorough investigations has led, predictably, to poor statistics and a low level of protection to women in the community who have been sexually assaulted. In 2018, Lawrence police made an arrest is only 13.8% of reported rape cases, 1% behind the state average. In the previous two years, fewer than 5% of LPD sexual assault cases led to an arrest.  Bernard, "Lawrence Police Cannot Be Trusted to Investigate Rapes of KU Students, Women Say," Kansas City Star, Dec. 8, 2018, https://www.kansascity.com/news/local/crime/article237679439.html  Nationwide, the Bureau of Justice Statistics found a higher arrest rate nationally – that about 20% of reported sexual assaults led to an arrest.

106.     The failure of the LPD to properly address sexual assault is due to a lack of adequate policies and officer training and a reliance on longstanding customs and the embedded biases of police, detectives, their supervisors and the LPD.

107.     None of the three officers who investigated Bobbie's case had any specialized or up-to-date training in conducting sexual assault investigations, interviewing sexual assault victims or dealing with anyone who had suffered this type of trauma. In contrast, most police departments have specialized units dedicated to sexual assault victims, as it is widely known that inadequate training can contribute to harmful practices and a misperception that victims lie about sexual assault.

108.     The impact that trauma has on a victim's brain can affect how and when memories surface and can cause inconsistencies in the victim's account.   These problems may be compounded if alcohol is involved or if the victim knows her assailant.

109.    Joanne Archambault, who spent decades in law enforcement with the San Diego Police Department, is a nationally recognized expert and police trainer on conducting proper investigations of sexual assaults. She teaches that trauma victims may react in many different ways, and that some of their behaviors may seem unusual or unexpected. Investigators who lack proper training may misinterpret these behaviors.   After an assault by an acquaintance, it is common for the victim's initial disclosure to be inaccurate or minimized. Also, the facts, as provided by the victim, may change over time.  This does not mean the victim is lying. The victim of any sexual assault is also typically dealing with powerful emotions, reactions and symptoms of trauma, including mood instability, depression, sleep disturbances, nightmares, flashbacks, hypervigilance and ongoing emotional stress.

110.    The detectives who investigated Bobbie's allegations lacked necessary training and understanding.  They had never received specialized law enforcement training on sexual assaults or even attended a seminar by a SANE nurse who could address the neurobiology of trauma and how the trauma of sexual assault can affect each victim differently.  Most notably, the LPD lacked a specialized unit – which most medium-sized and larger departments have – to address sexual assault cases.  Such units are typically staffed with personnel who have specialized training and knowledge of the needs of sexual assault victims and the particular demands of such cases.

111.    In the absence of proper training, supervision and policies, the detectives quickly and recklessly adopted the position that Bobbie had not been sexually assaulted. They then proceeded to aggressively target her for filing a false report even though she had *repeatedly* told police that she did not want to pursue charges and even though her interviews occurred at their urging because they claimed they needed a complete, recorded account.  Instead of seeking out specialized expertise or consultation to handle the case, the detectives conducted a biased and

reckless investigation, repeatedly burying or disregarding the real facts in favor of manufacturing a case against Bobbie based on the false narrative that she was taking revenge after the break-up with her boyfriend, Guillot.  In adopting this false narrative, police disregarded overwhelming evidence of Bobbie's true motivations, which were, initially, to preserve evidence, and then to pull back from pursuing any charges against Thompson as she did not want to harm her career or professional relationships.

112.    The constitutional violations that caused the injuries suffered by Plaintiff flowed directly from: (1) the LPD's failure to provide proper and necessary training for their officers and detectives in the handling of sexual assault cases; (2) the LPD's failure to have adequate policies, practices and customs that would have required proper training and guidance for handling sexual assault cases; and (3) the failure to provide adequate supervision to deter detectives from conducting reckless, biased and grossly inadequate investigations aimed not at finding the truth but at protecting the perpetrator.

113.    The City of Lawrence, through the LPD and its encouragement, ratification and/or approval of the aforementioned policies, customs and/or practices, in spite of their known and obvious inadequacies and dangers, has been deliberately indifferent to the constitutional rights of Bobbie Horocofsky and other victims of sexual assault.

114.     Defendants' actions deprived the plaintiff of her rights, privileges or immunities secured by the Constitution or laws of the United States. LPD's policies, customs and/or practices were the moving force behind the violation of Plaintiff's federally-protected rights.

**The University of Kansas' responsibilities and conduct**

115.    Title IX, 20 U.S.C. § 1681(a) states:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance.

116.     A school that receives federal funds violates Title IX and is subject to a private action for damages where the school is "deliberately indifferent" to known acts of discrimination against students. *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988).

117.     The protections of Title IX extend to situations where the school is deliberately indifferent to the sexual harassment of a student by another student. *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999).

118.     The KU Office of Institutional Opportunity and Access (IOA) is the KU office responsible for investigating complaints of discrimination and sexual harassment, including all forms of sexual violence (rape, sexual assault, domestic violence, dating violence, stalking, etc.).

119.     KU's employees were operating within the scope of their employment at all time relevant with regard to the events described herein.

120.     KU has a specific history of publicly reported sexual assaults of women.

121.     The U.S. Department of Education had issued guidance to the KU that it should "promptly" take steps to protect the complainant once it had notice of a sexual violence allegation, by imposing interim measures that may include a "no-contact order" or suspension of the assailant.

122.      KU has policies that state sexual harassment, sexual violence and sexual misconduct are a form of sexual discrimination and are not tolerated at the University. KU affirmatively states that it is committed to the safety and well-being of every member of its community and encourages individuals who experience sexual violence and sexual misconduct to report the incident and seek help. The IOA office informs students that they can choose who to

talk to, what information to share, what support resources to use, and whether to go to law enforcement. The IOA office informs students that they determine if they want to file a formal IOA complaint. The IOA office informs students that it is able to offer interim measures to assist and prevent harm to a victim of sexual violence and sexual misconduct, and that these interim measures are available regardless of whether the student chooses to file a criminal or IOA complaint and regardless of whether the student chooses to participate in a criminal or IOA investigation.

123.    KU has policies that prohibit retaliation against those who file an IOA complaint, and state if a student believes she is experiencing retaliation in any form to notify the IOA office and the IOA will respond promptly to all allegations of retaliation.

124.    KU is responsible for enforcing these policies and ensuring that is employees are adequately trained to follow these policies.

125.    According to the KU IOA policies, the IOA complaint process is independent of any other complaint resolution process, including filing a criminal complaint with the appropriate law enforcement authorities.

126.    However, unbeknownst to Plaintiff, in March 2015, KU had entered into an agreement or a memorandum of understanding (MOU) with the City of Lawrence law enforcement regarding protocols for referring complaints, sharing information, and conducting investigations and agreed to share information and to "communicate regularly" about investigations."

127.    The Law School at the University of Kansas had a policy, custom and practice of sponsoring events for its students on and off campus at which significant quantities of alcoholic beverages were served and tolerated; students were encouraged to participate in these events. These sanctioned events include:

a.   Career Services Events, such as the one that took place on January 23, 2017whcih involved a 1L Law Clerk Panel Discussion at the Law School with an open bar afterwards at the 23rd Street Brewery where students could meet the panelists at the reception.

b.   Spring Law Prom, sponsored by SBA and KU Law, which had an open bar, with numerous incidents involving alcohol in 2017 and 2018.

c.   KU Law Student Bar Association sponsored events, such as weekly events at various bars around Lawrence that involved drinking alcohol and that regularly got out of control. These events were advertised on the law school facebook pages and to the public.

d.   Events hosted and sponsored through the Law School Dean's office, such as the KU Law Diversity & Inclusion Social at Johnny's North in Lawrence, Kansas on September 27, 2018 between the hours of 5pm and 7pm, which provided free beer to students.  This event, and others was published in the KU law School calendar.

128.   Upon information and belief, the KU law school was aware of prior reports of sexual assault involving Thompson but did nothing.

129.   KU knew or should have known that Thompson had angry or violent confrontations in conjunction with these sponsored or hosted events.  For example, at Law Prom in the Spring of 2018, there was a reported incident involving Joel Thompson and a female student in which Thompson confronted her somewhat angrily, told her that she did not need to "perpetuate a narrative wherein [he] was a predator," and she responded that he did not seem to need [her] help with that. And on October 5, 2018, at a SBA event off-campus, Thompson had a physical altercation with another law student.

130.    KU's law school was aware of Bobbie's anxiety, panic attacks, and the demands of the IOA investigation upon her time and emotional state.

131.    The July 9, 2019 "findings" by the IOA reiterated the false narrative that the Lawrence Police Department began in October 2018 about Plaintiff's "motivation to report Thompson."

132.    KU similarly adopted the LPD's near immediate conclusion by police that Bobbie was "lying," prior to any investigation.

133.    Plaintiff exercised her right to appeal to the Interim Provost and Executive Vice Chancellor. In the appeal, she identified errors created a substantiated bias in the investigation and demonstrate material deviations from established procedures, including the following:

a.    Extensive collaboration between Lawrence Police Department Detective, Charles Cottengim, and IOA investigator Kate Burns, specifically that the IOA report notes Cottengim contacted Burns seven times to share information with IOA which eroded the fairness of the investigation and severely violated the Complainant's rights.

b.    Neglect to review or interview important and essential witnesses whose names and contact information was provided to IOA; Bobbie provided a detailed list of seventeen witnesses important to the investigation. Of these seventeen witnesses only four were contacted or interviewed by IOA, and only three were included in the final report. In addition, the IOA report gave no weight to credible testimony provided by these witnesses which was supported by physical evidence.

c.    Failure to review medical documentation and to accommodate the Bobbie's disability throughout the complaint process; The University's indifference to this

trauma created a hostile environment for the Complainant resulting in significant harm.

d.     Failure to investigate retaliation and ongoing harassment against Complainant by Respondent and by the University of Kansas.

134.    Plaintiff also stated in her appeal that she was harassed by the perpetrator throughout the adjudication process, creating a retaliatory and hostile environment which was not recognized nor addressed by IOA. The perpetrator utilized his friendship with Kriston Guillot, a former friend and colleague of the Complainant, to intimidate and harass the Complainant. Mr. Guillot confronted the Complainant and asked her to "end this investigation or else you will lose everything". Although the Complainant reported the harassment to the IOA investigator, no steps were taken to end the harassment. Kriston Guillot's conduct was not fully reviewed or investigated which created further harm to Complainant and contributed to the erroneous findings.

135.    In her appeal, Plaintiff stated that during the pendency of the eight-month long Title IX investigation, Bobbie was harassed by Thompson through Guillot and when she informed the IOA of this harassment and retaliation, the IOA failed to address the complaint or take any appropriate remedial action in response to her complaint, evincing deliberate indifference to the retaliatory conduct.

136.    Plaintiff's informed the IOA investigator that she suffered from generalized anxiety disorder, flashbacks, nightmares, and panic attacks which progressively worsened after the sexual assault as she regularly saw her perpetrator on campus. Despite knowledge of this information, no actions were taken by IOA to protect her from further harm and resulted in withdrawal from coursework and delayed graduation.

137.    The University of Kansas' policy on sexual misconduct states that all cases should be resolved within sixty days, but in this case the investigation took more than eight months, which caused ongoing distress and negatively affected Plaintiff's mental health and academic performance.

138.    In response to her appeal, KU Interim Provost and Executive Vice Chancellor rubber-stamped the KU IOA findings as "reasonable." The Interim Provost also bought into the collusive findings of the LPD and KU, stating "Given IOA's findings as to your previous sexual relationship with Mr. Guillot, your desire to continue your relationship with Mr. Guillot, and your previous and ongoing workplace relationship with him, IOA's conclusion was reasonable."

139.    Like the LPD, KU was deliberately indifferent to Plaintiff's rights as evidenced by the following:

a.    Failing to conduct a specific investigation of her sexual assault allegations reflecting deliberate indifference;

b.    Failure to investigate her level of intoxication;

b.    Failure to investigate Joel's background and conduct;

c.    Failure to investigate Bobbie's injuries or ask for medical report/photographs from SANE exam;

d.    Failure to thoroughly review Thompson's text messages or accord weight to his admissions that he knew Bobbie was intoxicated;

e.    Little or no consultation with SANE nurses;

f.    Failure to interview witnesses who would corroborate Bobbie;

g.      Failure to interview her doctor who would have corroborated Bobbie's PTSD and

that she had advised her to consider not proceeding with police because of stress.

140.    KU's concealment of the actual focus of its investigation amounted to deliberate

indifference to the rights of the Plaintiff under Title IX, by deliberately misleading her.

141.    Plaintiff also was subjected to intimidation, harassment and retaliatory conduct at

the law school.

142.    University of Kansas Professor Quinton Lucas referenced Title IX during an

Administrative law class in which the Complainant was present. After making a joke at the

beginning of the semester about the #metoo movement during the February 5, 2019 class, Mr.

Lucas stated in his opinion the Title IX process regarding sexual assault on campus should be

abolished, stating he thought the District Attorney's office should handle sexual assault allegations

on campus because they were 'best suited.' Mr. Lucas then used the Bobbie Horocofsky by name

in a hypothetical example stating the University could not 'kick her out' without due process and

made comments directed towards the ongoing IOA investigation. By doing so, Mr. Lucas created

or contributed to an atmosphere that caused her to feel very uncomfortable, vulnerable, anxious

and targeted.

143.    The law school is supposed to provide a setting free of harassment where anyone -

and most especially a complainant - can feel safe and able to pursue their academic goals.

144.    Although documentation of this retaliation was provided to the IOA investigator

during an interview on March 14, 2019, Professor Quinton Lucas' conduct was not reviewed or

mentioned in the final report which created further harm to Complainant and further demonstrates

an incomplete and biased investigation.

145.     On or about November 1, 2019, Plaintiff filed another formal complaint with the IOA making claims of sex discrimination and retaliation.

146.     On December 5, 2019, KU administratively closed her complaint without an investigation. In its letter notifying Plaintiff of its action, KU's Title IX Director concluded the conduct in her complaint was not based on Plaintiff's sex or an attempt to harass or to retaliate against her.

147.     KU failed to provide adequate supervision, warnings, training, guidance and education to its employees and students in the law school. The likelihood of such misconduct was so obvious that KU's failure amounted to deliberate indifference to the rights of Plaintiff.

148.     KU then subjected Bobbie to a student conduct hearing, a proceeding at which she risked expulsion from the University.

**COUNT I**

**Claim Against the City of Lawrence under 42 USC § 1983, the Fourth and Fourteenth Amendments and *Monell* for Unconstitutional Policies, Customs, Practices and Inadequate Training**

149.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

150.     Defendant City of Lawrence, Kansas, was at all times relevant to this Complaint responsible for the policies, practices and customs of the LPD as well as the LPD's training of its personnel.

151.     Defendant City of Lawrence, by and through its final policymakers, had in force and effect during the false and fraudulent investigation of Plaintiff a policy, practice or custom of unconstitutional misconduct with respect to the investigation of sexual assault allegations, including, in particular, the failure to adequately investigate such allegations and, instead,

conduct grossly inadequate, biased, and fraudulent investigations of such allegations, which included, in this case and others, the targeting and charging of victims.

152.    Defendant City of Lawrence, by and through its final policymakers, had in force and effect during its investigation of Plaintiff a custom of providing little or no training to officers or detectives handling sexual assault cases, and allowed untrained personnel to investigate such  cases even though they had no knowledge of how to properly investigate them, or interview a sexual assault victim, or understand how victims respond to trauma.  There were no policies requiring or enforcing such training, and the policies and/or training and/or supervision were inadequate to protect against fraudulent, biased and grossly inadequate investigations.

153.    The City of Lawrence was aware of the LPD's problems with sexual assault investigations, yet repeatedly failed to make any meaningful changes or reforms that would have avoided the type of constitutional wrongs that injured Plaintiff.

154.    The City of Lawrence and LPD's unconstitutional policies, practices and customs and its failure to provide adequate training for its officers and detectives were the moving force behind Plaintiff's being wrongfully charged, detained and prosecuted even though she had done nothing wrong and was, in fact, a victim.

## COUNT II
### 42 USC § 1983 Claim for Denial of Equal Protection
### under the Fourteenth Amendment
*Against Defendants Cottengim, Nicholson, and Affalter*

155.     Plaintiff hereby adopts and incorporates the allegations set forth above as though fully set forth herein.

156.    The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." Denials

of equal protection by a municipal entity or any other person acting under color of state law are actionable under 42 U.S.C. § 1983.

157.    Plaintiff is a member of a protected class based on gender as she is a female. Plaintiff belongs to a class singled-out for invidious class-based discrimination.

158.    In addition to being a member of a protected class, Plaintiff was also a member of a "class of one," in that Defendants Cottengim, Nicholson, and Affalter specifically targeted her for unfair and unequal treatment on the basis of her gender.

159.    Defendants Cottengim, Nicholson, and Affalter treated Plaintiff differently under the law, in that:

•       They had evidence that Thompson had sexually assaulted Plaintiff but did not investigate him;

•       They targeted Plaintiff for punishment due to her gender and status as a rape victim when they knew she was struggling to finish her education as a KU law student under the stress of having to defend herself on a bogus charge.

160.    Defendants Cottengim, Nicholson, and Affalter's conduct was the result of enforcing policies unequally on the basis of Plaintiff's gender and it lacked any rational basis.

161.    There was no rational basis for Defendants Cottengim, Nicholson, and Affalter to single out Plaintiff, or any other victim of sexual assault for discrimination or retaliation.

162.    Defendants Cottengim, Nicholson, and Affalter were acting under color of law, in their capacity as law enforcement officers on City property and during City operating hours.

163.    At all times relevant, Defendants Cottengim, Nicholson, and Affalter were acting within the scope of their employment.

164.    At all times relevant, Defendants Cottengim, Nicholson, and Affalter had the

authority to stop the unequal treatment under the law being afforded the Plaintiff.

165.    Defendants Cottengim, Nicholson, and Affalter were deliberately indifferent to the unequal treatment suffered by Plaintiff.

166.    Defendants Cottengim, Nicholson, and Affalter's indifference and conduct was wanton, willful and in reckless disregard and neglect of Plaintiff's rights, safety and well-being, justifying the imposition of punitive damages.

167.    Defendants' conduct exhibited deliberate indifference to Plaintiff's rights and wellbeing.

168.    There is no qualified immunity available to Defendants as Plaintiffs' equal protection rights in this context were long ago clearly established by Supreme Court and Tenth Circuit precedent.

169.    As a direct result of Defendants Cottengim, Nicholson, and Affalter's wrongful conduct, Plaintiff has sustained or will sustain medically significant emotional distress, embarrassment, humiliation and loss of enjoyment of life, economic loss and hardships, lost time, lost earning potential, and expenses for medical and psychological treatment, therapy and counseling.

### **COUNT III**
**42 USC § 1983 Claim for Malicious Prosecution and Abuse of Process in Violation of the Fourth and Fourteenth Amendments of the United States Constitution**
*Against Defendants Cottengim, Nicholson, and Affalter*

170.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges the following.

171.    Defendants Affalter, Cottengim and Nicholson, acting individually and in concert, with malice and knowing that probable cause did not exist to prosecute Bobbie Horocofsky for the felony crime of making a false statement to police, intentionally caused Horocofsky to be arrested,

detained, charged and prosecuted for that crime, thereby violating her clearly established rights under the Fourth and Fourteenth Amendments to be free of prosecution absent probable cause.

172.     Specifically, as described in detail above, Defendants, acting individually and in concert, conducted a fraudulent and reckless investigation, intentionally ignored and suppressed exculpatory facts, and helped manufacture a false theory of motive, thereby building a false and fraudulent case against Plaintiff Horocofsky.

173.     Horocofsky was and is innocent.  She did not make any false statements to police, and is, instead, a victim of a reckless, fraudulent and biased police investigation that from its earliest moments targeted her as a suspect instead of a victim.

174.     That cause was finally terminated on October 29, 2019, when the Court granted the State's motion and dismissed with prejudice the case against Plaintiff.

175.     Plaintiff suffered economic and non-economic damages arising from her arrest, her detention on January 30, 2019, and the false and fraudulent prosecution against her that continued for nine months until the dismissal.

176.     Defendants Affalter, Cottengim and Nicholson performed the above-described acts in this case under color of state law, intentionally, and with reckless disregard for the truth, and with deliberate indifference to Plaintiff's clearly established constitutional rights.  No reasonable officer in 2018 and 2019 would have believed this conduct was lawful.

177.     The acts and omissions by the three individual defendants described above were the direct and proximate cause of Plaintiff's economic and non-economic injuries because these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, detention and prosecution of Plaintiff.

## COUNT IV
### Title IX Discrimination – *Simpson* Hostile Educational Environment
*Against KU*

178.    Plaintiff hereby adopts and incorporates the allegations set forth above as though fully set forth herein.

179.    In *Simpson v. University of Colorado, Boulder*, 500 F.3d 1170 (10th Cir. 2007), the Tenth Circuit stated that a school could be held liable under Title IX if it is a federal funding recipient and possesses an "official policy" of "deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient" or if a school district "sanctioned, supported, even funded a program … that, without proper control" would result in sexual harassment.

180.    Defendant KU is a recipient of federal funds.

181.    Defendant KU possessed an official policy of hosting and sponsoring events that served alcohol for students.

182.    In a related policy, Defendant KU had a policy of working with the Lawrence police department concerning claims of sexual assault.

183.    These two policies made Plaintiff more vulnerable to the sexual assault, rape and retaliation that did in fact occur.

184.    KU's affirmative actions and inactions made Plaintiff more susceptible to sexual harassment and retaliation both before and after her report.

185.    KU employees with authority to protect Plaintiff had actual knowledge that these policies were making her more susceptible to harm.

186.    Though unnecessary under *Simpson*, these same had actual knowledge that Plaintiff's assailant posed a serious, specific threat to Plaintiff and others similarly situated.

187.     Defendant KU's indifference and resulting inaction was wanton, willful and with reckless disregard and neglect of Plaintiff's rights, safety and well-being.

188.     Defendants' conduct exhibited deliberate indifference to Plaintiff's rights and wellbeing.

189.     As a direct and proximate result of the defendant's wrongful conduct, plaintiff has suffered and continues to suffer great pain of mind, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, missed and lost educational opportunities, lost earning capacity, medical expense and out-of-pocket costs.

190.     Plaintiff has incurred and will continue to incur necessary and reasonable expenses for medical and psychological treatment, therapy and counseling as well as other economic hardships.

## COUNT V
## Title IX Hostile Educational Environment
### *Against KU*

191.     Plaintiff hereby adopts and incorporates the allegations set forth above as though fully set forth herein.

192.     In *Escue v. N. Okla. Coll.*, 450 F.3d 1146 (10th Cir. 2006), the Tenth Circuit articulated three elements for a private cause of action under Title IX: first, the district remained deliberately indifferent to acts of harassment of which it has actual knowledge; second, the harassment was reported to an appropriate person with the authority to take corrective action; and third, the harassment deprived the victim of educational benefits or opportunities.

193.     Defendant KU is a recipient of federal funding.

194.     Plaintiff is a member of a protected class, female.

195.    Plaintiff suffered discrimination and harassment on the basis of her gender when she was sexually assaulted by Thompson and then harassed by other students as more fully detailed above.

196.    Plaintiff also suffered discrimination and harassment on the basis of her participation in a Title IX complaint when harassed by other students as more fully detailed above.

197.    KU had actual knowledge that Plaintiff had been sexually assaulted, that she was being intimidated in class and by other students.

198.    KU was deliberately indifferent to discrimination and harassment Plaintiff suffered, including but not limited to the following:

a.    KU failed to take reasonable steps to prevent sexual assaults from occurring at or following law school events, including failing to train employees and failing to adopt and implement simple, reasonable policies that would lessen the chance of rapes occurring, harassment occurring, or retaliation from occurring.

b.    KU failed to conduct an expedient investigation or hold a timely hearing in order to resolve Plaintiff's report.

c.    KU failed to take any action on Plaintiff's report.

d.    KU failed to stop Thompson and others from harassing or retaliating against Plaintiff after she reported his sexual assault.

e.    KU's affirmative attempts to frustrate any investigation into Plaintiff's sexual assault.

199.    KU's conduct is prohibited by Title IX.

200.    KU's conduct was in no way reasonably designed to help Plaintiff or stop the hostile educational environment.

201.     KU's conduct was wanton and in reckless disregard for the rights and safety of Plaintiff.

202.     Defendants' conduct exhibited deliberate indifference to Plaintiff's rights and wellbeing.

203.     Defendant KU's corrective or preventive opportunities regarding plaintiff's report of sexual assault and retaliation were unreasonable or inadequate.

204.     Defendant KU's indifference and resulting inaction was wanton, willful and with reckless disregard and neglect of Plaintiff's rights, safety and well-being.

205.     As a direct and proximate result of the defendant's wrongful conduct, plaintiff has suffered and continues to suffer great pain of mind, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, missed and lost educational opportunities, lost earning capacity, medical expense and out-of-pocket costs.

206.     Plaintiff has incurred and will continue to incur necessary and reasonable expenses for medical and psychological treatment, therapy and counseling as well as other economic hardships.

## COUNT VI
## Title IX Retaliation
*Against KU*

207.     Plaintiff hereby adopts and incorporates the allegations set forth above as though fully set forth herein.

208.     The Supreme Court recognized a cause of action for Title IX retaliation in *Jackson v. Birmingham Bd. of Ed.*, 544 US 167 (2005).

209.     Plaintiff engaged in a protected activity under Title IX when she:

a.      Reported her sexual assault.

b.      Reported Thompson's retaliatory treatment and comments toward her.

c.      Reported additional retaliation from her law school class.

210.    Contemporaneously with her protected activity, Plaintiff suffered adverse actions, including but not limited to the following:

a.      Acts of intimidation

b.      Acts of witness tampering on campus.

c.      Unfair and biased interrogations.

d.      Being forced to withdraw from classes which delayed her educational opportunities.

e.      Accusing Plaintiff of making a false report of sexual assault.

f.      Subjecting Plaintiff to a student conduct hearing for making a false report.

211.    Plaintiff's protected activity and the adverse actions are causally connected including but not limited to the following:

a.      The retaliatory acts came immediately after the protected activity.

b.      The retaliatory acts occurred as part of a clear chain of cause and effect stemming from her protected activity.

c.      The retaliatory acts were in some cases designed to thwart the efficacy of Plaintiffs' protected activities.

212.     Defendant KU's employees and administration had actual knowledge of the retaliation Plaintiff was suffering in that they knew Plaintiff was subjected to a sexual assault and was subject to intimidation and harassment on campus.

213.    Defendant KU did not adequately respond to the retaliation including but not limited to the following:

a.      KU knew retaliation was likely following her report of rape but took no proactive steps to protect Plaintiff.

b.      After receiving Plaintiff's second report of intimidation, KU failed to suspend Thompson or ban him from campus.

c.      KU failed to conduct a timely investigation.

d.      KU accused Plaintiff of making a false report of sexual assault.

e.      KU subjecting Plaintiff to a student conduct hearing

214.    An appropriate person had actual knowledge of the discrimination and retaliation suffered by Plaintiff.

215.    Furthermore, Defendant KU deliberately failed to supervise employees that had the means and authority to stop the discrimination and retaliation Plaintiff experienced.

216.     KU's affirmative actions and inactions made Plaintiff more susceptible to discrimination and retaliation after Plaintiffs' reports.

217.    Defendant's conduct exhibited deliberate indifference to Plaintiff's rights and wellbeing.

218.    Defendant KU's indifference and resulting inaction was deliberate, wanton, willful and with reckless disregard and neglect of Plaintiff's rights, safety and well being.

219.    As a direct and proximate result of the defendant's wrongful conduct, plaintiff has suffered and continues to suffer great pain of mind, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation,

missed and lost educational opportunities, lost earning capacity, medical expense and out-of-pocket costs.

220.    Plaintiff has incurred and will continue to incur necessary and reasonable expenses for medical and psychological treatment, therapy and counseling as well as other economic hardships.

## COUNT VII
### Conspiracy Under 42 USC § 1983 and 42 USC ¶ 1985(3)
### *Against Defendants Affalter, Cottengim and Nicholson*

221.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

222.    Defendants Affalter, Cottengim and Nicholson, acting within the scope of their employment and under color of state law, agreed among themselves with University of Kansas Title IX investigator/coordinator Kathryn Burns to conduct a biased, fraudulent and grossly inadequate investigation of Plaintiff's claims of sexual assault, in violation of the Fourth and Fourteenth Amendment rights to be free from malicious prosecution, coercion, deprivation of liberty without due process of law and also in violation of Plaintiff's Fourteenth Amendment right to equal protection of the law and her statutory rights under 42 USC § 1983, 42 USC § 1985 and Title IX.

223.    Throughout the investigation, detention and prosecution of Plaintiff and throughout her Title IX proceedings at the University of Kansas, Defendants acted in concert and committed overt acts in furtherance of their conspiracy, all of which served to deprive Plaintiff of her rights under the Fourth and Fourteenth Amendments, and her rights under federal statutory law.

224.        As a direct and proximate result of Defendants' actions and those of Ms. Burns, Plaintiff was charged, detained and prosecuted, and, further was denied a fair and unbiased hearing in her Title IX proceedings at the University of Kansas.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court conduct a jury trial on her claims, enter judgment in her favor in an amount in excess of $75,000 against Defendants, grant such declaratory and injunctive relief as is necessary and appropriate to remedy the wrongs alleged herein; award Plaintiff actual damages, compensatory damages, punitive damages, reasonable attorneys' fees and expenses, interest and costs of this suit; and grant such other and further legal and equitable relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Cheryl A. Pilate
Cheryl A. Pilate, KS # 14601
MORGAN PILATE, LLC
926 Cherry St.
Kansas City, Missouri 64106
(816) 471.6694 (phone)
(816) 472-3516 (fax)
cpilate@morganpilate.com


/s/ Sarah A. Brown
Sarah Brown, KS #12130
BROWN & CURRY, LLC
1600 Genessee Street, Suite 956
Kansas City, MO 64102
(816) 756-5458 (phone)
(816) 666-9596 (fax)
sarah@brownandcurry.com

ATTORNEYS FOR PLAINTIFF

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable by law.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Kansas City, Kansas, as the place of trial for this matter.

/s/ Cheryl A. Pilate
Cheryl A. Pilate, KS # 14601
MORGAN PILATE, LLC
926 Cherry St.
Kansas City, Missouri 64106
(816) 471.6694 (phone)
(816) 472-3516 (fax)
cpilate@morganpilate.com

/s/ Sarah A. Brown
Sarah Brown, KS #12130
BROWN & CURRY, LLC
1600 Genessee Street, Suite 956
Kansas City, MO 64102
(816) 756-5458 (phone)
(816) 666-9596 (fax)
sarah@brownandcurry.com

ATTORNEYS FOR PLAINTIFF