**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **BOBBIE JO HOROCOFSKY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case No.  20-CV-02529** |
| | ) |
| **CITY OF LAWRENCE, KANSAS,** | ) |
| | ) |
| **CHARLES B. COTTENGIM,** | ) |
| | ) |
| **KIMBERLEE A. NICHOLSON,** | ) |
| | ) |
| **DANIEL L. AFFALTER, JR.,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **THE UNIVERSITY OF KANSAS,** | ) |
| | ) |
| **Defendants.** | ) |

**FIRST AMENDED COMPLAINT WITH JURY DEMAND**

1.      Plaintiff Bobbie Jo Horocofsky brings this civil rights action under 42 U.S.C. §
1983, 42 U.S.C. § 1985, the Fourth and Fourteenth Amendments of the United States
Constitution and state law to seek compensation for harms she suffered and to redress the
deprivation under color of law of her rights secured by the United States Constitution.

2.      Plaintiff also brings this action to seek compensation for harms she suffered as a
result of the discriminatory and retaliatory educational environment created by the Defendant
University of Kansas in violation of Title IX of the Education Amendments of 1972, 20 U.S.C.
§ 1681(a).

3.      One night in Lawrence, Kansas, KU law student Bobbie Jo Horocofsky attended
a law school sponsored event at a bar in Lawrence with fellow law students. After this "Diversity
in Law" event, she and some of her fellow students decided to continue socializing and went bar

hopping. Before the night was over, she suffered a sexual assault that, remarkably, led to her being charged with making a false statement to police.

4.        Lawrence, Kansas, like many college towns, is plagued by a high number of sexual assaults of young women.  And, like many college towns, Lawrence has tried to sweep the problem under the rug by dropping investigations for flimsy reasons and disregarding credible accounts of women by classifying them as the result of "regret sex" or "experimenting." While other police departments established units with detectives trained in trauma-informed approaches, Lawrence took no such steps. Instead, policymakers decided they needed to bring a "false statement" case that would help discourage the unwanted reports of sexual assault. Not surprisingly, prosecution rates in Douglas County for such cases have lagged well behind the national average, and young women who've suffered sexual assault have been left physically, psychologically and emotionally injured.

5.        In the case of Bobbie Jo Horocofsky, police made a snap judgment to reject her account based on a handful of text messages she sent while still intoxicated, confused and in the presence of her attacker. Police also saw an opportunity. They decided they could flip her allegations on their head and develop a case against Bobbie for making a "false statement." Surely that would discourage other women from making unwanted complaints of sexual assault.

6.        Bobbie told police she was too intoxicated to consent; she had been a state of alcoholic black out, and her memory was fragmented. After a short phone call with a detective, she went to the hospital, was examined and had a rape kit taken. She was bruised and had a vaginal tear.  A nurse took photographs.

7.        In September 2018, Bobbie was a third-year law student at the University of Kansas School of Law. She had an undergraduate degree in Animal Science and Industry, a

certificate in Equine Science, and a Masters' degree in Biomedical Sciences. She planned to be a patent lawyer. Bobbie was involved in law school activities and events as a KU Law School Ambassador.

8.      Along with her law school friends, Bobbie attended a sanctioned law school event where beer was consumed.  She socialized at the event and then went drinking in downtown Lawrence with her law school classmates.  She consumed several drinks.  Hours later, she woke up groggy and confused in a strange bed and had no idea where she was. She was naked and had bruises on her body. She remembered feeling pressure on her neck, and a man whom she did not initially recognize – he had unfamiliar tattoos – was in bed with her. She quickly realized that the man had engaged in sex with her even though she was far too intoxicated to consent. Horocofsky then recognized him – he was Joel Thompson, a fellow law student and the best friend of her then-boyfriend, Kriston Guillot.

9.      Horocofsky pulled away and told him to stop. Thompson told her that her resistance was pointless; he'd already had his penis inside her and Guillot would therefore not want her anymore.

10.      The subsequent police investigation, conducted largely without Bobbie's knowledge, was not aimed at investigating the sexual assault of Bobbie, but rather at proving she had lied. After Bobbie told police she did not want to pursue charges, the police went full bore with an investigation to prove that she lied. The lead detective sympathized with perpetrator Thompson and voiced concerns about the harm a rape allegation could have on his career.

11.      While relying on a handful of Bobbie's text messages to reject her account, police disregarded numerous texts among Thompson and his friends joking about Bobbie's level of intoxication: "***She looked fucked up yo***" and "***she really was lolo***."  (Emphasis added).

3

Thompson knew Bobbie was heavily intoxicated, but he had a plan. By his description, Bobbie was not the girlfriend of his friend, Kriston Guillot – she was a mere "***side joint***." He hadn't "fucked yet" that day and planned to "fuck" with Bobbie so Kriston "knows I can." Thompson bragged to his friends: "***I'm bout to see what she working with***." (Emphasis added).

12.     Unknown to Bobbie, Thompson's plan to have sex with her dated back months, as expressed in a series of crude text messages he had with his friend Guillot, then a young lawyer at a Kansas City law firm who pretended to be Bobbie's boyfriend, but was secretly engaged to another woman.

13.     In the text messages, Thompson and Guillot joked about doing a "***tag team***" with Bobbie or maybe a "***train ride***." Bobbie viewed them as friends, but in their texts, they disparaged her, calling her a "***skeezer***."

14.     Despite the plentiful evidence of Thompson's intent to sexually assault Bobbie and his reputation for targeting intoxicated women for sex, the police instead targeted Bobbie. Four months after Bobbie was raped, she was charged with three felony counts of making a false statement to police.

15.     The willful failure of the Lawrence Police Department (LPD) to investigate Bobbie's case – as well as sexual assault complaints from other women -- reflects an across-the-board lack of adequate policies and training at the LPD as well as a persistent bias at the LPD in favor of protecting male perpetrators. The detectives assigned to Bobbie's case lacked any specialized training in the knowledge and skills necessary to properly investigate a report of sexual assault or to appropriately handle an interview with a traumatized victim. Investigators knew nothing about a "trauma-informed" approach, and their usual choice was to quickly dispose of such cases by deciding, with little or no basis, to reject the woman's account.

16.     LPD also had the specific intent to look for a "false statement" case that they could use to discourage sexual assault complaints.

17.     With little basis and no investigation, LPD detectives turned Bobbie into their suspect while she was still numb and going through a sexual assault examination at the hospital. Police decided to build a case against Bobbie as soon as they saw a handful of her text messages, sent while she was still intoxicated and with her attacker, trying to figure out what happened and how to get home.  Bobbie decided she didn't want to proceed with pressing a criminal case, but it was too late. Police made her their target and concocted a theory that Bobbie was essentially a "woman scorned" who retaliated against Thompson because she and her boyfriend, Kriston, had broken up a couple of weeks after the sexual assault.

18.     In reaching their investigative "conclusions," police paid no attention to evidence of Bobbie's level of intoxication even though her inability to consent was – and should have been – the central issue. They also paid no attention to Thompson's clear intent, as reflected in his crude texts, to "fuck" Bobbie despite her obvious impairment.

19.     Inexplicably, detectives recklessly or deliberately failed to investigate these critical and highly relevant facts. Detectives also intentionally disregarded the extent of Bobbie's physical injuries, including bruises on her neck, her extremities and a tear in her vaginal area, all of which were documented by a specially trained nurse. They also did not seek Bobbie's medical report or photographs from her examination. As they built a case that she lied about being raped, they did nothing to investigate whether she was, in fact, raped. They did not even seek testing of her rape kit. They failed to interview the women who saw Bobbie shortly after the assault, and they did not interview the doctor who treated Bobbie for PTSD.

20.     After Bobbie became fearful of upsetting her employment opportunities by pursuing a rape case against a fellow law student, she told police she did not want to pursue the case but would pursue redress by filing a Title IX complaint at KU.  Although the lead detective, Charles Cottengim, assured Bobbie that he would respect her choice to proceed only with the Title IX complaint, he stated in a police report that **he lied** and that "the investigation would continue despite what [I] told Bobbie."  Unknown to Bobbie, the investigation was of *her*.

21.      Detective Cottengim then went a step further, contacting KU Title IX investigator Kathryn Burns. The two worked closely together. Through a series of contacts – emails, phone calls, meetings – Cottengim shared not only his reports, but also his concocted theory that Bobbie accused Thompson to retaliate after she and Guillot broke up.

22.     After the rape, at first, Bobbie felt embarrassed, scared, and confused about what had happened.  She thought she could choose to ignore the assault, as so many other women have done. But when her friends raised concerns that her attacker had done this before and would ultimately do it again, Bobbie chose to do what she thought was the "right thing" and report it to the police and to KU.

23.     Detectives ignored all evidence supporting Bobbie while they built their false statement case and while they improperly influenced and conspired with the KU investigator Burns. Neither the LPD nor KU conducted a fair investigation and neither investigated Bobbie's injuries, her continuing trauma, or the background of her assailant. Neither provided any notice that they had turned Bobbie into their target.

24.     Like the LPD, the KU Title IX office chose to reject Bobbie's claims and accused her of falsely accusing Thompson.  Throughout its investigation, the KU Title IX office communicated regularly with the LPD and acted in concert with detectives.  The University's

failure to fairly and objectively investigate Bobbie's claim is deeply troubling as the school was on notice as to the danger of alcohol-driven sexual assaults and the culture of certain groups on its campus and yet did little to nothing about it. Moreover, after KU learned Plaintiff had become a victim of a sexual assault, the school again did little to nothing about it and merely replicated the flawed and biased LPD investigation.  And even more importantly, KU's Title IX investigators, who are supposed to be trained in trauma-informed interview techniques, completely disregarded such training and instead blamed the victim.

25.     The KU Title IX office – called Institutional Opportunity and Access – denied Bobbie's complaint nearly nine months later, find that the evidence did not support her complaints, and that "in fact [she] knowingly filed a false allegation of sexual assault."  KU then denied her appeal.

26.     KU did not put any sort of interim measures in effect to protect Bobbie from further harassment or harm, which led to troubling interactions with professors, which caused her to become violently ill after class. KU's lack of consideration for her safety was compounded by its support and endorsement of her assailant. Bobbie could not walk by the composite photo for her graduating class showing her attacker, or by the prominently displayed posters in the law school with her assailant's featured picture without feeling violently ill. She missed weeks of school in the fall of 2018 and the spring of 2019, suffered panic attacks, anxiety and nightmares which left her exhausted, depressed and unable to cope.

27.     The aftermath of Bobbie's reports to KU and the LPD have negatively impacted all areas of her life, including her financial well-being, her physical and mental well-being, her family, her academic performance and her current and future career opportunities. She went from being in the top twenty percent of her law school class to having to drop classes in the fall of 2018, and then

having to drop classes or take incompletes in 2019, which postponed her graduation and her employment opportunities.

28.     The wrongful actions of KU violated Bobbie's rights under Title IX, and the unconstitutional actions of the LPD violated Bobbie's clearly established constitutional rights to due process and equal protection under the Fourth and Fourteenth Amendments of the United States Constitution.

**Jurisdiction and Venue**

29.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343 and 1367 because the matters in controversy arise under the laws of the United States.

30.     This Court has supplemental jurisdiction over state and common law claims pursuant to 28 U.S.C. § 1367 because the claims arise and involve the same nexus of law and fact.

31.     Venue is proper with this Court pursuant to the provisions of 28 U.S.C. §1391 as the events, acts and omissions alleged in this Complaint were committed within this Judicial District.

**Parties**

32.     Plaintiff Horocofsky was a female student who at all relevant times was a student at the University of Kansas and a resident of the City of Lawrence, Kansas.

33.     Defendant City of Lawrence, Kansas is a home-rule municipal corporation and it operates and oversees the Lawrence Police Department ("LPD").

34.     Defendant Charles B. Cottengim was, at all times relevant to this complaint, a duly appointed and active detective of the LPD acting within the scope of his employment and

8

under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Lawrence, Kansas as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

35.     Defendant Kimberlee A. Nicholson was, at all times relevant to this complaint, a duly appointed and active detective of the LPD acting within the scope of her employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Lawrence, Kansas as well as the State of Kansas. Upon information and belief, she is entitled to indemnification under statute and by contract. She is sued in her individual capacity.

36.     Defendant Daniel L. Affalter, Jr. was, at all times relevant to this complaint, a duly appointed and active police officer of the LPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Lawrence, Kansas as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

37.     Defendant University of Kansas ("KU") is a Kansas educational institution located in the City of Lawrence, Douglas County, Kansas, and is a recipient of federal funds.

## Facts Supporting Plaintiff's Claims

### Friday, September 28

38.      In the early morning hours of September 28, 2018, Bobbie woke up in a strange bed and did not know where she was or how she got there. She was still feeling the effects of the alcohol she drank the night before during a night of bar hopping with other students after a law school event. She was naked and had bruises on her body on her arms and legs. She noticed uncomfortable pressure on her neck, and realized that a man whom she did not initially recognize was in bed with her.  She knew he'd had sex with her, even though she was far too intoxicated to

consent. Bobbie eventually recognized him – he was Joel Thompson, the best friend of her on-again, off-again boyfriend, Kriston Guillot. Horocofsky pulled away from him and told him to stop. She told him she could not believe this was happening. He told her she was being weird, and was making him feel like he needed to "Kavanaugh this bitch right now." Thompson also indicated her protest was pointless; he'd already had his penis inside her. Thompson told her that she was in his bedroom at his house. Bobbie tried to leave, but she was still too drunk and couldn't find her clothes. She laid back down, and woke up again around 4 a.m. She walked outside and could not find her car.  Thompson told her that her car is parked downtown and that he would drive her to it in the morning.

39.     At around six o'clock that morning, Bobbie started sending text messages to her close friend, Courtney Hurtig. When she first opened her phone, Bobbie noticed a message she'd sent to Hurtig at two o'clock that morning saying she had "fucked up" and "slept with Joel," but she had no memory of sending that message. Her memory of the night was very patchy and confused at that point and she was trying to piece together what had occurred.  She didn't want to believe she had been raped. She also knew Thompson, who was right next to her, was watching her send the messages. She told Hurtig that she was in Joel's bed but they would be leaving soon to take her back to her car.

40.     In response to Bobbie's text messages, Hurtig was shocked and asked Bobbie whether she is joking.

41.     Later that morning, after Bobbie was back home at the horse farm where she lived, the effects of the alcohol started to wear off.  Bobbie was anxious, upset, and very sore.  She texted Hurtig, starting: "Get here fast -- I'm literally about to have a breakdown." When Hurtig arrived at Bobbie's house, Hurtig noticed Bobbie's bruises and began to suspect that there was more to the story than what Bobbie had

initially told her. Hurtig, who had worked at an outpatient psychology center before law school, suspected that Bobbie had been raped. She also noticed that Bobbie's state of mind seemed "clearly off – like she was so upset," which was very unusual for Bobbie.

**Saturday, September 29**

42.     The next day, Hurtig wanted to get Bobbie out of her house, so she took her out to celebrate Homecoming weekend. Bobbie did not drink, but Hurtig and her boyfriend, Blake Stokes did. Hurtig and Stokes eventually argued, and Stokes told Hurtig to get all of her stuff out of Stokes's house. Bobbie and Hurtig left to do just that. Stokes then went to a party at Thompson's house. Stokes sent a text message to Bobbie, telling her that she was responsible for getting Hurtig out of his house. If she didn't, Stokes said, he would tell everyone that Bobbie slept with Thompson — something Stokes had learned from Hurtig.

43.     Stokes' threats struck a nerve. Bobbie was upset and emotional. She texted back: "I'm pretty sure it was borderline date rape and I have the bruises and statements to prove it."

44.     At that point, Bobbie's hazy memories of the night began to come back — fragments of memory, like snippets of a movie. She remembered someone on top of her, having sex with her. That he had tattoos that were unfamiliar to her; that she did not know who he was. She remembered telling Thompson that she didn't want to sleep with him, and Thompson telling her that his penis was already inside her. She remembered telling Thompson to stop, that her boyfriend, Guillot, would be mad, and Thompson replying that it was already done, that Guillot would never want her again. She remembered feeling pressure on her neck. Her memories were not in an orderly sequence; she could not remember which one happened first, or second, or third.

45.      She told Hurtig "I don't know…I don't know if it's rape. I'm so embarrassed." She fears people will not believe her because she did not leave Thompson's house, even though she was drunk and had no means to leave. Bobbie is also afraid – she and Thompson had both accepted offers to work at the same law firm after law school, and Bobbie tells Hurtig she's afraid that if she says anything, she would be the one to lose her job. Her boyfriend, Guillot, is already an associate at the firm, adding more pressure.

46.      When Bobbie finally acknowledges that she may have been raped, Hurtig springs into action. Hurtig had not shared her own conclusion that Bobbie was raped because she did not want to influence Bobbie; Bobbie needed to reach it on her own. Hurtig tells Bobbie that she knows what to do and she will take care of everything. Hurtig calls the Lawrence Police Department's nonemergency number and says that her friend is ready to report a rape. She leaves her phone number. Officer Dan Affalter calls Hurtig back and speaks with both women. He asks them to meet him outside the Lawrence Memorial Hospital.

47.      Bobbie is hesitant. Hurtig encourages her to come forward. "Even if you don't want to end up pressing charges," Hurtig tells her, "you still have all the marks from this. Let's, let's just go. They can document it, and then if you don't want to press charges, then no. You don't have to. That's not an obligation." Bobbie agrees, and they go to the hospital so at least the evidence can be collected.

48.      Officer Affalter, along with Detectives Charles Cottengim and Kim Nicholson, are waiting for them when they arrive at the hospital.

49.      Bobbie speaks with Nicholson, who explains that Bobbie has three choices. Option one: the police would do nothing. Option two: the police would document the report but do nothing further. Option three: the police would do a full-scale investigation, including questioning

witnesses and collecting evidence. Bobbie chose option one — she does not want the police to do anything. But by this point, Bobbie had already given her cell phone to police when they pushed her to provide it. Nicholson promises to have it back to her soon.

50.     Bobbie had told Affalter that she had been raped the day before. She explained the details were blurry because she had been drunk at the time. she remembered telling the man she wanted to leave, and she remembered the man telling her she couldn't leave. She remembered waking up naked in his bed while he was having sex with her, and him holding her down after she told him "no." She remembered waking up again to him still having sex with her and pushing him off of her before she blacked out again. Despite the memories surfacing, Bobbie did not want to press charges. She was worried about how reporting a rape could affect her career. She told officers she did not want to press charges. Nicholson told Bobbie if she decided to proceed, she could come down to station later and give full statement.

51.     Bobbie allowed the police to look through her phone before going inside for a rape examination. Hurtig provided her phone to the police as well. Nicholson, Cottengim, and Affalter return to the police station and examine Bobbie and Hurtig's phones. They see the text messages Bobbie had sent Hurtig after the assault while she was still at intoxicated and at Thompson's house, telling her friend that she was in Joel's bed and that she'd slept with him. Trying to conceal her own humiliation, Bobbie also seemingly tries to reassure a shocked Hurtig: "It's all good . . .this was a fuck up though I literally made him stop having sex and was like" [sic] oh no what will Kriston say." At that point, based solely on the text messages that Bobbie sent while she was still intoxicated, detectives leaped to the conclusion that no rape had occurred. The "investigation" barely one hour old, instantly morphed into a focus on Bobbie's "false statements."

52.     Lindsie Ford, a friend of Bobbie's, had joined Hurtig and Bobbie at the hospital to provide support and reassurance. Ford, who, like Hurtig, was also a law student, had worked as a victim advocate at the Johnson County District Attorney's Office, and at other organizations dedicated to helping survivors of sexual and domestic violence. Ford immediately noticed that Bobbie seems very distracted and "flat," not at all like her usual energetic self. Lindsie noted that Bobbie displayed trauma symptoms similar to those that Ford had seen in many other victims.

53.     Terri Woodson, a trained SANE nurse at LMH, examined Bobbie. She collected physical evidence, mapped Bobbie's vaginal injuries on an anatomical diagram and took photographs of Bobbie's bruised neck and extremities. The vaginal area had a small tear and bruising, and Bobbie's arms and legs all had bruises or contusions.  At the end of the examination, the nurse asks Bobbie if she wanted to disclose the evidence collected as part of examination to the police. Bobbie said, "no," she did not. By the time the detectives return to the hospital, the women had already left. Nurse Woodson tells them that Bobbie had decided not to report the rape.

*Monday, October 1*

54.     When Thompson learns that Bobbie felt he raped her, he sends a text message asking her to meet with him to discuss things. They agree to meet at the law library on October 1. Thompson does not know she had spoken with the police.

55.     Lindsie Ford is working at the library's front desk when Bobbie walks in to meet with Thompson. When Bobbie tells her why she is there, Ford tries to talk her out of meeting with Thompson. Bobbie says she needs some closure; she must know what happened. Ford would later surreptitiously sit outside the room where Thompson and Bobbie were meeting. While she could not hear much of what was said, she could partially see into the room. She saw Thompson as

relaxed, sitting back in his chair. She could not see Bobbie. She heard Thompson raise his voice. She heard him say that Bobbie was making him feel like an abuser.

56.     Inside the room, Bobbie asks Thompson what had happened. How had she ended up in his bed that night? Thompson tells her that they'd been drinking and that the sex was consensual.  Bobbie asks how she had gotten the bruises. Thompson says he doesn't know. Bobbie is concerned that her boyfriend, Guillot, thinks the two of them had made a conscious choice to betray Guillot. But that was not true and Thompson knew that. Bobbie asks Thompson to tell her boyfriend that Thompson had taken advantage of her; that she was intoxicated and had not chosen to sleep with Thompson. He agrees, as long as Bobbie remains silent about what happened and to tell Hurtig to do the same. Thompson is not worried about Bobbie; he is worried about his reputation. Bobbie does not tell Thompson that she had spoken to the police.

57.     Ford sees Thompson and Bobbie leave the meeting. Thompson looked casual and relaxed. Later that night, Bobbie sends Thompson a text message saying that she just wants her boyfriend to be happy even if they no longer see each other.

### *Wednesday, October 3*

58.     Even though Bobbie had told the detectives she did not want to proceed with criminal charges, Detective Nicholson called her a few days later.  Bobbie said she'd thought about it and had spoken to the nurses, and reiterates her decision to not proceed.  Nicholson nonetheless asks to speak to Bobbie in person, and Bobbie agrees.  It was policy "per our captain" to document accounts from victims who do not want to proceed.

59.     Nicholson and Affalter drive out to Bobbie's house and interview her at length. At least nine separate times, Bobbie expresses that she does not want to pursue charges, explaining

that she fears doing so could ruin law school and her career.  "I just signed a contract . . .[and] I do not want to lose that job. I don't want to put any pressure on my employment situation."

60.     Nicholson asks Bobbie about the text messages, saying that it looks like Bobbie just regrets what had happened. "No," Bobbie interjects. "That is not what happened." She explains that she "play[ed] it off" initially in the text messages with Courtney because she was concerned about protecting her future job. "I just honestly want to move forward without any repercussions in my job."

61.     Nicholson interjects with the detectives' "point of view," telling Bobbie that "it happens a lot in college towns, just things like that where females mess up or males mess up and sleep with the wrong person."

62.     Nicholson told Bobbie that "it looks like you cheated on your boyfriend and you're like 'Oh, shit,' and then your friend was like 'Well, you were raped,' and that's why we were called. And it happens a lot, and we just like to clear it up so we don't have to do further investigation…"

63.     Nicholson expresses no concern for Bobbie's well-being and does not ask her how she is doing. Remarkably, she increases Bobbie's discomfort by telling her that she should let Thompson know that she'd spoken with the police.  "I'm sure he would want to know."

64.     Nicholson then tried to intimidate Bobbie, stating that merely listing Thompson in a police report would turn him into a "person of interest" and that the listing "would pop up" if someone ran "a criminal background check."  So, in a rape investigation, police "like to clear it up so [they] don't have to do further investigation." Nicholson then expressed concern for the potential impact of the investigation on Bobbie's assailant, stating that *"listing Joel as a suspect in a rape could ruin his career [and] future."* (Emphasis added)

65.     Nicholson told Bobbie "We're not, per your request we're not going to go out and contact him or anything like that."

***Wednesday, October 10***

66.     As Bobbie struggled in the aftermath of the sexual assault, she started working with a counselor, Merrill Evans.  On October 10, Evans, Hurtig and Bobbie had a meeting, and the topic of contacting the University's Office of Institutional Opportunity and Access ("IOA") came up. The three made a visit to the office and met with IOA staff, who explained the complaint process to Bobbie. The first step would be for Bobbie to make a statement. Since she had already briefly spoken to the police, IOA staff suggested notifying the police that Bobbie would be making that statement. That way, the staff explained to Bobbie, she would not have to talk about what happened more than once.

67.     IOA staff also encouraged Bobbie to call Officer Affalter and let him know she had contacted the office. During the meeting at IOA, Bobbie calls Affalter. She tells him she's met with IOA and was *thinking about* making a full statement to the police and *potentially* pursuing charges against Thompson. Bobbie indicated she was willing to meet with any LPD detective other than Nicholson and do a joint interview with the LPD and Title IX office. She tells Affalter that IOA will be in touch with the police to schedule a time for her to make her statement. Very late that same day, however, Bobbie cancelled the interview due to a family emergency she needed to attend to.

68.     Affalter emails Cottengim and Nicholson that Bobbie "is thinking of going ahead and making a full statement and wanting to pursue charges in this case." He stated he informed her that he and a detective should be at KU when IOA interviews her. He also stated that the "Title IX people will call dispatch with some dates and times that work for them to have a meeting."

69.     When he receives this email, Cottengim immediately sought the phone number of IOA investigator Kathryn ("Kate") Burns and called her. Burns told him Bobbie was willing to meet for a joint interview.

70.     Cottengim then spoke to Captain Heffley and shared his concerns about the "possible repercussions that could affect Joel Thompson as the reported suspect." Cottengim asked his supervisor if he could share information with KU. Cottengim does not tell Bobbie he will do this.

71.     Cottengim also began immediately interviewing witnesses, including two of Thompson's roommates and then Thompson himself.

### *Thursday, October 11*

72.     Thompson shows up to meet with Cottengim a few minutes after midnight. He tells Cottengim that the sex with Bobbie was consensual. At the end of Thompson's interview, Cottengim tells Thompson that he doesn't believe Bobbie and that if he can prove it didn't happen, he will arrest her.

73.     Cottengim interviews Guillot, who started the false narrative that Bobbie indicated she would not pursue charges against Thompson if she got him back as her boyfriend. This false narrative was contradicted by Bobbie's own text messages to Thompson, which stated that she cared so much about Kriston that she "want[ed] him to be happy whether that include[d] [her] or not."

74.     At school, Bobbie heard that the police were interviewing witnesses. Amid this, her stress intensified, and she worried about the impact that her reporting Thompson might have on her job offer and future employment.

75.     Cottengim and Detective Amy Price meet with Kate Burns, a Title IX investigator at KU's IOA office. When they met, Burns told the detectives that Bobbie did not want to pursue this matter at this time and therefore, she would not be taking any action. Cottengim tells Burns he has concerns and shows Burns the messages he took from Bobbie's phone. His "concerns," as stated in his police report, included "possible repercussions that could affect Joel Thompson as the reported suspect."

76.     After Cottengim interviewed Guillot, he interviewed Thompson for the second time. Thompson built further on the false narrative by stating that, as long as Bobbie could continue her relationship with Guillot, she would stop saying Thompson had taken advantage of her.

77.     Cottengim was not able to extract Thompson's messages from his phone that day.

**Friday, October 12**

78.     Bobbie calls Cottengim and tells him that she does not want any criminal investigation to go forward. She tells him her doctor advised her not to continue with the investigation due to the amount of stress it was causing her. People were asking her questions about the case, and Bobbie repeats that she doesn't want this to jeopardize her job. She tells him that she does not plan to pursue a complaint with IOA and she doesn't want to give any more statements. She asks Cottengim if he plans to talk to anyone else about the case. He lies and tells her he does not. Cottengim states in his report: *"The investigation will continue despite what I told Bobbie Horocofsky over the phone."* (Emphasis added).

79.     Cottengim interviews Alison Collins, a girlfriend of Guillot. She tells the detective Guillot was seeing Bobbie.

***Saturday October 13***

80.     Cottengim sent an email to Burns informing her that he spoke to Bobbie and that she no longer wanted to pursue charges and that she would not be contacting the IOA office.

81.     Despite Bobbie's intent not to move forward, Cottengim interviews Blake Stokes and Austin Jaspers, both friends of Thompson. Stokes turns over the text messages from Bobbie referring to "date rape."  He told Cottengim that both Bobbie and Courtney Hurtig (his girlfriend) believe that what happened with Thompson was a rape.  Jaspers stated that he heard "sex sounds" coming from Thompson's room the night that Bobbie was there.

***Wednesday October 24***

82.     After seeking advice from a professor, Bobbie decides to proceed with the Title IX complaint. Bobbie meets with Ms. Burns of the KU IOA office. She then provides a written statement, a log of events and a copy of text messages with Blake Stokes where she said Thompson had committed "date rape."

83.     Burns then discloses this information to Cottengim.

***Thursday, October 25***

84.     Thompson calls Cottengim and tells the Detective that IOA is investigating the allegations against Thompson.

85.     Cottengim emails Burns and tells Burns that Thompson had called him to inform him the IOA had opened an investigation, and asked if he would be able to get a copy of the interview of Bobbie.

86.     Burns sends Bobbie an email with an attached letter providing the Notice of Investigation and No Contact directive to Thompson. Burns did not provide a similar letter to

Bobbie, but instead writes in her email to Bobbie that the no contact directive is mutual and also applies to Bobbie. The email states that "both you and Mr. Thompson are prohibited from initiating, or contributing through third parties, to any physical, verbal, electronic, or written communication with one another, directly or indirectly."

87.     The October 25, 2018 Notice of Investigation and No Contact directive sent to Thompson stated that "the Office of Institutional Opportunity and Access (IOA) has received information that you may have engaged in conduct that violates the University's *Sexual Harassment Policy."* The Notice directed Thompson to attend a meeting on November 1, 2018 with the IOA. TheNotice also stated that "it is a violation of the KU *Discrimination Complaint Resolution Process* to retaliate against a person who files a complaint or against a person who participates in the IOA investigative process."

### Friday, October 26

88.     On October 26, Cottengim heard that Detective Affalter had received a message from Bobbie asking that Cottengim call her.  Cottengim does not return her call but instead records Affalter calling Bobbie back.

89.     Bobbie tells Affalter she has given a statement to IOA and was going forward with the Title IX investigation but did not want to pursue any criminal charges. She was very clear about that. But rather than terminating contact with Bobbie at that point, Affalter, who isknowingly furthering the "false statement" investigation, tells Bobbie that he really needs her to come to the police station, explaining that he hadn't a chance to record everything the first time hespoke to her. He states: "Would you be able to come in and just run through everything again withme? So it could be recorded this time?" Affalter tells Bobbie that it's best to get her statement "[w]hile it's still fresh" instead of "months down the road" if Bobbie ever did decide to pursue

charges. Affalter tells her that he "empathize[s]" with Bobbie, and she agreed to come in and give her full statement.

90.     Affalter does not tell Bobbie that he's recording their call.  He also does not tell her that there is no rape investigation, that she is no longer regarded as a victim and that she is instead now considered the "suspect."

91.     Leah Terranova, who is the KU Law School's Director of Career & Student Counseling Services, emails Bobbie and states she had been in touch with someone on the administration who told her about the incident involving Bobbie and another student, which has led to a formal investigation.

*Monday, October 29*

92.     Cottengim informs Burns that Bobbie has agreed to give the LPD a complete statement, that she does not want to pursue charges at this time, but does want to pursue a Title IX investigation. He states that he hopes Bobbie will sign a waiver allowing him to share the LPD reports with the IOA office.

93.     Bobbie meets with Affalter and Cottengim at the LPD, and she provides her full account. They record her statement. Unknown to Bobbie, they are not interviewing her as a rape victim. Instead, she is a target in their "false statement" investigation.

*Tuesday, October 30, 2018*

94.     Burns emails Cottengim about sharing of information between offices and offers to discuss this by phone or in person.

*Wednesday, October 31*

95.     Cottengim notifies Burns that he met with Bobbie on October 29 and she signed a waiver allowing the release of the LPD reports to the IOA office. He stated that he would work on getting everything that he can from the investigation to her.

96.     Burns specifically asks if he will be able to provide text messages and when he anticipated the investigation will be complete.

***November 5-7***

97.     Burns contacts Cottengim about the information he planned on sharing. Cottengim responded that he should be back on track soon.

98.     On November 6, 2018, Burns also provided Bobbie with links to the Discrimination Complaint Resolution Process and the Sexual Violence Procedure at KU for her reference.

***Wednesday, November 14***

99.     Bobbie contacted Cottengim to request the case number for the investigation. Cottengim returned her call and provided the case number. Bobbie reported to Cottengim that Guillot had threatened her employment at the law firm (where he was employed as an associate and she was then a law clerk) if she continued to pursue the rape case against Thompson.

100.     Bobbie meets with Ms. Burns of the IOA office and reports that Thompson is retaliating through Guillot by threatening her employment.

***Saturday, November 17***

101.     Burns then sends an updated respondent notification letter to Thompson. The letter informs him of Bobbie's allegation and stated: "Mr. Guillot advocated for her to drop the IOA investigation and that she 'be ready to deal with the repercussions of what [she] was doing because the

"other shoe hadn't dropped yet."" Ms. Horocofsky alleged that you are retaliating against her through Mr. Guillot as a third party."

### Monday November 19, 2018

102.     Cottengim emails Burns to set up a meeting with her at her office. They agree to meet the next day and Burns states she is looking forward to meeting with Cottengim again.

### Tuesday November 20

103.     Cottengim and Burns meet at the KU IOA office and discussed the LPD investigation for approximately three (3) hours. Cottengim allowed Burns to read and take notes from his report, documenting text messages recovered during his investigation. Throughout October and November, Cottengim and Burns had frequently exchanged emails, and it appeared that Burns was eager for Cottengim's information and was following his lead.

### Monday, November 26

104.     Bobbie contacted Cottengim and informed him she no longer consented to the LPD sharing her information with the IOA office.  Cottengim agreed to comply with her request.

105.     Cottengim did not tell Bobbie about his extensive contacts with Kate Burns and told her that IOA had only reviewed a couple reports in the case.

### Wednesday, December 5

106.     Burns contacted Cottengim for an update on the investigation and asked if Cottengim was able to verify if there were text messages "missing in the string we reviewed" as they had discussed. Cottengim responded to Burns' email, asking her to call him.

***Cottengim's Probable Cause Affidavit Reflects Detectives' Biased and Reckless
Investigation, Full of Intentional Omissions, Falsehoods and Targeting of the Victim***

107.     On December 5, 2018, Cottengim signed a probable cause Affidavit in which he
alleged and stated under oath that he believes Bobbie had consented to sexual intercourse with
Thompson and had falsely reported to police that she'd been raped. Cottengim's affidavit
relied almost entirely on what he "believed" about Bobbie's motives. He stated that she
reported she'd been raped to get back at Guillot after she found out he was having a relationship
with another woman at the same time as her.

108.     The affidavit was full of material and gross omissions, misleading statements, and
unsupported claims. It reflected the LPD's biased, incomplete and reckless investigation that, from
the beginning, had been aimed at clearing Thompson rather than discovering the facts. *Had the
affidavit contained accurate and complete information, it would **not** have supported probable
cause to arrest Bobbie.* If police had conducted a thorough, fair and unbiased investigation from
the beginning, they would have discovered that the overwhelming weight of the evidence
supported Bobbie. They would have discovered that her text messages sent to Hurtig while she
was still at Thompson's apartment reflected that she was still under the influence of alcohol and
was embarrassed, confused and unsure what to do next.  They would have discovered her assailant
had a history of sleeping with intoxicated women and that he'd been bragging about his intent to
have sex with Bobbie. The investigation by detectives was biased, incomplete and consisted of
deliberate, intentional and reckless failures to ascertain and/or document the facts. The affidavit
lacks probable cause on its face. In addition, when the unreliable and speculative statements,
including statements of the detective's "beliefs," are subtracted from the probable cause affidavit
and the exculpatory evidence is included, the affidavit utterly fails to support probable cause.
Exculpatory evidence and the reckless or intentional investigative failures include the following:

a.  Bobbie reported from the beginning, and consistently throughout, that she was too intoxicated to consent. Under Kansas law, engaging in sexual intercourse with a victim who is too intoxicated to consent constitutes rape under K.S.A. 21-5503(a)(2). Despite the centrality of this issue, none of the detectives ever made any effort to determine the level of Bobbie's intoxication or to determine whether she suffered an alcoholic blackout as she had described. Although the surveillance video from one of the bars clearly showed Bobbie stumbling and bumping her shoulder into the door frame as she entered, Cottengim did not include this key material fact in his affidavit. He made no effort to investigate the amount of alcohol she ingested even though that fact was undeniably material and even though he could have easily requested her credit card receipts, which reflected the purchase of numerous drinks. Cottengim also could have interviewed witnesses who saw that Bobbie was still in poor condition the next day. Cottengim also could have relied on numerous, highly material text messages exchanged among Thompson and his friends observing how "fucked up" Bobbie was. Inexplicably, Cottengim did not credit this evidence and instead repeatedly indicated in the affidavit his skepticism that Bobbie had "blacked out."

b.  Cottengim never investigated the red flags in Thompson's background even though Bobbie and other witnesses said he had a reputation for taking advantage of young women who'd had too much to drink. Even one of Thompson's casual girlfriends, Miranda Clark, indicated that she'd heard of "something occurring" between Thompson and another young woman, whose name she provided. Detectives were also told that Thompson had some type of "hit" or "to do" list of women he wanted

to have sex with, and that Bobbie was on it. Beyond obtaining a denial from Thompson, detectives made no effort to document or investigate this critical fact, and the affidavit made no mention of it. Instead, detectives were concerned about "possible repercussions" to Thompson.

c.      Given the allegations about Thompson, detectives inexplicably failed to carefully review or place weight on _his_ text messages. Those messages were both material and inculpatory of Thompson. Thompson clearly expressed his intent, while he and Bobbie and the other students were bar hopping, to have sex with Bobbie that night. He sent a series of crude texts, telling a male friend that Bobbie "was so fucked up," that Bobbie was "Kriston's side joint," and that he was going to be "fucking" Bobbie just so "he [Kriston] knows I can." As he and Bobbie continueddrinking, Thompson bragged to his friend: "I'm bout to see what she working with." Thompson's intent to have sex with Bobbie dated back months. During July 2018, Thompson and Guillot had exchanged crude texts about Bobbie, with Thompson bantering to his friend about "tak[ing] Bobbie Jo off your hands now I know she down for the team." They also joked about "tag team[ing]" her and doing a "train ride." Bobbie had no knowledge of these texts or that the two of them had even discussed her.

d.      The affidavit was silent on Bobbie's physical injuries, all of which corroborated her account. Inexplicably, detectives had never asked her to release the results of her rape examination to them, including the diagram and photographs that documented her injuries. She had a tear in her vaginal opening as well as a small bruise. Her neck had bruising, which would be consistent with the "pressure" she remembered

feeling during the assault, and her arms and legs all had bruising and contusions. Bobbie had none of those injuries prior to that evening. Detectives never asked Bobbie to consent to a release of her medical examination report and photos, nor did they interview either of the SANE nurses, who would have told them that Bobbie's injuries were consistent with the sexual assault she described. Detectives had notice that Bobbie had injuries, and their failure to gather and document that evidence was deliberate.

e.       Detectives did not attempt to seek Bobbie's consent to have the biological material in the rape kit tested.  Although Thompson admitted that he'd had sex with Bobbie, he also indicated that he had stopped after a few minutes after Bobbie told him to stop.[1]  The rape kit was eventually tested during Bobbie's criminal case, and, significantly, a compound found in seminal fluid was detected on a swab.

f.       Detectives failed to conduct key interviews and made no mention of material, exculpatory facts of which they had clear notice or which were available to them. Bobbie's friend Courtney Hurtig was with Bobbie for much of the weekend, and noticed Bobbie's emotional distress and physical injuries, including bruising. At the hospital, Hurtig told police about Bobbie's distress and her injuries, but they made no attempt to follow up or include these facts in the affidavit. Detectives also failed to interview: (1) Lindsie Ford who was at the hospital with Bobbie and made similar observations; (2) Amy Adams, a friend who saw Bobbie early the next morning, and noticed that Bobbie seemed troubled and distracted; (3) Bobbie's

---

[1] Thompson told the KU investigator the same thing, and the KU findings stated Thompson"stopped prior to reaching climax."

medical providers, including Dr. Pavika Saripalli who diagnosed Bobbie with PTSD and treated her ongoing symptoms of anxiety, insomnia, flashbacks, mood changes, and hypervigilance. Dr. Saripalli was the doctor who had advised Bobbie that proceeding with her complaint against Thompson might be too stressful for her to handle. Bobbie had told this to Cottengim, but he chose, without basis, to disbelieve Bobbie's report and never contacted or interviewed Dr. Saripalli.

*December 6-12*

109.    Still unaware that both the LPD and KU were treating her as the suspect, Bobbie emails Burns regarding the KU investigation, requests information about the availability of evidence and interviews, and also provides her with the names of two additional witnesses.

*Monday December 10*

110.     KU Law School Associate Dean Lumen Mulligan spoke with Professor Valdez about the investigation and then emailed Bobbie about his conversation with her. Mulligan informed Bobbie that he has known Thompson for his entire law school experience, that Thompson "related his version of the events" to Mulligan, and that "the police opened a false claim investigation" against Bobbie. Mulligan informed Bobbie he had reported this information to the IOA, which he understood to be a confidential investigation, and that he was surprised when two professors showed up in his office with the notice of investigation and the names of the persons involved. Mulligan then reported all of the one-sided information he had to Law School Dean Mazza and Associate Dean Kronk-Warner.

*Thursday, January 3*

111.    Burns extends the 60-day timeframe for the IOA investigation and notifies Bobbie of the extension.

*Monday January 14*

112.　Bobbie contacts Leah Terranova at KU law school to inquire about any overlap with her class schedule and Thompson's. She explained that she was taking 18 hours that spring semester due to having to drop courses in the fall, and that many of the courses were required for her to graduate. Bobbie notified Terranova as the Director of Career & Student Counseling Services because she was already aware of details of Bobbie's situation and she was not comfortable contacting others in the law school unless absolutely necessary.

*Friday, January 25*

113.　Cottengim obtains a warrant for Bobbie's arrest for the felony crime of providing false information to a police officer. Bobbie is unaware of Cottengim's actions and is trying to focus on starting the spring semester at law school.

*Monday, January 28*

114.　Cottengim employs a ruse to lure Bobbie to the Lawrence Police Department so that detectives can arrest her.  He calls Bobbie and says he received an anonymous note about her rape. But he can't decipher it. He asks Bobbie to come to the police station and help him. She says she will. He does not tell Bobbie about the arrest warrant. Instead, he tells her not to worry, it was nothing "bad."

*Wednesday, January 30*

115.　As requested, Bobbie goes to the police station with her care advocate, Merrill Evans. Cottengim then tells Bobbie that he lied to her and that he has a warrant for her arrest for falsely reporting a rape.  He does not immediately tell her about her Miranda rights. He tries to get

Bobbie to admit that she made a false claim. He tells her that he does not believe she was raped. Bobbie remained adamant, telling Cottengim and another detective, Amy Price, that "this did happen" and that her "story had not changed from the very beginning."

116.     Cottengim then reads Bobbie the Miranda warnings and tries to get her to admit she made a false claim again. He relies on the false narrative and suggests she had been scheming and that it "appeared as though she was using the threat of rape to get what she wanted." Bobbie responded firmly: "No, sir." She tells Cottengim that he's wrong. Bobbie asks Cottengim why he couldn't have just told her the truth about the warrant; that she has class that afternoon. He does not answer her question.

117.     The police put her in handcuffs. She is forced to wait in the lobby while Cottengim and Price bring up the car. They place her in the police vehicle and transport her to the detention center, where she is fingerprinted and processed. Bobbie calls Lindsie Ford and gets her help to secure bond money so she can be released.  Bobbie is detained and remained in custody the entire afternoon, missing her classes and dealing with a trauma that had been totally unexpected.

118.      That same day, Cottengim emails Burns and asks her to call him that afternoon.

*February 13*

119.     Bobbie appeared in Douglas County District Court and was provided with a copy of the Complaint filed against her.

120.     Bobbie was then required to provide information about the criminal prosecution as part of the character and fitness disclosure requirement of the law school, as requested by Associate Dean Kronk-Warner and Leah Terranova.

*February 19 - March 13*

121.    After learning that witnesses whose names were provided to IOA in connection with the sexual assault that occurred on Sept. 28, 2018 had not yet been contacted or interviewed. Bobbie communicates with Burns regarding the investigation and schedules a follow up meeting.

**March 26**

122.    Bobbie filed a supplement to her Title IX complaint, adding specific claims about Quinton Lucas. Her supplement was made in person and through an email to Burns, with a "cc" to Michael Leitch. Along with a narrative description and her statement, she sent texts by Blake Ronnebaum and a statement by Ronnebaum who witnessed the interaction. She also pointed out that at the beginning of the semester, Lucas had joked in front of his class about the "#metoo" movement.

123.    IOA never investigated Bobbie's March 26, 2019 supplemental claim.

**April 17**

124.    Bobbie withdraws from some of her law school classes due to the stress of the case and the impact on her health. Terranova informs her that Professor Drahozal and Lucas had expressed that Bobbie was still on their rosters.

**May 1-7**

125.    Bobbie and Burns communicate about reviewing Bobbie's statement provided to the IOA.

**Wednesday, June 5**

126.    On the first day of her preliminary hearing, Bobbie learns she has been charged with two additional counts of falsely reporting a felony crime. She now faced up to seven to twenty-three months in prison for each count.

*Wednesday, June 12*

127.     At the conclusion of the hearing on June 12, 2019, the district court, remarkably, found probable cause to support the charges, relying largely on the correct spelling in Bobbie's early morning text messages to Hurtig, while also failing to note that smart phones all have "auto correct" and would likely fix any spelling errors. The litigation continues for months, with the filing of motions and responses by both sides.

*Monday, July 1*

128.     Bobbie emails Burns about the status of the IOA investigation and the release of the final report, since it had been 8 weeks since they last spoke and over 8 months since the investigation began.

*Tuesday, July 9*

129.     The IOA issues its report of its investigation which concluded that Bobbie had made a false complaint, engaged in "serious misconduct" and referred her to the Office of Student Conduct for further review.

130.     The July 9, 2019 report made numerous references to "witnesses" but no specific witnesses were identified in the report as having been interviewed.

131.     Like the Lawrence Police Department, the Title IX investigator made a finding that Plaintiff had filed a "false complaint" and referred this "finding" to the Office of Student Conduct and Community Standards to "determine whether a policy violation occurred regarding the filing of a false complaint."

*October 29, 2019*

132.    With little warning, the District Attorney filed on October 28, 2019, a motion to dismiss the case against Bobbie. No explanation was provided. On October 29, the district court dismissed with prejudice all charges against Bobbie. The case is over. A couple of weeks later, Bobbie learns that, shortly after the case against her was initially filed, some detectives had been cheering that they "finally got our false reporter," knowing that such a false report case would likely discourage women from reporting.

**LPD's responsibilities and conduct**

133.    It is well recognized that a police department that pursues charges for a "false report" leads to a "chilling effect" and prevents survivors across the county, especially college students, from reporting assault as it is not safe to do so.

134.    It is also well recognized that untrained investigators easily misinterpret a sexual assault survivor's response shortly after an incident because trauma manifests in many different ways and often the victims' account of the assault changes as they remember pieces of it. They may also act in unexpected ways as a result of the trauma.

135.    Throughout the case, the detectives showed startling solicitude for Thompson but indifference or even hostility toward Bobbie. Even though Thompson was the alleged assailant, Cottengim shared his perceptions of the case (that he hadn't yet investigated) with Thompson, telling him that he did not believe Bobbie and that if he could prove she was lying, he would arrest her. He made clear to Thompson that the investigation of sexual assault allegations was a task to be dispatched quickly, stating: "I don't want to drag this out forever. And I…want to document the best I can, so that if it didn't happen, it didn't happen. I'm fine with it."

136.    The failure of the LPD to take sexual assault cases seriously and conduct fair and thorough investigations has led, predictably, to poor statistics and a low level of protection to

women in the community who have been sexually assaulted. In 2018, Lawrence police made an arrest in only 13.8% of reported rape cases, 1% behind the state average. In the previous two years, fewer than 5% of LPD sexual assault cases led to an arrest.  Bernard, "Lawrence Police Cannot Be Trusted to Investigate Rapes of KU Students, Women Say," Kansas City Star, Dec. 8, 2018, https://www.kansascity.com/news/local/crime/article237679439.html.    Nationwide, the Bureau of Justice Statistics found a higher arrest rate nationally – that about 20% of reported sexual assaults led to an arrest.

137.    Moreover, interviews with other sexual assault survivors in Lawrence (including plaintiff's witnesses Jane Doe 1, Jane Doe 2, and Jane Doe 3) all show the same deliberate and/or reckless investigative omissions, inexplicable failures and deliberate misconduct that characterized Bobbie's case, including but not limited to: the deliberate and persistent failure to properly investigate sexual assault allegations made by women; the deliberate and persistent failure to properly collect, document and preserve physical evidence in sexual assault cases; the deliberate and persistent failure to properly gather and timely document witness accounts in sexual assault cases; the deliberate and persistent failure to investigate anything about the alleged assailant in a sexual assault case, including the background of the alleged male assailant; the deliberate, persistent and baseless rejection of credible accounts from women who have been sexually assaulted; the deliberate and persistent failure to conduct investigations free of gender bias; the deliberate and persistent characterizing of women as "liars" and "unreliable" witnesses; the deliberate, persistent and inaccurate characterizing of sexual assaults on women as simply "sexual experimentation" or "regret sex"; the deliberate and persistent assignment of detectives to sexual assault cases when those detectives are wholly untrained in the handling of such investigations; the deliberate and persistent use of rudeness, insults and manipulation by detectives as tools to discourage women from proceeding with their complaints of sexual assault; the deliberate and

persistent handling of sexual assault investigations in a manner intended to reduce or eliminate any possibility that the case would be charged and would almost certainly be rejected by the District Attorney based on the failure to collect available and material evidence; the deliberate and persistent use of techniques such as "foot dragging" and neglect to drag out investigations and reduce the likelihood of criminal charging; the deliberate and persistent manufacturing of baseless reasons to terminate a sexual assault case without adequate or proper investigation of the woman's allegations; and the deliberate and persistent effort to develop a "false statement" case as a means to discourage further reporting of sexual assaults by women who have actually been sexually assaulted. At the same time that detectives have deliberately and persistently discouraged and rejected sexual assault allegations brought by women, the LPD has displayed immense solicitude and protectiveness toward alleged male assailants, and instead of investigating them, has instead assured them that the claims of their female victims are false or are unlikely to result in charges.

138.    The failure of the LPD to properly address sexual assault is due to a lack of adequate policies and officer training as well as a reliance on longstanding customs and the embedded biases of police, detectives, their supervisors and the LPD.

139.    None of the three officers who investigated Bobbie's case had any specialized or up-to-date training in conducting sexual assault investigations, interviewing sexual assault victims or dealing with anyone who had suffered this type of trauma. In contrast, most police departments have specialized units dedicated to sexual assault victims, as it is widely known that inadequate

Case 2:20-cv-02529-JWB-KGG  Document 25  Filed 03/04/21  Page 37 of 73

training can contribute to harmful practices and a misperception that victims lie about sexual assault.

140.    The impact that trauma has on a victim's brain can affect how and when memories surface and can cause inconsistencies in the victim's account. These problems may be compounded if alcohol is involved or if the victim knows her assailant.

141.    Joanne Archambault, who spent decades in law enforcement with the San Diego Police Department, is a nationally recognized expert and police trainer on conducting proper investigations of sexual assaults. She teaches that trauma victims may react in many different ways, and that some of their behaviors may seem unusual or unexpected. Investigators who lack proper training may misinterpret these behaviors. After an assault by an acquaintance, it is common for the victim's initial disclosure to be inaccurate or minimized. Also, the facts, as provided by the victim, may change over time.  This does not mean the victim is lying. The victim of any sexual assault is also typically dealing with powerful emotions, reactions and symptoms of trauma, including mood instability, depression, sleep disturbances, nightmares, flashbacks, hypervigilance and ongoing emotional stress.

142.    The detectives who investigated Bobbie's allegations lacked necessary training and understanding. They had never received specialized law enforcement training on sexual assaults or even attended a seminar by a SANE[2] nurse who could address the neurobiology of trauma and how the trauma of sexual assault can affect each victim differently.  Most notably, the LPD lacked a specialized unit – which most medium-sized and larger departments have – to address sexual assault cases. Such units are typically staffed with personnel who have specialized training and knowledge of the needs of sexual assault victims and the particular demands of such cases.

---

[2] S A N E stands for "Sexual Assault Nurse Examiner."

143.    In the absence of proper training, supervision and policies, the detectives deliberately and recklessly adopted the position that Bobbie had not been sexually assaulted. They then proceeded to aggressively target her for filing a "false report" even though she had *repeatedly* told police that she did not want to pursue charges and even though her interviews occurred at police urging because they claimed they needed a complete, recorded account. Instead of seeking out specialized expertise or consultation to handle the case, the detectives deliberately conducted a biased and reckless investigation, repeatedly burying or disregarding the real facts in favor of manufacturing a case against Bobbie based on the false narrative that she was taking revenge after the break-up with her boyfriend, Guillot. In adopting this false narrative, police disregarded overwhelming evidence of Bobbie's true motivations, which were, initially, to preserve evidence, and then to pull back from pursuing any charges against Thompson as she did not want to harm her career or professional relationships.

144.    The constitutional violations that caused the injuries suffered by Bobbie flowed directly from: (1) the LPD's failure to provide proper and necessary training for their officers and detectives in the handling of sexual assault cases; (2) the LPD's failure to have adequate policies, practices and customs that would have required proper training and guidance for handling sexual assault cases; and (3) the failure to provide adequate supervision to deter detectives from conducting reckless, biased and grossly inadequate investigations aimed not at finding the truth but at protecting the perpetrator.

145.    The City of Lawrence, through the LPD and its encouragement, ratification and/or approval of the aforementioned policies, customs and/or practices, in spite of their known and obvious inadequacies and dangers, has been deliberately indifferent to the constitutional rights of

Bobbie Horocofsky and other victims of sexual assault, in violation of the Fourth and Fourteenth Amendments.

146.     Defendants' actions deprived the plaintiff of her rights, privileges or immunities secured by the Constitution or laws of the United States. The LPD's policies, customs and/or practices were the moving force behind the violation of Plaintiff's federally-protected rights.

### The University of Kansas' responsibilities and conduct

147.    Title IX, 20 U.S.C. § 1681(a) states:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance.

148.    A school that receives federal funds violates Title IX and is subject to a private action for damages where the school is "deliberately indifferent" to known acts of discrimination against students. *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988).

149.    The protections of Title IX extend to situations where the school is deliberately indifferent to the sexual harassment of a student by another student. *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999).

150.    The protections of Title IX extend to situations where the school is deliberately indifferent to a report of sexual assault which causes harassment or makes a student vulnerable to it. *Farmer v. Kansas State University*, 918 F.3d 1094 (10th Cir. 2019).

151.    The KU Office of Institutional Opportunity and Access (IOA) is the KU office responsible for investigating complaints of discrimination and sexual harassment, including all forms of sexual violence (rape, sexual assault, domestic violence, dating violence, stalking, etc.).

152.    KU's employees were operating within the scope of their employment at all times relevant with regard to the events described herein.

153.    KU has a specific history of publicly reported sexual assaults of women.

154.    The U.S. Department of Education had issued guidance to the KU that it should "promptly" take steps to protect the complainant once it had notice of a sexual violence allegation, by imposing interim measures that may include a "no-contact order," academic accommodations and even including the suspension of the assailant.

155.    KU has policies that state sexual harassment, sexual violence and sexual misconduct are a form of sexual discrimination and are not tolerated at the University. KU affirmatively states that it is committed to the safety and well-being of every member of its community and encourages individuals who experience sexual violence and sexual misconduct to report the incident and seek help. The IOA office informs students that they can choose who to talk to, what information to share, what support resources to use, and whether to go to law enforcement. The IOA office informs students that they determine if they want to file a formal IOA complaint. The IOA office informs students that it is able to offer interim measures to assist and prevent harm to a victim of sexual violence and sexual misconduct, and that these interim measures are available regardless of whether the student chooses to file a criminal or IOA complaint and regardless of whether the student chooses to participate in a criminal or IOA investigation.

156.    KU has policies that prohibit retaliation against those who file an IOA discrimination/harassment complaint or who participate in an investigation of a complaint. The anti-retaliation policy identifies conduct such as phone calls, e-mail or other attempts to discuss the complaint, as well as disciplinary action, harassment, unsupported evaluations, or other adverse

changes in the conditions of the educational environment as retaliation. The policy states if a student believes she is experiencing retaliation in any form to notify the IOA office and the IOA will respond promptly to all allegations of retaliation.

157.    KU has a Code of Student Rights and Responsibilities, adopted and enforced by the University of Kansas, that defines its jurisdiction to apply to behavior not only on University premises and at University-sponsored activities, but also to off-campus conduct *"when the behavior affects the on-campus safety of a member of the University community or University operations.* (Emphasis added).

158.    Section VI of the Code of Student Rights and Responsibilities governs Non-Academic Misconduct and provides that "students and organizations are subject to disciplinary action for violations of laws, published policies, rules and regulations of the University and Kansas Board of Regents," including specifically, "where the university has jurisdiction," violations of KU's sexual harassment policy at http://policy.ku.edu/IOA/sexual-harassment and discrimination policy at http://policy.ku.edu/IOA/discrimination-complaint-resolution, among others.

159.    The Code of Student Rights and Responsibilities also subjects students and organizations to disciplinary action for retaliation, which is defined as "any behavior, direct or indirect, taken to or attempt to harass, intimidate, or improperly influence any individual associated with the student conduct process or any other University grievance or complaint process.

160.    The Code of Student Rights and Responsibilities also subjects students and organizations to disciplinary action for Threatening Behaviors, Intimidation, Bullying and Cyberbullying, Stalking, and Hazing.

161.    The Code of Student Rights and Responsibilities also subjects students and organizations to disciplinary action for Intimate Partner/Relationship Violence, which is defined

"to mean any physical, sexual, or psychological harm against an individual by a current or former partner or spouse of the individual. It would include stalking, dating violence, sexual violence, or domestic violence."

162.    Pursuant to and as a result of these policies, Defendant KU had disciplinary authority or control over students who live off campus as well as student conduct issues that arise off-campus.

163.    The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act requires KU to annually publish the number of criminal sex offenses that were reported to campus security authorities or local police agencies and that occurred on or and off campus. 20 U.S.C. § 1092(f)(1)(F)(i).

164.    Defendant's sexual harassment policy and its discrimination policy clearly cover "off-campus" conduct that has continuing adverse effects on campus, in the context of an education program or activity. KU has substantial control over conduct that occurs off-campus, that violates its policies, and affects its educational programs and activities. KU has control over both Plaintiff's assailant, who was a KU law school student, as well as the law school's programs and activities.

165.    KU is responsible for enforcing these policies and ensuring that its employees are adequately trained to follow these policies.

166.    According to the KU IOA policies, the IOA complaint investigation process is independent of any other complaint resolution process, including the choice to file a criminal complaint with the appropriate law enforcement authorities or not to do so.

167.    Unbeknownst to Plaintiff, in March 2015, KU had entered into an agreement or a memorandum of understanding (MOU) with the City of Lawrence law enforcement relating to training and coordination of investigations in cases involving sexual violence, protocols for

referring complaints, and an agreement to share information and to "communicate regularly" about investigations.

168.    The Law School at the University of Kansas had a policy, custom and practice of sponsoring events for its students on and off campus at which significant quantities of alcoholic beverages were served and tolerated; students were encouraged to participate in these events. These sanctioned events include:

a.    Career Services Events, such as the one that took place on January 23, 2017, which involved a 1L Law Clerk Panel Discussion at the Law School with an open bar afterwards at the 23rd Street Brewery where students could meet the panelists at the reception.

b.    Spring Law Prom, sponsored by SBA and KU Law, which had an open bar, with numerous incidents involving alcohol in 2017 and 2018.

c.    KU Law Student Bar Association sponsored events, such as weekly events at various bars around Lawrence that involved drinking alcohol and that regularly got out of control. These events were advertised on the law school Facebook pages and to the public.

d.    Events hosted and sponsored through the Law School Dean's office, such as the KU Law Diversity & Inclusion Social at Johnny's North in Lawrence, Kansas on September 27, 2018 between the hours of 5pm and 7pm, which provided free beer to students.  This event, and others was published in the KU law School calendar.

169.    KU promoted its events on Facebook, through emails to students and in the law school itself.  KU's promotion of the events, which encouraged drinking by offering free alcoholic beverages to students, led to the September 2018 night of bar-hopping and the rape.

170.    Upon information and belief, KU administrators or mandated reporters were aware of prior reports of sexual assault or sexual misconduct involving Thompson, but did nothing; discovery is needed to confirm this allegation which would support KU's actual knowledge that Thompson had sexually assaulted, raped or harassed other female students before his assault of plaintiff.

171.    Upon information and belief, the KU law school knew that Thompson had angry or violent confrontations in conjunction with these law school sponsored or hosted events. For example, at Law Prom in the Spring of 2018, there was a reported incident involving Thompson and a female student in which Thompson confronted her somewhat angrily, told her that she did not need to "perpetuate a narrative wherein [he] was a predator," and she responded that he did not seem to need [her] help with that. And on October 5, 2018, at an SBA event off-campus, Thompson had a physical altercation with another law student.

172.    KU's law school was aware of Bobbie's anxiety, panic attacks, and the demands of the IOA investigation upon her time and emotional state. Following her IOA contact, Bobbie still had to attend law school classes in the same building at KU where her student assailant continued to attend law school classes, making her vulnerable to continuing harassment.

173.    After it became known in the law school that Bobbie had reported the rape to the IOA and the LPD, Bobbie dropped some of her classes in the fall of 2018, as well as in the spring of 2019. Some of her law school professors and an administrator were pressuring her to drop out of school completely.

174.    The July 9, 2019 "findings" by the IOA reiterated the false narrative that the Lawrence Police Department adopted in October 2018 about Plaintiff's alleged "motivation to report Thompson."

175.    Bobbie exercised her right to appeal to the retaliation to Provost and Executive Vice Chancellor. In the appeal, she identified errors created a substantiated bias in the investigation and demonstrated material deviations from established procedures, including the following:

a.    Extensive collaboration between Lawrence Police Department Detective, Charles Cottengim, and IOA investigator Kate Burns, specifically that the IOA report notes Cottengim contacted Burns seven times to share information with IOA, which eroded the fairness of the IOA investigation and severely violated Bobbie's rights.

b.    Failure to review or interview important and essential witnesses whose names and contact information were provided to IOA; Bobbie provided a detailed list of seventeen witnesses important to the investigation. Of these seventeen witnesses, only four were contacted or interviewed by IOA, and only three were included in the final report. In addition, the IOA report gave no weight to credible testimony provided by these witnesses which was supported by physical evidence.

c.    Failure to review medical documentation and to accommodate Bobbie's disability throughout the complaint process; the University's indifference to this trauma created a hostile environment for Bobbie, resulting in significant harm.

d.    Failure to investigate retaliation and ongoing harassment against Bobbie by Thompson and by the University of Kansas.

176.    Plaintiff also stated in her appeal that she was harassed by the perpetrator throughout the adjudication process, creating a retaliatory and hostile environment which was not recognized nor addressed by IOA. The perpetrator utilized his friendship with Kriston Guillot, a former friend and colleague of Bobbie, to intimidate and harass the her.  Guillot confronted Bobbie and asked her to "end this investigation or else you will lose everything." Although Bobbie

reported the harassment to the IOA investigator, no steps were taken to end the harassment. Guillot's conduct was not fully reviewed or investigated, which created further harm to Bobbie and contributed to the erroneous findings.

177.    In her appeal, Bobbie stated that during the pendency of the eight-month long Title IX investigation, Bobbie was harassed by Thompson through Guillot and when she informed the IOA of this harassment and retaliation, the IOA failed to address the complaint or take any appropriate remedial action in response to her complaint, evincing deliberate indifference to the retaliatory conduct.

178.    Bobbie informed the IOA investigator that she suffered from generalized anxiety disorder, flashbacks, nightmares, and panic attacks which progressively worsened after the sexual assault as she regularly saw her perpetrator on campus, on an almost daily basis in the fall of 2018. Despite knowledge of this information, no actions were taken by the IOA to protect her from further harm and resulted in Bobbie's withdrawal from some of her courses and delayed her graduation.

179.    The University of Kansas' policy on sexual misconduct states that all cases should be resolved within sixty days, but, in this case, the investigation took more than eight months, which caused ongoing distress and negatively affected Bobbie's mental and physical health and academic performance.

180.    KU has conducted IOA investigations involving students who were raped or involved in off-campus sexual assaults on numerous occasions, some of which have led to serious disciplinary action toward the attacker, including expulsion, stemming from off-campus sexual misconduct.

181.    In response to her appeal, KU Interim Provost and Executive Vice Chancellor Carl Lejuez rubber-stamped the KU IOA findings as "reasonable." The Interim Provost also bought into the collusive findings of the LPD and KU, stating "Given IOA's findings as to your previous sexual relationship with Mr. Guillot, your desire to continue your relationship with Mr. Guillot, and your previous and ongoing workplace relationship with him, IOA's conclusion was reasonable."

182.    Like the LPD, KU was deliberately indifferent to Plaintiff's rights as evidenced by the following:

a.    Failing to conduct a specific investigation of her sexual assault allegations;

b.    Failure to investigate her level of intoxication;

c.    Failure to consider her ability to consent based on her level of intoxication;

d.    Failure to investigate Thompson's background and conduct;

e.    Failure to investigate Bobbie's injuries or ask for medical report/photographs from SANE exam;

f.    Failure to thoroughly review Thompson's text messages or accord weight to his admissions that he knew Bobbie was intoxicated;

g.    Little or no meaningful consultation with SANE nurses;

h.    Failure to interview witnesses who would corroborate Bobbie;

i.    Failure to interview Bobbie's doctor, who would have corroborated Bobbie's PTSD and that she had advised her to consider not proceeding with police because of stress.

j.    Failure to provide regular updates on the status of its investigation to Bobbie.

k.      Failure to notify Bobbie that she was the subject of the investigation, not Thompson.

183.    KU's concealment of the actual focus of its investigation amounted to deliberate indifference to the rights of the Plaintiff under Title IX, by deliberately misleading her.

184.    KU responded with deliberate indifference to Bobbie's reports of rape by not performing an independent, unbiased investigation and instead conspiring with the LPD to accuse her of making a false report.

185.    KU law school endorsed Plaintiff's assailant prominently on its law school advertisements, promotional materials and posters displayed in the law school, which demonstrates its deliberate indifference and emboldened Thompson to influence professors and administrators in his favor.

186.    Plaintiff also was subjected to intimidation from law school professors as well as Thompson's roommates and friends who were KU law students and who were advocates for her assailant. Plaintiff was forced to endure an educational environment that constantly exposed her to potential encounters with her assailant, his roommates and his friends, or caused her to miss classes out of fear of running into them in the fall of 2018.

187.    Plaintiff secluded herself from friends, and withdrew from KU activities in which she had previously taken a leadership role.

188.    Bobbie had qualified for the KU moot court team and ensuing competition, but was unable to attend or compete due to the discrimination and harassment she was subjected to.

189.    University of Kansas Professor Quinton Lucas referenced Title IX during a small Administrative law class in which the Bobbie was present. After making a joke at the beginning

of the semester about the #metoo movement during the February 5, 2019 class, Mr. Lucas stated in his opinion the Title IX process regarding sexual assault on campus should be abolished, stating he thought the District Attorney's office should handle sexual assault allegations on campus because they were 'best suited.' Mr. Lucas then used the Bobbie Horocofsky by name in a hypothetical example stating the University could not 'kick her out' without due process and made comments directed towards the ongoing IOA investigation. By doing so, Mr. Lucas created or contributed to an atmosphere that caused her to feel very uncomfortable, vulnerable, anxious and targeted.

190. As a result of this conduct which contributed to the harm and by failing to protect her from further harm, Bobbie was unable to return to her spring 2019 Administrative Law course and ultimately formally withdrew from the class. She also had to withdraw from another class, took incompletes in two other classes and was not able to graduate on schedule in May 2019.

191. The law school is supposed to provide a setting free of harassment where anyone - and most especially a complainant - can feel safe and able to pursue their academic goals.

192. Although documentation of this retaliation was provided to the IOA investigator during an interview on March 14, 2019, Professor Quinton Lucas' conduct was not reviewed or mentioned in the final report which created further harm to Bobbie and further demonstrates an incomplete and biased investigation.

193. KU's response was clearly unreasonable in that it continued to advocate and promote Bobbie's assailant, while, at the same time, focusing its efforts on investigating her for an alleged false report. Every day at the law school, Bobbie had to walk by a poster with a picture of her assailant that was used to promote the law school. The continuing harassment and

endorsement of her assailant prevented Bobbie from seeking help from the law school administration.

194.     KU's deliberate indifference caused Bobbie to withdraw from participating in educational opportunities, taking incompletes for her courses in the Fall of 2018, and eventually withdrawing from classes completely in the Spring of 2019, which was to be her final semester of law school.

195.     KU refused to investigate the off-campus rape and instead focused its investigation on Bobbie. By refusing to investigate off-campus sexual assaults such as the assault on Bobbie, KU makes students, like Bobbie more vulnerable to rape because it sends a message that students can rape other students with no fear of school disciplinary action.

196.     KU's practice ignores the reality that many off-campus sexual assaults adversely impact the on-campus educational environment for victims, just as it did Bobbie. KU sent a message to male law students and emboldened them with the knowledge that they can rape other students off campus with no fear of school disciplinary action.

197.     On or about November 1, 2019, Bobbie filed another formal complaint with the IOA making claims of sex discrimination and retaliation. This complaint stated that the harassment, discrimination and retaliation all began after Bobbie filed her first Title IX complaint, which was based on sex and falls under Title IX. She referenced her October 2018 complaint and her supplemental complaint in March 2019 as protected activity. She alleged that the nature of her March 2019 supplemental complaint and the November 2019 complaint were retaliation and continued hostile educational environment claims that fall under Title IX. She stated her assailant seemed to be exalted and held up as a role model by KU and its law school, as his face appeared in KU media in admissions, and on marketing materials posted on bulletin boards in the school.

She alleged KU failed to properly investigate her complaint, ignored critical evidence and caused her to suffer mental and emotional harm, further resulting in severe physical illness. She alleged that instead of attempting to aid and support her, representatives of the Law School urged her to drop out and made it difficult for her to obtain accommodations to finish school.

198.    On December 5, 2019, KU administratively closed her complaint without an investigation. In its letter notifying Plaintiff of its action, KU's Title IX Director concluded the conduct in her complaint was not based on Plaintiff's sex or an attempt to harass or to retaliate against her.

199.    KU failed to provide adequate supervision, warnings, training, guidance and education to its employees and students in the law school. The likelihood of such misconduct was so obvious that KU's failure amounted to deliberate indifference to the rights of Plaintiff.

200.    KU then subjected Bobbie to a student conduct hearing, a proceeding at which she risked expulsion from the University.

201.    KU's deliberate indifference caused Plaintiff to exhibit symptoms of post-traumatic stress disorder (PTSD) and become depressed and withdrawn.

202.    KU's policy of cooperation and collusion with the LPD caused harm to Plaintiff, including the charge of making a false report and the ensuing student conduct violation which threatened her law degree, her future as a lawyer, her job and her reputation.

203.    The KU investigation was tightly intertwined with the LPD investigation, and the two agencies moved in lockstep, with frequent communication and information sharing between Cottengim and Burns. KU adopted the LPD's near immediate conclusion by police that Bobbie was "lying," prior to any investigation. The final conclusions of both entities rested almost entirely on Cottengim's "beliefs" about Bobbie's motives, which draw from the age-old stereotype that

Bobbie was a "woman scorned" and was seeking revenge. Cottengim's "beliefs" were adopted wholesale by KU. Those "beliefs" were not rooted in the evidence or any understanding of how victims react to sexual trauma. Instead, Cottengim reached conclusions based on his own (and his colleagues') biases, and KU endorsed those conclusions.

204.    Throughout the two, essentially parallel investigations, KU and the LPD stuck to interviewing a narrow set of witnesses, many of them JT's friends, while they failed to interview a host of witnesses favorable to Bobbie, including (1) **Lindsie Ford** (fellow law student who was familiar with JT's reputation at the law school and met Bobbie at the hospital when she got the SANE examination and kept watch outside the library meeting room when Bobbie met with Joel); (2) **Amy Adams** and other women who worked at the horse barn where Bobbie worked and observed her distressed demeanor just hours after the sexual assault; (3) **Dr. Saripalli,** Bobbie's doctor at KU Health Service who treated Bobbie for PTSD; and (4) SANE nurse **Cori Green** who would have explained the significance of Bobbie's injuries, including the vaginal tear and bruising.

**COUNT I**
**Claim Against Defendant City of Lawrence under 42 USC § 1983, the Fourth and Fourteenth Amendments and *Monell* for Unconstitutional Policies, Customs, Practices and Inadequate Training**

205.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

206.    Defendant City of Lawrence, Kansas, was at all times relevant to this Complaint responsible for the policies, practices and customs of the LPD as well as the LPD's training of its personnel.

*207.*    Defendant City of Lawrence, by and through its final policymakers, had in force and effect during the false and fraudulent investigation of Plaintiff a ***policy, practice or custom***

of unconstitutional misconduct with respect to the investigation of sexual assault allegations brought by, including, in particular, the failure to adequately investigate such allegations and, instead, conduct grossly inadequate, biased, and fraudulent investigations of such allegations, which included, in this case and others, the targeting and charging of female victims.

208.    Defendant City of Lawrence, by and through its final policymakers, also had in force and effect during its investigation of Plaintiff a ***policy, practice or custom*** of providing little or ***no training*** to officers or detectives handling sexual assault cases, and allowed untrained personnel to investigate such cases even though they had no knowledge of how to properly investigate them, or interview a sexual assault victim, or understand how victims respond to trauma. There were no policies requiring or enforcing such training, and the policies and/or training and/or supervision were inadequate to protect against fraudulent, biased and grossly inadequate investigations, resulting injury to Plaintiff and to other sexual assault victims.

209.    The City of Lawrence was aware of the LPD's problems with sexual assault investigations, yet repeatedly failed to make any meaningful changes or reforms that would have avoided the type of constitutional wrongs that injured Plaintiff and others.

210.    Defendant's unconstitutional actions violated Plaintiff's rights under the Fourth and Fourteenth Amendments, as they resulted from unlawful gender bias and resulted in arrest and prosecution in the absence of probable cause.

211.    The City of Lawrence and LPD's unconstitutional policies, practices and customs and its failure to provide adequate training for its officers and detectives were the moving force behind Plaintiff's being wrongfully charged, detained and prosecuted even though she had done nothing wrong and was, in fact, a victim.

**COUNT II**
**42 USC § 1983 Claim for Denial of Equal Protection**
**under the Fourteenth Amendment**
*Against Defendants Cottengim, Nicholson, and Affalter*

212.     Plaintiff hereby adopts and incorporates the allegations set forth above as though fully set forth herein.

213.     The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." Denials of equal protection by a municipal entity or any other person acting under color of state law are actionable under 42 U.S.C. § 1983.

214.     Plaintiff is a member of a protected class based on gender as she is a female. Plaintiff and others, including Jane Doe 1, Jane Doe 2 and Jane Doe 3, belong to a class singled-out for invidious class-based discrimination.

215.     *In addition* to being a member of a protected class, Plaintiff is *also* a member of a "class of one," in that Defendants Cottengim, Nicholson, and Affalter specifically targeted her for unfair and unequal treatment on the basis of her gender. The actions of defendants were objectively irrational and abusive.

216.     Defendants Cottengim, Nicholson, and Affalter treated Plaintiff differently under the law and failed to take her complaint seriously and investigate it because she is a woman who alleged she was sexually assaulted, with the different treatment of her reflected as follows:

a.     Police had evidence that Thompson had sexually assaulted Plaintiff but did not investigate him; instead, they persistently expressed concern for the impact of the allegations on Thompson's career, decided to accept his story, and failed to pursue evidence showing Thompson's guilt, including evidence of which they had notice or which was plainly available to them;

54

b.      Police targeted Plaintiff for punishment due to her gender and status as a rape victim when they knew she was struggling to finish her education as a KU law student under the stress of having to defend herself on a bogus charge.

c.      Police targeted Plaintiff for punishment due to gender and status as a rape victim when they knew that their case did not support probable cause and that it was primarily based on detectives' "beliefs" which were not rooted in evidence but were instead rooted in gender animus or bias.

217.    Defendants Cottengim, Nicholson, and Affalter's conduct was the result of enforcing policies unequally on the basis of Plaintiff's gender and it lacked any rational basis.

218.    There was no rational basis for Defendants Cottengim, Nicholson, and Affalter to single out Plaintiff, or any other victim of sexual assault for discrimination or retaliation.

219.    Defendants Cottengim, Nicholson, and Affalter were acting under color of law, in their capacity as law enforcement officers on City property and during City operating hours.

220.    At all times relevant, Defendants Cottengim, Nicholson, and Affalter were acting within the scope of their employment.

221.    At all times relevant, Defendants Cottengim, Nicholson, and Affalter had the authority to stop the unequal treatment under the law being afforded the Plaintiff.

222.    Defendants Cottengim, Nicholson, and Affalter were deliberately indifferent to the unequal treatment suffered by Plaintiff.

223.    Defendants Cottengim, Nicholson, and Affalter's indifference and conduct was wanton, willful and in reckless disregard and neglect of Plaintiff's rights, safety and well-being, justifying the imposition of punitive damages.

224.    Defendants' conduct exhibited deliberate indifference to Plaintiff's rights and wellbeing.

225.    There is no qualified immunity available to Defendants as Plaintiffs' equal protection rights in this context were long ago clearly established by Supreme Court and Tenth Circuit precedent.

226.    As a direct result of Defendants Cottengim, Nicholson, and Affalter's wrongful conduct, Plaintiff has sustained or will sustain medically significant emotional distress, embarrassment, humiliation and loss of enjoyment of life, economic loss and hardships, lost time, lost earning potential, and expenses for medical and psychological treatment, therapy and counseling.

## <u>COUNT III</u>
**42 USC § 1983 Claim for Malicious Prosecution and Abuse of Process in Violation of the Fourth and Fourteenth Amendments of the United States Constitution**
*Against Defendants Cottengim, Nicholson, and Affalter*

227.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges the following.

228.    Defendants Affalter, Cottengim and Nicholson, acting individually and in concert, with malice and knowing that probable cause did not exist to prosecute Bobbie Horocofsky for the felony crime of making a false statement to police, intentionally caused Horocofsky to be arrested, detained, charged and prosecuted for that crime, thereby violating her clearly established rights under the Fourth and Fourteenth Amendments to be free of prosecution absent probable cause.

229.    Defendants' actions also violated the Fourth and Fourteenth Amendments in that they constituted abuse of process because those actions arose from ulterior motives and relied on improper acts to cause the arrest, detention, charging and prosecution of Plaintiff in the absence of probable cause.

230.     Specifically, as described in detail above, Defendants, acting individually and in concert, conducted a fraudulent and reckless investigation, intentionally ignored and suppressed exculpatory facts, and helped manufacture a false theory of motive, thereby building a false and fraudulent case against Plaintiff Horocofsky. Defendants' actions were malicious and used

231.     Horocofsky was and is innocent. She did not make any false statements to police, and is, instead, a victim of a reckless, fraudulent and biased police investigation that from its earliest moments targeted her as a suspect instead of a victim.

232.     That cause was finally terminated on October 29, 2019, when the Court granted the State's motion and dismissed with prejudice the case against Plaintiff.

233.     Plaintiff suffered economic and non-economic damages arising from her arrest, her detention on January 30, 2019, and the false and fraudulent prosecution against her that continued for nine months until the dismissal.

234.     Defendants Affalter, Cottengim and Nicholson performed the above-described acts in this case under color of state law, intentionally, and with reckless disregard for the truth, and with deliberate indifference to Plaintiff's clearly established constitutional rights. No reasonable officer in 2018 and 2019 would have believed this conduct was lawful.

235.     The acts and omissions by the three individual defendants described above were the direct and proximate cause of Plaintiff's economic and non-economic injuries because these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, detention and prosecution of Plaintiff.

**COUNT IV**
**Title IX Discrimination – *Simpson* Hostile Educational Environment**
*Against KU*

236.    Plaintiff hereby adopts and incorporates the allegations set forth above as though fully set forth herein.

237.    In *Simpson v. University of Colorado, Boulder*, 500 F.3d 1170 (10th Cir. 2007), the Tenth Circuit stated that a school could be held liable under Title IX if it is a federal funding recipient and possesses an "official policy" of "deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient" or if a school district "sanctioned, supported, even funded a program … that, without proper control" would result in sexual harassment.

238.    Defendant KU is a recipient of federal funds.

239.    Defendant KU possessed an official policy of deliberate indifference concerning the aftermath and predictable sexual misconduct following its hosting and sponsoring events that served alcohol for students. KU's policy of serving alcohol at law school sanctioned events is indicative of its tolerance for sexual misconduct associated with intoxication.

240.    KU maintained a policy of deliberate indifference to sexual assault or misconduct against female students, especially when collaborating with the Lawrence Police Department which created a "sexually hostile environment" and a heightened risk of sexual harassment that was known or obvious in a context subject to the school's investigative and disciplinary control.

241.    These policies, in addition to other policies of deliberate indifference alleged herein, made Plaintiff more vulnerable to the sexual assault, harassment and retaliation that did in fact occur.

58

242.    KU's affirmative actions and inactions made Plaintiff more susceptible to sexual harassment and retaliation both before and after her report.

243.    KU employees with authority to protect Plaintiff had actual knowledge that these policies were making her more susceptible to harm.

244.    Though unnecessary under *Simpson*, KU employees had actual knowledge that Plaintiff's assailant posed a serious, specific threat to Plaintiff and others similarly situated.

245.    Defendant KU's indifference and resulting inaction was wanton, willful and with reckless disregard and neglect of Plaintiff's rights, safety and well-being.

246.    Defendants' conduct exhibited deliberate indifference to Plaintiff's rights and wellbeing.

247.    As a direct and proximate result of the defendant's wrongful conduct, plaintiff has suffered and continues to suffer great pain of mind, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, missed and lost educational opportunities, lost earning capacity, medical expense and out-of-pocket costs.

248.    Plaintiff has incurred and will continue to incur necessary and reasonable expenses for medical and psychological treatment, therapy and counseling as well as other economic hardships.

## **COUNT V**
**Title IX Hostile Educational Environment**
*Against KU*

249.    Plaintiff hereby adopts and incorporates the allegations set forth above as though fully set forth herein.

250.    In *Escue v. N. Okla. Coll.*, 450 F.3d 1146 (10th Cir. 2006), the Tenth Circuit articulated three elements for a private cause of action under Title IX: first, the district remained deliberately indifferent to acts of harassment of which it has actual knowledge; second, the harassment was reported to an appropriate person with the authority to take corrective action; and third, the harassment deprived the victim of educational benefits or opportunities.

251.    In *Farmer v. Kansas State University*, 918 F.3d 1094 (10th Cir. 2019), the Tenth Circuit held that a student has a viable claim under Title IX for the university's deliberate indifference to the initial discrimination subjected Plaintiff to further discrimination or made her more vulnerable to it.

252.    Defendant KU is a recipient of federal funding.

253.    Plaintiff is a member of a protected class, female.

254.    Plaintiff suffered discrimination and harassment on the basis of her sex when she was sexually assaulted by Thompson and then harassed by other students, professors and administrators as more fully detailed above.

255.    Plaintiff also suffered discrimination and harassment on the basis of her participation in a Title IX complaint when she was harassed by other students, professors and administrators as more fully detailed above.

256.    KU had actual knowledge that Plaintiff had been sexually assaulted, that she was being intimidated in class and by students, professors and administrators.

257.    KU was deliberately indifferent to discrimination and harassment Plaintiff suffered, including but not limited to the following:

a.      KU failed to take reasonable steps to prevent sexual assaults from occurring at or following law school events, including failing to train employees and failing to

adopt and implement simple, reasonable policies that would lessen the chance of rapes occurring, harassment occurring, or retaliation from occurring.

b.      KU failed to conduct an appropriate or expedient investigation or hold a timely hearing in order to resolve Plaintiff's report.

c.      KU failed to take any action on Plaintiff's report of sexual misconduct.

d.      KU failed to stop Thompson and others from harassing or retaliating against Plaintiff after she reported his sexual assault.

e.      KU acted affirmatively to frustrate any investigation into Plaintiff's report of sexual assault or harassment or retaliation.

f.      KU acted affirmatively when they shared confidential information with police and released the information to law school professors and administrators without Plaintiff's knowledge or permission.

258.    KU's conduct is prohibited by Title IX.

259.    KU's conduct was in no way reasonably designed to help Plaintiff or to stop the hostile educational environment.

260.    KU's conduct subjected Plaintiff to additional discrimination, harassment or retaliation or made her more vulnerable to it.

261.    Defendant's conduct exhibited deliberate indifference to Plaintiff's rights and wellbeing, as more fully alleged above.

262.    Defendant KU's corrective or preventive opportunities regarding plaintiff's report of sexual assault and retaliation were clearly unreasonable or inadequate.

263.    Defendant KU's indifference and resulting action or inaction was wanton, willful and with reckless disregard and neglect of Plaintiff's rights, safety and well-being.

264.     As a direct and proximate cause of the defendant's wrongful conduct, Plaintiff withdrew from school activities, missed classes, lived in fear of seeing her assailant at the law school and on campus, faced intimidation from law school students and personnel who were friendly with her assailant at the law school and on campus, withdrew from the law school Ambassador program, law school clubs and earned opportunities such as the Moot Court competition, depriving her of educational opportunities offered and available to other students.

265.     As a direct and proximate result of the defendant's wrongful conduct, plaintiff has suffered and continues to suffer great pain of mind, shock, emotional distress, PTSD, depression, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, missed and lost educational opportunities, lost earning capacity, medical expense and out-of-pocket costs.

266.     Plaintiff has incurred and will continue to incur necessary and reasonable expenses for medical and psychological treatment, therapy and counseling as well as other economic hardships.

**COUNT VI**
**Title IX Retaliation**
*Against KU*

267.     Plaintiff hereby adopts and incorporates the allegations set forth above as though fully set forth herein.

*268.*     The Supreme Court recognized a cause of action for Title IX retaliation in *Jackson v. Birmingham Bd. of Ed.*, 544 US 167 (2005).

269.     Plaintiff engaged in a protected activity under Title IX when she:

a.     Reported her sexual assault to KU in October 2018.

b.      Reported Thompson's harassment, retaliatory treatment and comments toward her in November 2018.

c.      Reported additional harassment or retaliation, and specifically the conduct in her law school class with Lucas, in March 2019.

d.      Reported additional harassment and retaliation in November 2019.

270.    Contemporaneously with her protected activity, Plaintiff suffered adverse actions, as more fully alleged above, including but not limited to the following:

a.      Acts of intimidation and ostracization on campus and at the law school.

b.      Acts of witness tampering on campus and at the law school.

c.      Unfair and biased interrogation and investigation by IOA and law school personnel on campus.

d.      Being forced to withdraw from classes which denied and delayed educational opportunities.

e.      Accusing Plaintiff of making a false report of sexual assault.

f.      Subjecting Plaintiff to disciplinary action and a student conduct hearing for allegedly making a false report.

g.      Subjecting Plaintiff to ridicule and embarrassment in class which caused her to drop the class.

h.      Continuing harassment at the law school and the IOA office.

i.      Treating her assailant more favorably in the law school and the IOA investigation.

271.    Plaintiff's protected activity and the adverse actions are causally connected including but not limited to the following:

a.      The retaliatory acts came immediately after the protected activity.

b.      The retaliatory acts occurred as part of a clear chain of cause and effect stemming from her protected activity.

c.      The retaliatory acts were in some cases designed to thwart the efficacy of Plaintiff's protected activities.

272.    The retaliation and harassment directed at Plaintiff would deter a reasonable student from engaging in protected activity with respect to a claim of sex discrimination or harassment in an educational environment.

273.    Defendant KU's employees and administration had actual knowledge of the retaliation Plaintiff was suffering in that they knew Plaintiff was subjected to a sexual assault and was subject to intimidation and harassment on campus.

274.    Defendant KU's employees and administration had actual knowledge of the retaliation Plaintiff was suffering either condoned or encouraged the retaliation or harassment

275.    Defendant KU did not adequately respond to the retaliation including but not limited to the following:

a.      KU knew retaliation was likely following her report of rape but took no proactive steps to protect Plaintiff.

b.      After receiving Plaintiff's second report of intimidation, KU failed to suspend Thompson or ban him from campus.

c.      KU failed to conduct a timely or impartial investigation.

d.      KU accused Plaintiff of making a false report of sexual assault.

e.      KU subjected Plaintiff to a disciplinary student conduct hearing.

276.     An appropriate person had actual knowledge of the discrimination and retaliation suffered by Plaintiff.

277.     Furthermore, Defendant KU deliberately failed to supervise employees that had the means and authority to stop the discrimination and retaliation Plaintiff experienced.

278.      KU's affirmative actions and inactions made Plaintiff more susceptible and vulnerable to discrimination and retaliation after Plaintiffs' reports.

279.     Defendant's conduct exhibited deliberate indifference to Plaintiff's rights and wellbeing.

280.     Defendant KU's indifference and resulting action or inaction was deliberate, wanton, willful and with reckless disregard and neglect of Plaintiff's rights, safety and well-being.

281.     As a direct and proximate result of the defendant's wrongful conduct, plaintiff has suffered and continues to suffer great pain of mind, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, missed and lost educational opportunities, lost earning capacity, medical expense and out-of-pocket costs.

282.     Plaintiff has incurred and will continue to incur necessary and reasonable expenses for medical and psychological treatment, therapy and counseling as well as other economic hardships.

### COUNT VII
### Conspiracy Under 42 USC § 1983 and 42 USC ¶ 1985(3)
### *Against Defendants Affalter, Cottengim and Nicholson*

283.     Plaintiff hereby incorporates by reference *all* of the foregoing paragraphs and further alleges as follows.

284.     Defendants Affalter, Cottengim and Nicholson, acting within the scope of their employment and under color of state law, agreed among themselves and with University of Kansas Title IX investigator/coordinator Kathryn Burns to conduct a biased, fraudulent and grossly inadequate investigation of Plaintiff's claims of sexual assault, deliberately disregarding and burying evidence of Plaintiff's innocence and instead protecting her male assailant and deliberately disregarding and burying evidence of his guilt, all in violation of the Fourth and Fourteenth Amendment rights to be free from malicious prosecution, abuse of process, coercion, deprivation of liberty without due process of law and also in violation of Plaintiff's Fourteenth Amendment right to equal protection of the law, and as protected under 42 U.S.C. § 1983, 42 U.S.C. § 1985 and Title IX.

285.     Throughout the investigation, arrest, detention and prosecution of Plaintiff and throughout her Title IX proceedings at the University of Kansas, Defendants acted in concert and committed overt acts in furtherance of their conspiracy, all of which served to deprive Plaintiff of her rights under the Fourth and Fourteenth Amendments, and her rights under federal statutory law, including Title IX.

286.     As a direct and proximate result of Defendants' actions and those of Ms. Burns, Plaintiff was charged, arrested, detained and prosecuted in violation of the Fourth and Fourteenth Amendments, and, further was denied a fair and unbiased hearing in her Title IX proceedings at the University of Kansas.

## COUNT VIII
**Malicious Prosecution**
*Against City of Lawrence*

287.     Plaintiff hereby adopts and incorporates the allegations set forth above as though fully set forth herein.

288.    On December 5, 2018, Cottengim signed a probable cause Affidavit in which he alleged Plaintiff had falsely reported to the police that she had been raped.

289.    On January 23, 2019, Defendant City of Lawrence initiated a criminal complaint against Plaintiff falsely alleging Plaintiff had interfered with law enforcement by filing a false report of rape (the "Action"). Plaintiff was served with the Complaint and arrested on January 30, 2019. Plaintiff denied all charges alleged against her.

290.    On June 5, 2019, Plaintiff was served with an Amended Complaint adding two more counts, which also alleged she made a false statement to police.

291.    In so doing so, Defendant acted without probable cause, as more fully detailed above.

292.    In so doing so, Defendant acted with malice.

293.    The Action terminated in Plaintiff's favor when all charges were dismissed on October 29, 2019.

294.    Costs were assessed against Defendant City of Lawrence.

295.    As a result of the above-described conduct, Plaintiff has suffered emotional distress, embarrassment and humiliation; was prevented from performing daily activities and obtaining the full enjoyment of life; and other actual and compensatory damages to be proven at trial; and has incurred attorney's fees and costs.

296.    Defendants committed these acts within the scope of their employment.

297.    Plaintiffs gave notice to the City of Lawrence by timely filing a notice of claim under KSA § 12-105b with the City clerk, and more than 120 days have elapsed without a response.

## COUNT IX
### Abuse of Process
*Against City of Lawrence*

298.    Plaintiff hereby adopts and incorporates the allegations set forth above as though fully set forth herein.

299.    On December 5, 2018, Cottengim signed a probable cause Affidavit in which he alleged Plaintiff had falsely reported to the police that she had been raped.

300.    On January 23, 2019, Defendant City of Lawrence initiated a criminal complaint against Plaintiff falsely alleging Plaintiff had interfered with law enforcement by filing a false report of rape (the "Action"). Plaintiff was served with the Complaint and arrested on January 30, 2019. Plaintiff denied all charges alleged against her.

301.    On June 5, 2019, Plaintiff was served with an Amended Complaint adding two more counts, which also alleged she made a false statement to police

302.    Defendant's use of the legal process was illegal, improper and/or unauthorized.

303.    Defendants had knowledge of the illegal, improper or unauthorized use of the process.

304.    Defendants had an improper purpose in engaging in the illegal, improper or unauthorized use of the process in that it was done for the purpose of intimidating or causing great inconvenience or causing great hardship to Plaintiff.

305.    As a result of the above-described conduct, Plaintiff has suffered emotional distress, embarrassment and humiliation; was prevented from performing daily activities and obtaining the full enjoyment of life; and other actual and compensatory damages to be proven at trial; and has incurred attorneys fees and costs.

306.     Plaintiffs gave notice to the City of Lawrence by timely filing a notice of claim under KSA § 12-105b with the City clerk, and more than 120 days have elapsed without a response.

### COUNT X
**Intentional and/or Reckless Infliction of Emotional Distress**
*Against City of Lawrence, Affalter, Cottengim and Nicholson*

307.     Plaintiff hereby adopts and incorporates the allegations set forth above as though fully set forth herein.

308.   Defendants intentionally sought to engage in outrageous conduct calculated to cause maximum emotional harm to Plaintiff, and they intentionally and/or recklessly breached their duties owed to Plaintiff, including but not limited to the following conduct, when they:

a.   Turned the investigation of her report of rape against her and investigated her instead of the rapist.

b.   Coerced and manipulated her into giving multiple statements about her rape without informing her that she was the focus of their investigation.

c.   Directly and proximately caused Bobbie Horocofsky, an innocent person, to be falsely arrested and maliciously prosecuted.

d.   Deliberately targeted her for prosecution, knowing her to be innocent, in order to discriminate against her, harass her and retaliate against her and to cause her pain and suffering.

e.   Breached confidentiality and shared details of their investigation with persons who had no need to know such information.

309.   Defendants intentionally sought to engage in outrageous conduct calculated to cause maximum emotional harm to the Plaintiff when they sought to intimidate, discriminate and harass her.

310.   Defendants' conduct was extreme and outrageous.

311.   The individual Defendants' conduct was within their scope of employment.

312.   Plaintiff sustained medically significant, extreme and severe emotional distress accompanied by or resulting in physical injuries, resulting from the pursuit of her arrest, her false arrest, the malicious prosecution and abuse of process.

313.    Defendants directly and proximately caused Bobbie Horocofsky to suffer, and continue to suffer, medically significant pain of mind and body, shock, emotional distress, physical

harm, physical manifestations of emotional harm, anger, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, and caused her to fear for her physical safety from October 24 2018 and throughout the period of her prosecution.

314.    Defendants directly and proximately caused Bobbie Horocofsky to sustain and continue to sustain loss of earnings and earning capacity, and to have incurred and continue to incur expenses for medical and psychological treatment, therapy, and counseling.

315.    Plaintiffs gave notice to the City of Lawrence by timely filing a notice of claim under KSA § 12-105b with the City clerk, and more than 120 days have elapsed without a response.

**COUNT XI:**
**Respondent Superior Liability**
*Against City of Lawrence*

316.    Plaintiff hereby adopts and incorporates the allegations set forth above as though fully set forth herein.

317.    Defendants Affalter, Cottengim and Nicholson were at all times material to this complaint employees of the City of Lawrence and acted within the scope of their employment in committing the misconduct described above.

318.    Defendants' tortious conduct was undertaken while carrying out routine investigative functions. The conduct was reasonably expected by, and in fact foreseen by, Defendants' employer.

319.    Defendant City of Lawrence is liable as principal for all intentional torts committed by its agents.

320.    Plaintiffs gave notice to the City of Lawrence by timely filing a notice of claim under KSA § 12-105b with the City clerk, and more than 120 days have elapsed without a response.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court conduct a jury trial on her claims, enter judgment in her favor in an amount in excess of $75,000 against Defendants, grant such declaratory

and injunctive relief as is necessary and appropriate to remedy the wrongs alleged herein; award Plaintiff actual damages, compensatory damages, punitive damages, reasonable attorneys' fees and expenses, interest and costs of this suit; and grant such other and further legal and equitable relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Cheryl A. Pilate
Cheryl A. Pilate, KS # 14601
MORGAN PILATE, LLC
926 Cherry St.
Kansas City, Missouri 64106
(816) 471.6694 (phone)
(816) 472-3516 (fax)
cpilate@morganpilate.com


/s/ Sarah A. Brown
Sarah Brown, KS #12130
BROWN & CURRY, LLC
1600 Genessee Street, Suite 956
Kansas City, MO 64102
(816) 756-5458 (phone)
(816) 666-9596 (fax)
sarah@brownandcurry.com

ATTORNEYS FOR PLAINTIFF

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable by law.

## <u>DESIGNATION OF PLACE OF TRIAL</u>

Plaintiff designates Kansas City, Kansas, as the place of trial for this matter.

<u>/s/ Cheryl A. Pilate</u>
Cheryl A. Pilate, KS # 14601
MORGAN PILATE, LLC
926 Cherry St.
Kansas City, Missouri 64106
(816) 471.6694 (phone)
(816) 472-3516 (fax)
cpilate@morganpilate.com


<u>/s/ Sarah A. Brown</u>
Sarah Brown, KS #12130
BROWN & CURRY, LLC
1600 Genessee Street, Suite 956
Kansas City, MO 64102
(816) 756-5458 (phone)
(816) 666-9596 (fax)
sarah@brownandcurry.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2021, I filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all attorneys of record.

/s/ Sarah A Brown