## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **BOBBIE JO HOROCOFSKY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No. 20-CV-02529-JWB-KGG** |
| | ) |
| **CITY OF LAWRENCE, KANSAS, et.al.** | ) |
| | ) |
| **Defendants** | ) |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT UNIVERSITY OF KANSAS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

Bobbie Jo Horocofsky was in her third year of law school when a KU law student raped her after they attended a KU law school event. She decided to pursue a Title IX complaint pursuant to KU policies and gave a statement to the KU Title IX investigator. But, unknown to her, Lawrence Police detectives had already been in contact with KU's Title IX office – and KU never told her. KU never informed her that it was engaging in concerted action with the LPD to investigate her for supposedly making a false report. KU ignored her when she withdrew her authorization for the University to share her information with police. Not until July of 2019 did KU tell her it had been investigating *her* all along. By then, KU's concealed assistance led not only to unfounded criminal charges against Bobbie, but to KU's own patently false finding nearly nine months after she initiated the Title IX process that she had falsely reported her rape. While Bobbie was exonerated from all criminal charges, the damage had already been done.

KU's Title IX office is supposed to give a student notice of an investigation. It deliberately concealed the focus of its investigation from Bobbie.

KU is not supposed to retaliate against a student for filing a Title IX report. Yet, Bobbie sat in the classroom of KU professor Quinton Lucas – the future Kansas City mayor and a friend of her assailant – and listened while he used her as an example of why Title IX processes regarding

sexual assault should be abolished. She could not complete that class after that.

KU is supposed to take action when it receives reports of discrimination and retaliation. Yet, after Bobbie reported Professor Lucas' conduct, the University did nothing at all to investigate the incident. Doing nothing at all is the hallmark of "deliberate indifference."

The University of Kansas is subject to the broad proscription against sex discrimination mandated by Title IX:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a); *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982) (Title IX must receive "a sweep as broad as its language"). There is no dispute that Defendant KU is an institution with education programs and activities or that it is a recipient of federal financial assistance. (Doc. 25, ¶ 37, 252). And there should be no dispute that KU was deliberately indifferent to Bobbie Horocofsky's Title IX rights. Defendant's motion must be denied.

## I.     Nature of the Matter Before the Court

KU seeks to have all claims asserted against it dismissed for failure to state a claim, relying on exaggerations and hyperbole rather than the pleaded facts. Pertinent to this case, courts have recognized four different Title IX theories of liability, two of which address liability for "pre-assault" conduct and the other two of which address liability for "post assault' conduct. In the First Amended Complaint ("FAC"), Plaintiff has adequately pled four of these theories, and only the fourth relies in part on facts pled upon information and belief. The FAC contains "enough facts to state a claim to relief that is plausible on its face". *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 8(a)(2).

First, Bobbie Jo Horocofsky has stated a claim against KU under a "pre-assault" *Simpson*[1] theory in Count IV. This theory stems from KU's "official policy" of "deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient" or "sanctioned, supported, even funded a program … that, without proper control" would result in sexual harassment. (Doc. 25, ¶ 237). Here, Plaintiff sues KU for its deliberate indifference to her rape that resulted from the law school's official policy of sponsoring, sanctioning, supporting and funding law school events that served alcohol to attendees that, without proper control, training or guidance, KU knew would lead to sexual assault or sexual harassment. Plaintiff also sues KU for its deliberate indifference to harassment and discrimination of female students like Plaintiff stemming from its official policy to not independently investigate sexual assaults involving a police investigation. Such a hands-off approach emboldens student rapists and endangers female students who report sexual assault.

Second, Plaintiff states a claim against KU under a "post-assault" *Farmer*[2] theory in Count V. KU's deliberate indifference to Plaintiff's report of rape to the IOA caused Plaintiff to undergo intimidation and harassment on campus and at the law school or made her vulnerable to it, which in turn caused her to be deprived of educational opportunities and benefits at KU. When a school fails to adequately respond to a report of rape, regardless of where it occurred, the assailant's on-campus presence and persistent risk of encounter with the victim can constitute a hostile environment, triggering a school's Title IX duty to respond. Such an on-campus hostile educational environment is under a school's substantial control.

Third, Plaintiff states a claim against KU under a "post-assault" *Jackson*[3] retaliation theory

---

[1]     *Simpson v. Univ. of Colo. Boulder,* 500 F.3d 1170 (10th Cir. 2007).
[2]     *Farmer v. Kansas State University,* 918 F. 3d 1094 (10th Cir. 2019).
[3]     *Jackson v. Birmingham Bd. of Ed.*, 544 US 167 (2005).

in Count VI. After Bobbie reported the rape to KU and engaged in other protected activity, KU failed to protect her from retaliatory conduct and instead, condoned and encouraged the conduct.

Fourth, Plaintiff pled facts in support of the "pre-assault" Title IX discrimination theory in Count V, only some of which are upon information and belief: KU's deliberate indifference to prior reports that the law student who raped her had assaulted or harassed female students caused Plaintiff to subsequently be assaulted or harassed.

KU wants this Court to constrict the scope of Plaintiff's claims contrary to Supreme Court precedent that emphasizes the broad remedial purpose of Title IX. KU's Motion to Dismiss should be denied because Bobbie pleads adequate facts to make each Title IX cause of action plausible.

## II.     Plaintiff's Statement of Facts

In September 2018, Bobbie Jo Horocofsky was a third-year law student at Defendant KU's law school. With her undergraduate and Master's degrees, she planned to be a patent lawyer. (Doc. 25, ¶ 7). Throughout her first two years of law school, Bobbie was involved in law school activities and events, and served as a KU Law School Ambassador. (Doc. 25, ¶¶ 7, 32). One of those activities was a Diversity & Inclusion event at Johnny's Tavern on September 27, 2018, sanctioned by KU's law school. (Doc. 25, ¶¶ 8, 168). KU's custom and practice at law school events was to provide alcohol; students were encouraged to participate and drink. (Doc. 25, ¶ 168).[4]

Bobbie attended the event with other law students. Hours later, she woke up groggy and confused in a strange bed and had no idea where she was. She was naked and had bruises on her body. (Doc. 25, ¶¶ 8, 38). As fragments of her memory returned, she realized that she had become intoxicated beginning with the law school event. (Doc. 25, ¶¶ 8, 38). She realized that a fellow law

---

[4]     For example, a month after Plaintiff's rape, KU Law Professor Quinton Lucas was arrested on charges of driving under the influence. Lucas tweeted the next day: "Last evening, I attended a university event gathering. I consumed alcohol. At 10:45 pm, I decided to leave. When I got to my car I decided that I was not prepared to drive home to Kansas City…. Apparently, while waiting, I dozed off. …" *See* https://fox4kc.com/news/prosecutor-dismisses-dui-charge-against-kc-mayoral-candidate-quinton-lucas/.

student, Joel Thompson, had engaged in sex while she was blacked-out and unable to consent. (Doc. 25, ¶¶ 8, 38).

KU was on notice as to the danger of alcohol-driven sexual assaults and the culture of certain groups on its campus and yet did little to nothing about it. (Doc. 25, ¶ 24)

**Institutional policies**

KU's policies encourages individuals who experience sexual violence to report the incident and seek help. KU's policies state sexual harassment, violence and misconduct are not tolerated at the University. The IOA office informs students that it is able to offer interim measures to assist and prevent harm to a victim of sexual violence and sexual misconduct, and that these interim measures are available regardless of whether the student chooses to file a criminal or IOA complaint and regardless of whether the student chooses to participate in a criminal or IOA investigation. (Doc. 25, ¶ 155). KU knew it should "promptly" take steps to protect the complainant by imposing interim measures once it had notice of a sexual violence allegation. Doc. 25, ¶ 154).

KU has policies that prohibit retaliation against those who file an IOA complaint. The policy states if a student believes she is experiencing retaliation in any form to notify the IOA office and the IOA will respond promptly to all allegations of retaliation. (Doc. 25, ¶ 156).

KU's Code of Student Rights and Responsibilities governs student misconduct. Students are subject to disciplinary action for violations of KU's sexual harassment policy "where the university has jurisdiction," which includes behavior on University premises, at University-sponsored activities, and also to off-campus conduct "when the behavior affects the on-campus safety of a member of the University community or University operations." (Doc. 25, ¶¶ 157, 158). The Code may subject students to disciplinary action for Threatening Behaviors, Intimidation, Bullying and Cyberbullying, Stalking, and Hazing. (Doc. 25, ¶ 160). The Code specifically applies

to "Intimate Partner/Relationship Violence," which includes stalking, dating violence, sexual violence, or domestic violence." (Doc. 25, ¶ 161). And the Code also subjects students to disciplinary action for retaliation, which is defined as "any behavior, direct or indirect, taken to or attempt to harass, intimidate, or improperly influence any individual associated with the student conduct process or any other University grievance or complaint process. (Doc. 25, ¶ 159). Pursuant to and as a result of these policies, KU had disciplinary authority or control over students who live off campus as well as student conduct issues that arise off-campus. (Doc. 25, ¶ 162).

According to the KU IOA policies, the IOA complaint investigation process is independent of any other complaint resolution process, including the choice to file a criminal complaint with the appropriate law enforcement authorities or not to do so. (Doc. 25, ¶ 166). Despite this proclaimed policy, KU had an agreement with the City of Lawrence regarding investigations of cases involving sexual violence. (Doc. 25, ¶ 167).

**The October 2018 Title IX complaint**

Bobbie decided to file a Title IX complaint with the KU Office of Institutional Opportunity and Access (IOA) after she became fearful of pursuing a criminal rape case against a fellow law student. (Doc. 25, ¶ 20). She was struggling with the sexual assault's aftermath, and she started working with a KU counselor, Merrill Evans, who accompanied her to meet with the IOA staff. (Doc. 25, ¶ 66). The IOA is responsible for investigating complaints of discrimination and sexual harassment, including all forms of sexual violence. (Doc. 25, ¶ 151). The IOA staff told Bobbie she needed to make a statement, and suggested she make only one statement to the IOA and the police. (Doc. 25, ¶¶ 66, 67). Before Bobbie gave her statement to the IOA, she learned at the law school that police had been interviewing witnesses; This intensified her stress about her future. (Doc. 25, ¶ 74).

On October 24, 2018, Bobbie met with Kathryn Burns at the KU IOA office and provided

a written statement, a log of events and a copy of text messages referencing the "date rape." (Doc. 25, ¶ 82). Burns then sent mutual no-contact directives to both Bobbie and Thompson on October 25, 2018. (Doc. 25, ¶ 86). KU informed Thompson that he "may have engaged in conduct that violates the University's *Sexual Harassment Policy*" and was warned not to retaliate. (Doc. 25, ¶ 87). Burns also provided Bobbie with links to the Discrimination Complaint Resolution Process and the Sexual Violence Procedure at KU for her reference. (Doc. 25, ¶ 98).

Unbeknownst to Bobbie, and well before she gave her statement to the IOA, the LPD and KU's investigator had already discussed Bobbie's report of rape. (Doc. 25, ¶ 69). The LPD detective told Burns that he had concerns about "possible repercussions that could affect Joel Thompson as the reported suspect." (Doc. 25, ¶ 75). But Burns kept this secret from Bobbie.

**Intimidation and harassment after her IOA complaint**

Following her initial IOA contact, Bobbie faced the prospect of attending law school classes in the same building at KU where her student assailant continued to attend classes – she was vulnerable to continuing harassment. (Doc. 25, ¶ 172). Indeed, Thompson began retaliating against her, and she reported his conduct to the IOA office on November 14, 2018. Burns duly notified Thompson about the retaliation complaint, but took no further action. (Doc. 25, ¶¶ 100, 101). Troubling too was that, despite IOA confidentiality proscriptions, a law school administrator somehow learned of Bobbie's complaint, shared it with other administrators and contacted her about the incident and the IOA investigation. (Doc. 25, ¶ 91).

Bobbie informed the IOA investigator that she suffered from generalized anxiety disorder, flashbacks, nightmares, and panic attacks which progressively worsened after the sexual assault as she regularly saw Thompson on campus, on an almost daily basis in the fall of 2018. (Doc. 25, ¶ 178). Yet KU did not put any sort of interim measures in effect to protect Bobbie from further harassment or harm, which led to continued interactions with professors so troubling it made her

violently ill after class. (Doc. 25, ¶ 26).

One of the troubling interactions occurred in December 2018 when KU Law School Associate Dean Lumen Mulligan emailed Bobbie about his conversation with Professor Valdez concerning the IOA investigation. In his email, Mulligan informed Bobbie that he has known Thompson for his entire law school experience, that Thompson "related his version of the events" to Mulligan, and that "the police opened a false claim investigation" against Bobbie. Mulligan informed Bobbie he had reported this information to the IOA, which he understood to be a confidential investigation, and that he was surprised when two professors showed up in his office with the notice of investigation and the names of the persons involved. Mulligan then informed Bobbie he had reported all of the one-sided information he had to Law School Dean Mazza and Associate Dean Kronk-Warner. (Doc. 25, ¶ 110).

Thompson's roommates and friends who were also KU law students acted to intimidate her.  (Doc. 25, ¶ 186).  She reported the hostile educational environment. (Doc. 25, ¶ 176-178). Again, KU did nothing. *Id.*

KU *did,* however, continued a highly visible endorsement of her assailant. The law school prominently displayed posters of her assailant; the photo of her class prominently feature him; Plaintiff passed them each day in the law school, and it made her feel ill. (Doc. 25, ¶ 26)

Plaintiff secluded herself from friends and withdrew from KU activities in which she had previously taken a leadership role. (Doc. 25, ¶ 187). Bobbie had qualified for the KU moot court team and ensuing competition, but was unable to attend due to the discrimination and harassment KU did not try to stop. (Doc. 25, ¶ 188)

The stress of it caused Bobbie to drop classes in December 2018. (Doc. 25, ¶ 112).  Bobbie had already missed weeks of school in the fall of 2018, as well as in the spring of 2019, suffered panic attacks, anxiety and nightmares which left her exhausted, depressed and unable to cope.

(Doc. 25, ¶¶ 26, 178). KU's law school was aware of Bobbie's anxiety, panic attacks, and the demands of the IOA investigation upon her time and emotional state. (Doc. 25, ¶ 172).

**March 2019 Title IX retaliation complaint**

Bobbie tried to return the next semester and avoid classes with her assailant. (Doc. 25, ¶ 112). Then, in her administrative law class, Professor Quinton Lucas started the semester making a joke about the **#metoo** movement. Later, during a February 5, 2019 class, Lucas stated his opinion the Title IX process regarding sexual assault on campus should be abolished. (Doc. 25, ¶ 122, 189). Lucas then referred directly to Bobbie in a hypothetical example stating the University could not 'kick her out' without due process and made comments directed towards the ongoing IOA investigation. By doing so, Lucas created or contributed to an atmosphere that caused Bobbie to feel very uncomfortable, vulnerable, anxious and targeted. (Doc. 25, ¶ 189). On March 26, 2019, Bobbie reported these events to Burns in the IOA office, copying KU's attorney Michael Leitch, and provided a statement from a fellow student who witnessed the interaction. (Doc. 25, ¶ 122). KU did nothing with the report and never investigated this claim. (Doc. 25, ¶ 123).

KU's failure to even attempt to protect her from further harm caused Bobbie to be unable to return to her spring 2019 Administrative Law course; she ultimately formally withdrew from the class. She also had to withdraw from another class, took incompletes in two other classes and was not able to graduate on schedule in May 2019. (Doc. 25, ¶¶ 124, 178, 190). Some of her law school professors and an administrator were pressuring her to leave the school. (Doc. 25, ¶ 173).

**KU's IOA investigation and collusion with the LPD**

Bobbie believed KU was investigating her valid report of rape; but without giving Bobbie any notice, KU's Title IX office acted in concert with LPD detectives to investigate *her*. (Doc. 25, ¶ 24). Burns immediately disclosed the information she received from Bobbie on October 24 to the LPD detectives. (Doc. 25, ¶ 83). The next day, the LPD and Burns exchanged email concerning

Thompson's calls about the investigation. (Doc. 25, ¶ 85). Between October 29, 2018 and November 26, 2018, LPD detectives and Burns sent emails sharing information and then they met for approximately **three hours** at the IOA office to discuss the investigation into Bobbie. (Doc. 25, ¶¶ 94, 95, 96, 97, 102, 103, 104). Burns was eager for the LPD detective's information and was following his lead. (Doc. 25, ¶ 103). She communicated regularly with the LPD. (Doc. 25, ¶ 24). KU then adopted the LPD's unexamined premise that Bobbie was "lying," without any investigation occurring, much less an independent investigation by KU.  (Doc. 25, ¶ 203).

Bobbie revoked her consent for the LPD to share information with KU; but Burns continued to contact the detective for updates on the investigation and asked if he was able to verify if there were text messages "missing in the string we reviewed" as they had discussed. (Doc. 25, ¶ 106). On January 30, 2019, the day Bobbie was arrested, the LPD detective emailed Burns and asked her to call him. (Doc. 25, ¶ 118).

KU never investigated Bobbie's injuries, her continuing trauma, or the background of her assailant. KU never notified Bobbie that she was a target if its investigation. (Doc. 25, ¶ 23). KU's Title IX investigators, who are supposed to be trained in trauma-informed interview techniques, completely disregarded such training and instead sought to discredit the victim. (Doc. 25, ¶ 24). KU's policy of cooperation and collusion with the LPD caused harm to Plaintiff, including the debunked charge of making a false report and the ensuing student conduct violation which threatened her law degree, her future as a lawyer, her job and her reputation. (Doc. 25, ¶ 202).

In December 2018, six weeks after Bobbie gave her statement to the IOA, still unaware that both the LPD and KU were treating her as the suspect, Bobbie emailed Burns regarding the KU investigation, requested information about the availability of evidence and interviews, and provided her with the names of two additional witnesses. (Doc. 25, ¶ 109). Then in January 2019, Burns extended the 60-day timeframe for the IOA investigation and notified Bobbie of the

extension. (Doc. 25, ¶ 111). Burns still did not tell her she was working with police to entrap her. (Doc. 25, ¶¶ 182j, 182k).

Between February 19 and March 13, 2019, after learning that KU still had not contacted her witnesses, Bobbie communicated with Burns regarding the investigation and scheduled a follow up meeting. (Doc. 25, ¶ 121). In early May 2019, Bobbie and Burns communicated about Bobbie's statement provided to the IOA the previous October. (Doc. 25, ¶ 125). On July 1, 2019, Bobbie emailed Burns about the status of the IOA investigation since it had been eight weeks since they last spoke **and over eight months since the purported investigation began.** (Doc. 25, ¶ 128). Despite Bobbie's efforts, KU never interviewed a host of witnesses favorable to Bobbie. (Doc. 25, ¶ 204). KU's deliberate indifference caused Bobbie to withdraw from participating in educational opportunities, taking incompletes for her courses and eventually withdrawing from classes completely in the Spring of 2019, which was to be her final semester of law school. (Doc. 25, ¶ 194).

On July 9, 2019, the IOA issued its report which concluded that the evidence it chose to gather did not support her complaints, and that "in fact [she] knowingly filed a false allegation of sexual assault," engaged in "serious misconduct" and referred her to the Office of Student Conduct for further action. (Doc. 25, ¶¶ 25, 129, 131). The July 9, 2019 report made numerous references to "witnesses," but of the seventeen witnesses Bobbie provided, only four were contacted, only three were mentioned, and the IOA report gave no weight to credible testimony provided by these witnesses which was supported by physical evidence. (Doc. 25, ¶¶ 130, 175). The "findings" by the IOA reiterated and adopted the false narrative that the LPD detectives adopted in October 2018 about Plaintiff's alleged "motivation to report Thompson." (Doc. 25, ¶ 174).

KU's policy on sexual misconduct states that all cases should be resolved within sixty days, but, in this case, the investigation **took more than eight months**, which caused ongoing distress

and negatively affected Bobbie's mental and physical health and academic performance. (Doc. 25, ¶ 179)

Bobbie exercised her right to appeal. She identified errors that created a substantiated bias in the investigation and demonstrated material deviations from established procedures that prejudiced her and violated her rights.  (Doc. 25, ¶ 175). Bobbie also stated in her appeal that she was harassed by the perpetrator throughout the adjudication process, creating a retaliatory and hostile environment which was not recognized nor addressed by IOA. (Doc. 25, ¶¶ 176, 177).

KU rubber-stamped the IOA findings as "reasonable." (Doc. 25, ¶ 181). KU then subjected Bobbie to a student conduct hearing, a proceeding at which she risked expulsion from the University. (Doc. 25, ¶ 200).

### November 1, 2019 Title IX Retaliation Complaint

Around November 1, 2019, Bobbie filed another formal complaint with the IOA making claims of sex discrimination and retaliation. This complaint stated that the harassment, discrimination and retaliation all began after Bobbie filed her first Title IX complaint, which was based on sex and falls under Title IX. She referenced her October 2018 complaint and her supplemental complaint in March 2019 as protected activity. She alleged that the nature of her March 2019 supplemental complaint and the November 2019 complaint were retaliation and continued hostile educational environment claims that fall under Title IX. She stated her assailant seemed to be exalted and held up as a role model by KU and its law school, as his face appeared in KU media in admissions, and on marketing materials posted on bulletin boards in the school. She alleged KU failed to properly investigate her complaint, ignored critical evidence and caused her to suffer mental and emotional harm, further resulting in severe physical illness. She alleged that instead of attempting to aid and support her, representatives of the Law School urged her to drop out and made it difficult for her to obtain accommodations to finish school. (Doc. 25, ¶ 197)

Contemporaneously with her protected activity, Plaintiff suffered adverse actions including acts of intimidation and ostracization on campus and at the law school; acts of witness tampering on campus and at the law school; incomplete, unfair and biased interrogation and investigation by IOA and law school personnel on campus; being forced to withdraw from classes which denied and delayed educational opportunities; being subjected to ridicule and embarrassment in class which caused her to drop the class; being accused Plaintiff of making a false report of sexual assault; and being subjected to disciplinary action and a student conduct hearing for allegedly making a false report. (Doc. 25, ¶ 270). KU's deliberate indifference caused Plaintiff to exhibit symptoms of post-traumatic stress disorder (PTSD) and become depressed and withdrawn. (Doc. 25, ¶ 201)

KU's conduct ignored the reality that many off-campus sexual assaults adversely impact the on-campus educational environment for victims, just as it did Bobbie. (Doc. 25, ¶ 196). KU refusal to investigate the off-campus rape and instead focusing its investigation on Bobbie sent a message that students can rape other students with no fear of school disciplinary action. (Doc. 25, ¶ 195).

**Facts demonstrating that KU was deliberately indifferent**

KU's concealment from Bobbie that she was the actual focus of its "investigation" amounted to deliberate indifference to her rights under Title IX, by deliberately misleading her. (Doc. 25, ¶ 183).

KU responded with deliberate indifference to Bobbie's rights by not performing an independent, unbiased investigation into her sexual assault and instead conspiring with the LPD to accuse her of making a false report. (Doc. 25, ¶¶ 182, 184). There are corollaries to this, which Plaintiff pled with some specificity – such as failing to investigate her level of intoxication and her ability to consent; failing to investigate Thompson's background, his text messages and his prior

conduct; failing to investigate Bobbie's injuries or ask for medical report/photographs from SANE exam; and, importantly, failing to interview witnesses or her doctor who would have corroborated her claim; (Doc. 25, ¶ 182).

KU was deliberatively indifferent when it did not provide regular updates on the status of its investigation to Bobbie or, stunningly, even notify her that she was the subject of their investigation, not Thompson. (Doc. 25, ¶ 182).

KU ignored Bobbie's retaliation complaint in March 2019 and did not review or investigate Professor Lucas' conduct which further demonstrates an incomplete and biased investigation. (Doc. 25, ¶ 192).

The more than eight months KU took to complete its investigation is evidence of deliberate indifference. (Doc. 25, ¶ 257).

The law school is supposed to provide a setting free of harassment where anyone – especially a complainant – can feel safe and able to pursue her academic goals. (Doc. 25, ¶ 191). By refusing to respond to her reports of retaliation and harassment, and instead opening promoting her assailant and secretly lending him aid, KU demonstrated its deliberate indifference and emboldened Thompson to influence professors and administrators in his favor. (Doc. 25, ¶ 185). KU's response was clearly unreasonable because this continuing intimidation and harassment prevented Bobbie from seeking help from the law school administration. (Doc. 25, ¶ 193).

KU failed to take reasonable steps to prevent sexual assaults from occurring at or after law school events, including failing to provide adequate supervision, warnings, training, guidance and education to its employees and students and failing to adopt and implement simple, reasonable policies that would lessen the chance of rapes occurring, harassment occurring, or retaliation from occurring. (Doc. 25, ¶¶ 199, 257). The likelihood of misconduct was so obvious that KU's failure amounted to deliberate indifference to the rights of Plaintiff. (Doc. 25, ¶ 199).

KU did not stop Thompson and others from harassing or retaliating against Plaintiff after her report of sexual assault. (Doc. 25, ¶ 257). And KU shared confidential information with police and released the information to law school professors and administrators without Plaintiff's knowledge or permission. (Doc. 25, ¶ 257).

## III.   Questions Presented

A.   Whether Plaintiff has plausibly pleaded a Title IX claim under *Simpson*. (Count IV)

B.   Whether Plaintiff has plausibly pleaded a post-assault Title IX claim for a hostile education environment or discrimination that was pervasive, severe and objectively offensive. (Count V).

C.   Whether Plaintiff plausibly pleaded deliberate indifference in that KU's actions were clearly unreasonable in light of known circumstances.

D.   Whether Plaintiff plausibly pleaded protected activity and adverse action for her Title IX claim for retaliation. (Count VI).

E.   Whether Plaintiff has plausibly pleaded a pre-assault Title IX claim for a hostile education environment or discrimination. (Count V).

F.   Whether KU is liable under Title IX for off-campus sexual assault under Title IX.

## IV.   Arguments and Authorities

### A.   Standard of review

Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver,* 567 F.3d 1169, 1178 (10th Cir.2009)(quotation marks omitted). When reviewing a motion to dismiss under Rule 12(b)(6), the Court must "accept as true all the factual allegations in the complaint" and "construe them in a light most favorable to the plaintiff" and "resolve all reasonable inferences in plaintiff's favor." *Seamons v. Snow*, 84 F.3d

1226, 1232 (10th Cir. 1996). "Dismissal is inappropriate under Fed. R. Civ. P. 12(b)(6) unless the plaintiff can prove no set of facts in support of his claims to entitle him to relief." *Id.*

"[T]he Federal Rules of Civil Procedure erect a powerful presumption against rejecting pleadings for failure to state a claim." *Cayman Exploration Corp. v. United Gas Pipe Line Co.,* 873 F.2d 1357, 1359 (10th Cir.1989). The dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir.2007) (quoting *Twombly,* 550 U.S. at 570). With this inquiry, the Court should ignore, as exceeding the strictures of a motion to dismiss, Defendant's factual assertions outside the allegations in the FAC, as well as its arguments that attempt to engage the Court in weighing the evidence. *See Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir.1985) (holding Rule 12(b)(6) consideration of documents attached to defendants' motion to dismiss improper). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly,* 550 U.S. at 556).

## B.  Pleaded facts that establish a Title IX *Simpson* claim (Count IV).

*Simpson v. Univ. of Colo. Boulder,* 500 F.3d 1170 (10th Cir. 2007)[5] permits Title IX liability to arise from official policies of funding recipients, namely policies that rendered a plaintiff vulnerable to sexual harassment. The *Simpson* plaintiffs were sexually assaulted by football players and high school football recruits visiting the university's football program. Plaintiffs claimed that the university knew of the risk of sexual harassment of female students in connection with the football recruiting program and failed to take any action to prevent further harassment before their assaults. *Id.* at 1174. The Tenth Circuit held that summary judgment was erroneously

---

[5]  *Simpson* cites *Gebser v. Labo Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) and *Davis v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629 (1999) to find that an official policy theory, like that under § 1983, can also support Title IX liability. 500 F.3d at 1174-79.

granted for the university where facts showed university officials had knowledge of prior rapes and harassment in the context of the recruiting program, even though those prior acts were not committed against the same plaintiffs or by the same perpetrators, and that the conduct occurred off campus. In so doing, the Tenth Circuit distinguished the claims at issue in *Gebser v. Labo Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) and *Davis v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629 (1999) from the claims at issue in *Simpson,* as follows:

> We find it significant that in those cases there was no element of encouragement of the misconduct by the school district. … Here, however, the gist of the complaint is that CU sanctioned, supported, even funded, a program (showing recruits a "good time") that, without proper control, would encourage young men to engage in opprobrious acts. We do not think that the notice standards established for sexual-harassment claims in *Gebser* and *Davis* necessarily apply in this circumstance.

*Id.* at 1177.

 *Simpson* recognized that a funding recipient may be liable under Title IX when a violation is caused by a "policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient." *Id.* The Supreme Court and the Tenth Circuit hold a school is liable under Title IX when its deliberate indifference to known sexual violence "cause[s] students to undergo harassment ***or make[s] them liable or vulnerable to it***." *Davis*, 526 U.S. at 644-45 (emphasis added); *Rost ex rel. K.C. v. Steamboat Springs RE-2 School District*, 511 F.3d 1114, 1123 (10th Cir. 2008).

 In *Doe v. University of Tennessee*, 186 F.Supp.3d 788 (M.D. Tenn. 2016), the district court applied *Simpson* and found potential grounds for establishing Title IX liability where: "the FAC has alleged a number of official policies by UT that rendered the plaintiffs vulnerable to assault." *Id.* at \*806.  In *Doe,* the FAC did not allege a "policy of hosting a discrete event at which the assaults took place, as in *Simpson*"; Instead, it alleged more broadly policies "related to

encouraging and condoning similar types of events to entertain athletes and recruits, handling athlete discipline, housing students, and lack of sexual harassment training, among others." The court denied UT's motion to dismiss Doe's *Simpson* claims and held it was "a question of fact to determine whether any of these practices are, in fact, official policies of UT and, if so, whether they gave rise to the plaintiffs' assaults." *Id.* at 807-808.

In *Karasek v. Regents of University of California*, 956 F. 3d 1093 (9th Cir. 2020), the Ninth Circuit recognized that an official policy claim under the reasoning of *Simpson, Gebser* and *Davis* supports imposing Title IX liability when a school's official policy is one of deliberate indifference to sexual harassment in any context subject to the school's control. The policy in *Karasek* was based on the university's avoidance of Title IX reporting requirements by funneling sexual harassment reports through an informal investigation process. *Id.* at 1114. *Karasek* did not foreclose the possibility that a plaintiff could adequately allege causation even when a school's policy of deliberate indifference extends to sexual misconduct occurring across campus. *Id.* at 1113. Ultimately, "the question is whether [plaintiffs] plausibly allege that UC had a policy of deliberate indifference that heightened the risk of sexual harassment on campus, resulting in the assaults Appellants experienced." *Id.* at 1114. *See also Doe v. Michigan State University,* No. 1:18-cv-390, 2019 WL 5085567, at *8-10 (W.D. Mich. Aug. 21, 2019) (allowing an official policy claim to proceed where plaintiff alleged sexual assaults by student-athletes and plaintiff claimed reports against athletes were handled differently "behind closed doors").

In this case, Bobbie pled facts that substantiate Title IX liability under *Simpson*. First, she pled that KU is a "funding recipient." (Doc. 25, ¶¶ 37, 238). Second, she pled specific facts in her FAC, in excess of what is required under the Fed. R. Civ. P. 8(a), that identified KU's official policies of fostering sexual misconduct toward female students as well as a "deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a

specific program or policy of the recipient." *Simpson*, 500 F.3d. at 1178; (*See* Doc. 25 ¶¶ 24, 167, 237). The "official policy" alleged in this case is similar to that alleged in *Simpson* – to show recruits a "good time."  Here, the law school hosted events to for students to drink and have a good time, which led to sexual assault of female students.

Furthermore, Plaintiff's official policy claim related to KU's investigation is similar to the "behind closed doors" policies in *Karasek* and *Doe v. Michigan State University*, as well as in *Doe 12 v. Baylor University*, 336 F. Supp. 3d 763 (W.D. Texas 2018). In *Doe 12*, the district court denied defendant's motion to dismiss, holding: "the Court finds it plausible from the facts alleged that Baylor's practice of inadequately handling and even discouraging reports of peer sexual assault constituted an official policy." *Id*. at 782. The allegations in *Doe 12* included:

> that Baylor, "its staff, and highest officers," with knowledge of numerous and detailed reports of sexual assault, "maintained a set of policies, procedures, and customs ... that were implemented in a sexually discriminatory manner," and "permitted a campus condition rife with sexual assault," that "substantially increased Plaintiffs' chances of being sexually assaulted." Specifically, Plaintiffs allege that Baylor and its staff discouraged them from reporting her assault(s), misled and lied to Plaintiffs about their options for reporting and accommodations under Title IX, failed to adequately investigate reported sexual assaults, and failed to take steps to ensure that students who did report would not be subjected to continuing assault and harassment, …. These alleged facts, construed as true, "raise a right to relief above the speculative level" that Baylor's policy or custom of inadequately handling and even discouraging reports of peer sexual assault constituted an official policy of discrimination that created a heightened risk of sexual assault, thereby inflicting the injury of which Plaintiffs complain.

*Id*. at 783-784. (internal citations omitted).

Similarly, in *Doe 1 v. Baylor University*, 240 F. Supp. 3d 646 (W.D. Texas 2017), plaintiffs alleged the official policy or custom was "a widespread pattern of discriminatory responses to female students' reports of sexual assault," which the court found arguably more egregious than alleging the university's knowledge of accusations against specific assailants prior to the initial assaults. *Id*. at 653. Citing *Davis*, 526 U.S. at 683, the Texas court found "a clear pattern of discriminatory enforcement of school rules could raise an inference that the school itself is

discriminating." *Id*. The Plaintiffs alleged they were repeatedly misinformed about their rights under Title IX, that Baylor failed to investigate reported sexual assaults and discouraged sexual assault reporting, and that Baylor falsely reported to the U.S. Department of Education that no such assaults took place on its campus between 2008 and 2011.  The court held that "[t]hese alleged facts, if construed as true, could allow a jury to infer that Baylor's policy or custom of inadequately handling and even discouraging reports of peer sexual assault created a heightened risk of sexual assault, thereby inflicting the injury of which Plaintiffs complain."  *Id*. at 662.

Bobbie has similarly pled facts demonstrating that KU had an official policy of not investigating her reports of retaliation and harassment; concealing facts; failing to give her notice of their investigation into her; and otherwise inadequately responding to her reports.

### 1.   KU possessed official policies that resulted in harm to Plaintiff.

First, KU had a policy, custom and practice in its law school of sponsoring events for its students on and off campus at which alcoholic beverages were served and tolerated; students were encouraged to participate in these events. (Doc. 25, ¶ 168). KU sanctioned, supported, and presumably funded these events. (Doc. 25, ¶¶ 8, 168, 239).  Plaintiff pled examples of the sponsored events, including the Diversity & Inclusion Social at Johnny's North in Lawrence, Kansas on September 27, 2018.  (Doc. 25, ¶ 168a.-d.). KU's event, which encouraged drinking by offering free alcoholic beverages to students, led to the September 2018 night of bar-hopping and her rape. (Doc. 25, ¶ 169). KU's official policy of deliberate indifference concerning the aftermath and predictable sexual misconduct following its hosting and sponsoring events that served alcohol for students caused harm to Plaintiff.  KU's policy of serving alcohol at law school sanctioned events evinces its tolerance for sexual misconduct associated with intoxication. (Doc. 25, ¶ 239)

Second, KU had an official policy of selectively not investigating rapes off-campus where the police claim there was a false report. KU's policy of cooperation and collusion with the LPD

caused harm to Plaintiff, including the charge of making a false report and the ensuing student conduct violation which threatened her law degree, her job and her reputation. (Doc. 25, ¶ 202). KU's policy of deliberate indifference to sexual assault or misconduct against female students, especially when collaborating with the LPD, created a "sexually hostile environment" and a heightened risk of sexual harassment that was known or obvious in a context subject to the school's investigative and disciplinary control. (Doc. 25, ¶ 240). KU's policy caused her to drop classes, delay her graduation and caused severe emotional distress.

As Plaintiff alleged in her FAC, these policies, in addition to other policies of deliberate indifference alleged herein, made Plaintiff more vulnerable to the sexual assault, harassment and retaliation that did in fact occur. (Doc. 25, ¶¶ 241, 242, 243). As in *Simpson*, Plaintiff's sexual assault was "the natural, perhaps inevitable, consequence of an officially sanctioned but unsupervised effort to show recruits a 'good time.'" *Id.* at 1174-75. Here, however, the gist of the complaint is that KU "sanctioned, supported, even funded, a program … that, without proper control, would encourage young men to engage in opprobrious acts." *Id.* at 1177.

Though unnecessary under *Simpson*, KU employees with authority to protect Plaintiff had actual knowledge that these policies posed a serious, specific threat to Plaintiff and others similarly situated. (Doc. 25, ¶¶ 243, 244). KU had knowledge that sexual assaults were not only a problem, but a likely and predictable outcome. These allegations establish KU's *Simpson* liability for the harm to Bobbie. KU's motion to dismiss should therefore be denied.

### 2.    Defendant KU's arguments are unavailing

KU erroneously contends the sexual assault did not happen in the context of any alleged programs. Defendant reads *Simpson* much too narrowly. And Plaintiff did allege her rape resulted from KU's policy of serving alcohol at school sponsored, sanctioned and funded events. (*See* Doc. 25, ¶¶ 168, 169).

Moreover, Plaintiff also alleged KU had a policy of deliberate indifference to Bobbie's rights by not performing an independent, unbiased investigation into her sexual assault and instead conspiring with the LPD who targeted her, as a victim of sexual assault, for making a false report which rendered her vulnerable to further discrimination, harassment and retaliation. (Doc. 25, ¶¶ 182, 184, 202). KU's argument for dismissal omits these allegations as well as the allegations that KU failed to provide adequate supervision, warnings, training, guidance and education to its employees and students in the law school where the likelihood of misconduct from its events was so obvious that KU's failure amounted to deliberate indifference to the rights of Plaintiff. (Doc. 25, ¶ 199). Plaintiff clearly alleged KU was deliberately indifferent to discrimination and harassment Plaintiff suffered, including taking reasonable steps to prevent sexual assaults from occurring at or following law school events by failing to train employees and failing to adopt and implement simple, reasonable policies that would lessen the chance of rapes occurring, harassment occurring, or retaliation from occurring. (Doc. 25, ¶ 257).

KU urges the court to "evaluate the two alleged 'official policies.'" (Doc. 30 at 22).  On a motion to dismiss, the court only needs to evaluate whether plaintiff has alleged facts that show a policy of deliberate indifference that caused her injuries. The policies alleged in the FAC are no more "breathtaking" than those articulated in *Doe v. University of Tennessee, Karasek, Doe 1 v. Baylor University* and *Doe 12 v. Baylor University, supra,* all cases in which the school's motion to dismiss the *Simpson* claim was denied.

KU cites no authority for its argument that no nexus exists if there is an intervening period of time between the school sponsored event and the sexual assault. No such authority exists. Regardless, Plaintiff alleged KU has conducted IOA investigations involving students who were raped or involved in off-campus sexual assaults on numerous occasions, some of which have led to serious disciplinary action toward the attacker, including expulsion, stemming from off-campus

sexual misconduct. (Doc. 25, ¶ 180). This allegation establishes the nexus.

Regarding the policy of deliberate indifference to sexual assaults emanating from school-sponsored and funded events where alcohol is served to students, plaintiff should not have to allege the number of drinks consumed or how she paid for them.[6] *Doe v. School District Number 1, Denver, Colorado*, 970 F.3d 1300, 1311-1312 (10th Cir. 2020).

KU ridicules the numerous types of events which illustrate its policy of deliberate indifference to sexual assault following law school sponsored events that ply students with alcohol, and then erroneously argues that it must have "notice" of the risk of sexual harassment under her *Simpson* theory.  (Doc. 30 at 23). Actual notice standards established in *Gebser* and *Davis* do not apply in cases that involve official school policy. *Simpson,* 500 F.3d at 1177. *See also Mansourian v. Regents of Univ. of Cal.,* 602 F.3d 957, 967 (9th Cir. 2010) (holding that actual knowledge required by *Gebser* is not applicable in cases involving an official policy).

KU also mischaracterizes its policy of deliberate indifference to sexual harassment when it collaborates with the LPD, and by doing so fails to evaluate rape complaints or independently investigate them.  See Doc. 30 at 23-24.  KU did not "cooperate with the police" in this case; it illegally conspired with the detectives, without Plaintiff's consent, to improperly target Plaintiff for making a report. KU failed to conduct an independent, objective investigation of its own.  *Id.*

KU compares this case to *Rost, supra,* and *C.R.K. v. U.S.D. 260*, 176 F. Supp. 2d 1145 (D. Kan. 2001), both of which are K-12 cases, in which the harassment occurred *before* the school year began and off-school grounds. Notably, both cases were decided on summary judgment. Neither case compels this Court to dismiss Bobbie's claim here.

In *C.R.K.*, the court granted the school's summary judgment motion where the assault

---

[6]    KU's reference to plaintiff's credit card receipts in its IOA investigation report, which has neither been stated in the FAC nor has discovery been allowed on that alleged extraneous fact, should be disregarded as outside the pleadings that the court must consider at this stage of the proceedings.

occurred over the summer, when school was not in session, off school grounds, and at a location without any connection to the school. 176 F. Supp. 2d at 1164.  The plaintiff in *C.R.K.* did not ask the school to investigate. *Id*. Contrary to *C.R.K*, this case, where a rape that followed a law school sanctioned event, between students, when school is in session and where the university exercised significant authority over the event, fulfills factors lacking in *C.R.K*.

In *Rost*, the middle-school principal allowed the school resource officer ("SRO") to "take the lead" on investigating the sexual assault that occurred off school grounds prior to enrollment. 511 F.3d at 1121. The victim "refused to communicate" relevant information to the SRO or principal, preventing further investigation. *Id.* at 1123. The court determined that under those circumstances it was not deliberately indifferent for the principal to allow the SRO to take the lead while he stayed in contact with and assisted the SRO, based on his belief that the assault was not under his control. *Id.* at 1121-23. In contrast, Bobbie was raped during the school year, following a sanctioned law school event. Where the school in *Rost* took active steps to ensure an investigation of the sexual assault occurred, KU did not do so and instead followed the lead of the LPD detectives with an investigation of the victim, not the assailant, thus ignoring Bobbie's report of rape. Moreover, in *support* of Bobbie's Title IX claim here, *Rost* acknowledged that even where harassment took place outside of the school's control and prior to enrollment, the *school could still be liable to a resulting hostile environment at school*. *Id.* at 1124.

KU's motion to dismiss Plaintiff's *Simpson* claims should be denied.

## C.  Pled facts establish Title IX Hostile Education Environment claims (Count V).

KU lumps two hostile education environment claims together and confuses the elements of the pre-assault and post-assault hostile education environment claims.

### 1.      Overview of the post-assault Hostile Education Environment claim.

In *Farmer v. Kansas State University,* 918 F. 3d 1094 (10th Cir. 2019), the Tenth Circuit

held: "Plaintiffs can state a viable Title IX claim for student-on-student harassment by alleging that the funding recipient's deliberate indifference caused them to be 'vulnerable to' further harassment without requiring an allegation of subsequent actual sexual harassment." *Id.* at 1104, 1109. In *Farmer*, the Tenth Circuit further distinguished its decisions in *Rost, supra,* and *Escue v. Northern Oklahoma College*, 450 F.3d 1146 (10th Cir. 2006), cases KU relies on here, finding that the allegation the school created an adverse educational environment "by its dismissive treatment of their complaints of rape … that reasonably prevented them from accessing the educational opportunities available to other students … was not presented in nor resolved by either *Rost* or *Escue*." *Id.* at 1106.

As in *Farmer*, Bobbie has stated a claim for Title IX harassment in her FAC. The facts giving rise to *Farmer*'s "post-assault" claims are strikingly similar to those Plaintiff alleges now.[7]

> **a.    Plaintiff has stated a claim for pervasive, severe and offensive post-assault liability**

KU contends Plaintiff has not pled pervasive sex discrimination for her post-assault claim and that a single instance of sexual assault does not meet the pervasive standard.  Contrary to KU's argument and authorities, Plaintiff has stated a claim under prevailing law. The Tenth Circuit specifically held the "further harassment" need not be *sexual* harassment. *Farmer*, 918 F.3d at 1104.  Thus, KU's citations to *Seamons v. Snow*, 84 F.3d 1226, 1232-33 (10th Cir. 1996) and *Cubie v. Bryan Career Coll., Inc.*, 244 F. Supp. 2d 1191 1204 (D. Kan. 2003) for such a requirement have been overruled and are without merit.

Recently, the Tenth Circuit held that a victim of single incident of off-site sexual assault

---

[7]    In *Farmer*, the court summarized the allegations as follows:

> Plaintiffs sufficiently pled that KSU's deliberate indifference to their reports of rape made them vulnerable to harassment by alleging that the fear of running into their student-rapists caused them, among other things, to struggle in school, lose a scholarship, withdraw from activities KSU offers its students, and avoid going anywhere on campus without being accompanied by friends or sorority sisters.

*Id.* at 1104-1105.

had adequately alleged that her harassment was severe, pervasive, and objectively offensive. *Doe v. School District Number 1, Denver, Colorado*, 970 F.3d 1300, 1311-1312 (10th Cir. 2020). Doe was sexually assaulted by a male classmate at his home on a Saturday night and she reported the assault to the school the following Monday. Doe then started experiencing "backlash from her peers who had heard about the assault" and reported that to the school. Her assailant's friends verbally harassed and bullied her. The harassment continued for 14 months, eventually causing her to transfer to another school. The Tenth Circuit held that the harassment Doe experienced after she reported her rape was discrimination on the basis of sex:

> "A plaintiff should have—and must plead—at least some relevant information to make the claims plausible on their face." *Bekkem v. Wilkie,* 915 F.3d 1258, 1275 (10th Cir. 2019) … But the plaintiff is not required to prove her case at the motion-to-dismiss stage. *See id.* at 1274 … Further, matters of degree—such as severity and pervasiveness—are often best left to the jury. Thus, we have observed that "**the severity and pervasiveness evaluation** is particularly unsuited for summary judgment because it is quintessentially a question of fact," *O'Shea v. Yellow Tech. Servs., Inc.,* 185 F.3d 1093, 1098 (10th Cir. 1999); **and it is even less suited for dismissal on the pleadings.**
>
> These considerations are particularly potent here. Ms. Doe alleges that she was continuously harassed for a number of months. **The complaint need not provide details of the time, place, offender, and precise statement for every incident**. Describing more than half a dozen of the types of things said to her, apparently repeatedly, can suffice, particularly when combined with her allegations that she reported ongoing and continuous harassment to school personnel almost monthly from the time of the sexual assault to the time she left the school.

*Id.* at 1311-1312. (emphasis added). The Tenth Circuit reversed the district court's order granting the defendant school's motion to dismiss her Title IX complaint for failure to state a claim. *Id.*

A single incident of sexual assault or rape can give rise to post-assault Title IX liability. *See Tackett v. University of Kansas*, 234 F.Supp.3d 1100, 1108 (D. Kan. 2017) (rejecting motion to dismiss where plaintiff plead facts showing KU responsible for post-assault conduct after a single incident of sexual harassment). *See also Spencer v. University of New Mexico Board of Regents,* No. 15-CV-141 MCA/SCY, 2016 WL 10592223, (D.N.M. 2016). In *Spencer*, Plaintiff alleged that

while she was incapacitated, she was transported by a football player from an on-campus gathering to an off-campus location where she was placed in a car by three men and raped inside the vehicle. The New Mexico district court summarized the law on this subject:

- "A single act of severe sexual harassment—particularly a rape …. can support a Title IX claim where the claim is premised upon the school's response to the report of the incident of sexual harassment." (*citing Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 259, n.4 (6th Cir. 2000) and *S.S. v. Alexander*, 177 P.3d 724, 739 (Wash. Ct. App. 2008).

- "In the context of Title IX, "there is no 'one free rape' rule"; and a victim does not have to be raped twice before the school is required to respond appropriately." (*citing SS.,* 177 P.3d at 741.)

- "A jury may conclude that harassment is severe, pervasive, and objectively offensive from evidence that a student who is known to have perpetrated a sexual assault upon another student is permitted to continue attending the same school as the victim, leaving open the potential for interactions between the two." (*citing Doe ex rel. Doe v. Derby Bd. of Educ.,* 451 F.Supp.2d 438, 444 (D. Conn. 2006)).

- "[A] reasonable jury [may] conclude that further encounters, of any sort, between a rape victim and her attacker could create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided by a university." (*quoting Kelly v. Yale Univ.,* No. 3:01-CV-1591, 2003 WL 1563424, at *3 (D. Conn. 2003).

- "[W]here the victim of student-on-student sexual harassment whose report of a rape was met with deliberate indifference by the school *voluntarily* withdraws from school to avoid exposure to further harassment, the voluntary withdrawal may yet support a finding that the school 'effectively barred her access to an educational opportunity[.]'" (*quoting Williams v. Bd. of Regents of Univ. Sys. of Georgia,* 477 F.3d 1282, 1296-98 (11th Cir. 2007)).

After distinguishing *Rost* and *Escue*, the *Spencer* court denied Defendant's motion to dismiss. *Id.*

Here, Bobbie has pleaded that the harassment she suffered was pervasive, severe and offensive enough to deprive her of an educational benefit of opportunity. Plaintiff's pleaded facts strikingly similar to *Spencer* showing she was subjected to a hostile educational environment. She was raped by a fellow law student, and KU refused to investigate her complaint. Bobbie experienced serious safety issues when she was forced to continue to attend law school with her

assailant, his friends and his advocates. ¶¶ 172, 186). She secluded herself from friends and withdrew from activities. (Doc. 25, ¶¶187, 188, 264). She pled facts that show that harassment she suffered from the law school students and professors actually did deprive her of educational opportunities when she was forced to withdraw from school. Doc. 25, ¶¶ 124, 178, 190). The constant risk of encounter and lack of access to educational opportunities amounted to an "intimidating, hostile, or offensive educational environment" which interfered with her academic performance, participation, and opportunities. *See also Doe ex rel. Doe v. Coventry Bd. of Educ.*, 630 F.Supp.2d 226, 233 (D. Conn. 2009) (stating that a reasonable jury could find that funding recipient forcing high school victim of sexual assault to attend school with her assailant amounted to sufficiently severe harassment to deprive victim of access to educational opportunities, based on "potential interactions" between victim and the student harasser). Based on the facts alleged, Bobbie has demonstrated that KU acted with deliberate indifference when it ignored that hostile environment in violation of her rights under Title IX.

Defendant cites *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1059 (8th Cir. 2017) in support of its argument that a single incident of rape is not enough to state a claim. *K.T.* was a pre-assault Title IX claim that involved a high school student-recruit who was sexually assaulted at a fraternity. In response to her assault report, the college did nothing other than cancel a scheduled conference with the girl and her parents. The Eighth Circuit found no actual knowledge of prior notice for her *pre-assault* claim, and that the single incident was insufficient to show pervasive discrimination. Unlike *K.T.*, Plaintiff alleges *post-assault* harassment that was severe, pervasive and offensive.

Defendant KU makes a spurious argument that the post-assault harassment she experienced from other students at the law school is not actionable as it is speech "protected under the First Amendment." (Doc. 30 at 28).  Defendant ignores the conduct of its own professors and

administrator.  Moreover, it cites no authority for the application of First Amendment protections in this case, or how they would serve as a defense in any form or manner to KU's conduct that violated Title IX. This "red-herring" argument completely ignores the focus of this Title IX claim – that KU's deliberate indifference caused Plaintiff to be "vulnerable to" further harassment.

### b.    Plaintiff plausibly pled deliberate indifference for her Title IX claims.

Under Title IX, the school must be found to have acted with legal culpability known as "deliberate indifference." To show deliberate indifference, KU must have acted in a **"clearly unreasonable"** manner. *Davis, supra,* 526 U.S. at 646-647. A response is "clearly unreasonable" when it is not calculated to be effective, or when repeated harassment demonstrates that it has not been effective. *Vance,* 231 F.3d at 262. ("Although talking to the offenders produced no results, [the school] continued to employ this ineffective method.... [O]nce [the school] had knowledge that its response was inadequate, it was required to take further reasonable action in light of the circumstances to avoid new liability.").[8]  In *Tackett*, Judge Marten held that pleadings that indicated KU's administrator's ignored complaints of harassment and did not investigate them "support a finding of deliberate indifference."  234 F.Supp.3d at 1108.

KU argues the FAC does not plead deliberate indifference, arguing facts in the light most favorable to KU. (Doc. 30 at 30).  Contrary to KU's view of the facts, Plaintiff did plead deliberate indifference in several respects.

Plaintiff pled facts showing her vulnerability and the further harassment she suffered. (See, e.g., Doc. 25, ¶¶ 172, 189).  Deliberate indifference may be shown by evidence that makes a student more vulnerable to sexual harassment or by evidence that results in additional harassment. *Davis,* 526 U.S. at 645; *Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F.Supp.2d 438, 440, 444-45 (D. Conn.

---

[8]       See also, OCR Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12034 (Mar. 13, 1997).

2006) (holding the funding recipient could be liable under Title IX for its post-assault deliberate indifference which "constantly exposed" the plaintiff "to the possibility of an encounter with" the perpetrator, even if there was no evidence that the perpetrator actually harassed the victim after she reported rape); *Ross v. Corp. of Mercer Univ.*, 506 F.Supp.2d 1325, 1346 (M.D. Ga. 2007); *Rost*, 511 F. 3d at 1123.

In *Rullo v. University of Pittsburgh-of the Commonwealth System of Higher Education*, No. 17-1380, 2020 WL 1472422 (W.D. Pa. 2020), on a summary judgment record, the court found the university's decision to not address the plaintiff's complaints while she attempted to attend law school classes in the face of ongoing intimidation and disparaging treatment raised a genuine issue of fact as to the university's deliberate indifference. *Rullo* is strikingly similar to the facts in this case.

Bobbie pled facts demonstrating KU's deliberate indifference to the harassment she suffered. (*See, e.g.*, Doc. 25, ¶¶ 122, 123, 189). In *John Doe 4 v. Freeburg Community Consolidated School District No. 70*, 279 F.Supp.3d 807 (S.D. Ill. 2017), the court found that the school district's response to the prior harassment, or lack thereof, was undisputed evidence of deliberate indifference. *Id.* at 815. No response, a minimal response, or actual encouragement of sexual harassment will amount to deliberate indifference. *Simpson*, 500 F.3d at 1177-1179; *Escue*, 450 F.3d at 1155 (citing *Vance*, 231 F.3d at 260); s*ee also BPS v. Board of Trustees for Colorado School for The Deaf and Blind*, 12-cv-02664-RM-KLM (D. Colo. September 16, 2015).

Bobbie pled facts showing KU's deliberate indifference in its response to her complaint by its failure to investigate. (*See, e.g.*, Doc. 25, ¶¶ 177-180, 182-184).[9]  A failure to investigate and put a stop to harassment may constitute "gross negligence amounting to deliberate indifference."

---

[9]     Notably, KU's same argument for dismissal was rejected in the Tackett case, where the pleaded facts demonstrated the school was still not investigating reports of harassment. *Tackett*, 234 F.Supp.3d at 1108.

*Doe v. School District No. 1,* 970 F.3d at 1314; *Lipsett v. University of Puerto Rico*, 864 F. 2d 881 (1st Cir. 1988); *Davis,* 526 U.S. at 654; *Doe v. School District No. 1,* 970 F.3d 1314 (failure to document the complaints or take them seriously is evidence of deliberate indifference); *see also Nave v. Indep. Sch. Dist. No. 20 of LeFlore Cty.,* 2018 WL 6419296 (E.D. Okla. Dec. 6, 2018) (lack of action in further investigating the incidents cited was clearly inadequate and deliberately indifferent). In *Chancellor v. Pottsgrove School Dist.*, 501 F. Supp. 2d 695 (E. D. Penn. 2007)*,* the court denied summary judgment based on the fact that the school principal took no action to investigate the sexual relationship between the teacher and the student, contrary to school district policy. This fact alone demonstrated "deliberate indifference to the relationship." *Id.* at 709.

KU's deliberate indifference was also apparent in how it concealed, rather than gave, proper notice to Plaintiff that it was investigating *her*, demonstrating its sexually discriminatory bias. In *Doe v. Oberlin College*, 963 F.3d 580 (6th Cir. 2020), the Sixth Circuit held that procedural irregularities, including a suspect "not even informed of the specific allegations against him," and an investigation that took 120 days to complete, permit a plausible inference of sex discrimination. *Id.* at 586-587 (citing *Menaker v. Hofsta Univ*., 935 F.3d 20, 33 (2d Cir. 2019)). Similarly, the College's failure to address inconsistencies in the evidence also constituted procedural irregularities that supported an inference of discrimination. *Id.* at 587 (citing *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018). Finally, where there are "grave" doubts as to a university's Title IX proceeding, the outcome itself can support an inference of sex bias. *Id*. at 587-588 (citing *Doe v. Purdue Univ*., 928 F.3d 652, 669 (7th Cir. 2019).

Failure to interview witnesses provided by the accused plausibly supported a Title IX discrimination claim. *Lee v. University of New Mexico*, 449 F.Supp.3d 1071, 1140 (D.N.M. 2020) (discussing *Doe v. Columbia Univ*., 831 F.3d 46, 57 (2d. Cir. 2016) ("When the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion

in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer ... that the evaluator has been influenced by bias.").

KU cites *Doe v. Univ. of Miami*, 446 F. Supp. 3d 1000, 1008 (S.D. Fla. 2020), arguing the fact that an "investigation lasted longer than the DOE's suggested 60 days does not alone constitute deliberate indifference," and *Moore v. Regents of the Univ. of California*, Civ. No. 15-5779 RS, 2016 WL 2961984, at *6 (N.D. Cal. May 23, 2016), where the court found a three-month delay was not clearly unreasonable in light of the known circumstances. Here, KU did not reach a resolution of Bobbie IOA report for nearly **nine months** – a length of time that evinces deliberate indifference to the impact the on-going investigation was having on her ability to study and participate as a student at KU. (Doc. 25, ¶¶ 124, 129-131). A "lengthy and unjustified delay" in implementing remedial action can establish "deliberate indifference." *Hayut v. State University of New York*, 352 F.3d 733, 751 (2d Cir. 2003); *Davis*, 526 U.S. at 649 (failure to respond to complaints from plaintiff and other students for five months could establish "deliberate indifference."); *Doe v. University of Kentucky*, No. 5:15-cv-00296-JMH, 2016 WL 4578328 (E.D. Kentucky 2016) (University's ongoing failure to resolve the matter amounted to "deliberate indifference."). KU was aware that a typical investigation takes approximately 60 calendar days following receipt of the complaint, but only extended the time frame once. (Doc. 25, ¶ 111).

KU's conclusion that the "conduct in her complaint was not based on Plaintiff's sex or an attempt to harass or to retaliate against her" in response to her November 1, 2019 retaliation complaint is clearly unreasonable. The Tenth Circuit does not require continuing harassment to be sexual in nature. *Farmer*, 918 F.3d at 1104. KU confuses and conflates conduct in the 2018-2019 school year with its response to conduct in November of the next school year. (Doc. 30 at 31).

The facts in this case are contrary to those in *Rost*, where the police were investigating the plaintiff's complaint, not the plaintiff herself.  KU continued to conspire with the LPD for months

after Plaintiff revoked her consent to share information, and by doing so, it was deliberately indifferent.  All reasonable inferences here indicate KU was targeting Bobbie, and not investigating her sexual assault report.

KU's "deliberate indifference" to the discrimination and harassment Bobbie Jo suffered has been adequately pled. "[W]hether a school acted with deliberate indifference is typically a question of fact to be resolved by the jury." *Joyce v. Wright State Univ.,* No. 3:17-CV-387, 2018 WL 3009105, at *6 (S.D. Ohio June 15, 2018).  KU's motion to dismiss should be denied.

### 2.    Overview of the pre-assault Hostile Education Environment claim.

The Supreme Court has recognized civil damage claims against educational institutions for sexual harassment, first for teacher-on-student sexual harassment in *Gebser*, 524 U.S. at 287 and then for student-on-student harassment in *Davis*, 526 U.S. at 642. Sexual harassment "is a form of discrimination on the basis of sex and is actionable under Title IX." *Escue v. N. Okla. Coll.,* 450 F.3d 1146 (10th Cir. 2006).  Sexual assault is a form of sexual harassment.  *Vance*, 231 F.3d at 259.

To state a claim under Title IX for student-on-student sexual harassment, a plaintiff must show that the school "(1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it … deprived the victim of access to the educational benefits or opportunities provided by the school." *Murrell v. Sch. Dist. No. 1, Denver, Colo.,* 186 F.3d 1238, 1246 (10th Cir. 1999); *Gebser,* 524 U.S. at 287.

Here, KU claims a failure to plead "actual knowledge" of prior sexual harassment.  Plaintiff does not disagree that evidence of prior reports of sexual assault or sexual misconduct involving Plaintiff's assailant is sparce, and that she has only information and belief that KU administrators or mandated reporters were aware of prior reports of sexual assault or sexual misconduct involving Thompson, (Doc. 25, ¶ 170) and that the KU law school knew that Thompson had angry or violent confrontations in conjunction with law school sponsored or hosted events where he stated a female

student did not need to "perpetuate a narrative wherein [he] was a predator" (Doc. 25, ¶ 171).[10]

*See Lopez v. Metro. Gov't,* 646 F.Supp.2d 891 (M.D. Tenn. 2009) (defendant's notice of prior harassment against victims other than the plaintiff can give rise to Title IX liability, so long as the defendant "possessed enough knowledge of the harassment that it could reasonably have responded with remedial measures to address the kind of harassment upon which the plaintiff's legal claim is based.").

Without discovery, Plaintiff possesses only two prior acts of sexual harassment were pervasive, severe or objectively offensive. Defendant possesses the evidence in support of this claim and the court should not dismiss at this stage of the proceedings.  See *S.C. v. Lansing Unified School District*, Case No. 18-2228-DDC-JPO, 2019 WL 1317503 (D. Kan. 2019).

### D.      Plaintiff plausibly pleaded facts that establish a Title IX retaliation claim.

The Supreme Court recognized a cause of action for retaliation as a form of discrimination under Title IX in *Jackson v. Birmingham Bd. of Ed.*, 544 US 167, 173-174 (2005). There, the Court stated Title IX is a "**broadly written general prohibition on discrimination**…"  *Id.* at 175 (emphasis added). In *Jackson*, the Court held that a male athletic coach could bring suit under Title IX where he alleged that he had suffered adverse consequences for protesting discriminatory treatment of female athletes.

The broad coverage of Title IX is furthered by the stated intent in the U. S. Department of Education regulations that Title IX protect all individuals from retaliation. Section (e) of 34 C.F.R. § 100.7(e) states:

> (e) *Intimidatory or retaliatory acts prohibited.* No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part. The identity of

---

[10]      The reasonable inference from this allegation is that the word "predator" was in reference to sexual conduct.

complainants shall be kept confidential except to the extent necessary to carry out the purposes of this part, including the conduct of any investigation, hearing, or judicial proceeding arising thereunder.

To state a claim for retaliation under Title IX, a plaintiff must allege that: 1) she engaged in protected activity; 2) defendant had knowledge of the protected activity; 3) materially adverse school-related action taken against plaintiff; and 4) a causal connection between the protected activity and the adverse action. *Tackett,* 234 F. Supp.3d at 1109; *see also Nave v. Indep. Sch. Dist. No. 20 of LeFlore Cty.,* 2018 WL 6419296 (E.D. Okla. Dec. 6, 2018) ((student's report of sexual relationship with teacher was protected activity).

KU challenges this claim by contending Plaintiff's protected activity is based a "mistaken belief" that KU is responsible for actions of employees or students. Plaintiff claims here that KU is responsible for its deliberate indifference to retaliation by employees and students and she has pled facts that establish all three elements for a prima facie case of retaliation. KU challenges her pleading as to only the first and third elements of this claim.

### 1. Pleaded facts show Plaintiff engaged in protected activity.

The Tenth Circuit has recognized that the Supreme Court enlarged the scope of what conduct can constitute protected activity – "all one has to do to oppose an unlawful employment practice in Title VII cases is to 'resist or antagonize…; contend against; … confront; resist; [or] withstand' it." *Weeks v. Kansas*, 503 F. App'x 640, 643 (10th Cir. 2012) (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009)).

In Count VI of Plaintiff's FAC, she alleged that she engaged in at least four distinct instances of protected activity. Plaintiff engaged in a protected activity under Title IX when she (1) reported her sexual assault to KU's IOA office and gave a statement in October 2018; (2) reported Thompson's harassment, retaliatory treatment and comments toward her in November 2018; (3) reported additional harassment or discriminatory treatment in her law school class with

Prof. Lucas, in March 2019;[11] and (4) reported additional harassment, discriminatory treatment and retaliation in November 2019. (Doc. 25, ¶ 269). All of these reports were to the IOA office, and one was to KU's attorney. (Doc. 25, ¶ 82, 100, 122, 197). This is all protected activity. When she complained in November 2018, and again in March and November 2019, KU's response was "clearly unreasonable." (Doc. 25, ¶ 103, 123, 198).

KU asserts a report of rape by a fellow law student is not protected activity. (Doc. 30 at 34). There is no mistake that reporting sexual assault is protected activity. *Doe v. School District No. 1*, 970 F. 3d at 1310-1311. Instead of looking at binding authority from the District of Kansas, the Tenth Circuit, or the Supreme Court, KU relies on a case from Florida for its position.[12]

In *Jackson*, the Supreme Court held that retaliation for reporting sex discrimination comes within the meaning of the statutory language prohibiting discrimination on the basis of sex. The Supreme Court explained:

> Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action. Retaliation is, by definition, an intentional act. It is a form of `discrimination' because the complainant is being subjected to differential treatment. Moreover, retaliation is discrimination `on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination.

*Id.* at 173-74.

Bobbie made an allegation of sex discrimination when she reported her rape to the IOA office. (Doc. 25, ¶ 269). *Doe v. School District No. 1*, 970 F. 3d at 1311; *See also Rene v. MGM Grand Hotel, Inc.,* 305 F.3d 1061, 1065-1066 (9th Cir. 2002) (collecting cases holding that

---

[11]   Plaintiff believes that discovery will demonstrate the close relationship between her assailant and Lucas, which will show the continuing harassment and intimidation for which she complained in March 2019.

[12]   The district court decision in *Garrett v. Univ. of S. Fla. Bd. of Trustees,* 448 F. Supp. 3d 1286 (M.D. Fla. 2020) – that she engaged in protected activity by criticizing the school's disposition of her complaint – is inapposite on its facts, unauthoritative, and contrary the Supreme Court authority in *Jackson* and Tenth Circuit authority in *Doe v. School District No. 1.*

physical sexual assault is sexual harassment). Bobbie then reported she was being harassed and retaliated against for reporting the misconduct on three occasions. (Doc. 25, ¶ 100, 122, 197). As the Tenth Circuit explained in *Doe v. School District No. 1*:

> [A]ny harassment of her that was motivated by retaliatory animus for her complaint was "an intentional response to the nature of [her] complaint" and was therefore "discrimination `on the basis of sex.'" *Jackson,* 544 U.S. at 173-74, 125 S.Ct. 1497; *see Feminist Majority Found. v. Hurley,* 911 F.3d 674, 695 (4th Cir. 2018) ("[W]e are satisfied that an educational institution can be liable for acting with deliberate indifference toward known instances of student-on-student retaliatory harassment."); *cf. Fuller v. Idaho Dep't of Corr.,* 865 F.3d 1154, 1166-67 (9th Cir. 2017) ("[W]hen an employer acts in a way that effectively condones or ratifies a rape or sexual assault and its effects, a jury may reasonably infer that the employer itself is discriminating because of sex."

*Id.* at 1311.

The District of Kansas found protected opposition to sex discrimination sufficient to state a claim of retaliation under Title IX in *Zamora v. Unified Government*, Case No. 17-CV-2261-JAR 2019 WL 6052493 (D. Kan. 2019).  In *Zamora*, the plaintiff made a report about a juvenile detention center employee's physical behavior toward a minor resident of the center. The court explained that "a meritorious retaliation claim will stand even if the underlying discrimination claim fails" and then found Zamora had established a subjective and objective reasonable belief that she reported conduct forbidden by Title IX sufficient to show protected opposition. *Id*. at *20. And in *Tackett*, this Court held that the Plaintiff's complaint about her KU coach's inappropriate comments at a team meeting sufficiently pled protected activity. 234 F.Supp.3d at 1109.

Plaintiff is protected from retaliation for her opposition to sexual discrimination as well as her participation in the IOA investigation or proceeding under Title IX. "Title IX empowers a woman student to complain, without fear of retaliation, that the educational establishment treats women unequally." *Emeldi v. University of Oregon,* 698 F.3d 715, 725 (9th Cir. 2012) (complaints about gender-based institutional bias and unequal treatment of graduate students is protected activity).  KU gave her male assailant preferential treatment in its determinations.

Finally, KU argues that Plaintiff failed to allege that she complained about KU's response to her reports, again relying on *Garrett*. However, she did allege that KU's response was not adequate when it took no proactive steps to protect her, it failed to suspend her assailant or ban him from campus, it failed to conduct a timely or impartial investigation, it accused her of making a false report of sexual assault, it subjected her to a student conduct hearing and it deliberately failed to supervise employees that had the means and authority to stop the discrimination and retaliation she experienced – all of which were clearly unreasonable. (Doc. 25, ¶¶ 193, 275, 277). Plaintiff has alleged protected activity sufficient to state a claim for retaliation.

### 2.    Pleaded facts show Plaintiff suffered adverse action.

For Title IX retaliation, "a plaintiff need only show that a reasonable [student] would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable [student] from making or supporting a charge of discrimination." *Somoza v. University of Denver*, 513 F.3d 1206, 1213 (10th Cir. 2008) (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)); *Doe v. Brown University*, 304 F. Supp. 3d 252, 260 (D. R.I. 2018). As the Supreme Court recognized, "context matters," and thus the court must assess the "significance" of the action in light of "the particular circumstances." *White*, 548 U.S. at 69. Each case is "judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 71.  The Tenth Circuit construes the term "adverse action" liberally. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1219 (10th Cir. 2013).

Cases involving students demonstrate that the materially adverse school-related action is of a distinctly different nature and character than adverse action in an employment context.  In *Nave, supra,* conduct by teachers and students intended to intimidate the plaintiff, which school administrators permitted to occur, was "sufficient to present the issue of retaliation to the jury." *See also Rullo, supra* (Plaintiff forced to request a leave of absence and then dismissed for the

academic year was adverse action); *Doe 1 v. George Washington University*, 369 F. Supp.3d 49 (D.D.C. 2019) ("demeaning, insulting, and ridiculing" statement was sufficient adverse action at motion to dismiss stage to support a chilling inference); *Tackett*, 234 F.Supp.3d at 1109 (denial of the opportunity to participate in winter training was sufficient adverse action); *Higgins v. Saavedra*, Case No. CIV 17-0234RB/LF (D. N.M. January 8, 2018) (coach's discipline, alienation, and demotion of the student from the team and obstruction of her transfer found to be "objectively material and adverse."); *IG v. Board of Education of Aztec Municipal School District*, Case No. 18-124KK/KBM, (D. N.M. Sept. 30, 2018) (refusal to exempt plaintiff from grades requirement to participate in sports and awareness of teacher's text message eliciting support for abuser was materially adverse school-related action).

In *Doe v. University of Tennessee*, 186 F.Supp.3d 788 (M.D. Tenn. 2016), the court found evidence of retaliation in the school's tolerance or condoning harassing behavior and its failure to respond to the plaintiff's complaints. *Id.* at 810-811. The court relied on Title VII coworker retaliatory harassment case law to find sufficient support of adverse action, citing *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 347 (6th Cir. 2008); s*ee also Richardson v. New York State Dep't of Correctional Service,* 180 F.3d 426, 446 (2d Cir. 1999) ("unchecked" coworker harassment may constitute an adverse employment action); *Knox v. Indiana,* 93 F.3d 1327, 1334 (7th Cir. 1996) (acquiescence in a coworker's campaign of retaliatory harassment was adverse action); *Wyatt v. City of Boston,* 35 F.3d 13, 15-16 (1st Cir. 1994) (adverse action includes "toleration of harassment by other employees"); *Gunnell v. Utah Valley State Coll.,* 152 F.3d 1253, 1264-65 (10th Cir. 1998) (sufficiently severe co-worker hostility or retaliatory harassment may constitute adverse action for a retaliation claim).

In *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 986 (10th Cir.1996) the court found that the filing of knowingly false criminal charges against a plaintiff, because of their impact on future

potential employment, can constitute an adverse employment action for the purposes of a retaliation claim. *See also Velikonja v. Gonzales,* 466 F.3d 122, 124 (D.C.Cir. 2006) (holding that the "prospect" of an investigation resulting from the employer's false accusations, during the pendency of which the employee was prevented from receiving promotions, and which prevented her from obtaining assignments, could dissuade a reasonable person from making or supporting a charge of discrimination).

In this case, Bobbie pled facts showing KU took action that adversely impacted her education, including intimidation and ostracization on campus and at the law school, accusing her of making a false report of sexual assault, subjecting her to disciplinary action and a student conduct hearing which threatened her law degree, her future as a lawyer, her job and her reputation, subjecting her to ridicule and embarrassment in class, and forcing her to drop classes and withdraw from school. (*See, e.g.,* Doc. 25, ¶¶ 184, 186, 193, 202, 264, 270). These facts, and the reasonable inference derived therefrom, establish that KU took adverse actions against her that deprived her of educational opportunities and would certainly deter other students from lodging complaints.

### 3. Defendant KU's arguments are unavailing

KU suggests that Plaintiff's FAC is deficient because she does not "identify what the acts are, who committed them, when they were committed, etc., so KU, and the Court, are left to guess." Doc. 30 at 35-36. To survive a motion to dismiss, it is not necessary to identify the "who, what, when, where." *Doe v. School District No. 1*, 970 F.3d at 1311. KU seeks more specificity in this FAC than Rule 8 requires. *Erickson v. Pardus,* 551 U.S. 89, 93 (2007) ("[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'").

KU cites *Rossley v. Drake University*, 958 F. 3d 679 (8th Cir. 2020) in support of its contention that plaintiff has not alleged sufficient facts to show the retaliation occurred in KU's

programs or activities. *Rossley* was a summary judgment decision, involving a claim that the university directed a Board member not frequent an off-campus tavern.  It has no application to the facts in this case, where Bobbie has alleged her adverse action occurred at KU law school which is undisputedly one of KU's educational programs.

Defendant's reliance on cases decided at the summary judgment stage, such as *Rossley* and *Doe,* should not control at this motion to dismiss stage. There was nothing "standard" in the investigative process KU decided to follow in this case, and Plaintiff did not plead this alleged fact suggested by KU. Instead, Plaintiff pled KU was deliberately indifferent to plaintiff when it targeted her for making a false report because she reported KU's "poster boy" of raping her.  And "[b]eing forced to withdraw from classes which denied and delayed educational opportunities," as alleged, (Doc. 25, ¶ 270(d)), is adverse action. *See Rullo, supra.*

Reading Plaintiff's FAC as a whole, she has pled sufficient facts to demonstrate adverse action for her retaliation claim.  She also pled that the IOA personnel had notice of her claims, that the Dean and administrators at the law school had knowledge of her IOA complaint and that KU was deliberately indifferent to the harassment and discrimination she experienced. See Section IV., C., 1., b., above. Defendant's motion should be denied.

### E.      Rebuttal to KU's "threshold claim"

KU seeks a *per se* rule that an educational institution has no Title IX liability for sexual misconduct that occurs off-campus. The Supreme Court and Tenth Circuit do not recognize such a rule. And KU has not provided any precedent or persuasive support for its contention that a school is immune from Title IX liability when its student is sexually assaulted off-campus.

When examining off-campus sexual harassment under *Davis*, the Tenth Circuit adopted a nexus requirement for Title IX liability, but explicitly *rejected* a bright line rule distinguishing a school's obligations regarding on-campus sexual harassment as opposed to off-campus

harassment, stating "We do not suggest that harassment occurring off school grounds cannot as a matter of law create liability under Title IX." *Rost,* 511 F.3d at 1121 n.1. "Ultimately, it is the school's response to the harassment, and exacerbation of the harassment, which is placed at issue under Title IX." *Opatz v. Boise State University*, No. CV-PI-2014-0004132, *35 (Idaho Dist. Ct. 4th Dist. 2015) (summary judgment denied on a Title IX claim when the victim was raped *off-campus at a student's private home*).

The Department of Education's guidance has recognized that Title IX extends to off-campus harassment for nearly 25 years:

> Title IX protects students in connection with all of the academic, educational, extra-curricular, athletic, and other programs of the school, whether they take place in the facilities of the school, on a school bus, at a class or training program sponsored by the school at another location, or elsewhere.

U.S. Dept. of Educ., Office for Civil Rights, *Sexual Harassment Guidance* (1997).

*Simpson* imposed liability under Title IX for the rapes of plaintiffs at an *off-campus* apartment. 500 F.3d at 1185. In *Kinsman v. Fla. State Univ. Bd. of Trustees*, No. 4L15cv235-MW/CAS (N.D. Fla. 2015), the plaintiff alleged that "another FSU student – the football player Jameis Winston – raped her at an *off-campus apartment* in Tallahassee, Florida." (emphasis added). The court denied FSU's motion to dismiss Kinsman's Title IX suit for failure to properly investigate or respond to the rape, despite the off-campus, private location of the assault. *Id.* at *15. S*ee also Crandell v. New York College of Osteopathic Med.,*87 F. Supp. 2d 304, 316, n.126 (S.D.N.Y. 2000) ("Courts frequently have upheld sexual harassment claims under Title IX where some or all of the alleged misconduct occurred off campus," (listing cases); allegations of a nexus between the off-campus misconduct and the hostile environment at the institution were sufficient).

KU contends it has no liability because of Plaintiff's alleged "failure to plead that the alleged sexual assault occurred in a University 'program or activity.'" (Doc. 30 at p. 16). But as stated above in Section IV. B., Plaintiff pled that the assault occurred in conjunction with a KU

law school sanctioned activity.  (Doc. 25, ¶ 8, 168).  In addition, KU has substantial control over conduct that occurs off-campus that violates its policies and affects its educational programs and activities. As pled in the FAC, KU's student conduct policy provided explicit *disciplinary authority* over Bobbie's assailant, who was a KU law school student. (Doc. 25, ¶ 156, 158-162). Not only did KU have control over her assailant, it had control over the law school's programs and activities. (Doc. 25, ¶ 164). Defendant KU's sexual harassment policy and its discrimination policy clearly cover "off-campus" conduct that has continuing adverse effects on campus, in the context of an education program or activity. (Doc. 25, ¶ 157, 162, 164, 180).  KU has inconsistently used its disciplinary authority over incidents of off-campus rape. (Doc. 25, ¶ 180, 196). This inconsistent application of a policy reinforces that KU had disciplinary authority and simply chose not to use it here, exhibiting deliberate indifference.

KU relies heavily on Judge Robinson's opinion in *Weckhurst v. Kansas State University,* 241 F. Supp. 3d 1154, 1164 (D. Kan. 2017). However, the points relied upon from this district court opinion are contrary to subsequent Tenth Circuit law. *See, e.g., Doe v. School District No. 1*, *supra,* where plaintiff stated a claim for Title IX liability even though the sexual assault occurred off premises and on a Saturday night.  Moreover, the *Weckhorst* opinion only looked at a Title IX liability for pre-assault actions, not actions arising under the *Simpson*, *Farmer* or *Jackson* theories.

Finally, KU's "threshold" argument – that the alleged sexual assault must occur in a University "program or activity" – is misplaced here because such an analysis only applies to the "pre-assault" cases.  *Davis* does not say "geographic location" – instead what the Supreme Court requires is that a funding recipient "may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment by 'caus[ing] [students] to undergo' harassment or 'make them liable or vulnerable' to it."  *Id.* at 64-645. Defining the context of "under" "the operations of" a funding recipient, the Supreme Court looked at the plain meaning of the word "under" to be

defined as "subject to the authority, direction, or supervision of." *Id.* at 645. Significantly, The Court held in *Davis*: "We thus conclude that recipients of federal funding may be liable for 'subject[ing]' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and **the harasser is under the school's disciplinary authority**." *Id.* at 646-647. (emphasis added). Davis recognized that a funding recipient is "liable for its *own* decision to remain idle in the face of known student-on-student harassment in its schools." *Id.* at 641.

In *Roe v. St. Louis University,* 746 F.3d 874 (8th Cir. 2014), the court failed to address the control the university had over the "aftermath" of the rape when it affirmed summary judgment on the plaintiff's Title IX claim and concluded SLU was not deliberately indifferent to Roe's rape where she "never told anyone who had assaulted her until after she left the University" and declined to file a report which would have allowed SLU to investigate. *Id.* at 879. The court found the university did not have sufficient control over the party hosted at an apartment building, but did not make the *location* of the assault a threshold liability question, as KU asks this court to do here. *Id.* at 880.  *Roe* is contrary to binding authority in the Tenth Circuit. *See, e.g., Farmer, supra.*

*Rost, supra,* is similarly distinguished. There, the court found that the student's statement to school officials that "these boys [are] bothering me" was insufficient to give actual notice of the sexual harassment. Once the school had actual notice, the court reviewed whether the school was deliberately indifferent, but there was no evidence that the school's response caused further harassment or made her vulnerable to it. *Id.* at 1123-1124. Thus, the school "district's response was not clearly unreasonable so as to be deliberately indifferent to the harassment." *Id.* at 1124. Here, there is evidence of further harassment.

In *Samuelson v. Oregon State Univ.*, 162 F. Supp. 3d 1123, 1131-32 (D. Or. 2016), *aff'd*, 725 F. App'x 598 (9th Cir. 2018), the rapist was not a student or associate of the university and

Title IX liability did not extend to the university because "no one connected to the university sexually assaulted Ms. Samuelson." *Id.* at 1133. Here, Bobbie's assailant was a KU law student.

None of KU's authority mandates dismissal of this case.

## V.  Conclusion

Plaintiff has plausibly pleaded KU violated Plaintiff's rights to be free from discrimination and retaliation under Title IX. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer* v. *Rhodes,* 416 U. S. 232, 236 (1974). The "high standard" KU argues exists for Title IX claims is misleading and contrary to the law. The pleaded facts show that Plaintiff's allegations support her Title IX claims. Defendant's motion should be denied.

Dated: May 6, 2021                          Respectfully submitted,


/s/ Sarah A. Brown
Sarah Brown, KS #12130
BROWN & CURRY, LLC
1600 Genessee Street, Suite 956
Kansas City, MO 64102
(816) 756-5458 (phone)
(816) 666-9596 (fax)
sarah@brownandcurry.com


/s/ Cheryl A. Pilate
Cheryl A. Pilate, KS # 14601
MORGAN PILATE, LLC
926 Cherry St.
Kansas City, Missouri 64106
(816) 471.6694 (phone)
(816) 472-3516 (fax)
cpilate@morganpilate.com

ATTORNEYS FOR PLAINTIFF

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 6, 2021, the above and foregoing document was filed using the Court's CM/ECF system which sent notice to all counsel of record.

<u>/s/ Sarah A. Brown</u>
Attorney for Plaintiff