IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BOBBIE JO HOROCOFSKY,

*Plaintiff*,

vs.

Case No. 20-2529-EFM

CITY OF LAWRENCE, *et al*.,

*Defendants*.

## MEMORANDUM AND ORDER

In late 2018, Plaintiff Bobbie Jo Horocofsky, a student at the University of Kansas School of Law, made a statement to officers of the Lawrence, Kansas police department, and later to University investigators, indicating she had been raped by another law student. A police detective subsequently submitted a probable cause affidavit stating the investigation showed that Plaintiff's report was false. The Douglas County District Attorney filed state criminal charges against Plaintiff, and on June 5, 2019, the Douglas County District Court conducted a preliminary hearing and found that probable cause supported the charges.

Shortly before the trial, however, the District Attorney dismissed the charges, and Plaintiff instituted the present action against the University, the City of Lawrence, and three officers of the Lawrence Police Department (LPD): Detectives Charles Cottengim and

Kimberlee Nicholson, and Officer Daniel Affalter, Jr. (the "Individual Defendants"). All of the Defendants have moved to dismiss the claims against them.

For the reason identified below, the Court grants the University's Motion to Dismiss. The Court grants in part and denies in part the Motion to Dismiss of the City and the Individual Defendants.

## I.        Factual and Procedural Background

On the evening of September 27, 2018, Plaintiff and other law students went bar hopping after a law school event. Plaintiff and one of the other students, Joel Thompson, had both accepted employment offers at a Kansas City law firm, which also employed a recent graduate and sometime boyfriend of the Plaintiff, Kriston Guillot.

Plaintiff and Thompson drank heavily. At 11:04 p.m., Thompson texted to a friend that "We at sandbar man lol we got on the road and she was so fucked up I was like hell Na." At 11:31 p.m., Thompson's friend texted, "Wanted to chill bro but didn't wanna cock block haha. She looked fucked up yo."[1]

---

[1] In the Amended Complaint and her responses to Defendants' motions to dismiss, Plaintiff quotes some of the text messages sent by Thompson over the course of the evening, as later set forth in the probable cause affidavit completed by Detective Cottengim. The Amended Complaint fails to note other text messages contained in the affidavit, or to attach a copy of that affidavit. As noted below, while Plaintiff contends that Cottengim failed to include some relevant information in affidavit, she does not allege that the text messages identified in the affidavit aren't genuine, nor has she objected to the affidavit submitted by the City of Lawrence Defendants. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

Thompson responded, "She wants to fuck soooo bad," followed by, "And I haven't fucked yet."  The friend responded "Yeah I could tell," and, "You didn't even look tipsy lmfaoooo."

Thompson identified Plaintiff as "Kriston's side joint," and he would be "fucking" her just so "he [Guillot] knows I can."  As the drinking continued, Thompson texted, "I'm bout to see what she working with."  Eventually, Plaintiff and Thompson went to his residence.

At approximately 2:00 a.m. the following morning, Plaintiff texted her close friend, Courtney Hurtig,  saying, "Ummmm I fucked up …. I slept with Joel."

According to the Amended Complaint, Plaintiff woke up that morning in a strange bed and did not know where she was or how she got there. Her memory of the night before was "very patchy and confused."  She felt the effects of the alcohol she had consumed earlier.  She was naked and bruised.  She states that though still intoxicated, she realized that she was in bed with Thompson, and that the two had had sex, and that Thompson was continuing to have sex with her.

Plaintiff told Thompson to stop, but he told her she was being weird, "and was making him feel like he needed to 'Kavanaugh this bitch right now.' "

Thompson told Plaintiff she was in his bedroom at his house.  When she tried to leave, she found she was too drunk and couldn't find her clothes.  She laid down, and woke again around 4:00 a.m.  She then walked outside but could not find her car.  Thompson told her that her car was parked downtown and that he would drive her to it in the morning.

Plaintiff opened her phone again around 6:00 a.m. and noticed her earlier 2:00 a.m. text to Hurtig.  Plaintiff states she had no memory of sending the message.  She began texting Hurtig she was in Thompson's bed but they would be leaving soon to take her back to her car.  Hurtig asked Plaintiff if she was joking.

The texts between Plaintiff and Hurtig are recounted in the affidavit later prepared by the Lawrence police, with Hurtig first responding to Plaintiff's 2:00 a.m. message:

| Hurtig | 6:10 a.m. | Ummm what?!?!? |
|---|---|---|
| Hurtig | 6:10 a.m. | When was this?? |
| Plaintiff | 6:12 a.m. | Right now I'm is [sic] his bed |
| Plaintiff | 6:15 a.m. | It's all good . . . this was a fuck up though I literally made him stop having sex and was like 'oh no what will Kriston say' |
| Hurtig | 6:22 a.m. | This is too much to peocess |
| Hurtig | 6:22 a.m. | Process |
| Plaintiff | 6:23 a.m. | I know . . . like I feel kinda terrible about it |
| Plaintiff | 6:23 a.m. | But whatever Kriston is the one who said we need to stop sleeping together. |
| Hurting | 6:28 a.m. | What happened to it being gross and he slept with half the law school?!  Dirty.  Dick. |
| Plaintiff | 6:28 a.m. | I know . . . maybe I should start an antibiotic |
| Plaintiff | 6:28 a.m. | I know!  It is gross . . . he's actually really good at sex though |
| Hurtig | 6:28 a.m. | God please tell me this was a one time thing |
| Plaintiff | 6:28 a.m. | Omg yes one time thing . . . I just don't know how I'm going to tell Kriston |
| Hurtig | 6:44 a.m. | Why did you do it?! This was such a bad call |
| Plaintiff | 6:44 a.m. | Like I literally asked him 3 million times if he has been tested |

After she had returned to her home, Plaintiff texted Hurtig, starting: "Get here fast—I'm literally about to have a breakdown."  According to the Amended Complaint, the alcohol had begun to wear off and Plaintiff was feeling upset and very sore.

When Hurtig arrived at Plaintiff's house, she saw Plaintiff was bruised and that she seemed "clearly off—like she was so upset."  A former outpatient psychology center employee before law school, Hurtig suspected that Plaintiff had been raped.

On Saturday, September 29, Hurtig wanted to get Plaintiff out of her house, so she took her out to celebrate Homecoming weekend.  Hurtig and her boyfriend, Blake Stokes, drank, but Plaintiff did not.  Hurtig and Stokes argued, and Stokes told Hurtig to get all of her stuff out of his house. Plaintiff and Hurtig left, while Stokes went to a party at Thompson's house.

Stokes texted Plaintiff that she was responsible for getting Hurtig out of his house. If she didn't, Stokes said, he would tell everyone that Plaintiff had slept with Thompson, which he had learned from Hurtig.  Plaintiff texted back: "I'm pretty sure it was borderline date rape and I have the bruises and statements to prove it."

Plaintiff alleges in the Amended Complaint that during this Saturday, "hazy memories of the night began to come back."  She remembered someone on top of her, having sex with her. This man had tattoos that were unfamiliar to her; that she did not know who he was.  She states she remembered telling Thompson that she didn't want to sleep with him, but he told her that his penis was already inside her.  When she told him she wanted him to stop and that Guillot would be mad, Thompson told her it was already done, and Guillot would never want her again. She states she remembered feeling pressure on her neck.  The Amended Complaint states that at this

point, Plaintiff's "memories were not in an orderly sequence; she could not remember which one happened first, or second, or third."

Plaintiff told Hurtig at this time, "I don't know . . . I don't know if it's rape. I'm so embarrassed."

Plaintiff states that she was afraid people would not believe her, and that she might lose her position at a law firm where she and Thompson had both been hired, and where Guillot was already an associate.

Eventually, Plaintiff told Hurtig she believed Thompson had raped her.  Hurtig called a nonemergency number at the LPD and left a message that her friend wished to report a rape.

Officer Affalter returned the call and spoke with Hurtig and Plaintiff, and asked them to meet him outside the Lawrence Memorial Hospital ("LMH").  When they arrived at the hospital, they met Affalter and Detectives Cottengim and Nicholson.  Plaintiff and Hurtig gave the officers their cell phones when asked.  Nicholson told her she could have it back soon.

Plaintiff told Affalter that she had been raped the day before, saying the details were blurry because she had been drunk at the time. She said she woke up naked in bed while a man was holding her down having sex with her after she told him "no."  She remembered waking up later to find Thompson still having sex with her, and pushing him off before she blacked out again.

Nicholson told Plaintiff her options were to do nothing, allow the police to  document the report but do nothing further, or have the police would do a full-scale investigation, including questioning witnesses and collecting evidence. Plaintiff chose the first option, saying she did not

want the police to do anything.  Nicholson told Plaintiff if she later decided to proceed, she could come down to station and give full statement.

Plaintiff was joined at the hospital by a friend and fellow law student, Lindsie Ford. According to Ford, a victim advocate at the Johnson County District Attorney's Office, Plaintiff appeared distracted and "flat."

Terri Woodson, a trained SANE nurse at LMH, examined Plaintiff. She collected physical evidence and recorded a small tear and bruising on a diagram of the vaginal area, and took photographs of Plaintiff's bruised neck and extremities. Plaintiff's arms and legs all had bruises or contusions. At the end of the examination, Woodson asked Plaintiff if she wanted to disclose the evidence collected as part of examination to the police.  Plaintiff said, "no," she did not.

By the time the detectives returned to the hospital, Plaintiff had left.  Having seen the text messages between Plaintiff and Hurtig, the detectives doubted that a rape had occurred.  Nurse Woodson told the detectives that Plaintiff had decided not to report the rape.

At some point, Thompson learned that Plaintiff had indicated that he had raped her.  On Monday, October 1, 2018, he texted Plaintiff asking her to meet with him to discuss things. They agreed to meet at the law library that day.  Thompson did not know Plaintiff had spoken with the police.

Ford was working at the library's front desk when Plaintiff arrived to meet with Thompson.  When Plaintiff told her why she was there, Ford tried to talk her out of meeting with Thompson.  Plaintiff said she needed some closure, and had to know what happened.

The Amended Complaint states that Ford surreptitiously sat outside the room where Thompson and Plaintiff met.   While she could not hear much of what was said, she could partially see into the room.  According to Ford, Thompson appeared relaxed.  Ford could not see Plaintiff.  She heard Thompson raise his voice, complaining that Plaintiff was making him feel like an abuser.

According to the Complaint, Plaintiff met with Thompson in one of the rooms adjoining the library, and asked him what had happened.  Thompson told her that they had been drinking and that the sex was consensual.  Plaintiff asked how she had gotten the bruises, and Thompson said he did not know.

Plaintiff asked Thompson to tell Guillot that he had taken advantage of her; that she was intoxicated and had not chosen to sleep with Thompson.  According to Plaintiff, Thompson agreed, as long as Plaintiff remained silent about what happened and told Hurtig to do the same. Plaintiff did not tell Thompson that she had spoken to the police.

Later that evening, Plaintiff texted Thompson "want[ed] him [Guillot] to be happy whether that include[d] [her] or not."

Two days later, on October 3, Detective Nicholson called Plaintiff.  Plaintiff said she'd thought about it and had spoken to the nurses, and reiterated her decision to not proceed. Nicholson asked to speak to Plaintiff in person, and Plaintiff agreed.  Nicholson stated it was policy "per our captain" to document accounts from victims who did not want to proceed.

Nicholson and Affalter drove to Plaintiff's house and interviewed her at length. At least nine separate times, Plaintiff indicated that she did not want to pursue charges, explaining that

she feared doing so could ruin law school and her career. Plaintiff stated, "I just signed a contract [and] I do not want to lose that job. I don't want to put any pressure on my employment situation."

Nicholson asked Plaintiff about the text messages, saying that it looked like Plaintiff just regretted what had happened.

"No," Plaintiff said, "That is not what happened." Plaintiff stated, she "play[ed] it off" initially in the text messages with Hurtig because she was concerned about protecting her future job. "I just honestly want to move forward without any repercussions in my job."

Nicholson stated that "it happens a lot in college towns, just things like that where females mess up or males mess up and sleep with the wrong person." She told Plaintiff that "it looks like you cheated on your boyfriend and you're like 'Oh, shit,' and then your friend was like 'Well, you were raped,' and that's why we were called. And it happens a lot, and we just like to clear it up so we don't have to do further investigation."

Nicholson told Plaintiff that she should let Thompson know that she had spoken with the police, saying, "I'm sure he would want to know." Plaintiff states this made her uncomfortable, and believes Nicholson tried to intimidate her when she said that merely listing Thompson in a police report would turn him into a "person of interest" and that the listing "would pop up" if someone ran "a criminal background check." So, in a rape investigation, police "like to clear it up so [they] don't have to do further investigation." Nicholson stated that "listing Joel as a suspect in a rape could ruin his career [and] future." She told Plaintiff, "We're not, per your request we're not going to go out and contact him or anything like that."

On October 10, Plaintiff and Hurtig met with a counselor, Merrill Evans. The topic of contacting the University's Office of Institutional Opportunity and Access ("IOA") came up. Plaintiff, Hurtig, and Evans met with IOA staff, who explained the complaint process to Plaintiff. The first step would be for Plaintiff to make a statement. Since she had already briefly spoken to the police, IOA staff suggested notifying the police that Plaintiff would be making that statement. That way, the staff explained to Plaintiff, she would not have to talk about what happened more than once.

IOA staff also encouraged Plaintiff to call Officer Affalter and let him know she had contacted the office. During the meeting at IOA, Plaintiff called Affalter, stating she had met with IOA and was thinking about making a full statement to the police and potentially pursuing charges against Thompson.  Plaintiff indicated she was willing to meet with any LPD detective other than Nicholson and do a joint interview with the LPD and Title IX office.  Plaintiff told Affalter that IOA would be in touch with the police to schedule a time for her to make her statement. Later that day, however, Plaintiff cancelled the interview due to a family emergency.

Officer Affalter emailed Detectives Cottengim and Nicholson that Plaintiff "is thinking of going ahead and making a full statement and wanting to pursue charges in this case."  He stated he had informed her that he and a detective should be at KU when IOA interviewed her. He also stated that the "Title IX people will call dispatch with some dates and times that work for them to have a meeting."

When he received this email, Cottengim immediately sought the phone number of IOA investigator Kathryn Burns and called her. Burns told him Plaintiff was willing to meet for a joint interview.

Cottengim then spoke to Captain Heffley and shared his concerns about the "possible repercussions that could affect Joel Thompson as the reported suspect." Cottengim asked his supervisor if he could share information with KU. Cottengim also began interviewing witnesses, including Thompson and two of his roommates and then Thompson himself.

The next day, October 11, Cottengim met with Thompson, who stated the sex was consensual. At the end of the interview, Cottengim told Thompson that he did not believe Plaintiff and that if he could prove it didn't happen, he would arrest her.

Cottengim next interviewed Guillot, who told him that Plaintiff had indicated she would not pursue charges against Thompson if she got Guillot back as her boyfriend. Plaintiff contends that Guillot's statement to Cottengim was false, citing her earlier text in which she told Thompson that she wanted Guillot to be happy, even if they were no longer together.

Cottengim and Detective Amy Price met with Burns at the IOA office. Burns told the detectives that Plaintiff did not want to pursue this matter at this time and therefore, she would not be taking any action. Cottengim told Burns he had concerns, including potential damage to Thompson, and showed Burns the messages he took from Plaintiff's phone.

After Cottengim interviewed Guillot, he interviewed Thompson again. Thompson said that Plaintiff had said that as long as she could continue her relationship with Guillot, she would

stop saying Thompson had taken advantage of her.   Cottengim was unable to extract Thompson's messages from his phone that day.

At school, Plaintiff heard that the police were interviewing witnesses. On Friday, October 12, she called Cottengim and told him that she did not want any criminal investigation to go forward. She told him her doctor advised her not to continue with the investigation due to the amount of stress it was causing her. She also told Cottengim that she did not plan to pursue a complaint with IOA and she did not want to give any more statements. She asked Cottengim if he planned to talk to anyone else about the case.  He told her he did not.

However, in his report, Cottengim wrote:  "The investigation will continue despite what I told Plaintiff Horocofsky over the phone."

Cottengim then interviewed Alison Collins, a girlfriend of Guillot.  Collins told the detective Guillot was seeing Plaintiff.

On October 13, Cottengim emailed Burns, stating he had spoken to Plaintiff and that she no longer wanted to pursue charges and that she would not be contacting the IOA office.

Cottengim interviewed Thompson's friends, Blake Stokes and Austin Jaspers.  Stokes turned over the text messages from Plaintiff referring to a "borderline date rape."  Stokes told Cottengim that both Plaintiff and Hurtig believed that what happened with Thompson was a rape. Jaspers stated that he heard "sex sounds" coming from Thompson's room the night that Plaintiff was there.

After seeking advice from a professor, Plaintiff decided to proceed with the Title IX complaint. On October 24, she met with Burns and gave a written statement, a log of events and a copy of her text messages with Stokes. Burns forwarded this information to Cottengim.

On October 25, Burns sent a Notice of Investigation and No Contact directive to Thompson, which stated the IOA had "received information that you may have engaged in conduct that violates the University's Sexual Harassment Policy." The Notice directed Thompson to attend a meeting on November 1, 2018, with the IOA. The Notice also stated that "it is a violation of the KU Discrimination Complaint Resolution Process to retaliate against a person who files a complaint or against a person who participates in the IOA investigative process."

Burns also sent Plaintiff an email, attaching a copy of the Notice that had been sent to Thompson. Burns told Plaintiff the no-contact directive was mutual: "both you and Mr. Thompson are prohibited from initiating, or contributing through third parties, to any physical, verbal, electronic, or written communication with one another, directly or indirectly."

Burns called Cottengim and told him that IOA was investigating Plaintiff's allegations against Thompson. Cottengim reported this by email to Burns, and asked if he would be able to get a copy of her interview of Plaintiff.

Plaintiff called Officer Affalter, and left a message for Cottengim to call her. Cottengim did not return her call but instead recorded Affalter calling Plaintiff back.

Plaintiff told Affalter she had given a statement to IOA and was going forward with the Title IX investigation but did not want to pursue any criminal charges. Affalter told Plaintiff that

- 13 -

he really needed her to come to the police station, explaining that he hadn't had a chance to record everything the first time he spoke to her. He asked: "Would you be able to come in and just run through everything again with me? So it could be recorded this time?" Affalter told Plaintiff that it would best to get her statement "[w]hile it's still fresh," instead of "months down the road" if Plaintiff ever did decide to pursue charges.  He told Plaintiff he "empathized" with her, and she agreed to come in and give her full statement.

Affalter did not tell Plaintiff that he was recording the call. He also did not tell her that she was suspected of making a false statement to the police.

Leah Terranova, KU Law School's Director of Career & Student Counseling Services, emailed Plaintiff and stated she had been in touch with someone on the administration who told her about the incident involving Plaintiff and another student, which had led to a formal investigation.

On October 29, Cottengim told Burns that Plaintiff had agreed to give the LPD a complete statement, that she did not want to pursue charges at this time, but did want to pursue a Title IX investigation.  He stated that he hoped Plaintiff would sign a waiver allowing him to share the LPD reports with the IOA office.

Plaintiff then met with Affalter and Cottengim at the LPD, and gave a full statement.  The officers did not tell Plaintiff she was suspected of making a false statement.

On October 30, Burns emailed Cottengim about sharing of information between offices and offered to discuss this by phone or in person.  The next day, Cottengim told Burns he had met with Plaintiff two days earlier, and she signed a waiver allowing the release of the LPD

reports to the IOA office. He stated that he would work on getting everything that he could from the investigation to her. Burns asked Cottengim if he would provide text messages and when he anticipated the investigation would be complete.

In early November 2018, Burns contacted Cottengim about the information he planned on sharing. Cottengim responded that he should be back on track soon. Burns also provided Plaintiff with links to the Discrimination Complaint Resolution Process and the Sexual Violence Procedure at KU for her reference.

On November 14, Plaintiff contacted Cottengim to request the case number for the investigation. Cottengim returned her call and provided the case number. Plaintiff reported to Cottengim that Guillot had threatened her employment at the law firm if she continued to pursue the rape case against Thompson. Plaintiff also told Burns of Guillot's threat

Burns sent an updated respondent notification letter to Thompson on November 17. The letter relates to Plaintiff's allegation that Guillot told her to drop the IOA investigation or she should "be ready to deal with the repercussions of what [she] was doing" because "the other shoe hadn't dropped yet."

On November 19, Cottengim emailed Burns to set up a meeting with her at her office. They agreed to meet the next day and Burns stated she was looking forward to meeting with Cottengim. During this three-hour meeting, Burns read and took notes from Cottengim's report. Since the incident, Cottengim and Burns had frequently exchanged emails, Burns was eager for Cottengim's information and was following his lead.

Plaintiff told Cottengim on November 26 that she no longer consented to the police sharing her information with the IOA office. Cottengim agreed to comply with her request. He did not tell her about his earlier contacts with Burns.

Burns sought an update from Cottengim on December 5, asking if he had been able to verify if there were text messages "missing in the string we reviewed." Cottengim asked Burns to call him.

The same day, Cottengim signed a probable cause affidavit in which he alleged and stated under oath that he believed Plaintiff had consented to sexual intercourse with Thompson and had falsely reported to police that she'd been raped. Cottengim expressed his belief that Plaintiff made the report to get back at Guillot after she found out he was having a relationship with another woman at the same time as her.

The Complaint argues the affidavit suffered from bias and incompleteness. Specifically, the Complaint contends the affidavit was flawed because (1) it failed to note that Plaintiff's own text messages, otherwise central to the affidavit, show she was confused and under the influence of alcohol; (2) Thompson had a history of sleeping with intoxicated women;[2] (3) Thompson for months had bragged about his intent to have sex with Plaintiff; (4) the police had failed to determine her blood alcohol level, and failed to obtain surveillance video from one bar which showed her stumbling; (5) the affidavit was silent on Plaintiff's physical injuries, having never

---

[2] According to the Amended Complaint, one of Thompson's casual girlfriends indicated that she had "heard of 'something occurring' between Thompson and another young woman, whose name she had provided." In addition, Plaintiff also alleges the police were also told that Thompson had a "hit" or "to do" list of women he wanted to have sex with, and that Plaintiff was on it

- 16 -

asked her to release the results of her rape examination; and (6) the detectives had failed to follow up with witnesses who could have supported Plaintiff's report. These witnesses included Hurtig (who could corroborate Plaintiff's distress and physical injuries), Ford (who was also present at the hospital), Amy Adams (another friend of Plaintiff who saw Plaintiff early the next morning and believed she was troubled and distracted), and Dr. Pavika Saripalli (Plaintiff's doctor, who diagnosed her as suffering from PTSD).

Plaintiff then emailed Burns regarding the IOA investigation, asked for information about the availability of evidence and interviews, and gave the names of two additional witnesses.

On December 10, KU Law School Associate Dean Lumen Mulligan emailed Plaintiff, stating he had had a conversation with Professor Suzanne Valdez about the investigation. Mulligan told Plaintiff that he had known Thompson for his entire law school experience, that Thompson "related his version of the events" to her, and that "the police opened a false claim investigation." Mulligan also told her that he had reported this information to the IOA, which he understood to be a confidential investigation, and so had been surprised when two professors showed up in his office with the notice of investigation and the names of the persons involved. Mulligan then reported this information to Law School Dean Stephen Mazza and Associate Dean Elizabeth Kronk-Warner.

On January 3, 2019, Burns extended the 60-day timeframe for the IOA investigation and notified Plaintiff of the extension.

On January 14, Plaintiff asked Leah Terranova, Director of Career & Student Counseling Services at the law school, if her class schedule would overlap with Thompson. Plaintiff told

Terranova she was taking 18 hours that semester due to having to drop courses in the fall, and that many of the courses were required for her to graduate. Plaintiff addressed Terranova because she was aware of the details of her situation, and Plaintiff was uncomfortable speaking to others at the law school.

On January 25, 2019, Cottengim obtained a warrant for Plaintiff's arrest for the felony crime of providing false information to a police officer. Three days later, Cottengim lured Plaintiff to the Lawrence Police Department by telling her that he had received an anonymous note about the rape but couldn't decipher it. Plaintiff agreed to come to the police station to help.

Plaintiff went to the police station two days later with her counselor, Merrill Evans. Cottengim told Plaintiff he had lied to her, and that he had a warrant for her arrest. Cottengim told her he did not believe she had been raped. He did not inform her of her *Miranda* rights, and tried to get her to admit that she made a false claim. Plaintiff told Cottengim and another detective, Amy Price, that "this did happen" and that her "story had not changed from the very beginning."

Cottengim read Plaintiff the *Miranda* warnings, and asked her to admit she had made a false claim. He said it "appeared as though she was using the threat of rape to get what she wanted." Plaintiff told Cottengim that he was wrong, and asked why he couldn't have just told her the truth about the warrant, that she had class that afternoon. He did not answer the question.

Plaintiff was handcuffed and required to wait in the lobby while Cottengim and Price brought up a car. They placed her in the vehicle and drove her to the detention center, where she

was fingerprinted and processed.  Plaintiff called Ford and got her help to secure bond money so she could be released. Plaintiff was detained the entire afternoon, missing her classes.

The same day, Cottengim emailed Burns and asked her to call him that afternoon.

On February 13, 2019, Plaintiff appeared in Douglas County District Court and was provided with a copy of the Complaint filed against her.  As requested by Associate Dean Kronk-Warner and Leah Terranova, Plaintiff was required to provide information about the prosecution as part of the school's character and fitness disclosure requirement.

After learning that there had been no interviews or contacts had been made with witnesses whose names she had been provided to IOA, Plaintiff scheduled a follow up meeting with Burns.  In May, Plaintiff and Burns communicated about reviewing Plaintiff's statement provided to the IOA.

At her June 5, 2019 preliminary hearing, Plaintiff learned she had been charged with two additional counts of falsely reporting a felony crime.  At the conclusion of the hearing, the court found there was probable cause to support the charges.  The court noted in particular Plaintiff's text messages to Hurtig.

On July 1, 2019, Plaintiff emailed Burns about the status of the IOA investigation and the release of the final report.

The IOA issued its report on July 9, 2019, concluding that Plaintiff had made a false complaint, engaged in "serious misconduct" and referred her to the Office of Student Conduct ("OSC") for further review.  Although it made a number of references to "witnesses," the report

did not identify any specific witness as having been interviewed.  The referral asked the OSC to "determine whether a policy violation occurred regarding the filing of a false complaint."

On October 28, 2019, the District Attorney moved to dismiss the case against Plaintiff. The motion made no explanation for the request.  The court dismissed the case the following day.

The Amended Complaint alleges that pursuing false report charges deters assault victims from making reports.  According to Plaintiff, untrained officers may misinterpret post-incident behavior "because trauma manifests in many different ways," causing victims to "act in unexpected ways."  Plaintiff contends the police "showed startling solicitude for Thompson but indifference or even hostility" towards her.

Plaintiff alleges that Lawrence police do not take sexual assault seriously, citing a *Kansas City Star* newspaper article detailing the views of some students.  She states that three Jane Doe witnesses would state that they believed the police had failed to promptly and effectively investigate claims of sexual assault.  Plaintiff contends this failure is the result of inadequate policies and training.

 Plaintiff contends that KU has a specific history of publicly reported sexual assaults of women.  Plaintiff alleges that the Department of Education had issued guidance that colleges should promptly take steps to protect the complainant alleging assault.  Plaintiff alleges the guidance was issued "to the KU [sic]," but does not allege that such guidance has not been directed to all public universities generally.

University policies prohibit sexual violence as a form of sexual discrimination, and it has committed itself to student safety.  The IOA office tells students that they can choose who to talk to, what information to share, what support resources to use, and whether to go to law enforcement.  University policies also prohibit retaliation against persons filing an IOA complaint.  The University's Code of Student Rights and Responsibilities states that its provisions may apply to off-campus conduct "when the behavior affects the on-campus safety of a member of the University community or University operations."  Under the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (20 U.S.C. §1092(f)(1)(F)(i), the University publishes the number of criminal sex offenses reported to campus security authorities or local police agencies, both on and off campus.

According to University policies, the IOA complaint investigation process is independent of any other complaint resolution process, including the choice to file a criminal complaint with the appropriate law enforcement authorities or not to do so.  However, in March 2015, KU entered into an agreement or a memorandum of understanding (MOU) with the City of Lawrence for training and coordination of investigations in cases involving sexual violence, protocols for referring complaints, and an agreement to share information and to "communicate regularly" about investigations.

The University's policy on sexual misconduct states that all cases should be resolved within sixty days.  According to Plaintiff, KU has conducted IOA investigations claims of off-campus sexual assaults, which have lead to disciplinary actions against attackers.

- 21 -

The Complaint alleges that the KU law school had a policy, custom, and practice of sponsoring events for its students on and off campus at which "significant" quantities of alcoholic beverages were served. These events include (1) a 2017 panel discussion for first year students "with an open bar afterwards at the 23rd Street Brewery," (2) the 2017 and 2018 Spring Law Prom, also with an open bar and "numerous incidents involving alcohol," (3) Student Bar Association events at bars in Lawrence which "regularly got out of control," and (4) Dean's office events at Johnny's North, a Lawrence tavern, featuring free beer. The later event lasting between 5:00 p.m. and 7:00 p.m.

Plaintiff states "[u]pon information and belief" that KU administrators knew of reports that Thompson was involved in sexual assaults or misconduct, and had been angry or violent at other school-sponsored events, and that "discovery is needed to confirm this allegation."

At some point, according to Plaintiff, it became generally known that Plaintiff had reported a rape to the IOA and the LPD. Plaintiff then dropped some of her classes in the fall of 2018, as well as in the spring of 2019. According to Plaintiff, "[s]ome of her law school professors and an administrator [not identified by Plaintiff] pressur[ed] her to drop out of school completely." The Amended Complaint generally claims that Plaintiff was subjected to "intimidation from law school professors as well as Thompson's roommates and friend." However, the Complaint only identifies three specific instances of harassment or retaliation.

First, as noted earlier, Plaintiff claims that Guillot had threatened her employment at the law firm if she continued to pursue the rape case. At the time this threat was made, Guillot had apparently graduated from the University and was employed as an associate at a law firm.

Second, Plaintiff references an incident in her small section Administrative Law class taught by Professor Quinton Lucas.[3]  During the class in question, according to the Complaint, Lucas referenced the report and noted, in a hypothetical example, that the University could not "kick her out" without due process.  At some point, Plaintiff withdrew from this class and another class, took incompletes in two other classes, and was unable to graduate on schedule in May 2019.

Third, Plaintiff complains that she suffered from mental distress because Thompson's image was featured in school marketing materials. In particular, she complains that "[e]very day at the law school, [she] had to walk by a [promotional] poster" which included a picture of Thompson

Plaintiff presented several administrative complaints to the University.  In October 2018, she had filed a Title IX complaint with the IOA, alleging sex discrimination.  In March 2019, she filed a supplemental complaint alleging retaliation and a hostile education environment.

On March 26, 2019, Plaintiff filed a supplement to her Title IX complaint, adding specific claims about Quinton Lucas. Her supplement was made in person and through an email to Burns, with a "cc" to Michael Leitch. Along with a narrative description and her statement, she sent texts by Blake Ronnebaum and a statement by Ronnebaum who witnessed the interaction. She also pointed out that at the beginning of the semester, Lucas had joked in front

---

[3] According to Plaintiff, Lucas has previously made an unspecified "joke . . . about the #metoo movement." He had also expressed the opinion that sexual assault allegations should be handled by the District Attorney rather that through the Title IX process.

of his class about the "#metoo" movement.  IOA did not investigate Plaintiff's March 26, 2019 supplemental claim.

On July 9, 2019, the IOA issued a report which relied on the investigation of the LPD as reflected in the probable cause affidavit and Plaintiff's preliminary hearing, concluding that Plaintiff had made false statements to the police.

On November 1, 2019, Plaintiff filed another claim with the IOA, complaining of harassment and retaliation in the wake of her earlier complaint.

On December 5, 2019, KU administratively closed her complaint without an investigation.  The University's Title IX Director found that the conduct cited in the complaint was not based Plaintiff's sex or an attempt to harass or to retaliate against her.  Plaintiff appealed this decision to the University Provost and Executive Vice Chancellor Carl Lejuez.

Lejuez denied the appeal, finding the IOA's conclusions were reasonable.  He wrote: "Given IOA's findings as to your previous sexual relationship with Mr. Guillot, your desire to continue your relationship with Mr. Guillot, and your previous and ongoing workplace relationship with him, IOA's conclusion was reasonable."

In the present action, Plaintiff brings three claims against the University under Title IX, 20 U.S.C. § 1681(a).  She argues the University discriminated against her by creating an abusive environment similar to that presented in *Simpson v. University of Colorado, Boulder*[4] (Count IV), that it created or tolerated a hostile educational environment (Count V), and that the University retaliated against her (Count VI).

---

[4] 500 F.3d 1170 (10th Cir. 2007).

Plaintiff brings four claims against the City of Lawrence.  She alleges in Count I that the City violated her civil rights by providing inadequate police training, which led to her arrest, in violation of 42 U.S.C. § 1983. Plaintiff also brings three claims under Kansas law against the City, including malicious prosecution (Count VIII), abuse of process (Count IX), and respondeat superior liability (Count XI).[5]

Against the Individual Defendants, Plaintiff raises three claims under 42 U.S.C. § 1983, including denial of equal protection (Count II) as a result of both gender bias and discrimination against her as a "class of one;" violation of her rights under the Fourth and Fourteenth Amendments through malicious prosecution and abuse of process (Count III); and conspiracy in violation of 42 U.S.C. § 1985(e) (Count VII).

Finally, Plaintiff advances a claim against the City and the Individual Defendants under Kansa law for reckless or intentional infliction of emotional distress (Count X). For the reasons provided below, the Court grants the motion of the University, and grants in part and denies in part the motion of the City and the Individual Defendants.

## II.    Legal Standard

Under Rule 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted.[6]  Upon such motion, the court must decide "whether the complaint contains 'enough facts to state a claim to relief that is

---

[5] Plaintiff has separately moved to amend her First Amended Complaint to add the Individual Defendants in Counts VIII and IX, stating that these Defendants were omitted from these pendent claims through inadvertence. (Doc. 41). Based on the Plaintiff's statement that the amendment should not affect resolution of the pending motions to dismiss, the Magistrate Judge denied the motion without prejudice.  (Doc. 50).

[6] Fed. R. Civ. P. 12(b)(6).

plausible on its face.' "[7]  A claim is facially plausible if the plaintiff pleads facts sufficient for the court to reasonably infer that the defendant is liable for the alleged misconduct.[8]  Facial plausibility is not "a 'probability requirement,' " but a requirement of factual allegations showing "more than a sheer possibility that a defendant has acted unlawfully."[9]  The plausibility standard reflects the requirement in Rule 8 that pleadings provide defendants with fair notice of the nature of claims as well the grounds on which each claim rests.[10]

Rule 12(b)(6) provides that a court must accept as true all factual allegations in the complaint, but need not afford such a presumption to legal conclusions.[11]  Viewing the complaint in this manner, the court must decide whether the plaintiff's allegations give rise to more than speculative possibilities.[12]  If the allegations in the complaint are "so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.' "[13]

### III.    Analysis

### A.    Claims against the University

---

[7] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[8] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[9] *Id.*

[10] *See Robbins v. Okla.*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

[11] *Iqbal*, 556 U.S. at 678-79.

[12] *See id*. at 679 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.") (citation omitted).

[13] *Robbins*, 519 F.3d at 1247 (quoting *Twombly*, 550 U.S. at 570).

1.      *Discrimination under Title IX*

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[14]  This provision gives rise to an implied private right of action against a recipient of federal education funding for money damages when the discrimination arises from student-on-student sexual harassment.[15]  However, an educational facility is liable only for its own decisions and conduct.[16]  As a result, "a school district [will be] liable only where it has made a conscious decision to permit sex discrimination in its programs, and precludes liability where the school district could not have remedied the harassment because it had no knowledge thereof or had no authority to respond to the harassment."[17]

To avoid liability under Title IX, a school need "merely respond to known peer harassment in a manner that is not clearly unreasonable."[18]  This standard requires more than negligence.[19]  The school is liable under Title IX only if it is deliberately indifferent to acts of harassment of which it has actual knowledge, "a high hurdle [which] does not dictate any

---

[14] 20 U.S.C. § 1681(a).

[15] *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 639-44 (1999).

[16] *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 283 (1998).

[17] *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1246 (10th Cir. 1999)

[18] *Davis*, 526 U.S. at 649.

[19] *Id.* at 642.

specific manner of dealing with peer harassment."[20]   Further, liability under Title IX is limited "to circumstances where[ ] the [school] exercises substantial control over *both* the harasser and the context in which the known harassment occurs."[21]

Plaintiff argues that the University is liable under Title IX pursuant to the Tenth Circuit's decision in *Simpson v. University of Colorado, Boulder.*   In that case the court recognized that the student-on-student deliberate indifference standard of *Davis* may be inapplicable where the harassment has been encouraged by an official policy of the school.[22]

In *Simpson*, the plaintiffs were sexually assaulted by prospective university football players who were participating in an official recruiting program "sanctioned, supported, even funded" by the school, under which "assaults were the natural, perhaps inevitable, consequence."[23]   In the program, recruits were paired both with female "Ambassadors," "who escorted the recruit around campus throughout the visit," and player-hosts, who "were chosen because they knew how to 'party' and how 'to show recruits a good time,' and would 'do a good job of entertaining [them].' "[24]   During a recruiting visit shortly after the 2001 Big 12 championship, some prospective players had sex with female students at a local hotel room, and at least one student was "assured by players that he could expect similar treatment that night and

---

[20] *J.L. v. Royal Valley U.S.D. 337*, 2021 WL 4197720, at *5 (D. Kan. 2021).

[21] *Id*. at 645 (emphasis added).

[22] 500 F.3d 1170 (10th Cir. 2007).

[23] *Id*. at 1175, 1177.

[24] *Id*. at 1180.

every weekend."[25]   The assaults occurred the following night at the apartment one of the plaintiffs, where, according to one player, he was told by a female tutor for the athletic department, "he should stay because 'it was about to go down,' which he understood to mean that the women would begin showing recruits a 'good time.' "[26]

The deliberate indifference standard of *Simpson* is a limited exception to the requirement in *Davis* that a recipient of Title IX funds is only responsible for sexual harassment in programs or activities under its control.   The standard is "confined to circumstances where a federal funding recipient sanctions a specific program that, without proper control, would encourage sexual harassment and abuse such that the need for training or guidance is obvious."[27]

Plaintiff has failed to allege anything approaching the extreme dereliction shown in *Simpson*, where the University of Colorado officially sanctioned a program to show high school football recruits a "good time," under which sexual assault was "the natural, perhaps inevitable, consequence."   *Simpson* reflected an extreme, at a substantial distance from the "far more typical circumstances" presented under which a school "might . . . anticipate[] that various aspects of its operations would be accompanied by unfortunate incidents of sexual harassment by flawed humans," but lack actual knowledge of a probable danger.[28]

---

[25] *Id*.

[26] *Id*.

[27] *C.T. v. Liberal Sch. Dist*., 562 F. Supp. 2d 1324, 1339 (D. Kan. 2008).

[28] *Id*. at 1340.

*Simpson* is inapplicable to the present case, given the markedly different nature of the allegations involved. The sexual assaults at issue occurred in the context of an official school program of the university, one designed to show football recruits a "good time." There the circumstances of the case supported the conclusion that the University had encouraged the harassment, by creating an environment where sexual assault was the natural if not inevitable result.

In an attempt to draw her claims within the orbit of *Simpson*, Plaintiff points to other events sponsored by the University Law School (or its student association) in which alcohol was served, and the University's policy of cooperation with local police. Neither of these circumstances, however, plausibly suggests that the sexual assault was a natural and perhaps inevitable result of an official University policy.

The plaintiff's allegation that the University is indifferent to assault "especially when collaborating with the Lawrence Police Department" bears little scrutiny. Here, Plaintiff had reported a *crime* committed off campus, even if she also indicated she did not want to formally press charges against Thompson. Indeed, Plaintiff reported her allegation to the police first, and waited for a month before also reporting the matter to the University. Plaintiff has not cited any authority or rationale for a university to refuse to cooperate with police in investigating off-campus crimes, and cases addressing the issue have approved rather than condemned such

cooperation.[29]  The University notified Plaintiff that it would cooperate in the investigation with the police, and this decision was reasonable and appropriate.

Similarly insufficient is the allegation that alcohol was served at the Diversity in Law event, and that the law school has sponsored other events at which alcohol was served.  The Amended Complaint itself acknowledges that the marathon drinking that followed the Diversity in Law event was not sponsored by the University.  The event was held from 5:00 to 7:00, the assault appears to have occurred five to seven hours later.  Further, the Amended Complaint expressly states it was "[P]laintiff and some her fellow law students [who] decided to [go] bar hopping," and that the students made decision "[a]fter [the diversity] event."

In discussing prior law school events, Plaintiff alleges there were "numerous incidents involving alcohol" and that some drinking "got out of control."  But Plaintiff makes no allegation of *sexual assaults* at or during any University events because of alcohol.  Plaintiff's claim against the University thus ultimately rests on the idea that simply by "serving alcohol at law school sanctioned events" the University "indicat[ed] its tolerance for sexual misconduct associated with intoxication."

This is a connection which is not grounded in the factual allegations in the Amended Complaint.  Under such an approach, the only way a college could effectively protect itself from Title IX liability would be to completely prohibit any consumption of alcohol at all school

---

[29] *See Rost ex. rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.* 511 F.3d 1114, 1121 (10th Cir. 2008) ("We do not think that the district can be faulted for letting Officer Patrick take the lead in this very serious situation," involving instances of sexual harassment "occurring outside the school grounds."); *C.R.K. v. U.S.D. 260*, 176 F. Supp. 2d 1145, 1165 (D. Kan. 2001) (holding it was not deliberately indifferent for a school to rely entirely on law enforcement and the criminal justice system to adjudicate a similar incident).

events.  The facts presented in the Amended Complaint show that Plaintiff was injured through the actions of a fellow student outside the University's programs or activities.

In her response to the University's motion, Plaintiff relies on *Doe v. School Dist. No. 1, Denver, Colo.*,[30] and *Farmer v. Kansas State Univ.*[31] as somehow circumscribing the clear statement of the Supreme Court in *Davis* that Title IX liability requires that the school have control over *both* the harasser *and* the program or activity where the harassment occurs.  Neither decision lends support to imposing Title IX liability against the University.  In *Farmer*, the court expressly declined to discuss the "programs or activities" requirement explicitly set forth in *Davis*.[32]  In *Doe*, while the plaintiff had been sexually assaulted at the home of another student, this was not the focus of her harassment complaint.  Rather, the plaintiff's complaint focused on the school's alleged failure to respond to subsequent harassment *at the school*, much of which was highly sexually charged, by friends of her assailant.[33]  The result of the harassment was that the plaintiff "did not feel safe or protected *at school*."[34]

Here, the only allegation of sexual harassment made by Plaintiff is the original, alleged assault by Thompson.  Of course, Plaintiff does advance a "hostile environment" claim, but (as discussed below) none of the conduct experienced at the school was sexually grounded or motivated.  The point for present purposes is that nothing in the cited cases would alter the

---

[30] 970 F.3d 1300 (10th Cir. 2020).

[31] 918 F.3d 1094 (10th Cir. 2019).

[32] *Id*. at 1102 n.3.

[33] *Doe*, 970 F.3d at 1305-06, 1311.

[34] *Id*. at 1307 (emphasis added).

express requirement in *Davis* that Title IX liability arises only when the funding recipient controls both the harasser and the program or activity in which it occurred.

### 2.    *Hostile Environment*

Plaintiff's Title IX allegations of a hostile environment at the University after the assault by Thompson are subject to dismissal for additional reasons.   An actionable Title IX hostile environment arises where a defendant school "(1) has actual knowledge of, and (2) is deliberately indifferent to, (3) harassment that is so severe, pervasive and objectively offensive as to (4) deprive access to the educational benefits or opportunities provided by the school."[35]

Here, the Court finds that Plaintiff has failed to demonstrate the existences of *pervasive* sexual harassment after the incident on the morning of September 28, 2018.   To be sure, the alleged assault by Thompson would constitute an outrage of the first order.   But Title IX imposes liability where a school ignores sexual harassment which is "so severe, pervasive, and objectively offensive that it can be said to deprive the victim[] of access to the educational opportunities or benefits provided by the school."[36]   The Court in *Davis* observed:

> Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, we think it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment.[37]

---

[35] *Rost*, 511 F.3d at 1119.

[36] *Davis*, 526 U.S. at 650.

[37] *Id*. at 652-53.

Here, Plaintiff's hostile environment claims rest almost entirely upon such a single instance of sexual assault, one which, as noted above, occurred off campus and outside any program or activity of the University.  To the extent Plaintiff attempts to reach beyond that original event, she points to utterly unspecific suggestions by other students that they did not believe her version of events.  She also cites the comment by her former boyfriend, and more importantly a former student, that she should stop the investigation or she "will lose everything."  Even assuming this was a threat, one which a new associate at a law firm could somehow follow through on, Plaintiff has not pointed to any actions endorsed, upheld, or condoned by the University.  Just as importantly, none of the incidents cited by Plaintiff reflect *sexual* harassment justifying Title IX liability.[38]

Ultimately, Plaintiff's Title IX hostile environment claim rests on the assault by Thompson.  As the Tenth Circuit observed in another Title IX action, "[a]lthough we are sympathetic to [the plaintiff]'s circumstances and agree that she has alleged opprobrious misconduct on the part of the [assailant], [her] singular grievance on its own does not plausibly allege pervasive discrimination as required to state a peer harassment claim."[39]

---

[38] *See Seamons v. Snow*, 84 F.3d 1226, 1232-33 (10th Cir. 1996) (dismissing claim where retaliatory harassment was not alleged to have any sexual component); *see also Cubie v. Bryan Career Coll., Inc.*, 244 F. Supp. 2d 1191, 1204 (D. Kan. 2003) (dismissing Title IX claim where instances of harassment were infrequent and "not taken or intended as sexual in nature"). Plaintiff suggests that these decisions are no longer valid in light of *Doe*, but as noted earlier, the plaintiff in *Doe* was subjected to wide-ranging abuse, including, as the court stressed, "comments that were sexual in nature—such as those relating to consent and the loss of her virginity," which could reasonably be deemed "harassment based on sex that went beyond gender-neutral harassment motivated only by a desire to retaliate against one who reports misconduct."  970 F.3d at 1310.  Here, the only sexual harassment alleged in the Amended Complaint was the original assault by Thompson.  Plaintiff makes no allegation of any subsequent harassment of a sexual nature.

[39] *K.T. v. Culver-Stockton Col.*, 865 F.3d 1054, 1059 (10th Cir. 2017).

Similarly, the Amended Complaint fails to credibly allege that the University was deliberately indifferent to her assault complaint. "[S]chools need not expel every student accused of sexual harassment to protect themselves from liability, and 'victims of peer harassment [do not] have a Title IX right to make particular remedial demands.' "[40] "The standard is not that schools must 'remedy' peer harassment, but that they 'must merely respond to known peer harassment in a manner that is not clearly unreasonable.' "[41] The Amended Complaint itself indicates that, upon receiving Plaintiff's administrative complaint, the University promptly issued a no-contract order between Plaintiff and Thompson, and Plaintiff makes no allegation that Thompson breached the terms of the order.

Plaintiff does allege that the University exhibited deliberate indifference to her report in various respects, including failing to complete its investigation within the 60 days normally provided for in University policy, failing to stop retaliation against her, cooperating with local police, and failing to appropriately weigh the evidence relating to the assault. The Court finds that Plaintiff has failed to advance credible allegations that the University was deliberately indifferent to her situation.

Again, deliberate indifference exists only if a school's response to a complaint of harassment is "clearly unreasonable."[42] Here the IOA investigated Plaintiff's report and consulted with the police, issuing a report with findings unfavorable to Plaintiff, and to which

---

[40] *Rost*, 511 F.3d at 1123 (quoting *Davis*, 526 U.S. at 648) (second alteration in original).

[41] *Id.* (quoting *Davis*, 526 U.S. at 648-49).

[42] *Davis*, 526 U.S. at 648.

she duly appealed.  The timing of the investigation does not suggest deliberate indifference.  The Amended Complaint itself acknowledges that Plaintiff waited over a month after the police report before also reporting to the IOA.  Plaintiff was given notice that the normal 60-day timeframe was being extended.  Additional investigation was not clearly unreasonable, given Plaintiff's own text messages stating she had "fucked up," and the need for cooperation with the police.  Plaintiff was independently charged by the District Attorney with making a false police report, charges that a district court found to be supported by probable cause.  Plaintiff has failed to show that that deliberate indifference is established by the timing of the investigation.[43]

Defendant also argues that Plaintiff's "pre-assault" claims are insufficient because she has failed to allege that the University had actual knowledge of any danger presented by Thompson.  Such "pre-assault" Title IX claims require a showing "that the funding recipient had actual knowledge of, and was deliberately indifferent to, prior complaints of harassment, which led to the current harassment for which redress is sought."[44]

Here, in contrast to the remainder of the lengthy and highly detailed Amended Complaint, Plaintiff makes two allegations regarding the University's knowledge of Thompson's

---

[43] *See Doe v. Univ. of Miami*, 446 F. Supp. 3d 1000, 1008 (S.D. Fla. 2020) (finding an investigation of longer than 60 days not deliberately indifferent in light of the circumstances); *Moore v. Regents of the Univ. of California*, 2016 WL 2961984, at *6 (N.D. Cal. 2016) (concluding that the plaintiff did not adequately plead deliberate indifference based on investigative delay).

[44] *Weckhorst v. Kan. State Univ.*, 241 F. Supp. 3d 1154, 1165 (2017).

character based "[u]pon information and belief."  Certainly, "pleading 'upon information and belief' is acceptable *as long as the complaint contains the factual basis for the belief.*"[45]

The Amended Complaint, however, gives no factual basis whatsoever for these two critical allegations.  "Upon information and belief," Plaintiff alleges (¶ 170) that "KU administrators or mandated reporters were aware of prior reports of sexual assault or sexual misconduct involving Thompson."

Plaintiff makes no attempt to explain the nature of these reports, the activity involved, or when they occurred.  More importantly, Plaintiff makes no attempt at all to vouch for this allegation or offer a factual basis for the belief.  To the contrary, the Amended Complaint states circumspectly only that "discovery is needed to confirm this allegation."

The same is true for the following paragraph (¶ 171), in which Plaintiff states "[u]pon information and belief" that "KU law school knew Thompson had angry or violent confrontations" at other law school events.  Again, the allegation is utterly devoid of any factual basis for the alleged belief that KU administrators knew of these confrontations.

But even assuming there was some factual basis for the Plaintiff's general belief, these allegations are insufficient.  It is not enough that some person holding some position at KU might have heard some unspecified reports about Thompson.  Title IX liability is contingent on an allegation that an "appropriate person" had actual knowledge that Thompson was

---

[45] *Dionne v. ITP W. Express, Inc*., 2020 WL 4347044, at *3 (D. Kan. 2020) (quoting *Moore v. Kobach*, 359 F. Supp. 3d 1029, 1039-41 (D. Kan. 2019) (emphasis added)). *See also Jackson-Cobb v. Sprint United Mgmt.,* 173 F. Supp. 3d 1139, 1149 (D. Colo. 2016) (citing *Scheidt v. Klein*, 956 F.2d 963, 967 (10th Cir. 1992)).

dangerous.[46]  "An appropriate person 'is, at a minimum, an official of the [university] with authority to take corrective action [on behalf of the university] to end the discrimination.' "[47] Plaintiff makes no such allegation.

And even if she did, the allegation would still fail because the eventual injury—the alleged assault by Thompson—did not occur within a program or activity controlled by the University.  It is not an injury remediable against the University through Title IX.

3.     *Retaliation*

The Supreme Court has held that Title IX's implied right of action encompasses a claim of retaliation for a complaint about sex discrimination.[48]  In analyzing such claims, courts have looked to caselaw governing retaliation claims under Title VII, including use of the *McDonnell Douglas* framework.[49]  Under that framework, the plaintiff must show a materially adverse action, one which would have dissuaded a reasonable person from making or supporting the charge of discrimination.[50]

The Amended Complaint alleges that students at the law school became aware of her allegations, and many of them expressed support for Thompson.  However, the Amended

---

[46] *Gebser*, 524 U.S. at 290.

[47] *Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1283 (10th Cir. 2017) (quoting, with alterations, *Gebser*, 524 U.S. at 290).

[48] *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 173-74 (2005).

[49] *See C.T. v. Liberal Sch. Dist*., 562 F. Supp. 2d 1324, 1336 (D. Kan. 2008) (citation omitted).

[50] *See Burlington N. & S.F. Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation omitted)..

Complaint fails to allege retaliatory conduct by the University, or which might be fairly attributed to the University.[51]

Plaintiff points to various incidents she claims show that University retaliated against her, making her situation at the law school intolerable.  During one class, the professor noted in a hypothetical that Plaintiff could not be removed from the law school without due process.  But this comment was made in an Administrative Law class, after Plaintiff had advanced an administrative complaint against Thompson, and was made at a time when, as noted above, information about the incident had become known among students and faculty at the law school. The Amended Complaint makes no allegation that the professor supported either Plaintiff or Thompson, and in fact merely indicated that Plaintiff was entitled to due process.

Otherwise, she had to walk by a poster that featured a picture of Thompson.  But there is no allegation that the poster was newly installed after her administrative complaint, or could somehow have otherwise been understood to show the University approved his version of events.

But even if Plaintiff had alleged facts showing that the University's actions contributed to an intolerable atmosphere at the law school, dismissal would still be appropriate because Plaintiff's complaint regarding Thompson did not fall within the scope of Title IX, as it was not an injury occurring within a program or activity of the University.  Plaintiff argues that that Title IX prohibits any retaliation based on a complaint of discrimination that was advanced in good faith.

---

[51] *Gebser*, 524 U.S. at 291 (Title IX liability arises for a school's "own official decision[s]" rather than "for its employees' independent actions.").

But good faith is measured both subjectively and objectively.[52]  "The plaintiff must not only have a subjective (sincere, good faith) belief that he opposed an unlawful practice; his belief must also be objectively reasonable, which means that the complaint must involve discrimination prohibited by the statute."[53]  The complainant's belief must be "objectively reasonable under existing substantive law."[54]  Here, Plaintiff's administrative complaint addressed an off-campus assault which under existing law, as expressed in *Davis*, was simply not an event for which the University could be held responsible. Accordingly, Plaintiff's retaliation claim is also subject to dismissal because any retaliation was not a response to an objectively reasonable complaint of Title IX discrimination.

## B.   Individual Defendants

Plaintiff makes multiple claims against the Individual Defendants under 42 U.S.C. § 1983.  This statue holds liable every person "who, under color of any statute, ordinance regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, [another person] to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws."[55]  To state a claim under § 1983, plaintiff

---

[52] *See Scheidler v. Indiana*, 914 F.3d 535, 542 (7th Cir. 2019) ("A retaliation claim requires statutorily protected activity, which generally involves subjective and objective factors.").

[53] *Pease v. Whitewater Unified Sch. Dist.*, 2022 WL 671226, at *4 (E.D. Wisc. 2022).  *See also Royal v. Kirschling*, 2020 WL 1849712, at *13 (D. Md. 2020); *Garrett v. Univ. of S. Fla. Bd. of Tr.*, 448 F.Supp. 2d 1286, 1305 (M.D. Fla. 2020); *Cuffee v. Tidewater Cmty. Coll.*, 409 F. Supp. 2d 709, 720 (E.D. Va.), *aff'd*, 194 F. App'x 127 (4th Cir. 2006).

[54] *Kocsis v. Fla. St. Univ. Bd. of Tr.*, 788 F. App'[x 680, 686 (11th Cir. 2019).  *See also Magyar v. St. Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008) (A complaint's objective reasonableness is determined by "whether it falls into the category of conduct prohibited by the statute.").

[55] *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 n.1 (1982) (quoting 42 U.S.C. § 1983).

must allege both that (1) defendants deprived him of a right secured by the Constitution or the laws of the United States and (2) defendants acted under color of the law of a state, territory, or the District of Columbia.[56]

The Individual Defendants argue they are protected by the doctrine of qualified immunity. Public officers enjoy a qualified immunity to suit under § 1983, which applies unless their conduct was unreasonable in light of clearly established law. "If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation."[57] Once a defendant has asserted qualified immunity, the burden is on the plaintiff to prove (1) the officer violated a federal constitutional or statutory right, and (2) that the right was clearly established at the time of the unlawful conduct.[58] In their Motion to Dismiss, the Individual Defendants argue that Plaintiff has failed to show they violated any consititutional or statutory rights.

### 1. Equal Protection

Plaintiff claims that the Individual Defendants violated her right to equal protection of the laws because her arrest and prosecution reflected both discrimination against her has a woman, and as a "class of one." The Individual Defendants have moved to dismiss both claims.

The Individual Defendants' motion is cursory as to the class-based claim, arguing simply that Plaintiff's claims are too vague. Instead, the Individual Defendants focus their argument on

---

[56] See Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970).

[57] Brosseau v. Haugen, 543 U.S. 194, 198 (2004).

[58] Saucier v, Katz, 533 U.S. 194, 201 (2001), overruled on other gds., Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Plaintiff's "class of one" claim, contending that this claim cannot survive in light of the Tenth Circuit's decision in *Jennings v. City of Stillwater*.[59]  In that case, the court upheld an award of summary judgment against the plaintiff's "class of one" equal protection claim that the police had failed to properly investigate her sexual assault claims against Oklahoma State University football players.

The Supreme Court had previously recognized that equal protection served to guard individual persons against intentional and arbitrary discrimination in *Village of Willowbrook v. Olech*.[60]  The Tenth Circuit in *Jennings* recognized the "struggle[] to define the contours of class-of-one cases" following *Olech*, and observed that its own decisions appeared to narrow the doctrine so that a plaintiff raising such a claim must "present evidence not merely of arbitrariness but of malice or ill-will against the plaintiff."[61]

Although the Tenth Circuit observed that the plaintiff had failed to allege such malice, its decision affirming the district court's award of summary judgment rested on two separate conclusions.  First, the court held that the plaintiff's claim failed, even assuming the lead detective failed to energetically investigate the case, because the investigation was "but one link in the chain of events," which led to the decision by the District Attorney not to prosecute the alleged assailants, and thus did not have "a concrete effect on her rights."[62]  The court explained:

---

[59] 383 F.3d 1199 (10th Cir. 2004).

[60] 528 U.S. 562, 564 (2000).

[61] *Jennings*, 383 F.3d at 1210, 1211.

[62] 383 F.3d at 1212.

The ultimate decisions not to prosecute the football players and to release the rape kit were made not by [the detectives], but by District Attorney Hudson, who is not a defendant. Plaintiff makes no allegation that Hudson's actions were discriminatory or wholly arbitrary. According to undisputed evidence in the record, Hudson's office routinely prosecuted other OSU athletes, including at least one other OSU football player for rape at or around the time of the Jennings incident.
. . . .

[T]here was ample basis for Hudson's decision not to prosecute, independent of Detective Buzzard's mischaracterizations of Plaintiff's testimony in his report. Indeed, Plaintiff does not contend otherwise. A plaintiff may not base an equal protection challenge to intermediate steps in a decisionmaking process, where the ultimate result was not discriminatory.[63]

Second, the plaintiff in *Jennings* failed to show that she was indeed similarly situated to other rape victims whose claims were prosecuted, an element "especially important in class-of-one cases."[64]

Looking only at one individual . . . there is no way to know whether the difference in treatment was occasioned by legitimate or illegitimate considerations without a comprehensive and largely subjective canvassing of all possible relevant factors. It is therefore imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the favored class.[65]

This derives not only from the nature of class-of-one allegations, but the "presumption that a prosecutor has not violated equal protection."[66]

Because the exercise of prosecutorial discretion implicates a host of variables from the relative culpability of the defendants to the optimal deployment of prosecutorial resources, it is correspondingly more difficult to bring an equal

---

[63] *Id*. at 1213.

[64] *Id*. at 1213 (citations omitted).

[65] *Id*. at 1213-14.

[66] *United States v. Armstrong*, 517 U.S. 456, 465 (1996).

- 43 -

protection claim than in the classic case of discrimination against a suspect claim. These burdens are occasioned by the multifarious nature of enforcement and prosecution decisions which touch on such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan. These concerns are not readily susceptible to the kind of analysis the courts are competent to undertake.[67]

Here, Plaintiff does allege that the decision to prosecute her for making a false statement was direct and concrete result of the actions of the police. However, the Amended Complaint makes no allegation of gender bias by the District Attorney, the individual who made the decision to charge Plaintiff with making a false statement. Similarly, the Amended Complaint makes no allegation that the District Court, which found there was probable cause to support the charges against Plaintiff, was motivated by either malice against Plaintiff in particular, or gender bias.

Just as importantly, Plaintiff has made no attempt at all to articulate how she was treated differently from other assault victims. While *Jennings* was decided on summary judgment, the Tenth Circuit noted Supreme Court authority stressing the wide variety of factors which may affect prosecutorial decisions, thus explaining "why the Supreme Court has imposed a substantially more 'demanding' *pleading* burden on plaintiffs bringing claims of selective law enforcement."[68] Here, Plaintiff makes no attempt to meet this heavy pleading burden.[69]

---

[67] *Jennings*, 383 F.3d at 1214-15 (citations, internal quotation, and alterations omitted).

[68] *Id*. at 1214 (citing *Armstrong*, 517 U.S. at 463-64) (emphasis added).

[69] In a habeas action, this Court has recognized that equal protection claims alleging a selective exercise of prosecutorial discretion face "the heavy burden imposed by *Jennings*." *See also Rondini v. Bunn*, 2018 WL 317713, at *9 (N.D. Ala. 2018) ("[T]he court finds no plausible 'class of one' equal protection claim because the First

In the Amended Complaint, Plaintiff makes no attempt to define the "class of one," and makes no attempt to explain how her assault claim was treated differently from other assault victims.  To the contrary, after stating in purely conclusory fashion that she was also making a "class of one" claim, the Amended Complaint immediately switches back to a classification-based equal protection claim, arguing she was "targeted . . . on the basis of her gender," targeted "because she was a woman who alleged she was sexually assaulted," treated "due to her gender and status as a rape victim."  She alleges Defendants were operating under beliefs "rooted in gender bias," and were "enforcing policies unequally on the basis of Plaintiff's gender."  Thus, rather than arguing that Plaintiff was treated uniquely, the Amended Complaint cites three Jane Does, identified as "other sexual assault survivors," who would corroborate her claims that the LPD fails to take serious claims of sexual assault "by women."

Plaintiff argues that *Jennings* is inapplicable because in that case there was merely a decision not to prosecute the OSU football players, while here the District Attorney did file charges—against her.  However painful the result for Plaintiff, however, this is not a meaningful distinction.  The decision to file charges against Plaintiff still reflects prosecutorial weighing of "concerns are not readily susceptible to the kind of analysis the courts are competent to undertake."[70]  *Jennings* remains applicable, and Plaintiff's failure to meet the heightened pleading requirement on  a "class of one" equal protection claim based on selective prosecution claim warrants dismissal.

---

Amended Complaint fails to plead that Megan's case was identical in all relevant respects to one where the crime victim received more favorable treatment from Defendants Jones or Hastings.").

[70] *Jennings*, 383 F.3d at 1215 (citation, internal alteration, and quotation omitted0. .

Plaintiff is on stronger ground as to her class based claim. As noted earlier, the Individual Defendants argue the class-based equal protection claim is "wholly conclusory" and "vague." The Defendants do not develop the argument beyond this bare assertion, hurrying on to address Plaintiff's "class of one claim."

The Court finds that Plaintiff has presented a colorable claim that gender bias may have played a role in causing a rush to judgment. Plaintiff alleges a general bias against female assault victims and in favor of males accused of assault. Plaintiff makes extensive allegations that the police may have been influenced by a lack of training on the affect of trauma and alcohol on the victim of a sexual assault. Plaintiff cites the experience of three other women presenting similar stories of their experiences with LPD. Given the relevant standards for resolving a motion to dismiss, the court finds that Plaintiff's class-based equal protection challenge to her arrest should proceed.

Plaintiff cites *Chase v. Nodine's Smokehouse*[71] as supporting the viability of her claim that the Individual Defendants deprived her of equal protection through an anti-female animus. In that case, the plaintiff alleged she had been arrested for making a false statement of sexual assault.[72] Plaintiff claimed the arrest was the product of gender bias, and the district court denied the police's motion for summary judgment of the police.[73]

---

[71] 2020 WL 8181655 (D. Conn. 2020), *appeal dismissed sub nom. Chase v. Penney*, 2021 WL 4519707 (2d Cir. 2021), *cert. dismissed sub nom. Colangelo v. Chase*, 2022 WL 904126 (U.S. 2022).

[72] Id. at *7.

[73] Id. at *20.

- 46 -

The Individual Defendants argue the *Chase* is inapplicable because "[t]he plaintiff in *Chase* set forth actual facts that she was treated differently because she was treated differently because she was a female."  But the distinction fails, because the plaintiff in *Chase* was able to present such "actual facts" precisely because discovery had occurred and the matter had proceeded to summary judgment.

Citing *Jennings* in their Reply brief, the Individual Defendants argue that they are entitled to qualified immunity because the law relating to the investigation of sexual assault claims was not clearly established.  However, this is a new argument.  In their original memorandum, the Individual Defendants only mention the second, "clearly established" prong in their recitation of the general principles of qualified immunity.  When the Defendants address the specific § 1983 claims advanced by Plaintiff, they argue that no constitutional violation occurred; and do not address the "clearly established" state of the law for the remainder of the brief.  "[T]his Court does not consider issues raised for the first time in a reply brief, and thus will not consider the merits of that argument."[74]

Accordingly, the Court dismisses Plaintiff's "class of one" claim against the Individual Defendants.  The Court denies the Individual Defendants' motion as it relates to Plaintiff's broader, gender-based equal protection claim.

### 2.   *Malicious Prosecution*

"A § 1983 malicious prosecution claim requires a showing that: 1) the defendant caused plaintiff's continued confinement or prosecution; 2) the original action terminated in plaintiff's

---

[74] *Holman v. Fifth Third Bank*, 2021 WL 5578549, at *4 n.19  (D. Kan. 2021) (citation omitted).

favor; 3) there was no probable cause to support the original arrest, continued confinement or prosecution; 4) the defendant acted with malice; and 5) plaintiff sustained damages."[75]   A plaintiff presenting a claim of malicious prosecution must supply more than conclusory allegations.[76]   "Unlike a false arrest claim, malicious prosecution concerns detention only after the institution of legal process."[77]

"Even if an officer 'subjectively intended to base the arrest on an offense for which probable cause is lacking,' no Fourth Amendment violation occurs as 'long as the circumstances, viewed objectively, justify the arrest.' "[78]   "[I]t is incumbent upon a plaintiff to 'identify *specific* actions taken by *particular* defendants' in order to make out a viable § 1983 . . . claim."[79]   No viable claim of malicious prosecution exists where a plaintiff simply "lumps the police officers together in his complaint without differentiating what their specific roles and actions were."[80]

"Probable cause does not require proof beyond a reasonable doubt or even a preponderance of the evidence."[81]   "Instead, the relevant question is whether a substantial

---

[75] *Townsend v. Marengo*, 2022 WL 266810, at *3 (D. Kan. 2022).  *See Margheim v. Buljko*, 855 F.3d 1077, 1085 (10th Cir. 2017) (quoting *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008)).

[76] *See Erikson v. Pawnee Cnty. Bd. of Cnty. Comm'rs*, 263 F.3d 1151, 1154-55 (10th Cir. 2001) (dismissing malicious prosecution claim based on conclusory allegations of an absence of probable cause).

[77] *Wilkins*, 528 F.3d at 798 (internal quotation, alteration, and citation omitted).

[78] *McKnight v. City of Topeka,* 2020 WL 5747917, at *19 (D. Kan. 2020) (quoting *Quinn v. Young*, 780 F.3d 998, 1006 (10th Cir. 2015)).

[79] *Pahls v. Thomas*, 718 F.3d 1210, 1226 (10th Cir. 2013) (quoting, and adding emphasis to, *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 532-33 (10th Cir. 1998)).

[80] *Townsend*, 2022 WL 266810, at *3.

[81] *Hopper v. Fenton*, 665 F. App'x 685, 686 (10th Cir. 2016).

probability existed that the suspect committed the crime, requiring something more than a bare suspicion."[82]  "[I]t is a Fourth Amendment violation to 'knowingly or recklessly omit from the affidavit information which, if included, would have vitiated probable cause.' "[83]  If information has been omitted from an affidavit, the court asks "if the affidavit would still have given rise to probable cause for the warrant" with the missing information added.[84]

The Amended Complaint contends Cottengim's affidavit should have included evidence showing  (a) that Thompson had a long-standing plan or intention of having sex with Plaintiff, including crude text messages and the existence of an alleged "to do list," (b) that Plaintiff suffered physical injuries, including bruising to her neck and a vaginal tear as shown in the rape kit documentation; (c) that witness statements from persons observing Plaintiff immediately after the incident would have corroborated reporting her apparent mental trauma; (d) that Thompson falsely told police he stopped having intercourse with Plaintiff when she asked; (e) a forensic examination of the rape kit showed the presence of seminal fluid; and (f) that Plaintiff's reported intoxication was corroborated by credit card receipts showing Plaintiff had bought "numerous drinks" during the night and surveillance video showed her stumbling movements, and Thompson's own text message identifying Plaintiff as "so fucked up."

There remains, against this, Plaintiff's own "fucked up" text message—her 2:00 a.m. text to her friend that she had "fucked up" and "slept with Joel."  Certainly a reasonable person could

---

[82] *Id*. (quoting *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011)).

[83] *Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996) (quoting *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir.1996).

[84] *Steward v. Donges*, 915 F.2d 572, 582 n.13 (10th Cir. 1990).

view this as a strong indication that Plaintiff had made an error in judgment by engaging in consensual sex.  As reported in the affidavit, Plaintiff texted Hurtig that "he's actually really good at sex."  Between 2:44 a.m. and 6:44 a.m. on September 28, 2018, Plaintiff sent ten text messages to her friend Hurtig, in none of which does she mention drinking or alcohol. Thompson's messages prior to the night of September 27-28, however crude, are not inconsistent with a desire to have consensual sex with her.

Still, the Court cannot say at this time that probable cause would exist if  the missing information was added to the affidavit.  Thompson's earlier text messages could be taken as showing a willingness to have sex with an incapacitated Plaintiff.  More importantly, his texts that "She looked fucked up yo," "she was really lolo," and "I'm bout to see what she working with" can be taken as corroboration of her statement that she was too drunk to consent to intercourse.  Similarly, the absence of consent could be corroborated by evidence Plaintiff had exhibited bruising on September 28.

However, the Individual Defendants' motion does not ask the Court to make this overall evaluation.  Instead, their motion presents a different argument, namely that the decision of the District Attorney to charge Plaintiff, and the District Court's finding of probable cause, break any chain of causation from the defective affidavit.  This argument rests on the Tenth Circuit's observation in *Taylor v. Meacham* that "the chain of causation [in a malicious prosecution action] is broken by an indictment, absent an allegation of pressure or influence exerted by the

police officers, or knowing misstatements made by the officers to the prosecutor."[85]   The court

continued:

> Here, too, there was a preliminary hearing, which, under Utah law is an adversarial proceeding, in which a judge independently listened to testimony, evaluated the credibility of those testifying, reviewed evidence, and concluded that the evidence was sufficient to bind Mr. Taylor over for trial. Thus, to the extent Sheriff Meacham set in motion a malicious prosecution, which we do not suggest that he did, the preliminary hearing broke the "chain of causation."[86]

In opposing the Motion to Dismiss, Plaintiff argues that the chain of causation was not

broken, claiming that Cottengim falsified evidence in the affidavit.  But a review of that affidavit

fails to show any "pressure" exerted on the District Attorney.   Further, the allegation of

"falsification of evidence" is not supported in the Amended Complaint. Certainly the Amended

Complaint presents a laundry list of additional evidence Plaintiff believes the detectives *should*

have included.  But to the extent the Amended Complaint criticizes what the affidavit actually

did include, it addresses only the portion of the affidavit in which the detective "indicated . . . his

skepticism" about her story.

In the concluding portion of affidavit, Cottengim explained his theory of Plaintiff's

"underlying motive" for making the allegedly false statement, centering on a supposed desire to

either maintain a relationship with Guillot, or for revenge against him, when she later learned

---

[85] *Taylor*, 82 F.3d at 1564 (quoting *Reed v. City of Chicago*, 77 F.3d 1049 (7th Cir. 1996)).  *See also Barham v. Town of Greybull Wyo.*, 483 F. App'x 506, 509 (10th Cir. 2012) (Where plaintiff failed to allege "any pressure or influence or made any knowing misstatements to the prosecutor, and thus the chain of causation was broken by the prosecutor's decision to file charges as well as by the state court's decision to bind Plaintiff over at the preliminary hearing.").

[86] *Taylor,* 82 F.3d at 1564.

how long Guillot had been in a relationship with another woman  All the reference to Plaintiff's mental state or motive are prefaced by the qualification that this what the "Affiant believes."

The detective thus expressed inferences and opinions, denominated expressly as such, of Plaintiff's credibility, something which the District Attorney, and later the District Coucrt court, could independently evaluate.  The Amended Complaint criticizes Cottengim's opinions as expressed in the affidavit, without showing any particular underlying evidence was false. Further, even though those opinions arose (according to Plaintiff) from gender bias, there is no allegation that Cottengim *falsified* those beliefs.  To the contrary, the entire thrust of the Amended Complaint is that Cottengim's belief was biased but real—she expressly alleges that the detective "chose, without basis, to disbelieve [her]."

The affidavit included Plaintiff's statement that she was unable to consent to sex.  The affidavit relates that Plaintiff had told Cottengim that she had consumed large amounts of alcohol, felt "fuzzy" while at the bars, had eventually blacked out.  Cottengim also noted that Plaintiff met with Guillot on September 28 and told him "she had been drinking" and had had sex with Thompson. The affidavit also includes Thompson's text message to a friend stating Plaintiff appeared "so fucked up" during their bar hopping.

Plaintiff argues Cottengim failed to document her bruising and injury as reflected in the rape kit, that a subsequent KBI examination of the rape kit showed seminal fluid (contradicting Thompson's story that he stopped having sex with Plaintiff when she asked), that Cottengim erred in suggesting she wanted to get back together with Guillot, and that evidence from a fuller

forensic examination of Thompson's phone demonstrated his long-standing desire to have sex with her.

The existence of seminal fluid contradicts Thompson's statement, but it also contradicts Plaintiff's own text message from 6:15 a.m., in which she stated "It's all good . . . this was a fuck up though I literally made him stop having sex . . . ."  There is no allegation that the analysis from the rape kit was made prior to Cottengim's affidavit and that he suppressed the results.

Similarly, there is no allegation indicating that Cottengim knew of but suppressed evidence showing that Thompson wanted to have sex with Plaintiff.  The affidavit shows that detectives had examined Thompson's phone, and duly reported what they found in the recent text messaging history.  The detectives did not perform a full forensic examination of Thompson's texting history, but the affidavit does not assert that they did.

Nor was the affidavit silent on plaintiff's physical injuries.  The affidavit notes that after Stokes threatened to reveal "the Joel thing" later in the day on September 28, along with Plaintiff's reply, "Ok, if you want the Joel thing to get out let's do it because I'm pretty sure it was borderline rape and I have the bruises and statements to prove it. . .  so if you want to go there let's do it[.]"

Thus, to the extent Plaintiff has identified missing information relevant to the evaluation of probable cause, this information could affect the weighing of evidence, but such evidence related to issues already red flagged in the affidavit for further inquiry by the District Attorney and by the Douglas County District Court.  Both were free to inquire into the actual nature and extent of any bruising.  Both were free to inquire about the results shown in the SANE kit

examination, which the affidavit noted had occurred.  Both were free to reach their own opinions about whether Plaintiff was actually motivated by a desire to get back together with Guillot.

Equally, Plaintiff was free to make these arguments to the District Court.  She texted to Stokes that the "Joel thing" was "borderline rape" and that that "I have the bruises and statement prove it."  Cottengim had explicitly noted these texts in the probable cause affidavit, along with Plaintiff's statements about her drinking, and Thompson's texts showing an awareness that Plaintiff was intoxicated.  These issues were expressly identified in the probable cause affidavit, and the District Court could explore them if it believed necessary to reach a finding of probable cause.  Further, the Plaintiff could offer her own evidence at the preliminary hearing, and could examine any detective testifying at the hearing about the grounds for his belief.

The chain of causation is broken by a preliminary hearing "in which a judge independently listened to testimony, evaluated the credibility of those testifying, reviewed evidence, and concluded that the evidence was sufficient to bind [a defendant] over for trial."[87] Moreover, as the court stressed in *Taylor* a preliminary hearing may serve as a break in the chain of causation even if the original affidavit for arrest otherwise lacks probable cause.  The plaintiff in that case alleged the sheriff had made willful misstatements of fact in the arrest warrant, but failed to allege "that he somehow caused false or perjured testimony at the preliminary hearing." Thus, even if the sheriff "set in motion a malicious prosecution [by means of the arrest warrant], the preliminary hearing broke the 'chain of causation.' "[88]

---

[87] *Id.*

[88] *Id*. at 1563-64 n.9.

Plaintiff has failed to allege the sort of affirmative falsification of evidence which would keep the chain of causation intact.[89]  Rather, she has at most alleged a failure to include exculpatory evidence, much which is equivocal, which *might* affect the evaluation of probable cause in the original affidavit.  Plaintiff has not shown any of the Individual Defendants caused false or perjured testimony at the preliminary hearing.  The Amended Complaint itself acknowledges that the district court rendered its decision "largely" on the basis of Plaintiff's own text messages, an evaluation which the additional evidence now cited by Plaintiff would not have affected.

### 3.    *Abuse of Process*

The common law tort of abuse of process provides the elements relevant for a federal cause of action pursuant to § 1983.[90]  "To set out a claim for the tort of abuse of process, plaintiff must allege that (1) defendants made an illegal, perverted or improper use of the process; (2) defendants had an ulterior purpose or motive for exercising the illegal, perverted or improper use of the process; and (3) plaintiff suffered damage from the irregularity."[91]  "The gist of tort of abuse of process is not commencing an action or causing process to issue without justification,

---

[89] *See Pierce v. Gilchrist*, 359 F.3d 1279, 1282, 1292 (10th Cir. 2004) (chain of causation not broken where forensic technician falsely linked defendant to sexual assault while also concealing enzyme test results which would have exonerated him); *Robinson v. Maruffi*, 895 F.2d 649, 653, 655 (10th Cir. 1990) (no break in causation where key witnesses to robbery and murder was coerced into giving false, memorized testimony); *Birdsong v. Unified Gov't of Wyandotte Cnty./Kansas City, Kan.*, 2014 WL 105509, at *5 (D. Kan. 2014) (chain of causation not broken where, among other things, officer "lied under oath" that plaintiff had assaulted him); *Bowling v. United States*, 2009 WL 723226, at *8 (D. Kan. 2009) (police officer allegedly testified falsely as to statements by plaintiff admitting guilt, while also suppressing evidence plaintiff was beaten by law enforcement).

[90] *See Stegall v. Great Am.Ins. Co.*, 996 F. Supp. 1060, 1069 (D.Kan. 1998); *McShares Inc. v. Barry*, 266 Kan. 479, 494, 970 P.2d 1005 (Kan. 1998); *Erikson*, 263 F.3d at 1155 n.5.

[91] *Hall v. Brownrigg*, 2012 WL 3024716, at *6 (D. Kan. 2012) (citations omitted).

but misusing or misapplying process justified in itself, for an end other than that which it was designed to accomplish."[92]

> An action for abuse of process differs from an action for malicious prosecution in that the latter is concerned with maliciously causing process to issue, while the former is concerned with the improper use of process after it has been issued. Thus it is said in substance that the distinction between the two is that malicious use of process is the employment of process for its ostensible purpose, but without reasonable or probable cause, whereas the malicious abuse of process is the employment of a process in a manner not contemplated by law, or to obtain an object which such a process is not intended by law to effect.[93]

Thus, is a narrow remedy applicable in rare instances,[94]  the action requiring some "extortionate perversion of lawfully initiated process to illegitimate ends."[95]

On this standard, Plaintiff's allegations in the Amended Complaint fail to make an plausible claim of abuse of process.  Plaintiff does allege that the Cottengim's affidavit lacked probable cause, and the detectives knew or should have known of this deficiency.  But Plaintiff does not allege that the detectives believed a rape had occurred, but prosecuted her anyway.  To the extent that the Amended Complaint offers something beyond purely conclusory allegations that the Individual Defendants acted with an improper purpose, it repeatedly asserts the opposite: that through lack of training or prejudice they genuinely believed Plaintiff's version of events was false—that no rape had occurred.

---

[92] *Good v. Bd. of Cnty. Com'rs of Shawnee Cnty., Kan.*, 331 F. Supp. 2d l1315, 1330 (D. Kan. 2004).

[93] *Jackson & Scherer, Inc. v. Washburn*, 209 Kan. 321, 496 P.2d 1358, 1366 (1972) (quoting 1 Am. Jur. 2d Abuse of Process, § 2 (1962)).

[94] *Green v. Blake*, 2021 WL 1910710, at *6 (D. Kan. 2021) (quoting *Tappen v. Aggeer*, 599 F.2d 376, 379 (10th Cir. 1979)).

[95] *Heck v. Humphrey*, 512 U.S. 477, 486 n.5 (1994).

Thus, the Amended Complaint alleges Cottengim "chose . . . to disbelieve [Plaintiff's] report," and as a result did not search out evidence which might corroborate her complaint.   The Amended Complaint complains that "some detectives had cheer[ed] that they 'finally got our false reporter.' "   Cottengim completed the probable cause affidavit because he "shared [Thompson's] perceptions of the case"—that is, that the encounter had been consensual.   The Amended Complaint alleges that the detectives "lacked necessary training and understanding" to appreciate the nature of sexual assaults, leading them to "adopt[] the position that Bobbie had not been sexually assaulted."

Beyond purely formulaic assertions of wrongful conduct, the Amended Complaint asserts only that, during an interview, Detective Nicholson cautioned Plaintiff her text messages could be viewed as indicating the encounter was consensual.   Nicholson also stated that any formal complaint against Thompson would appear in criminal background checks, affecting his employment prospects.

Neither of these cautions was untrue.   The Amended Complaint itself acknowledges that the Plaintiff's text messages on the night of the encounter were crucial for the District Court's independent decision that probable cause existed.   And the Amended Complaint makes no allegation that mentioning the potential impact of a formal complaint on Thompson was anything other than one element for Plaintiff to consider, and makes no allegation that Nicholson otherwise overbore Plaintiff's ability to decide whether to press charges.   While Plaintiff argues in her response that Nicholson's goal was "to protect Thompson," the Amended Complaint itself

indicates that such dissuasion was unnecessary, acknowledging that Plaintiff at that time adhered to her stated intention not to file a complaint.

Against this, as noted above, the overwhelming, specific, and repeated emphasis of the Amended Complaint is that, because the detectives were insufficiently trained and insensitive, they rushed into the belief that her version of the incident was false.  In the words of the Amended Complaint, the officers "leaped to the conclusion that no rape had occurred." Believing no rape had occurred, the detectives then (according to the Amended Complaint) committed various errors of omission, failing to obtain information which might have provided additional support for her version of events.  Assuming these allegations are true, the officers wrongly but sincerely decided Plaintiff's statements were false.  Prosecuting Plaintiff for statements they believed to be false was not acting for an improper purpose.

Because Plaintiff has presented nothing but conclusory allegations that the arrest warrant was advanced for an improper purpose, the § 1983 claim for abuse of process is dismissed.

   4.   *Conspiracy*

"[T]o recover under a § 1983 conspiracy theory, a plaintiff must plead and prove not only a conspiracy, but also an actual deprivation of rights; pleading proof of one without the other will be insufficient."[96]  To sufficiently plead the conspiracy element of a § 1983 claim, a plaintiff must allege "at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial

---

[96] *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir. 1990) (citations omitted).

objective."[97]   "Tenth Circuit law is clear that to assert a viable conspiracy claim against an individual, a plaintiff must allege specific facts showing an agreement and concerted action by that individual—conclusory allegations are not enough."[98]

The Amended Complaint lacks nonconclusory fact allegations which would plausibly suggest a meeting of minds among the Individual Defendants to deprive Plaintiff of her civil rights.  The overwhelming emphasis of the lengthy complaint is that the probable cause affidavit completed by Cottengim failed to include evidence which would have corroborated her version of events.  Even assuming this failure by Cottengim arose through gender bias, and that inclusion of the missing evidence would have rendered the affidavit lacking in probable cause, the Amended Complaint fails to set forth any factual allegations of persons acting in concert with Cottengim to achieve an illegal purpose.

Detective Nicholson and Officer Affalter receive at most passing attention in the course of the lengthy Complaint, and the acts ascribed to them do not plausibly suggest any collective improper purpose.  Affalter and Nicholson met with Plaintiff at the hospital on September 29, along with Cottengim. At the initial meeting, Nicholson told Plaintiff that the police could commence a full criminal investigation, could merely document Plaintiff's version of events for their records, or could take no action at all.  Plaintiff told the police "she d[id] not want the police to do anything," and Nicholson responded that if Plaintiff later "decided to proceed, she

---

[97] *Brooks v. Gaenzle*, 614 F.3d 1213, 1227-28 (10th Cir. 2010), *abrogated on other gds.*, *Torres v. Madrid*, __ U.S. __, 141 S. Ct. 989 (2021).

[98] *McIntyre v. Unified Gov't of Wyandotte Cnty. & Kansas City, Kan.*, 2020 WL 1028303, at *26 (D. Kan. Mar. 3, 2020) (internal quotation omitted).  *See also Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998); *Durre v. Dempsey*, 869 F.2d 543, 545 (10th Cir. 1989) (per curiam).

could come down to station later and give full statement."  The Amended Complaint alleges that Nicholson (and the other officers) examined Plaintiff's phone, while otherwise acknowledging that she "allowed the police to look through her phone."

Nicholson telephoned Plaintiff three days later, told her that it was policy to document the accounts of sexual assault victims even if they did not wish to press criminal charges.  The Amended Complaint does not allege that this was not in fact department policy.  Nicholson and Affalter drove to Plaintiff's house when she agreed to an interview.  Plaintiff complains that during the course of the interview, Nicholson told her that her text messages could suggest plaintiff had engaged in sexual intercourse, and that proceeding with formal criminal charges against Thompson could damage his career.  Neither comment is suggestive of a collusive agreement to deprive Plaintiff of her civil rights.  Both the District Attorney (who later made the decision to formally file false statement charges) and the District Court (which agreed that Plaintiff had probably violated the false statement statute) concurred as to the relevance of Plaintiff's text messages.  And while the Plaintiff now states that Nicholson's comment about the impact of a criminal prosecution on Thompson's career was "intimidat[ing]," at that point the comment was *supportive* of Plaintiff's decision, expressed "[a]t least nine separate times," that she "d[id] not want to pursue charges."

Plaintiff complains that Affalter subsequently emailed the detectives that Plaintiff told him she "is thinking of going ahead and making a full statement and wanting to pursue charges in this case."  But the Complaint itself acknowledges that this email documented a telephone call by Plaintiff, in which she told him she would she was "*thinking about … potentially* pursuing

- 60 -

charges against Thompson." The emphasis by Plaintiff in the Amended Complaint to one side, Affalter's email was therefore accurate, stating that Plaintiff was "thinking" about pressing criminal charges.

The Amended Complaint alleges that in a subsequent telephone conversation, Affalter encouraged Plaintiff to come in and give a full statement, but did not reveal that the conversation was being recorded, or that the police suspected her of giving false statements. But even assuming this reflected the rush to judgment otherwise described in the Amended Complaint, it was a judgment that Plaintiff had not been sexually assaulted, and thus had made false statements to the police.

Because Plaintiff's allegations of a conspiracy to deprive her of her civil rights are purely conclusory, the claim is appropriately dismissed.

**C.     Section 1983 claim against the City of Lawrence**

A municipality is not generally liable under § 1983 for the actions of its employees.[99] However, the Supreme Court has held that in "limited circumstances," a failure to train can be the basis for liability under § 1983.[100] "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."[101] It is only when a municipality's failure to train employees evidences a " 'deliberate indifference' to the rights of its inhabitants" that this failure to train can be considered "a city 'policy or custom' that is actionable under §

---

[99] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978).

[100] *City of Canton v. Harris*, 489 U.S. 378, 387 (1989).

[101] *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citation omitted).

1983."[102]   Deliberate indifference requires a showing that the municipality had "actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation," and a conscious or deliberate choice to disregard the harm.[103]   A municipal custom or policy may arise from "(1) a formal regulation or policy statement; (2) an informal custom that amounts to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) decisions of employees with final policymaking authority; or (4) ratification by such final policymakers of the decisions."[104]

Notice can be established by either (1) proving the existence of a pattern of tortious conduct, or (2) showing that a violation of constitutional rights is a " 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction."[105] "Evidence of a pre-existing pattern of violations is only unnecessary in a narrow range of circumstances, however rare, in which the unconstitutional consequences of a failure to train are highly predictable and patently obvious."[106]   It is not sufficient to simply show that an injury or accident could have been avoided if an employee had better training or that a training program had occasionally been

---

[102] *Canton*, 489 U.S. at 389.

[103] *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (1988).

[104] *Edgin ex rel. I.E. v. Blue Valley U.S.D. 229*, 2021 WL 1401644, at *3 (D. Kan. 2021) (citation and internal quotation omitted).

[105] *Barney*, 143 F.3d at 1307-08 (citations omitted).

[106] *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1285 (10th Cir. 2019) (quotation marks and citations omitted). *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002) (Deliberate indifference exists when a municipality has "actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm.").

negligently administered.[107]  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."[108]  A plaintiff must plausibly allege the existence of "actual or constructive notice of training deficiencies 'substantially certain to result in a constitutional violation.' "[109]

In her response, Plaintiff stresses that the Amended Complaint "detailed for pages" the failings of the detectives to correctly investigate the case.  But, however long the Amended Complaint's allegations, in the end there is simply no allegation of a widespread pattern of misconduct by Lawrence police.  As noted above, the Amended Complaint alleges that Plaintiff has identified three Jane Doe witnesses who believe their complaints of sexual assault were not vigorously investigated or successfully assaulted.

The 2020 Census counted 94,934 residents in the City of Lawrence,[110] and 118,785 in Douglas County.[111]  The Lawrence Police Department received reports of 55 sexual assaults annually.[112]  The Amended Complaint gives no specific particular allegations of the proposed Jane Doe witnesses, including over what period of time their complaints were presented to the

---

[107] *Canton*, 489 U.S. at 391.

[108] *Connick*, 563 U.S. at 62.

[109] *Edgin,* 2021 WL 1401644 at *4 (quoting *Barney*, 143 F.3d at 1307).

[110] https://www.census.gov/quickfacts/fact/table/lawrencecitykansas/POP010220  (last  visited  April  24, 2022).

[111] https://www.census.gov/quickfacts/fact/table/douglascountykansas/POP010220  (last  visited  April  24, 2022).

[112] Kan. Bureau of Investigation Incident Based Reporting Unit, *Kansas Crime Index 2020*, at 14, available at https://www.kansas.gov/kbi/stats/docs/pdf/2020%20Crime%20Index.pdf  (last visited April 24, 2022).

Lawrence police.  The Amended Complaint summary of the experiences of the Jane Does focuses entirely on alleged failures of Lawrence "detectives [who] are wholly untrained in the handling of [sexual assault] investigations," and makes no allegation that Jane Does gave notice of their experiences to the City.

The Amended Complaint thus presents no plausible allegation the City had notice that its training was deficient.  To the contrary, as noted earlier, Plaintiff relies on a Kansas City Star article which showed that Lawrence police had made arrests in 13.8% of reported rape cases, but as the Amended Complaint acknowledges, this was only "1% behind the state average."

Plaintiff has failed to allege the City had actual or constructive notice of training deficiencies which were substantially certain to result in a constitutional violation of her constitutional rights. Accordingly, the Court grants the City's motion to dismiss Count I.

**D.     State Law Claims**

Defendants argue the Court should dismiss the pendent state law claims for multiple reasons, but chiefly on the grounds that the Court may properly decline to exercise supplemental jurisdiction over these state law claims once the federal claims against the City and the Individual Defendants have been dismissed.[113]  Although Defendants raise additional arguments in their initial motion, this is the only grounds for relief cited in their Reply Memorandum.

This argument, of course, entirely depends on the dismissal of *all* federal claims against the Lawrence Defendants.  As noted above, the Individual Defendants fail to articulate a valid

---

[113] *See Koch v. City of Del City*., 660 F.3d 1228, 1248 (10th Cir. 2011).

basis for dismissal of Plaintiff's gender bias equal protection argument.  Accordingly, the Court cannot dismiss the state claims by declining to exercise supplemental jurisdiction.

The arguments the City otherwise advanced against the particular state law claims, abandoned in its Reply, fare no better.  The City argues that it cannot be held accountable for malicious prosecution or abuse of process on the grounds that the criminal charges against Plaintiff were brought by the State of Kansas, and thus it cannot be held responsible for the prosecution.  Second, it argues that it is immune under the Kansas Tort Claims Act ("KTCA").  The Court finds neither argument persuasive.

Defendant offers no authority for its first argument, that as a municipality it cannot be liable for malicious prosecution where the State has initiated a criminal action.  The Court notes the City made this same argument in another action in this District, *Tran v. County of Douglas*.[114]  In that case, the City opposed as futile a motion to amend which would add a claim that a Lawrence police officer fabricated evidence, on the grounds that "the criminal charges brought against plaintiff were from the state of Kansas, not the City of Lawrence," and because it was "immune to allegations arising from Plaintiff's criminal prosecution" under the KTCA.[115]  The court allowed the amendment, implicitly rejecting that first argument and expressly finding that no discretionary judgment immunity would apply where the police officer's conduct, as alleged, was "plainly wrongful."[116]  At least one other court has also rejected the argument.[117]

---

[114] 2022 WL 1102653 (D. Kan. 2022).

[115] *Id*. at *5.

[116] *Id*. at *5 (quoting *Estate of Randolph v. City of Wichita*, 57 Kan. App. 2d 686, syl. ¶ 7, 459 P.3d 802 (2020), *rev. denied* (Aug. 31, 2020)).

The City next turns to the decision of the Kansas Supreme Court in *Bribiesca v. City of Wichita*, [118] in particular that court's observation that "[u]nder no theory advanced by the appellant can the City of Wichita be held liable for the acts of its police officers herein."[119]  But *Bribiesca* was decided in 1977, prior to adoption of the KTCA in 1979; the district court having granted summary judgment to the City of Wichita, the plaintiff on appeal was forced to argue that application of "the common law doctrine of governmental immunity" violated his due process and equal protection rights.[120]  *Bribiesca* gives no guidance as to a municipality's liability under the KTCA.

The City identifies two provisions in the KTCA it claims are applicable.  The first, K.S.A. § 75-6104(i), provides immunity for "any claim which is limited or barred by any other law or which is for injuries or property damage against an officer, employee or agent where the individual is immune from suit or damages."  This statute provides a form of "adoptive immunity [which] prevents governmental employers from being liable under respondeat superior for the conduct of immunized employees."[121]  The City argues that, as the District Attorney who approved the charges against Plaintiff is protected by prosecutorial immunity, it enjoys this adoptive immunity under the KTCA.

---

[117] *See McIntyre*, 2020 WL 1028303 at *34 (denying motion to dismiss based in part on argument that it cannot be liable for state-level malicious prosecution claims.

[118] 221 Kan. 571, 561 P.2d 816 (1977)

[119] 561 P.2d at 818.

[120] *Id.*. at 817.

[121] *J.L. v. Royal Valley*, 2021 WL 4197720 at *10.

Second, the City cites the general waiver of governmental immunity in the KTCA, K.S.A. § 75-6103(a), which provides:

> Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state.

Defendant argues that this general provision cannot apply since the detectives' investigation of Plaintiff was inherently a governmental function, an action which a private person could not undertake.

Both of these specific provisions were also cited in *Tran* as grounds for denying the proposed amendment; the court found neither valid grounds for denying the amendment.[122]  The adoptive immunity provision is not controlling, because Plaintiff is not challenging the actions of the prosecutor, but of the police who allegedly gave misleading information to the prosecutor. And it is simply untrue that a private person can never be held responsible under Kansas law for malicious prosecution.

Certainly there is a high bar for such claims.  In *Howell v. FedEx Ground Package Sys., Inc.,*[123] the court observed that "[b]ecause malicious prosecution actions 'have long been disfavored in the law,' courts presented with such claims 'must construe the scope of the tort narrowly in order to protect litigants' right of access to the judicial process.' "[124]  Thus, a private

---

[122] 2022 WL 1102685, at *5.

[123] 2011 WL 4900038 (D. Kan. 2011).

[124] *Id*. at *7 (quoting *Good v. Bd. of Cnty. Comm'rs of Shawnee*, 331 F. Supp. 2d 1315, 1328 (D. Kan. 2004).

informant supplying information of a crime is not liable for malicious prosecution "*if the person supplies all the information available to the informant through diligent effort*."[125]

The Plaintiff here alleges that the Individual Defendants lacked such diligent effort. *Howell,* of course, notes that a claim of malicious prosecution may be defeated by showing "all of the facts known to the defendant have been fully and truthfully given to [the prosecuting attorney],"[126] as well as by the existence of probable cause.[127]   But the City makes neither of these arguments with respect to the state law claim of malicious prosecution.   It argues only that it is necessarily immune under the KTCA for such claims, because a private citizen categorically can never be liable for malicious prosecution.   This is simply incorrect.

Finally, the City argues the Court should dismiss Plaintiff's general Count XI respondeat superior claim on two grounds.   First, it argues that under *Monell v. Departmentt of Soc. Servs. of City of New York*,[128] it "cannot be held liable solely because it employs an alleged tortfeasor."   But the Supreme Court in *Monell* expressly limited respondeat superior liability for claims arising under 42 U.S.C. § 1983.   "[T]he 'policy or custom' requirement under *Monell* is not applicable to . . . state law claims."[129]

---

[125] *Id.* at *8 (quoting *Arceo v. City of Junction City*, 182 F. Supp. 2d 1062, 1087, 1088 (D. Kan. 2002) (emphasis added).

[126] *Id.* (quoting *Hunt v. Dresie*, 241 Kan. 647, 740 P.2d 1046, 1055 (1987)).

[127] *Id.* at *9.

[128] 436 U.S. 658, 694 (1978)

[129] *Zhu v. N. Cent. Educ. Serv. Dist.-ESD 17*1, 2016 WL 4445758, at *9 (E.D. Wash. 2016).

Second, the City contends that it is protected by discretionary function immunity under the KTCA.  As noted earlier, the court in *Tran* recently rejected a similar argument, holding that plainly wrongful conduct by a police officer would not be protected by discretionary function immunity.

### IV.    Conclusion

The Court grants the University's Motion to Dismiss.  The Court grants the Lawrence Defendants' Motion to Dismiss as to the Section 1983 claim against the City (Counts I), the "class of one" equal protection claim (Count II), the malicious prosecution and abuse of process claim (Count III), and the conspiracy claim (Count VII).  The Court denies the Lawrence Defendants' motion as to the gender-based equal protection claim (Count II), as well as the Kansas state law claims.

**IT IS THEREFORE ORDERED** that the University's Motion to Dismiss (Doc. 29) is **GRANTED** and they are dismissed from the case; the Motion of the Lawrence Defendants (Doc. 31) is **GRANTED IN PART** and **DENIED IN PART**, as provided in this Order.

**IT IS SO ORDERED**.

Dated this 5th day of May, 2022.


*Eric F. Melgren*

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE