## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

BOBBIE JO HOROCOFSKY,

       *Plaintiff,*

vs.

                                  Case No. 20-2529-EFM

CITY OF LAWRENCE, et al.,

       *Defendants.*

## MEMORANDUM AND ORDER

In late 2018, Plaintiff Bobbie Jo Horocofsky, a student at the University of Kansas School of Law, made a statement to officers of the Lawrence, Kansas, Police Department ("LPD") that she had been raped by another law student. One of the police detectives subsequently submitted a probable cause affidavit stating that the investigation showed that Plaintiff's report was false. The Douglas County District Attorney filed state criminal charges against Plaintiff. The Douglas County District Court conducted a preliminary hearing and found that probable cause supported the charges. Shortly before trial, the charges against Plaintiff were dismissed.

In 2020, Plaintiff filed suit asserting multiple claims against numerous Defendants. Three Defendants remain: Detective Charles B. Cottengim of the LPD, Detective Kimberly A. Nicholson of the LPD, and the City of Lawrence (the "City"). Plaintiff has five remaining claims: (1) a claim against the individual Defendants brought under 42 U.S.C. § 1983 for denial of equal protection under the Fourteenth Amendment based upon her gender; (2) a state law malicious prosecution

claim against the City; (3) a state law abuse of process claim against the City; (4) an intentional infliction of emotional distress claim against the individual Defendants and the City; and (5) a claim for respondeat superior against the City. Before the Court is Defendants' Motion for Summary Judgment (Doc. 247).[1]  For the reasons stated in detail below, the Court grants Defendants' motion.

## I.      Factual and Procedural Background

### A.      Factual Background[2]

On September 27, 2018, Plaintiff and other law students were drinking at several bars in Lawrence, Kansas.  Plaintiff and Joel Thompson took an Uber to Thompson's residence.  At 2:44 a.m., Plaintiff texted her friend, Courtney Hurtig, stating, "Ummm I fucked up" and "I slept with Joel."[3]  Plaintiff has no memory of sending this text.  Plaintiff also states that the LPD officers never asked her about this specific text.

Around 6 a.m., Plaintiff texted back and forth with Hurtig.  In these text messages, Plaintiff stated that "this was a fuck up though I literally made him stop having sex and was like 'oh no what will Kriston say'" and that "I feel kinda terrible about it."  Hurtig texted her, "What happened to it being gross he slept with half the law school?! Dirty. Dick."  Plaintiff responded, "I know. . .

---

[1] There are numerous other motions pending before the Court that the Court will dispose of below.

[2] The Court has set forth the uncontroverted facts and in the light most favorable to Plaintiff.  The Court notes that many of Plaintiff's facts are not supported by her record citation and/or contain improper argument, commentary, and legal conclusions.  Thus, the Court does not include these facts.

[3] Plaintiff objects to numerous facts set forth by Defendants because she contends that those facts are based on the LPD incident reports prepared by the officers and contain hearsay.  The Court has included facts that are in the police department reports if those facts are also supported by other evidence.  For example, this fact is also supported by Plaintiff's deposition testimony. To the extent the probable cause affidavit includes Cottengim's beliefs to support charging Plaintiff with a crime, the Court will discuss those facts in the malicious prosecution section.

maybe I should just start an antibiotic," and "It is gross … he's actually really good at sex though." Hurtig texted Plaintiff asking if it was a one-time thing, and Plaintiff responded with "Omg yes one time thing . . . I just don't know how I'm going to tell Kriston."

Plaintiff and Thompson agreed not to tell anyone they slept together. On September 28, Thompson's significant other, Miranda Clark, asked Plaintiff if she slept with Thompson. Plaintiff told her no. Plaintiff texted Thompson stating, "Just to confirm . . . tell no one! Miranda asked and I denied it."

In addition, on September 28, Plaintiff confided in Hurtig about her distress, and Plaintiff realized she had bruises on her body. On the evening of September 28, Plaintiff told Kriston Guillot, whom she was in a relationship with, that Thompson had taken advantage of her and that they had slept together.[4] Plaintiff did not tell Guillot that Thompson raped her or assaulted her.

On September 29, Plaintiff went out to celebrate KU's homecoming weekend. She exchanged text messages with Guillot asking for his forgiveness. In addition, Plaintiff took Hurtig to Blake Stokes's residence (Hurtig's boyfriend) while he was not present to pick up things after Hurtig and Stokes had an argument. Hurtig had previously told Stokes that Plaintiff and Thompson had engaged in sexual intercourse. Plaintiff and Stokes texted back and forth. Stokes texted Plaintiff that if Hurtig did anything to Stokes's residence, "the Joel thing will get out." Sometime in this text exchange, Plaintiff texted "Ok if you want the Joel thing to get out let's do it because I'm pretty sure it was borderline rape and I have the bruises and statements to prove it . . . so if you want to go there let's do it."

---

[4] Thompson and Guillot were friends.

Prior to Plaintiff's text exchange with Stokes, Plaintiff and Hurtig had been speaking about the assault and whether to report it. On the evening of September 29, Hurtig called the LPD, and Plaintiff reported that she had been raped by Thompson on September 27, 2018. Officer Affalter took Plaintiff's report and asked Plaintiff to report to Lawrence Memorial Hospital ("LMH") for evidence collection. Hurtig accompanied Plaintiff to LMH.

Officer Affalter and Detectives Cottengim and Nicholson responded to LMH on September 29, 2018. Plaintiff gave the LPD the names of four witnesses: Lindsie Ford, Amy Adams, Austin Jaspers, and Dan Cobb. Nicholson asked Plaintiff if she had any communication with Thompson on her phone. Plaintiff provided Nicholson with the code to unlock her phone, and both Plaintiff and Hurtig gave their phones to Nicholson and Cottengim to assist in the LPD's investigation. On September 29, 2018, Nicholson and Cottengim downloaded both Plaintiff's and Hurtig's phones.[5] Nicholson spoke with Plaintiff and told her that she had three reporting options.

Lindsie Ford, a victim advocate at a D.A.'s office and other organizations, joined Plaintiff and Hurtig at LMH to provide support and reassurance. Plaintiff had a sexual assault examination ("SANE") done, conducted by a trained SANE nurse, Terri Woodson. Woodson collected physical evidence, mapped Plaintiff's vaginal injuries on an anatomical diagram, and took dozens of photographs of her bruised neck and extremities. Cori Green, the supervisor of the SANE nurses

---

[5] Plaintiff does not dispute that she voluntarily gave her phone to the detectives. She contends, however, that she only agreed to a download of her text messages and that the detectives exceeded the scope and engaged in an illegal search and seizure. As will be discussed below in the procedural history of this case, Plaintiff attempted to bring an additional claim under 42 U.S.C. § 1983 for unlawful search and seizure in violation of the Fourth Amendment against Defendants Cottengim and Nicholson. Her request to amend her complaint was denied. Thus, Plaintiff cannot try to bring an illegal search and seizure claim through the back door. Furthermore, it is uncontroverted that Plaintiff gave Nicholson the code to unlock her phone, and she *agreed* to the download of her text messages. Plaintiff does not identify *any* additional evidence that was obtained from this allegedly broadened unlawful search and seizure of her phone that was used against her.

at the time, subsequently reviewed the report.  Green later testified that the injuries documented in the exam were consistent with Plaintiff's account of sexual assault.

Plaintiff signed the SANE reporting form, indicating that she was "choosing not to report to law enforcement at this time," and that she did "not authorize the release of the above evidence and information for the purpose of conducting a criminal investigation and/or criminal prosecution of the sexual assault or any crime related to the sexual assault or resulting from an examination(s) and or treatment(s) received during this sexual assault medical forensic exam."  When the detectives returned to LMH, Plaintiff and her friends had left.  Woodson told the police that Plaintiff had decided not to report the rape.

On October 1, 2018, Plaintiff and Thompson met at KU's law library and discussed the events of September 27 and 28.  Plaintiff agreed that Plaintiff would make sure her friends did not tell anyone what happened, and Thompson agreed that he would tell Guillot that he had taken advantage of Plaintiff.

On October 3, 2018, Detective Nicholson contacted Plaintiff by phone.  Plaintiff verbally told her that she did not want to pursue the report, and Nicholson told Plaintiff that she wanted to see her in person.  Nicholson and Affaltar met with Plaintiff at Plaintiff's residence.  At that point, Nicholson was investigating the sex crime complaint and a false report complaint.  Nicholson asked Plaintiff about text messages Plaintiff exchanged with Hurtig, but she did not ask Plaintiff about specific text messages.  Nicholson asked Plaintiff if Hurtig had guilted Plaintiff into filing a police report and stated that the situation happens a lot in college towns where females or males mess up and sleep with the wrong person.  Plaintiff stated that was not at all what happened and that she did not want to lose the job offer she had just received.  Nicholson stated that it looked

like Plaintiff may have cheated on her boyfriend and wanted to clear it up, so they would not have to do further investigation. She also told Plaintiff that any complaint against Thompson would appear in a criminal background check, and it could ruin Thompson's career. At this in-person meeting, Plaintiff again told LPD officers that she did not want to pursue charges against Thompson.

From October 3, 2018, through October 10, 2018, the LPD did not take any action on Plaintiff's report.

Plaintiff struggled with the aftermath of the alleged sexual assault, and she started working with an advocate and counselor, Merrill Evans. On October 9, 2018, Plaintiff saw her medical doctor, and she told her that she had been raped by an acquaintance and was experiencing nightmares, panic attacks, crying spells, and focus issues. In addition, on October 9, Alison Collins, who was in a romantic relationship with Guillot, spoke with Plaintiff about Plaintiff's previous sexual relationship with Guillot.

On October 10, Plaintiff, Evans, and Hurtig met, and they decided to contact the University of Kansas's ("KU") Title IX office, known as "IOA," about the assault. Plaintiff contacted Officer Affaltar and told him that she had met with IOA. Plaintiff stated that they were working with IOA about making a joint statement, so she would only have to talk about the assault once. Plaintiff indicated that she was willing to meet with any detective other than Nicholson.

Affalter emailed Cottengim and Nicholson stating that Plaintiff was "thinking of going ahead and making a full statement and wanting to pursue charges." Cottengim believed that it meant Plaintiff wanted to pursue charges, and he began contacting people that day. At that time, Cottengim only had Plaintiff's text messages to support a false report.

On October 10, Cottengim contacted Thompson's roommates.[6]  Thompson's roommates indicated both Plaintiff and Thompson were intoxicated. Thompson contacted the LPD on October 10 after hearing from his roommates that officers spoke with them, and he returned from Oklahoma to Lawrence, Kansas, to meet with the LPD.

On October 11, 2018, Thompson met with Cottengim for an interview in which Thompson stated the sexual encounter with Plaintiff was consensual.  Thompson provided his phone to Cottengim to be downloaded.

In addition, on October 11, Cottengim interviewed Guillot.  Guillot told Cottengim that Plaintiff told him on September 28, 2018, that she slept with Thompson and asked him to forgive her.  Guillot stated that Plaintiff said that she was intoxicated, and she did not want to have sex with Thompson.  Guillot also stated that Plaintiff did not tell him that Thompson raped her.  Guillot provided his cellular phone to Cottengim on October 11, 2018, to be downloaded.

On October 12, 2018, Plaintiff called Cottengim and told him that she did not want the criminal investigation to go forward and did not want to pursue criminal charges against Thompson.  Plaintiff told Cottengim that her doctor advised her to not continue with the investigation due to the severe stress it was causing her.  She said she might pursue charges after law school, but she did not want to jeopardize her job.  Cottengim told Plaintiff that the investigation would not continue, but he lied to her because he planned to continue it.

---

[6] The parties dispute whether Cottengim was investigating the sexual assault or the false report claim. Plaintiff states that it was the false report, and Defendants assert that it was the rape.  Cottengim testified that he was investigating both.

Prior to Plaintiff's October 12 phone call, Cottengim had contacted three additional witnesses: Miranda Clark, Blake Stokes, and Alison Collins. On October 13, 2018, Cottengim met with Austin Jaspers, one of Thompson's roommates. Jaspers told Cottengim that he was at the residence when Plaintiff and Thompson returned. He stated that Plaintiff was drunk and that he heard "sex sounds" from Thompson's room. On this same day, Cottengim and Nicholson interviewed Stokes.

On October 18, 2018, Nicholson contacted Alex Ward because he was one of the bartenders at the Sandbar, a bar Thompson and Plaintiff had attended on September 27. Ward was acquainted with Thompson and recalled Thompson sitting at the bar with a female, and they were both pretty drunk. Ward observed Thompson and the female kissing.

Cottengim met with Miranda Clark on October 24, 2018, in response to the message Cottengim left her on October 10. Clark told Cottengim that Plaintiff previously told Clark that she did not sleep with Thompson, but then later told Clark that she had engaged in sexual intercourse with Thompson, and that Plaintiff believed that Thompson had raped her.

Plaintiff went forward with KU's IOA investigation, and on October 29, 2018, Plaintiff met with Affalter and Cottengim to provide a recorded statement.[7] On this date, Plaintiff signed a "Consent to Provide Information Regarding Sexual Violence" form, authorizing the LPD to disclose information to KU's IOA. Plaintiff indicated that she was not willing to pursue criminal charges against Thompson on that date.

---

[7] Defendant's statement that Plaintiff contacted the LPD on October 26 is not supported by the record citation.

During the investigation into the facts of the case, Thompson was told he was a suspect in a rape investigation. Neither Cottengim nor Nicholson informed Plaintiff that she was being investigated as a suspect for a false report crime. On December 5, 2018, Cottengim signed a Probable Cause Affidavit requesting a warrant for Plaintiff's arrest for falsely reporting the felony crime of rape to the LPD.[8]

Myrone Grady and Hayden Fowler were the detective sergeants assigned to investigations in 2018 and 2019. Grady was Cottengim's supervisor, and Fowler was Nicholson's supervisor. Neither Grady nor Fowler ever worked as a detective for the LPD. Grady worked only one rape case when he was an officer on patrol, and he had never done an investigation into a false report of a crime.

Once detectives complete each report, they submit it to their sergeant who would read the report and correct grammatical errors. In 2018, the LPD did not have a policy on investigation of sexual assault crimes, and there was no policy specific to false report cases. The LPD only had a policy regarding preliminary investigation and follow-up for all investigations. There was no policy, procedure, or practice requiring a trauma-informed investigation.[9]

The LPD policy on probable cause affidavits requires a complete investigation and review by the officer's sergeant. The policy states that "a review by the officer's sergeant will be conducted along with the officer prior to the affidavit being notarized and submitted." It is important that every fact be accurately presented in a probable cause affidavit.

---

[8] The Court will discuss Cottengim's beliefs included in the probable cause affidavit in the malicious prosecution section of this Order.

[9] The Court notes that it previously dismissed Plaintiff's claim against the City for training deficiencies or failure to train, and Plaintiff cannot bring such a claim now.

Grady and Fowler reviewed and signed off on the reports for Plaintiff's investigation. Grady approved and notarized Cottengim's probable cause affidavit. Grady assumes he reviewed the affidavit for punctuation and spelling, but he did not compare it to the police report to make sure the detective was accurately reporting the facts. The LPD expects its sergeants and captains who review investigations to ask questions if something does not seem correct, and merely reading reports and rubber stamping them would be contrary to the processes at LPD.

Cottengim's probable cause affidavit was submitted to the Douglas County District Attorney's Office. Douglas County Chief Assistant Prosecutor Cynthia Jo Reig reviewed the affidavit. At the time of the charging, Rieg was provided with the investigative file from the LPD, and based on her review of the file, Rieg made the decision that there was probable cause to believe that Plaintiff violated K.S.A. § 21-5904(a)(1)(A). On January 23, 2019, Rieg filed a Complaint, on behalf of the State of Kansas, against Plaintiff for feloniously reporting to a law enforcement officer or state investigative agency that a particular person has committed a crime in violation of K.S.A. § 21-5904(a)(1)(A) and requested that a warrant be issued for her arrest. Rieg avers that her charging decision was based on the investigative file that the LPD provided her.

On January 24, 2019, Douglas County District Judge Paula Martin issued a warrant for Plaintiff's arrest. Cottengim contacted Plaintiff and told her that he had a piece of information he wanted to clarify with her and asked if she would meet him at the police station. Plaintiff went to the police station on January 30, 2019, to meet Cottengim, and she was arrested pursuant to the warrant. On that date, Plaintiff was advised of her *Miranda* rights, and she provided another statement to Cottengim and Detective Amy Price.

Sometime after Plaintiff's arrest, Cori Green, the director of the SANE program at Lawrence Memorial Hospital ("LMH"), states that she went to the LPD police station. She asserts that she was speaking to Grady, Fowler, and several other officers about teaching a class about "consent" in the context of sexual assault. Green avers that when she brought the topic up, the officers brushed her aside and said they had caught a "girl who was lying," got their "false reporter," and Grady and Fowler "high-fived" each other.[10]

Chief Assistant District Attorney Evelyn "Eve" Anne Kemple was assigned to prosecute the case against Plaintiff. Kemple received the investigative file from the LPD, including all interviews conducted and evidence collected with the cellular phone data downloads. Based on Kemple's review of the file, and her own review of the evidence, Kemple found that there was probable cause to charge Plaintiff with two additional crimes. On June 4, 2019, Kemple prepared an Amended Complaint and added two additional counts for false reporting to a law enforcement officer or state investigative agency that a particular person has committed a crime. Kemple's decision to amend the Complaint and add two additional charges was based on the entire investigative file and not on Cottengim's Affidavit because Kemple knew she would be presenting evidence at the preliminary hearing.

On June 5 and June 12, 2019, Judge Martin held a preliminary hearing in the case. Kemple presented evidence that she believed supported the charges. Plaintiff and eleven individuals offered

---

[10] The Court includes these facts but notes that Defendants object to them as they are contained in Cori Green's declaration, and Defendants filed a Motion to Strike Certain Opinions and Testimony of Plaintiff's Expert, Cori Green (Doc. 284). Defendants specifically sought to strike these facts asserting that Green seeks to offer an expert opinion, and this topic was not contained in Green's expert disclosure. These specific facts, however, are not Green's opinion—expert or otherwise. Instead, they are facts based on Green's personal knowledge of a situation. And Plaintiff previously disclosed Ms. Green in her Rule 26 disclosure as a witness. The Court, therefore, will include these facts because they are based on Ms. Green's personal knowledge, and Defendants do not dispute them otherwise.

testimony at the preliminary hearing.[11] The court received and considered multiple pieces of evidence, including Plaintiff's medical records from LMH, photographs of her injuries, the SANE examination report, video surveillance from the Sandbar, and her bank statements. At the end of the preliminary hearing, Judge Martin found sufficient probable cause to support the three felony charges against Plaintiff and bound her over for trial.[12]

On October 29, 2019, the State dismissed all counts of the Amended Complaint, and Judge Hanley ordered that the case be dismissed.

In May 2020, Plaintiff graduated from KU's law school. Plaintiff is a full-time employee with Polsinelli Law Firm and works in the intellectual property group in Houston, Texas.

Plaintiff sought medical treatment through KU's Watkins Health Services for the alleged sexual assault, and Plaintiff was diagnosed with PTSD on or around October 23, 2018. During the spring 2019 semester, Plaintiff suffered from PTSD and anxiety which exacerbated symptoms of a serious case of mononucleosis. Dr. Saripalli continued to treat Plaintiff through May 2020. Plaintiff has not sought other professional medical counseling or treatment since she left Lawrence in 2020. Plaintiff testified that she had physical pain, nightmares, PTSD, brain fog, and mental fatigue as a result of being investigated as a suspect and charged with false reporting. She also testified that she became isolated and withdrawn. In addition, Plaintiff testified that she suffered

---

[11] Those individuals include: Cottengim, Nicholson, Affalter, Thompson, Guillot, Jaspers, Stokes, Collins, Green, Woodson, and Ford.

[12] Plaintiff attempts to dispute this fact, but Plaintiff mainly asserts that Judge Martin's factual findings are erroneous, and Judge Martin's legal conclusions reflect an incorrect application of Kansas law. The fact that Plaintiff disagrees with Judge Martin's decision does not change the undisputed fact that Judge Martin found sufficient probable cause to support the charges.

from embarrassment, shame, guilt, and financial stress due to being deceived and investigated under a ruse and then being charged with false reporting.

Plaintiff identified three other female Jane Does as similarly situated females whose claims of sexual assault were not investigated by the LPD because of alleged gender bias. In 2017, Jane Doe #1 reported a sexual assault that occurred in 2016. This report did not involve either Cottengim or Nicholson. Jane Doe #1 did not request any follow-up investigation be performed by the LPD.

Jane Doe #2 reported a sexual assault to the LPD in April 2018. Nicholson was not involved with the investigation. Cottengim went with Detective Flachsbarth to go to an interview. Detective Flachsbarth submitted Jane Doe #2's case to the District Attorney's office, but prosecution for the rape case was declined.

In December 2019, Jane Doe #3 made a sexual assault report to the LPD. Cottengim was not involved in the report or investigation. Officer Anthony Cervantez took Jane Doe #3's report. Jane Doe #3 did not want to pursue charges at that time, but in March or April 2020, she decided she was ready to proceed with an investigation. Nicolson was assigned to the case at that point. Jane Doe #3 averred that Nicholson's manner of conduct was rude and abrasive, and she stated that she read a news article about her regarding her involvement in Plaintiff's case. Jane Doe #3 filed a complaint with the LPD about Nicholson and requested a different detective. Detective David Garcia was assigned to the case, and he submitted an affidavit to the District Attorney's Office requesting a warrant to arrest the rape suspect. Jane Doe #3 states that she was not informed by District Attorney Josh Seiden why the case was dismissed one month before the trial was scheduled.

**B.    Procedural Background**[13]

Plaintiff filed her first Complaint on October 23, 2020, and she then filed a 73-page Amended Complaint on March 4, 2021. Defendants included KU,[14] the City, and three officers of the LPD: Detectives Charles Cottengim and Kimberlee Nicholson, and Officer Daniel Affalter, Jr.

Plaintiff asserted five claims against the City, including: (1) a § 1983 claim for inadequate police training which led to her arrest; (2) a state law malicious prosecution claim; (3) an abuse of process claim; (4) an intentional infliction of emotional distress claim; and (5) a respondeat superior liability claim. Against the individual Defendants, she asserted three claims including: (1) denial of equal protection under the Fourteenth Amendment based on her gender and "class of one" under 42 U.S.C. § 1983; (2) violation of her rights under the Fourth and Fourteenth Amendments through malicious prosecution and abuse of process under 42 U.S.C. § 1983; (3) conspiracy in violation of 42 U.S.C. § 1985(e); and (4) intentional infliction of emotional distress.[15]

All Defendants filed motions to dismiss. Plaintiff responded to those motions, and she filed a motion for leave to amend complaint. Magistrate Judge Gale denied the motion for Leave to amend complaint without prejudice due to Plaintiff's statement that she did not seek substantive

---

[13] The procedural background of this case is extensive, and the Court will only set forth a brief procedural background relevant to the remaining claims in this case.

[14] The Court includes little discussion about KU because the claims against KU were dismissed early in the case.

[15] Technically, Plaintiff brought six claims even though she only designated these claims as four separate counts. The "class of one" equal protection claim is different than a gender-based equal protection claim. In addition, malicious prosecution and abuse of process are separate claims rather than one claim.

amendment to her federal claims and did not oppose the Court holding the motion in abeyance until the motions to dismiss were decided.

On May 5, 2022, the Court granted in part and denied in part the City's and individual Defendants' motions to dismiss.[16] Specifically, the Court dismissed the § 1983 inadequate police training claim against the City, the "class of one" equal protection claim against the individual Defendants, the malicious prosecution and abuse of process claims under § 1983 against the individual Defendants, and a conspiracy claim against the individual Defendants. The Court allowed the following claims to proceed: Plaintiff's state law claims of malicious prosecution, abuse of process and respondeat superior liability against the City; Plaintiff's gender-based equal protection claim against the individual Defendants; and the intentional infliction of emotional distress claim against the individual Defendants and the City.

Plaintiff then filed a motion to reconsider and a renewed motion to amend her complaint. In Plaintiff's motion to amend, she sought leave to assert state law claims for malicious prosecution and abuse of process against the individual Defendants. The undersigned denied both motions. In this Order, the Court found that Plaintiff failed to set forth an adequate basis for reconsidering its prior decision. In addition, the Court found that there were numerous reasons to deny Plaintiff's motion to amend, including that Plaintiff did not raise the necessity of amendment in the extensive briefing on the motion to dismiss.

Approximately three months later, Plaintiff filed another motion for leave to file a second amended complaint. Specifically, Plaintiff sought leave to include state law claims for malicious

---

[16] Doc. 58. The case was previously assigned to Judge Broomes, but it was transferred to the undersigned on March 15, 2022.

prosecution and abuse of process against the individual Defendants. Judge Gale denied this motion and stated that Plaintiff was attempting to bring claims that the Court previously disallowed on substantive grounds.[17] Plaintiff filed an objection to this Order. In February 2023, the undersigned overruled Plaintiff's objection determining that Judge Gale did not err in denying Plaintiff's motion.[18] In addition, the Court noted that Plaintiff's state law malicious prosecution and abuse of process claims were substantively identical to the § 1983 claims that the Court previously dismissed, and amendment would be futile and prejudicial.

On December 15, 2023, Plaintiff filed a Motion for Leave to File a Third Amended Complaint, seeking to assert an additional claim under 42 U.S.C. § 1983 for unlawful search and seizure against Defendants Cottengim and Nicholson.[19] Magistrate Judge Severson denied Plaintiff's request finding that Plaintiff could not meet the good cause standard in Fed. R. Civ. P. 16(b)(4) because Plaintiff knew, at the latest, the underlying facts for this new claim in July 2023 and did not move to amend until December 2023.[20] Plaintiff filed an objection, but the undersigned found that Magistrate Judge Severson's decision was neither clearly erroneous nor contrary to law.[21] Thus, Plaintiff was not allowed to include this additional claim.

---

[17] Doc. 85.

[18] Doc. 104.

[19] On January 30, 2024, a stipulation of dismissal of Defendant Officer Affalter was filed.

[20] Doc. 215. On August 21, 2023, the case was reassigned to Magistrate Judge Severson.

[21] Doc. 260.

There are currently sixteen pending motions in this case.[22] Defendants have filed a Motion for Summary Judgment,[23] six Motions to Exclude Testimony,[24] and four Motions to Strike Certain Opinions or Declarations.[25]  Plaintiff has filed four Motions to Exclude Testimony and a Motion Requesting Oral Argument.[26]

The Court will only substantively address the Motion for Summary Judgment. As to all the motions to exclude or strike testimony, the facts and/or testimony that the parties argue over is primarily not included in the summary judgment facts because those facts were not materially relevant to summary judgment issues.[27] Thus, the Court will deny these motions as moot.  As to Plaintiff's Motion Requesting Oral Argument on Pending Dispositive and *Daubert* Motions, the Court denies it in part, finding oral argument unnecessary on the summary judgment motion, and denies it as moot in part because the *Daubert* motions are also being denied as moot.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law.[28]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered

---

[22] To say that the parties are engaged in extensive motion practice is an understatement.

[23] Doc. 247.

[24] Docs. 250, 251, 252, 252, 254, and 255.

[25] Docs. 282, 284, 285, and 300.

[26] Docs. 239, 241, 243, 245, and 333.

[27] To the extent any facts were included, they were included and construed in the manner most favorable to Plaintiff.  For example, the Court included Cori Green's testimony regarding the LPD officers. *Supra* n. 10.

[28] Fed. R. Civ. P. 56(a).

evidence permits a reasonable jury to decide the issue in either party's favor.[29]  The movant bears

the initial burden of proof, though "a movant that will not bear the burden of persuasion at trial

need not negate the nonmovant's claim."[30]   "Such a movant may make its prima facie

demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an

essential element of the nonmovant's claim."[31]   The nonmovant must then bring forth "specific

facts showing a genuine issue for trial."[32]  These facts must be clearly identified through affidavits,

deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a

motion for summary judgment.[33]  The court views all evidence and draws "reasonable inferences

therefrom in the light most favorable to the nonmoving party."[34]

## III.    Analysis

Plaintiff has five remaining claims in this case.  The Court will first address Plaintiff's

gender-based equal protection claim against individual Defendants Cottengim and Nicholson.

Next, the Court will consider Plaintiff's state law claims of malicious prosecution and abuse of

process against the City.  Thirdly, the Court will address Plaintiff's intentional infliction of

---

[29] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (quoting *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[30] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

[31] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp.*, 477 U.S. at 325).

[32] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (quoting *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999)).

[33] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71).

[34] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (quoting *N. Tex. Prod. Credit Ass'n v. McCurtain Cty. Nat'l Bank*, 222 F.3d 800, 806 (10th Cir. 2000)).

emotional distress claim against the individual Defendants and the City. Finally, the Court will consider Plaintiff's stand-alone claim for respondeat superior against the City.

## A.    Claim for Denial of Equal Protection under the Fourteenth Amendment against Defendants Cottengim and Nicholson

Plaintiff asserts a Fourteenth Amendment claim based on her gender against individual Defendants Cottengim and Nicholson under 42 U.S.C. § 1983.  The Fourteenth Amendment's equal protection clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."[35]  "Equal protection 'is essentially a direction that all persons similarly situated should be treated alike.'"[36]  "To comport with the Equal Protection Clause, the law cannot be administered 'with an evil eye and an unequal hand.'"[37]

Defendants argue that they are protected by qualified immunity.  Qualified immunity protects public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[38]  Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."[39] When a defendant raises qualified immunity on summary judgment, the plaintiff must show that (1) the defendant's actions violated a constitutional or statutory right, and (2) the constitutional or statutory right was clearly established at the time of

---

[35] U.S. Const. Am. XIV, § 1.

[36] *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1233 (10th Cir. 2009) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

[37] *Eckert v. Town of Silverthorne*, 25 F. App'x 679, 684 (10th Cir. July 9, 2001) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886)).

[38] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[39] *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

the conduct at issue.[40]  The Court has discretion as to which prong to decide first.[41]  The Court will

address both prongs.

        *1.     Whether Defendants' Actions Violated a Constitutional Right*

An equal protection claim requires a threshold showing that the plaintiff was treated

differently from other individuals who were similarly situated to the plaintiff.[42]  The Equal

Protection Clause seeks to ensure that those people who are similarly situated are not treated

differently.[43]  "It is this comparative element that distinguishes the Equal Protection Clause from

the Due Process Clause."[44]  Thus, at summary judgment, Plaintiff must come forward with

evidence that Defendants "treated her differently than other similarly situated" individuals and that

Defendants were motivated by gender animus.[45]

Generally, a plaintiff may demonstrate discriminatory purpose by direct evidence or

statistical evidence.[46]  When considering direct evidence of an officer's conduct, a court may

consider an "officer's pattern of . . . arrests, his questions and statements to the person involved,

---

[40] *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (citation omitted).

[41] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

[42] *Brown v. Montoya*, 662 F.3d 1152, 1172-73 (10th Cir. 2011) (citing *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998)).

[43] *SECSYS, LLC v. Vigil*, 666 F.3d 678, 684 (10th Cir. 2012); *see also Arabalo v. City of Denver*, 625 F. App'x 851, 868-69 (10th Cir. 2015) ("[T]he purpose of equal protection is to ensure that the government treats similarly situated people similarly or otherwise gives a sufficient reason for affording unequal treatment.").

[44] *Jennings v. City of Stillwater*, 383 F.3d 1199, 1213 (10th Cir. 2004) (citation omitted).

[45] *See Sturdivant v. Blue Valley Unified Sch. Dist., USD 229*, 469 F. Supp. 3d 1121, 1137 (D. Kan. 2020) (discussing an equal protection claim based on race).

[46] *See Kendrex v. City of Independence*, 2016 WL 3917230, at *5 (D. Kan. July 20, 2016) (citing *Marshall v. Columbia Lea Reg. Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003)) (discussing a race-based claim).

and other relevant circumstances."[47]    Statistical evidence may also be relevant.    However, "[s]tatistical evidence, standing alone, is rarely sufficient to demonstrate a discriminatory purpose."[48]

> a.   There is no evidence that Plaintiff was treated differently than similarly situated individuals.

Defendants contend that Plaintiff cannot demonstrate discriminatory purpose because she does not have evidence that other similarly situated individuals were treated differently.  Plaintiff concedes that an equal protection violation occurs when the government treats someone differently from another who is similarly situated. Yet, Plaintiff's allegations as to whom she is similarly situated are less than clear.  On the one hand, she states that Defendants displayed gender bias by protecting males accused of rape and not investigating allegations against them.  But on the other hand, she states that she does not contend that men accused of sexual assault are treated more favorably than women reporting a sexual assault. These propositions are diametrically opposed.

Generally, however, it appears as though Plaintiff compares Defendants' treatment of her to Defendants' treatment of Thompson (her assailant) and contends that Defendants treated them differently due to their gender.  Thus, she is comparing herself as a victim of the crime to the suspect of the crime. Plaintiff's comparison, however, fails because Plaintiff and Thompson are not similarly situated because Plaintiff and Thompson did not both report crimes.  There are no allegations that Thompson reported a crime to Defendants and that Defendants treated him differently because of his gender, i.e, treated him better because he was a male.  Accordingly,

---

[47] *Id.* (quoting *Marshall*, 345 F.3d at 1168).

[48] *Id.* (citing *Blackwell v. Strain*, 496 F. App'x 836, 840 (10th Cir. 2012)).

Plaintiff does not have a similarly situated comparator for which the Court to find that Plaintiff was treated differently and thus cannot demonstrate discriminatory purpose.

The Court notes that Plaintiff's real contention appears to be that Defendants did not perform a proper investigation in this case or that they should have performed the investigation differently. Plaintiff, however, fails to direct the Court to evidence that Defendant's allegedly improper investigation was related to Plaintiff's gender or that the investigation rose to the level of a constitutional violation. Instead, the evidence demonstrates that when Plaintiff reported the incident to the police, Defendants met her at the hospital, spoke with her, and downloaded her and Hurtig's phones to assist in the investigation. Defendant Nicholson followed up several days later regarding Plaintiff's statement that she did not want to press charges. Admittedly, Plaintiff did not like Nicholson's demeanor or statements, but there is insufficient evidence to demonstrate that Nicholson was *not* investigating the rape allegation because Plaintiff was a female. When speaking with Nicholson, Plaintiff told her that she did not want to move forward with the investigation. And for approximately a week, the LPD did not move forward with any investigation.

Only after Plaintiff contacted Officer Affalter on October 10 stating that she was thinking of going ahead and making a full statement did Cottengim begin another investigation into the facts. Nicholson no longer worked on the case due to Plaintiff's statement that she did not want to work with her. Cottengim contacted numerous people on that date, spoke with several individuals over the next few days, and downloaded Thompson's and Guillot's phones. Although Plaintiff again told Cottengim that she did not want to pursue charges on October 12, it is undisputed that Cottengim had already contacted several witnesses and had begun an investigation into the facts of the case. It is also undisputed that Plaintiff later met with Affalter and Cottengim

-22-

on October 29 to provide a recorded statement.[49]  In sum, an equal protection claim requires evidence that Defendants treated her differently, based on her *gender*, from other similarly situated individuals. And Plaintiff fails to present evidence raising a genuine issue of material fact that Defendants failed to properly investigate her report of rape based on her gender.  Thus, Plaintiff cannot demonstrate a genuine issue of material fact as to the individual Defendants' discriminatory purpose.

        b.      There is no statistical evidence of discriminatory behavior.

Furthermore, Plaintiff fails to present statistical evidence that women reporting a sexual assault are treated less favorably than men accused of sexual assault.  Plaintiff identifies three individuals, who also reported a sexual assault to the LPD, but the facts and circumstances of their investigations are not similar.  As to Jane Doe #1, neither individual Defendant was involved in the investigation.  In addition, Jane Doe #1 reported the sexual assault in 2017 although it happened in 2016.  When she reported it, she did not request a follow-up investigation.  Thus, the LPD did not move forward with the case.

With regard to Jane Doe #2, Nicholson was not involved in the investigation, and Cottengim was only peripherally involved.  After investigation, however, the LPD submitted the rape case to the District Attorney's office to file charges, and the District Attorney's office declined to prosecute.  Thus, it was the District Attorney's office—not the individual Defendants or the LPD's decision—to not move forward with the rape case.

---

[49] The Court recognizes that Plaintiff contends she was providing a joint statement to the LPD and KU's IOA.

Finally, as to Jane Doe #3, Cottengim played no part in the investigation. Nicholson was involved briefly, and Jane Doe #3 asked for a different detective because she found Nicholson's conduct rude and abrasive. A different detective was assigned to Jane Doe #3's case, and the LPD presented the case to the District Attorney's office. The case then proceeded to be prosecuted by the District Attorney's office. Although Jane Doe #3's case was dismissed by the District Attorney's office one month prior to trial, that fact did not relate to the individual Defendants or the LPD because it was the prosecutor's decision. Thus, none of these facts support Plaintiff's argument that LPD officers, or the individual Defendants in this case, fail to investigate sexual assaults or treat women less favorably than men when investigating sexual assaults. Thus, Plaintiff does not raise a genuine issue of material fact as to Defendants' discriminatory purpose through statistical evidence.

### 2. Whether the Right was Clearly Established

Although the Court need not consider the second prong of the qualified immunity analysis, the Court nevertheless finds that Plaintiff does not identify clearly established law applicable to the facts in this case. "[C]onduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[50] A case does not have to be directly on point, however, "existing precedent must have placed the statutory or constitutional question beyond debate."[51] Generally, a plaintiff "may satisfy this clearly-established-law standard by identifying an on-point Supreme Court or published Tenth Circuit decision that

---

[50] *Ashcroft*, 563 U.S. at 741 (internal alterations, quotation marks, and citations omitted).

[51] *Id.*

establishes the unlawfulness of the defendant's conduct; alternatively, the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."[52] Clearly established law, however, is not law defined "at a high level of generality."[53]  Instead, the Court "must engage in a 'narrowly tailored and context-specific exercise.'"[54]

To determine whether a constitutional right was clearly established, "the court must discern the legal right at issue."[55]  In this case, Plaintiff broadly contends that her right to equal protection was violated by Defendants' conduct. Yet, Plaintiff's argument as to what clearly established law Defendants violated is less than clear because she cites to several cases that are distinguishable from the facts in this case.

Plaintiff contends that the Tenth Circuit has long recognized a constitutional right to have police protection services provided in a non-discriminatory manner.  The cases that Plaintiff relies upon do indeed provide that the state may not discriminate in providing police protection.[56]  And in those cases, the Tenth Circuit found that it was clearly established law that providing less police protection to domestic violence victims (and sub-classes of domestic violence victims) than to victims of non-domestic attacks violated the Equal Protection Law.[57]  But Plaintiff does not claim

---

[52] *Wood v. Welch*, 2024 WL 2880405, at *6 (D. Kan. June 7, 2024) (quoting *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019)).

[53] *Ashcroft*, 563 U.S. at 742; *see also Cummings*, 913 F.3d at 1239.

[54] *Wood*, 2024 WL 2880405, at *7 (quoting *Kan. Motorcycle Works USA, LLC v. McCloud*, 569 F. Supp. 3d 1112, 1123 (D. Kan. 2021)).

[55] *Id.* at *5.

[56] *Watson v. City of Kansas City, Kan*., 857 F.2d 690, 694 (10th Cir. 1988) (noting that although there is no general right to police protection, the state may not discriminate in providing such protection); *Price-Cornelison v. Brooks,* 524 F.3d 1103, 1113 (10th Cir. 2008) (same); *Dalton v. Reynolds*, 2 F.4th 1300, 1311 (10th Cir. 2021) (same).

[57] *Watson*, 857 F.2d at 696 (acknowledging that the state may not discriminate in providing police protection and finding that there was a question of fact as to whether the police afforded less police protection "to victims of

that she was provided with less police protection as a domestic violence victim.  And Plaintiff does not claim that she was provided with less or discriminatory police protection.  Instead, she claims that Defendants discriminated against her in their *investigation* of her sexual assault.  Thus, the clearly established law that police officers may not intentionally discriminate in providing police protection is inapplicable to Plaintiff's claim, and Plaintiff does not identify clearly established law applicable to the facts in this case.

In addition, Plaintiff specifically argues that the relevant question is whether it was clearly established that it was unconstitutional for an officer *to fail to investigate* a report of sexual assault because of gender.  Plaintiff does not direct the Court to clearly established law from the Supreme Court or the Tenth Circuit supporting this proposition.[58] Instead, Plaintiff relies on a District of Oregon case for this argument.[59] In addition, the decision was issued in 2023—five years *after the*

---

domestic violence than to victims of nondomestic attacks"); *Price-Cornelison*, 524 F.3d at 1114-15 (finding that *Watson's* clearly established law that "the state may not discriminate in providing such [police] protection" would have placed the officers on notice that providing less protection to lesbian domestic violence victims "would deprive her of equal protection of the law"); *Dalton*, 2 F.4th at 1311 (finding that there was clearly established precedent "that police officers may not intentionally discriminate in providing police protection to domestic violence victims" such that this law "would put a reasonable officer on notice that it is unlawful to provide less police protection to victims of domestic violence whose assailants are police officers with whom they had been in a domestic relationship than is provided to victims without police assailants.").

[58] Plaintiff also does not direct the Court to clear authority from other courts. *See Toevs v. Reid*, 685 F.3d 903, 916 (10th Cir. 2012) ("Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.") (quotation marks and citation omitted).

[59] *Doe v. Wright*, 2023 WL 6810734 (D. Or. Oct. 16, 2023).

events of this case.[60]  Thus, it is not clearly established law or applicable to the facts in this case.[61]

Accordingly, Defendants are entitled to qualified immunity.

**B.    Malicious Prosecution and Abuse of Process Claims against Defendant City**

Plaintiff brings malicious prosecution and abuse of process claims under Kansas state law against the City.  Defendant first argues that Plaintiff cannot prevail on these claims because the Court previously determined that Plaintiff's § 1983 claim for malicious prosecution failed against Cottengim and Nicholson, and thus Plaintiff's state law claim for malicious prosecution against the City must also fail.  In the alternative, Defendant argues that Plaintiff cannot produce sufficient evidence to satisfy the elements of these claims. The Court will address each argument in turn.

*1.  Defendant City's Liability on the Malicious Prosecution and Abuse of Process Claims*

Plaintiff's malicious prosecution and abuse of process claims against Defendant City are based on the conduct, acts, and omissions of Defendant City's employees—specifically, Detectives Cottengim and Nicholson and their supervisory personnel.  Pursuant to K.S.A. § 75-6103(a), a governmental entity "shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state."[62]  Conversely, if there is no negligent or wrongful action by a government employee,

---

[60] *Lutz v. Weld Cnty. Sch. Dist. No. 6*, 784 F.2d 340, 343 (10th Cir. 1986) (stating that the rights must be "clearly established at the time of the conduct at issue") (quoting *Davis v. Scherer*, 468 U.S. 183, 197 (1984)).

[61] The Court also notes that the facts in that case differ from the facts in this case because the police failed to do an investigation in the Oregon case. As noted above, the uncontroverted facts demonstrate that an investigation was performed here.

[62] K.S.A. § 75-6103(a).

the entity cannot be liable.[63]  Thus, in this case, Plaintiff's case against Defendant City rises and falls on whether Plaintiff can demonstrate Defendant City's employees committed the torts of malicious prosecution and abuse of process.

Defendant City argues that the Court already determined that Cottengim and Nicholson did not commit the torts of malicious prosecution and abuse of process.  Defendant contends that "[p]ursuant to the law of the case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"[64]  Thus, Defendant asserts that because the Court previously determined that Cottengim and Nicholson did not commit the torts of abuse of process or malicious prosecution, Plaintiff's claim against the City is barred by K.S.A. § 75-6103(a) because no employee engaged in the torts of malicious prosecution or abuse of process.

Defendant's argument is too broad.  Although the Court made several rulings relating to these claims and Defendants Cottengim and Nicholson, the Court did not specifically rule that no City employee (including Cottengin and Nicholson) engaged in the torts of malicious prosecution or abuse of process.  Instead, in dismissing the malicious prosecution claim, the Court found that the preliminary hearing, in which the Douglas County Judge heard the evidence, broke the chain of causation against Cottengim and Nicholson.  In dismissing the abuse of process claim, the Court found that the allegations in the Complaint failed to adequately allege an improper purpose.  In denying Plaintiff's motion to amend her complaint to include state law malicious prosecution and

---

[63] *Id.*

[64] *See United States v. Moore*, 96 F.4th 1290, 1301 (10th Cir. 2024) (quoting *United States v. Monsisvais*, 946 F.2d 114, 115 (10th Cir. 1991)).

abuse of process claims against Cottengim and Nicholson, the Court noted that the state law claims were substantively identical to the § 1983 claims that the Court previously dismissed, and thus amendment would be futile.[65]  Accordingly, the Court did not specifically rule that City employees did not commit these torts,[66] and the Court will address Plaintiff's state law malicious prosecution and abuse of process claims.

### 2.  *Malicious Prosecution against Defendant City*

A state law malicious prosecution claim requires "(1) that [the] defendant initiated, continued, or procured the proceeding of which complaint is made; (2) that [the] defendant in doing so acted without probable cause; (3) that [the] defendant must have acted with malice; (4) that the proceedings terminated in favor of [the] plaintiff; and (5) that [the] plaintiff sustained damages."[67]

Defendant argues that Plaintiff cannot meet the first three elements.  Specifically, as to the second element—probable cause—Defendant argues that it is uncontroverted that probable cause

---

[65] Doc. 104.  The Court notes that Plaintiff argues that a § 1983 malicious prosecution claim is not substantively identical to a state law malicious prosecution claim.  Although Plaintiff is correct, the underlying elements are identical, and a § 1983 malicious prosecution claim is *more* difficult to prove than a state law malicious prosecution claim.  *See Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996) (stating that "the common law elements of malicious prosecution [is] the 'starting point' for the analysis of a § 1983 malicious prosecution claim," and the plaintiff must also prove a constitutional violation); *see also Debbrecht v. City of Haysville*, 2014 WL 3397180, at *9 (Kan. Ct. App. July 11, 2014) ("The elements of a claim for malicious prosecution under section 1983 are identical to those required under Kansas law . . . including a requirement that the prosecution be undertaken without probable cause.").  Thus, Plaintiff's argument is counterproductive because the Court is now considering the state law claim which has less elements than the federal claim.

As to Plaintiff's abuse of process claim, "[t]he common law tort of abuse of process provides the elements relevant for a federal cause of action pursuant to § 1983."  *McGregor v. City of Neodesha*, 2022 WL 6728149, at *6 (D. Kan. Oct. 11, 2022).

[66] The Court's previous ruling, however, regarding chain of causation law remains applicable (and problematic for Plaintiff) to any actions taken by City employees.  In addition, the City is only liable if Plaintiff identifies evidence of wrongdoing by City employees such that the City could be liable. *See* K.S.A. § 75-6103(a).

[67] *Lindenman v. Umscheid*, 255 Kan. 610, 875 P.2d 964, 974 (1994).

existed for Plaintiff's criminal charges and arrest because two district attorneys and the Douglas County District Judge made this determination. In addition, Defendant contends that the District Court's independent findings at the preliminary hearing break any chain of causation. Plaintiff argues that the finding of probable cause at the preliminary hearing was based on false and incomplete evidence which led to a misunderstanding of the evidence by the court.

"Probable cause for instituting a proceeding exists when there is a reasonable ground for suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious or prudent person in the belief that the party committed the act of which he or she is complaining."[68] "Probable cause does not require proof beyond a reasonable doubt or even a preponderance of the evidence."[69] "Instead, the relevant question is whether a substantial probability existed that the suspect committed the crime, requiring more than a bare suspicion."[70]

As noted in the Court's previous Order, Tenth Circuit law establishes that "the chain of causation [in a malicious prosecution action] is broken by an indictment, absent an allegation of pressure or influence exerted by the police officers, or knowing misstatements made by the officers to the prosecutor."[71] When there is an adversarial proceeding, such as a preliminary hearing, and "a judge independently listened to testimony, evaluated the credibility of those testifying, reviewed evidence, and concluded that the evidence was sufficient to bind [the accused] over for trial," the

---

[68] *Bergstrom v. Noah*, 266 Kan. 829, 974 P.2d 520, 526 (1999) (citation omitted).

[69] *Hopper v. Fenton*, 665 F. App'x 685, 686 (10th Cir. Nov. 29, 2016).

[70] *Id.* (quoting *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011)).

[71] *Taylor*, 82 F.3d at 1564 (quoting *Reed v. City of Chicago*, 77 F.3d 1049 (7th Cir. 1996)).

preliminary hearing breaks the chain of causation.[72]  Furthermore, "[a] law enforcement officer cannot be held liable for malicious prosecution based upon an alleged wrongful arrest if there has been an independent hearing before a judge who determined that the evidence was sufficient to detain a suspect."[73]  Plaintiff does not dispute this Court's prior holding that in a malicious prosecution claim, the chain of causation is broken by the independent preliminary hearing.

Instead, Plaintiff argues that the finding of probable cause at the preliminary hearing was based on false or incomplete evidence. And Plaintiff primarily takes issue with Detective Cottengim's probable cause affidavit. The Court will address Plaintiff's contention that the affidavit contained both false and incomplete information.

As to whether Cottengim's affidavit included false information, the affidavit included such beliefs as: (1) although Plaintiff's level of intoxication was unknown, she was coherent enough to type correctly spelled words; (2) Plaintiff was unhappy that Guillot had ended his relationship with her and had sex with Thompson (Guillot's friend) to get back at him;[74] (3) Plaintiff's friend, Hurtig, had shamed her for having sex with Thompson; (4) Plaintiff did not want the fact that she had slept with Thompson to get out; (5) because Stokes had threatened Plaintiff that he would tell people that she had slept with Thompson, Plaintiff reported to the LPD on September 29 that she had been raped; and (5) Plaintiff became angry upon hearing how long Thompson had been in a relationship with another woman and Plaintiff re-contacted the LPD on October 10 advising the LPD that she

---

[72] *Id.*

[73] *Smith v. Barber*, 316 F. Supp. 2d 992, 1026 (D. Kan. 2004) (citing *Taylor*, 82 F.3d at 1564).

[74] Plaintiff disputes that her and Guillot's relationship had ended prior to September 28.  Plaintiff, however, does not dispute that Guillot told Officer Cottengim that Plaintiff's and Guillot's relationship had ended on September 21, 2018.

wanted to pursue rape charges against Thompson. The affidavit specifically states that these are Cottengim's *beliefs*. Although Plaintiff states that they are false statements, she does not provide evidence raising a genuine issue of material fact that Cottengim's beliefs were false. Nor does she provide evidence that Cottengim's beliefs were malicious.

Plaintiff also states that Cottengim's affidavit, other than his beliefs, contained misleading and false information. Plaintiff's citation to the record, however, frequently fails to support this proposition, and many of Plaintiff's facts are based on conjecture. Thus, the Court cannot conclude that Cottengim's affidavit included false information.

In addition, Plaintiff contends that Cottengim's affidavit should have included additional facts including (1) how much alcohol Plaintiff drank; (2) a video showing Plaintiff's intoxication and that she stumbled into a door frame; (3) Thompson's July 2018 crude text messages that he intended to engage in a "tag team" or "train ride" with Plaintiff; and (4) Plaintiff's physical injuries. Plaintiff asserted a similar argument in response to Defendants' motion to dismiss. Indeed, at the motion to dismiss stage, the Court credited to Plaintiff *more* information that she alleged should have been included. At summary judgment, Plaintiff frequently failed to support her evidence with an appropriate citation to the record, and thus the Court will only include the four facts identified above because they have support in the record.

As to the facts that Plaintiff contends were omitted, the affidavit did address her intoxication. Indeed, it stated that she had consumed large quantities of alcohol, had "blacked out," and did not remember much.[75] The affidavit also included information that Plaintiff believed

---

[75] Plaintiff contends that the quotation marks around "blacked out" indicates that Cottengim treated her statement as a lie rather than the quotation marks indicating that he was quoting Plaintiff.

she was too drunk to consent to sex.  Furthermore, the affidavit indicated that a SANE kit was

performed on Plaintiff, and because Plaintiff did not consent to the release of it, it would be sent

directly to the Kansas Bureau of Investigations.  Finally, the affidavit included Plaintiff's text

messages that she believed it was borderline rape, and she had the bruises and statements to prove

it. Thus, the affidavit included references to many of the facts Plaintiff contends should have been

included.  Accordingly, Plaintiff cannot demonstrate that the failure to include additional facts

affected the probable cause determination.

Furthermore, even if there was any missing information from the affidavit, as the Court

noted in its previous Order:

> [T]o the extent Plaintiff has identified missing information relevant to the
> evaluation of probable cause, this information could affect the weighing of
> evidence, but such evidence related to issues already red flagged in the affidavit for
> further inquiry by the District Attorney and by the Douglas County District Court.
> Both were free to inquire in the actual nature and extent of any bruising.  Both were
> free to inquire about the results shown in the SANE kit examination, which the
> affidavit noted had occurred.  Both were free to reach their own opinions about
> whether Plaintiff was actually motivated by a desire to get back together with
> Guillot.
>
> Equally, Plaintiff was free to make these arguments to the District Court.  She
> texted to Stokes that the "Joel thing" was borderline rape and that "I have the
> bruises and statement to prove it."  Cottengim explicitly noted these texts in the
> probable cause affidavit, along with Plaintiff's statements about her drinking, and
> Thompson's texts showing an awareness that Plaintiff was intoxicated.  These
> issues were expressly identified in the probable cause affidavit, and the District
> Court could explore them if it believed necessary to reach a finding of probable
> cause.  Further, the Plaintiff could offer her own evidence at the preliminary
> hearing, and could examine any detective testifying at the hearing about the grounds
> for his belief.
>
> The chain of causation is broken by a preliminary hearing "in which a judge
> independently listened to testimony, evaluated the credibility of those testifying,
> reviewed evidence, and concluded that the evidence was sufficient to bind [a
> defendant] over for trial." [citation.]  Moreover, as the court stressed in *Taylor* a

preliminary hearing may serve as a break in the chain of causation even if the original affidavit for arrest otherwise lacks probable cause.[76]

Defendant presents evidence that Douglas County Chief Assistant Prosecutor Reig reviewed Cottengim's affidavit. Rieg avers that she was provided the entire investigative file from the LPD, and based on her review of the file, Rieg made the decision that there was probable cause to believe that Plaintiff violated K.S.A. § 21-5904(a)(1)(A). Rieg filed a Complaint, on behalf of the State of Kansas, against Plaintiff for feloniously reporting to a law enforcement officer or state investigative agency that a particular person had committed a crime in violation of K.S.A. § 21-5904(a)(1)(A). Based on Rieg's Complaint, Douglas County District Judge Paula Martin issued a warrant for Plaintiff's arrest.

Subsequent to Plaintiff's arrest, Chief Assistant District Attorney Kemple was assigned to Plaintiff's case. Kemple received the investigative file from the LPD, and based on Kemple's review of the file, and her own review of the evidence, Kemple found that there was probable cause to charge Plaintiff with two additional crimes. Kemple then prepared an amended complaint, adding two additional counts against Plaintiff for false reporting to a law enforcement officer. Kemple averred that her decision to amend the complaint and add two additional charges was based on the entire investigative file and not on Cottengim's Affidavit because Kemple knew that she would be presenting evidence at the preliminary hearing.

In early June, Judge Martin held a two-day preliminary hearing in the case. Kemple presented the case. Plaintiff and eleven individuals offered testimony at the preliminary hearing. The court received and considered multiple pieces of evidence, including Plaintiff's medical

---

[76] Doc. 58 at 53–54.

records from LMH, photographs of her injuries, the SANE examination report, video surveillance from the Sandbar, and her bank statements. At the end of the preliminary hearing, Judge Martin found sufficient probable cause to support the three felony charges against Plaintiff and bound Plaintiff over for trial. Accordingly, the Douglas County District Attorney's actions and the Douglas County District Judge's actions broke the chain of causation.

Finally, the Court notes that Plaintiff primarily addresses Cottengim's probable cause affidavit in attempting to demonstrate a malicious prosecution claim. She includes very few facts related to Nicholson or any other City employee. Furthermore, Plaintiff fails to direct the Court to specific evidence that the detectives and supervisors initiated and continued to pursue criminal charges against Plaintiff without probable cause and with malice when they intentionally, knowingly, and deliberately misrepresented facts, relied on falsehoods and withheld exculpatory facts from prosecutors that vitiate probable cause. Thus, Plaintiff does not present evidence that would keep the chain of causation intact. Defendant City cannot be held liable for its employee's actions because the preliminary hearing broke the chain of causation between *any* employee's actions and the criminal proceedings brought against Plaintiff.[77] Accordingly, the Court grants summary judgment to Defendant City on this claim.

### 3. Abuse of Process against Defendant City

Plaintiff brings an abuse of process claim under Kansas state law against Defendant City. "The tort of abuse of process is narrow in scope."[78] "An abuse of process is based on the use of

---

[77] *Smith*, 316 F. Supp. 2d at 1027 ("Labette County could not be held liable for the actions of [its employee], because . . . [the] detention hearing broke the chain of causation between [the employee's] actions and the criminal proceedings brought against [the plaintiffs.]").

[78] *Tappen v. Ager*, 599 F.2d 376, 379 (10th Cir. 1979).

the judicial system for some process other than its intended purpose."[79]  The elements of an abuse

of process claim include: "(1) that the defendant made an illegal, improper, perverted use of the

process . . . , (2) that the defendant had an ulterior motive or purpose in exercising such illegal,

perverted, or improper use of process, and (3) that damage resulted to the plaintiff from the

irregularity."[80]  "The gravamen of [the] tort is not the wrongfulness of the prosecution, but some

extortionate perversion of lawfully initiated process to illegitimate ends."[81]  "[M]ere initiation of

proceedings with or without justification does not constitute abuse of process."[82]  The claim "refers

to the improper use of process *after* it has issued."[83]

Defendant argues that Plaintiff cannot demonstrate abuse of process.  First, Defendant

contends that the individual Defendants' actions all occurred before the initiation of any process.

Specifically, Defendant contends that Nicholson had limited involvement in the investigation, and

Cottengim simply prepared and submitted the probable cause affidavit to the District Attorney's

office.[84]  Plaintiff does not address the timing issue, and thus she cannot establish an abuse of

---

[79] *Davis v. Nebraska Furniture Mart, Inc.*, 2012 WL 1252633, at *4 (D. Kan. April 13, 2012) (citation omitted).

[80] *Porter v. Stormont-Vail Hospital*, 228 Kan. 641, 621 P.2d 411, 416 (1980) (quotation marks and citation omitted).

[81] *Davis*, 2012 WL 1252633, at *4 (quoting *Heck v. Humphrey*, 512 U.S. 477, 486 n.5 (1994)).

[82] *Jackson v. Kan. Cnty. Ass'n Multiline Pool*, 2005 WL 756773, at *6 (D. Kan. Jan. 19, 2005) (citation omitted).

[83] *Id.*; *see also Nelson v. Rains*, 2006 WL 1580978, at *3 (D. Kan. June 5, 2006) ("An abuse of process claim concerns the improper use of process after it has been issued.").

[84] As noted above, the individual Defendants are not parties to this claim, but Plaintiff's claim primarily relies on the individual Defendants' actions to support her cause of action.

process claim to the extent it relates to the individual Defendants' actions because these actions occurred before process was initiated.

Next, Defendant asserts that there is no evidence that *any* employee of the City misused process in any way. Plaintiff broadly argues that the City, through its police officers, caused an investigation of Plaintiff for the improper purpose of finding a false reporter in a sexual assault case or to charge a false report of sexual assault. Again, Plaintiff only discusses events or actions occurring prior to the use of process, and Plaintiff's facts relate to "initiation of process" and not to "the misuse of legal process after it was issued."[85] Furthermore, Plaintiff does not have any evidence of this improper purpose but instead simply engages in speculation.[86] Because Plaintiff cannot identify evidence demonstrating that any City employee engaged in abuse of process, her claim necessarily fails against the City because the City can only be held liable for the wrongful acts of its employee.[87] Thus, the Court grants Defendants summary judgment on this claim.

## C. Intentional Infliction of Emotional Distress Claim against Defendants Cottengim, Nicholson, and the City

To prevail on a claim for intentional infliction of emotional distress, a plaintiff must show four elements: "(1) [t]he conduct of the defendant was intentional or in reckless disregard of the

---

[85] *Eravi v. City of Lawrence*, 2024 WL 3360447, at *4 (D. Kan. July 9, 2024) (finding that the plaintiffs did not state a claim for abuse of process because the allegations related to the issuance of a citation for trespass and not to the misuse of process after the citation was issued).

[86] The Court notes that Plaintiff contends that the ulterior purpose was to charge a false report of sexual assault. In fact, it appears clear that the actual purpose—not the ulterior purpose—was to charge Plaintiff with falsely reporting rape. If the process was used for which it was intended, an abuse of process claim must fail. *See Bowling v. United States*, 2009 WL 723226, at *9 (D. Kan. Mar. 17, 2009) ("An abuse of process is based on the use of the judicial system for some process other than its intended purpose.").

[87] *See* K.S.A. § 75-6103(a) (stating that a governmental entity is liable for the "negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state.").

plaintiff; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress was extreme and severe."[88]  The absence of any element destroys Plaintiff's claim.  The Court will first address the claim against the individual Defendants and then address the claim against the City of Lawrence.

### 1.  Individual Defendants Cottengim and Nicholson

Defendants argue that Plaintiff does not have evidence establishing a genuine issue of material fact as to whether Nicholson's and Cottengim's conduct was extreme and outrageous.  In addition, Defendants assert that Plaintiff cannot demonstrate a causal connection between their conduct and her mental distress.  Finally, they argue that she cannot present evidence that her distress was severe or pervasive.

"[F]or conduct to be deemed sufficient to support the tort of [intentional infliction of emotional distress], it must be so outrageous in character and so extreme in degree as to go beyond the bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society."[89]  "Conduct that rises to the level of tortious outrage must transcend a certain amount of criticism, rough language, and occasional acts and words that are inconsiderate and unkind."[90]

Here, Plaintiff contends that Nicholson's and Cottengim's behavior was outrageous.  She states that Nicholson's download of her phone was extreme and outrageous.  Yet, it is undisputed

---

[88] *Valadez v. Emmis Commc'ns*, 290 Kan. 472, 229 P.3d 389, 394 (2010) (citations omitted).

[89] *Miller v. Sloan, Listrom, Eisenbarth, Sloan & Glassman*, 267 Kan. 245, 978 P.2d 922, 930 (1999) (citation omitted).

[90] *Valadez*, 299 P.3d at 394.

that Plaintiff gave Nicholson the code to her phone to unlock it. It is also undisputed that Plaintiff agreed to the download of Plaintiff's text messages. To the extent Plaintiff alleges that Nicholson exceeded the scope and performed an illegal search and seizure of her phone, she does not identify any evidence that was obtained or used against her. Nor does she direct the Court to any caselaw that this behavior would constitute extreme and outrageous behavior sufficient to satisfy a claim for intentional infliction of emotional distress.

Plaintiff also asserts that Nicholson's action of asking for a face-to-face meeting after Plaintiff told her that she did not want to pursue charges was an attempt to obtain a confession from Plaintiff. But, Nicholson's meeting with Plaintiff on October 3, 2018, does not rise to extreme and outrageous behavior. Construing the facts in the light most favorable to Plaintiff, Nicholson (and Affaltar) met with Plaintiff, and Nicholson rudely and abrasively questioned Plaintiff about text messages between Plaintiff and Hurtig. In addition, Nicholson stated to Plaintiff that it looked like Plaintiff had messed up, slept with the wrong person, and cheated on her boyfriend. As noted above, "rough language" or "occasional acts and words that are inconsiderate and unkind" are insufficient to demonstrate outrageous conduct.[91] It is undisputed that Plaintiff did not have further interactions with Nicholson. Thus, Plaintiff cannot demonstrate a genuine issue of material fact as to whether Nicholson's behavior was extreme and outrageous and cannot meet the second element of her claim against Nicholson.

As to Cottengim, Plaintiff contends that after she contacted Affalter on October 10, 2018, informing Affalter that she was thinking of going ahead and making a full statement, Cottengim

---

[91] *Id.*

jumped on the opportunity that day to contact witnesses that would assist his investigation into Plaintiff. However, starting an investigation based on Plaintiff's contact to the LPD stating that she was thinking of proceeding with the case is not extreme and outrageous conduct.

On October 12, 2018, Plaintiff contacted Cottengim and told him that she did not want to pursue charges, and Cottengim lied to her by saying that he would stop his investigation.[92] Plaintiff argues that this lie (and not informing her that she was a suspect), and the continuing investigation of Plaintiff, which culminated in charging her and arresting her for the crime of false reporting, is extreme and outrageous conduct. First, an investigation of a crime is not extreme and outrageous conduct, and Plaintiff directs the Court to no caselaw establishing such a proposition. Next, Cottengim's statement to Plaintiff that he was not continuing an investigation into the facts surrounding her allegation of rape and/or a charge of false reporting is not extreme and outrageous conduct. "The Supreme Court has long acknowledged the use of trickery or deception to be permissible in the detection of crime."[93] "A ruse by law enforcement officers to influence behavior is not prohibited unless it is unconstitutional."[94] Plaintiff does not identify unconstitutional behavior. Instead, Plaintiff merely identifies police investigative tactics. None of these actions raises a question of fact as to whether Cottengim's behavior was extreme and outrageous. Accordingly, Plaintiff cannot meet the second element of her intentional infliction of emotional distress claim.

---

[92] It is undisputed that Cottengim and Nicholson stopped any investigation until Plaintiff re-contacted the LPD on October 10, 2018, stating that she was thinking of moving forward and would work with any detective other than Nicholson. Cottengim started investigating again on that date.

[93] *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1146 (10th Cir. 2014) (citations omitted).

[94] *United States v. Ojeda-Ramos*, 455 F.3d 1178, 1184 (10th Cir. 2006).

Furthermore, Plaintiff does not raise a genuine issue of material fact regarding whether there was a causal connection between the individual Defendants' conduct and her mental distress. Although Plaintiff states that the evidence shows that she was diagnosed with PTSD and received significant counseling, she does not identify the causal connection to Defendants' actions. Instead, Plaintiff's evidence shows that she was diagnosed with PTSD prior to her arrest for false reporting. Indeed, on or around October 23, 2018—the day Plaintiff was diagnosed with PTSD—she had had very few interactions with the LPD. Plaintiff's doctor's diagnosis of PTSD was related to the events occurring on September 27, 2018, between her and Thompson. Thus, Plaintiff fails to demonstrate a causal connection between her distress and Defendants' conduct. Accordingly, Plaintiff's claim against Defendants Cottengim and Nicholson fails.

2.    *Defendant City of Lawrence*

Defendant City contends that it cannot be vicariously liable when the individual Defendants did not engage in any outrageous conduct. In addition, Defendant asserts that when there is no evidence that any employee of the City engaged in tortious conduct, it cannot be held liable.

Plaintiff asserts that her intentional infliction of emotional distress claim is based on more than Cottengim's and Nicholson's actions and is also based on the conduct of Cottengim's and Nicholson's supervisory officers. Specifically, she contends that Sergeants Grady and Fowler merely rubber stamped the police reports and affidavits, that no one was supervising this investigation, and that LPD allowed rogue detectives to get their "false reporter," which the

supervisors celebrated by "high-fiving" each other.[95]  Plaintiff also states that other outrageous behavior by the City includes illegal searches and the failure to train detectives in trauma-based investigative techniques.

Not only do some of Plaintiff's allegations lack factual support, but all of this conduct falls far short of what is needed to demonstrate extreme and outrageous behavior.  Kansas law is clear that an intentional infliction of emotional distress claim requires conduct that "must be so outrageous in character and so extreme in degree as to go beyond the bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society."[96]  In addition, Plaintiff must demonstrate a causal connection between any extreme and outrageous behavior and her extreme distress.  She directs the Court to no evidence establishing a question of fact as to this element.

In sum, Plaintiff fails to provide evidence that City employees committed the tort of intentional infliction of emotional distress.  Because Plaintiff cannot establish that the individual Defendants or any other City employee engaged in the tort, the City also cannot be found liable for intentional infliction of emotional distress.[97]

---

[95] As to this fact, Plaintiff does not direct the Court to any evidence that she *personally* knew this occurred.

[96] *Miller*, 978 P.2d at 930 (citation omitted); *see also Palmer v. Shawnee Mission Med. Ctr., Inc.*, 355 F. Supp. 3d 1003, 1022 (D. Kan. 2018) (noting that Kansas sets a high bar, and the conduct must be utterly intolerable in a civilized society).

[97] K.S.A. § 75-6103(a) (stating that a governmental entity liable for damages "caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state.").

**D.      Vicarious Liability (Respondeat Superior) against Defendant City**

Plaintiff has a separate claim for vicarious liability against the City, and this claim against the City is necessarily based on the actions of the City's employees. Defendants argue that because there is no evidence that any City employee engaged in any tortious or wrongful conduct, Plaintiff's separate cause of action against the City fails as a matter of law. Plaintiff simply states that Kansas law establishes the parameters of vicarious liability for the misconduct of any employee.

As noted above, a municipality can only be liable for the negligent or wrongful conduct of its employees.[98] Because Plaintiff does not present evidence raising a question of fact as to any City employees' wrongful or tortious conduct, she fails to establish a vicarious liability claim against the City. Accordingly, Defendant is entitled to summary judgment on this claim.

In sum, Defendants are entitled to summary judgment on Plaintiff's claims.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 247) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion Requesting Oral Argument on Pending Dispositive and *Daubert* Motions (Doc. 333) is **DENIED in part and DENIED AS MOOT in part**. To the extent Plaintiff requested oral argument on the pending dispositive motion, it is denied. To the extent Plaintiff requested oral argument on the pending *Daubert* motions, it is denied as moot.

---

[98] *Id.*

**IT IS FURTHER ORDERED** that Defendants' Motions to Exclude Testimony (Docs. 250, 251, 252, 252, 254, and 255) and Defendants' Motions to Strike Certain Opinions and Testimony (Docs. 282, 284, 285, and 300) are **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Plaintiff's Motions to Exclude Testimony (Docs. 239, 241, 243, and 245) are **DENIED AS MOOT**.

**IT IS SO ORDERED**.

Dated this 13th day of January, 2025.

This case is closed.

*Eric F. Melgren*

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE